<table>
<tr><td colspan="2"><strong>UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY</strong></td></tr>
<tr><td colspan="2"><strong>Caption in Compliance with D.N.J. LBR 9004-1(b)</strong></td></tr>
<tr><td>MULTI-COLOR CORPORATION, <em>et al.</em><br><br>Debtors.[1]</td><td>Case No. 26-10910 (MBK)<br><br>(Jointly Administered)</td></tr>
</table>

**Order Filed on February 2, 2026
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

**INTERIM ORDER
(I) AUTHORIZING THE DEBTORS
TO (A) OBTAIN POSTPETITION FINANCING,
(B) USE CASH COLLATERAL, AND (C) GRANT
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN
PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through one hundred and three (103), is **ORDERED.**

**DATED: February 2, 2026**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

[1]    The last four digits of Debtor Multi-Color Corporation's tax identification number are 5853.  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/MCC.  The location of the Debtors' service address for purposes of these Chapter 11 Cases is:  3284 Northside Parkway NW, Suite 400, Atlanta, Georgia 30327.

(Page | 1)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
Steven N. Serajeddini, P.C. (pro hac vice
pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
steven.serajeddini@kirkland.com

-and-

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS
INTERNATIONAL LLP
Rachael M. Bentley (pro hac vice
pending)
Peter A. Candel (pro hac vice pending)
Ashley L. Surinak (pro hac vice pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
rachael.bentley@kirkland.com
peter.candel@kirkland.com
ashley.surinak@kirkland.com

COLE SCHOTZ P.C.
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

(Page | 2)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Upon the motion (the "**DIP Motion**")[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 4001-1, 4001-3, 9013-1, 9013-2, 9013-3, and 9013-4 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**"), seeking entry of this interim order (this "**Interim Order**") and the Final Order (as defined below) (together with this Interim Order, the "**DIP Orders**"), among other things:

- authorizing the Borrowers (as defined below) to obtain postpetition financing ("**DIP Financing**") pursuant to (a) a senior secured superpriority debtor-in-possession term loan facility (the "**DIP Term Loan Facility**," and the loans issued thereunder, the "**DIP Term Loans**") subject to the terms and conditions set forth in this Interim Order and that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, attached hereto in substantially final form as **Exhibit 1** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**"), by and among MCC Manufacturing, Inc., Multi-Color Corporation, and Labels Buyer, LLC, as borrowers (the "**DIP Loan Borrowers**"), the DIP Guarantors (as defined below), the financial institutions or other entities from time to time party thereto as "Lenders" (as defined in the DIP Credit Agreement) (the "**DIP Term Loan Lenders**"), and Acquiom Agency Services LLC ("**Acquiom**") and Seaport Loan Products LLC ("**Seaport**") as co-administrative agents and Acquiom as collateral agent (Acquiom and Seaport together in such capacities, together with their successors and permitted assigns, the "**DIP Term Loan Agent**," and together with the DIP Term Loan Lenders, the "**DIP Term Loan Secured Parties**") and (b) a senior secured superpriority debtor-in-possession notes facility

---

[2]   Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the DIP Motion, the DIP Credit Agreement (as defined herein), or the DIP Note Purchase Agreement (as defined herein), as applicable.

(Page | 3)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(the "**DIP Notes Facility**," and together with the DIP Term Loan Facility, the "**DIP Facility**," and the notes issued under the DIP Notes Facility, the "**DIP Notes**," and together with the DIP Term Loans and the Backstop Premium (as defined below), the "**DIP Loans**," and the commitments therefor, the "**DIP Commitments**"), subject to the terms and conditions set forth in this Interim Order and that certain Senior Secured Superpriority Debtor-in-Possession Note Purchase Agreement, attached hereto in substantially final form as **Exhibit 2** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Note Purchase Agreement**"), by and among MCC Manufacturing, Inc. and Multi-Color Corporation, as issuers (the "**DIP Notes Issuers**," and together with the DIP Loan Borrowers, the "**Borrowers**"), the DIP Guarantors, the financial institutions or other entities from time to time party thereto as "Noteholders" (as defined in the DIP Note Purchase Agreement) (the "**DIP Noteholders**," and together with the DIP Term Loan Lenders, the "**DIP Lenders**"), and Acquiom as collateral agent (in such capacity, together with its successors and permitted assigns, the "**DIP Notes Agent**," and together with the DIP Term Loan Agent, the "**DIP Representatives**," and the DIP Term Loan Secured Parties, together with the DIP Noteholders and the DIP Notes Agent, the "**DIP Secured Parties**"), and all other documents and instruments related to the DIP Facility or that may be reasonably requested by the DIP Secured Parties in connection with the DIP Facility (in each case, as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof and hereof, subject to the consent rights set forth in the Restructuring Support Agreement, and together with the DIP Credit Agreement and the DIP Note Purchase Agreement, the "**DIP Documents**"), in an aggregate principal amount of up to $657.5 million, consisting of (a) "new money" super priority DIP Loans in an aggregate principal amount of $250 million (the "**New Money DIP Commitments**"), where (i) $125 million shall be made available immediately upon entry of this Interim Order, consisting of DIP Term Loans and DIP Notes (together, the "**Interim New Money DIP Loans**") (subject to certain conditions) and (ii) $125 million shall be made available immediately upon entry of the Final Order, consisting of DIP Term Loans and DIP Notes (together, the "**Final New Money DIP Loans**," and together with the Interim New Money DIP Loans, the "**New Money DIP Loans**") (subject to certain conditions), (b) a "roll-up" of $250 million in the collective aggregate principal amount of Prepetition Cash Flow Obligations (the "**Cash Flow Roll-Up DIP Loans**") and Prepetition Secured Notes Obligations (the "**Notes Roll-Up DIP Loans**," and together with the Cash Flow Roll-Up DIP Loans, the "**Roll-Up DIP Loans**"), with (i) $125 million of the Roll-Up DIP Loans issued as described herein upon entry of this Interim Order, consisting of DIP Term Loans and DIP Notes, and (ii) $125 million of the Roll-Up DIP Loans issued as described herein upon entry of the Final Order, consisting of DIP Term Loans and DIP Notes, in each case subject to the satisfaction or waiver of the conditions precedent contemplated herein (it being understood that each dollar of New Money DIP Commitment shall be accompanied with a corresponding dollar of Roll-Up DIP Loan), (c) $7.5 million in the form of the

(Page | 4)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Backstop Premium, of which 50% of such Backstop Premium shall be earned, due, and payable in-kind upon the initial funding of the New Money DIP Loans upon entry of this Interim Order, with the remaining 50% earned, due, and payable in-kind upon the funding of the New Money DIP Loans issued in connection with, and upon, the Final Order granting such relief, and (d) up to $150 million in incremental "new money" super priority DIP Loans under the DIP Term Loan Facility (the "**Incremental New Money DIP Loans**"), which may be borrowed subsequent to the issuance of the Final New Money DIP Loans in accordance with the terms and conditions of the DIP Documents;

- authorizing the Borrowers to incur, and the other Debtors to guarantee (such other Debtors, the "**DIP Guarantors**," and together with the Borrowers, the "**DIP Obligors**"), the DIP Facility and all extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, the backstop premium pursuant to the DIP Documents (the "**Backstop Premium**"), of which 50% of such Backstop Premium shall be earned, due, and payable in-kind upon the funding of the initial New Money DIP Loans upon entry of this Interim Order, with the remaining 50% earned, due, and payable in-kind upon the funding of the New Money DIP Loans issued in connection with, and upon, the Final Order granting such relief), costs, expenses, and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable, or appropriate in connection therewith;

- subject to the Carve Out (as defined below), and otherwise solely to the extent set forth herein, granting to the DIP Representatives, for itself and the benefit of the other DIP Secured Parties, in respect of all DIP Obligations of the DIP Obligors, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code;

- granting to the DIP Representatives, for itself and for the benefit of the other DIP Secured Parties, on the DIP Collateral (as defined below), valid, enforceable, non-avoidable, and automatically perfected security interests and liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, which security interests and liens shall be subject to the Carve Out and the relative rankings and priorities set forth in this Interim Order, and as further set forth on **Exhibit 3** attached hereto;

- authorizing the DIP Representatives, acting at the direction of the DIP Lenders holding at least 50.01% in principal amount of each of (a) the outstanding DIP Loans and DIP Commitments (excluding the Incremental New Money DIP Loans) held by the DIP Lenders and (b) the outstanding DIP Loans and DIP Commitments (excluding the Incremental New Money DIP Loans) held by the parties that fully backstopped the DIP Commitments

4

(Page | 5)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(the "**Required DIP Lenders**"), to take all commercially reasonable actions to implement the terms of this Interim Order, subject to the limitations set forth herein;

- subject to the entry of the Final Order granting such relief, waiving (a) the Debtors' right to surcharge the Prepetition Collateral (as defined below) and the DIP Collateral (together with the Prepetition Collateral, the "**Collateral**") pursuant to sections 105(a) or 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

- subject to the entry of the Final Order granting such relief, waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to the Prepetition Collateral for the benefit of any party other than the Prepetition Secured Parties (as defined below);

- authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral (as defined below) solely in accordance with the DIP Orders, the DIP Documents, and the Approved Budget (as defined below) (subject to permitted variances under the DIP Documents);

- authorizing the Debtors to pay the DIP Obligations as they become due and payable in accordance with the DIP Documents;

- subject to the restrictions set forth in the DIP Documents, the Approved Budget (subject to permitted variances under the DIP Documents), and the DIP Orders, authorizing the Debtors to use the Prepetition Collateral and provide automatically perfected security interests and liens, superpriority claims, and other adequate protection to the Prepetition Secured Parties solely to the extent of any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral) (collectively, the "**Diminution in Value**"), which liens shall have the relative priorities set forth in this Interim Order, and as further set forth on **Exhibit 3** attached hereto;

- modifying the automatic stay to the extent necessary to permit the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents;

- waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

- scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to the terms of a proposed order in substantially the form of this Interim Order and otherwise as agreed among the Debtors, the DIP Secured

(Page | 6)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Parties, and the DIP Representatives (the "**Final Order**") to be posted to the docket prior to the Final Hearing.

The Court (as defined below) having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Brent Banks in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**Banks Declaration**"), the *Declaration of Eric Koza in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (together with the Banks Declaration, the "**DIP Declarations**"), and the *Declaration of Garrett Gabel, Chief Restructuring Officer of Multi-Color Corporation and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on January 30, 2026 (the "**Interim Hearing**"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the

6

(Page | 7)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise fair and reasonable, in the best interests of the Debtors and their estates, and essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW, WHICH ARE IN ADDITION TO THE FINDINGS AND CONCLUSIONS MADE BY THE COURT DURING THE CONTINUED INTERIM HEARING HELD ON FEBRUARY 2, 2026:**[3]

A.      *Petition Date.*  On January 29, 2026 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey, Trenton Vicinage (the "**Court**").

---

[3]      The findings and conclusions made by the Court at the continued interim hearing held on February 2, 2026 and set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

(Page | 8)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

B.      *Debtors in Possession*.  The Debtors have continued in the management and operation of their business and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      *Jurisdiction and Venue*.  The Court has core jurisdiction over these Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.).   Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order approving the relief sought in the DIP Motion consistent with Article III of the United States Constitution.  Venue for these Chapter 11 Cases and proceedings on the DIP Motion is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(b), 363(c), 363(e), 363(m), 364(c), 364(d)(1), 364(e), 503, 506(c), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 4001-1, 4001-3, 9013-1, 9013-2, 9013-3, and 9013-4. The Court incorporates herein the reservation of rights set forth by the Court during its ruling given at the continued hearing on February 2, 2026 with regard to parties' rights to challenge and contest venue of this case.

D.      *Committee Formation*.  As of the date hereof, the United States Trustee for the District of New Jersey (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases (a "**Creditors' Committee**").

E.      *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate, and sufficient notice of the DIP Motion and the Interim Hearing

(Page | 9)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice was required under the circumstances. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

F. *Cash Collateral*. As used herein, the term "**Cash Collateral**" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties or DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

G. *Debtors' Stipulations*. Subject to the provisions and limitations contained in paragraph 21 hereof, and after consultation with their attorneys and financial advisors, the Debtors hereby admit, stipulate, and agree that:

(i) *Prepetition Cash Flow Loans*. Pursuant to that certain Cash Flow Credit Agreement, dated as of October 29, 2021 (as amended by that certain Amendment No. 1 to Cash Flow Credit Agreement, dated as of April 10, 2023, that certain Amendment No. 2 to Cash Flow Credit Agreement, dated as of October 8, 2024, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Cash Flow Credit Agreement**," and collectively with the other "Loan Documents" (as defined in the Prepetition Cash Flow Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date,

9

(Page | 10)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

the "**Prepetition Cash Flow Documents**") by and among (a) LABL Inc. (the "**Prepetition Cash Flow Parent Borrower**"), (b) the subsidiary borrowers party thereto (the "**Prepetition Cash Flow Subsidiary Borrowers**," and together with the Prepetition Cash Flow Parent Borrower and affiliates of the Prepetition Cash Flow Parent Borrower that have guaranteed the Prepetition Cash Flow Obligations pursuant to that certain Cash Flow Guarantee and Collateral Agreement, dated as of October 29, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), the "**Prepetition Cash Flow Loan Parties**"), (c) Barclays Bank PLC, as administrative and collateral agent (in such capacities, the "**Prepetition Cash Flow Agent**"), and (d) the lenders party thereto from time to time (the "**Prepetition Cash Flow Lenders**," and together with the Prepetition Cash Flow Agent, the "**Prepetition Cash Flow Secured Parties**"), the Prepetition Cash Flow Loan Parties incurred "Obligations" (as defined in the Prepetition Cash Flow Credit Agreement) (the "**Prepetition Cash Flow Obligations**") to the Prepetition Cash Flow Secured Parties on a joint and several basis;

   (ii) *Prepetition Senior Secured Notes*.  Pursuant to that certain Secured Notes Indenture, dated as of October 29, 2021 (as supplemented by that certain First Supplemental Indenture, dated as of October 29, 2021, that certain Second Supplemental Indenture, dated as of October 29, 2021, that certain Third Supplemental Indenture, dated as of February 21, 2023, that certain Fourth Supplemental Indenture, dated as of April 3, 2023, that certain Fifth Supplemental Indenture, dated as of October 8, 2024, that certain Sixth Supplemental Indenture, dated as of October 24, 2024, and as further amended, restated, amended and restated, supplemented, or

(Page | 11)
Debtors:         MULTI-COLOR CORPORATION, *et al.*
Case No.         26-10910 (MBK)
Caption of Order:   Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                Administrative Expense Claims, (II) Granting Adequate Protection to
                Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

otherwise modified from time to time prior to the Petition Date, the "**Prepetition Secured Notes**

**Indenture**," and collectively with the "Note Security Documents" (as defined in the Prepetition

Secured Notes Indenture) and any other agreements and documents executed or delivered in

connection therewith, each as may be amended, restated, amended and restated, supplemented,

waived, or otherwise modified prior to the Petition Date, the "**Prepetition Secured Notes**

**Documents**"), by and among (a) LABL, Inc. (the "**Prepetition Secured Notes Issuer**"), (b) the

guarantors from time to time party thereto (the "**Prepetition Secured Notes Guarantors**," and

together with the Prepetition Secured Notes Issuer, the "**Prepetition Secured Notes Obligors**"),

and (c) Wilmington Trust, National Association, as trustee and note collateral agent (in such

capacities, the "**Prepetition Secured Notes Trustee**," and together with the holders of the notes

issued pursuant to the Prepetition Secured Notes Indenture, the "**Prepetition Secured Notes**

**Secured Parties**"), the Prepetition Secured Notes Obligors incurred "Obligations" (as defined in

the Prepetition Secured Notes Indenture) (the "**Prepetition Secured Notes Obligations**") to the

Prepetition Secured Notes Secured Parties on a joint and several basis;

        (iii)    *Loans/Notes Intercreditor Agreement*.  Pursuant to (and to the extent set

forth in) that certain First Lien Intercreditor Agreement, dated as of July 1, 2019 (as amended,

supplemented, restated, or otherwise modified prior to the Petition Date, the "**Prepetition**

**Loans/Notes Intercreditor Agreement**"), by and among LABL Acquisition Corporation, the

Prepetition Cash Flow Agent, and the Prepetition Secured Notes Trustee, the parties thereto

agreed, among other things, to:  (a) consent to, or not oppose, certain actions taken, or rights

11

(Page | 12)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

asserted, by the Prepetition Cash Flow Secured Parties or the Prepetition Secured Notes Secured Parties, as applicable, and (b) refrain from taking certain actions with respect to the Collateral (as defined therein);

(iv) *Prepetition ABL Facility*. Pursuant to that certain ABL Credit Agreement dated as of October 29, 2021 (as amended by that certain Amendment No. 1 to the ABL Credit Agreement, dated as of November 16, 2022, that certain Amendment No. 2 to the ABL Credit Agreement, dated as of December 6, 2023, that certain Amendment No. 3 to the ABL Credit Agreement, dated as of October 8, 2024, that certain Amendment No. 4 to the ABL Credit Agreement, dated as of February 5, 2025, and as amended, supplemented, restated, or otherwise modified from time to time prior to the Petition Date, the "**Prepetition ABL Credit Agreement**," and collectively with the "Loan Documents" (as defined in the Prepetition ABL Credit Agreement) and any other agreements, instruments, and documents executed or delivered in connection therewith from time to time, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "**Prepetition ABL Loan Documents**," and the credit facility evidenced thereby, the "**Prepetition ABL Facility**"), by and among (a) LABL, Inc. (the "**Prepetition ABL Parent Borrower**"), (b) the other borrowers from time to time party thereto (together with the Prepetition ABL Parent Borrower and affiliates of the Prepetition ABL Parent Borrower that have guaranteed the Prepetition ABL Obligations pursuant to that certain ABL Guarantee Agreement, dated as of October 29, 2021 (as amended, restated, amended and restated, supplemented, or otherwise

(Page | 13)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

modified from time to time), the "**Prepetition ABL Loan Parties**," and together with the Prepetition Cash Flow Loan Parties and the Prepetition Secured Notes Obligors, the "**Prepetition Obligors**"), (c) Barclays Bank PLC, as an issuing lender, swingline lender, administrative agent, Australian security trustee, and collateral agent (in such capacities, together with its successors and assigns, the "**Prepetition ABL Agent**," and together with the Prepetition Cash Flow Agent and the Prepetition Secured Notes Trustee, the "**Prepetition Representatives**"), and (d) the lenders and issuing lenders from time to time party thereto (together with their respective successors and assigns, the "**Prepetition ABL Lenders**," and together with the Prepetition ABL Agent and all other holders of Prepetition ABL Obligations (as defined below) (including, without limitation, all Issuing Lenders, Bank Products Providers, and Hedging Providers (each as defined in the Prepetition ABL Credit Agreement)), together with their respective successors and assigns, collectively, the "**Prepetition ABL Secured Parties**," and the Prepetition ABL Secured Parties, together with the Prepetition Cash Flow Secured Parties and the Prepetition Secured Notes Secured Parties, collectively, the "**Prepetition Secured Parties**"), the Prepetition ABL Loan Parties incurred "Obligations" (as defined in the Prepetition ABL Credit Agreement) (the "**Prepetition ABL Obligations**," and together with the Prepetition Cash Flow Obligations and Prepetition Secured Notes Obligations, collectively, the "**Prepetition Secured Obligations**") to the Prepetition ABL Secured Parties on a joint and several basis;

(v)     *ABL Intercreditor Agreement*. Pursuant to (and as and to the extent set forth in) that certain ABL Intercreditor Agreement, dated as of July 1, 2019 (as amended, restated,

(Page | 14)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition ABL Intercreditor Agreement**," and together with the Prepetition Cash Flow Documents, the Prepetition Secured Notes Documents, the Prepetition Loans/Notes Intercreditor Agreement, and the Prepetition ABL Loan Documents, the "**Prepetition Debt Documents**"), by and among the Prepetition ABL Agent, the Prepetition Cash Flow Agent, the Prepetition Secured Notes Trustee, and the other parties thereto, the parties thereto agreed, among other things: (a) that the Prepetition ABL Liens (as defined below) on the ABL Priority Collateral (as defined below) are senior to the Prepetition Cash Flow Liens and the Prepetition Secured Notes Liens (each as defined below) on such collateral; and (b) that the Prepetition Cash Flow Liens and the Prepetition Secured Notes Liens on the Term/Notes Priority Collateral (as defined below) are senior to the Prepetition ABL Liens on such collateral;

(vi) *Prepetition Cash Flow Obligations*. As of the Petition Date, the Prepetition Cash Flow Loan Parties were justly and lawfully indebted and liable to the Prepetition Cash Flow Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for (a) the Initial Dollar Term Loans (as defined in the Prepetition Cash Flow Credit Agreement) in the aggregate principal amount of not less than $1,598,824,000, (b) the Initial Euro Term Loans (as defined in the Prepetition Cash Flow Credit Agreement) in the aggregate principal amount of not less than $569,280,000, and (c) the Initial Revolving Loans (as defined in the Prepetition Cash Flow Credit Agreement) in the aggregate principal amount of not less than $200,000,000, in each case, plus accrued and unpaid interest thereon and any fees, expenses, and disbursements

14

(Page | 15)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, consultants' fees, financial advisors' fees, and other professionals' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Cash Flow Documents), costs, charges, indemnities, premiums, reimbursement obligations, guarantee obligations, other contingent obligations, and other charges incurred in accordance with the Prepetition Cash Flow Documents;

(vii) *Prepetition Secured Notes Obligations.* As of the Petition Date, the Prepetition Secured Notes Obligors were justly and lawfully indebted and liable to the Prepetition Secured Notes Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for (a) the Initial Notes (as defined in the Prepetition Secured Notes Indenture) in the aggregate principal amount of not less than $500,000,000, (b) the 2028 Initial Notes (as defined in the Prepetition Secured Notes Indenture) in the aggregate principal amount of not less than $300,000,000, and (c) the 2031 Initial Notes (as defined in the Prepetition Secured Notes Indenture) in the aggregate principal amount of not less than $950,000,000, in each case, plus accrued and unpaid interest thereon and any fees, expenses, and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, consultants' fees, financial advisors' fees, and other professionals' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Secured Notes Documents), costs, charges, indemnities, premiums, reimbursement obligations, guarantee obligations, other contingent obligations, and other charges incurred in accordance with the Prepetition Secured Notes Documents;

15

(Page | 16)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(viii)    *Prepetition ABL Obligations*.  As of the Petition Date, the Prepetition ABL Loan Parties were justly and lawfully indebted and liable to the Prepetition ABL Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for not less than $445,000,000 in outstanding principal amount of "Revolving Credit Loans" (as defined in the Prepetition ABL Credit Agreement), and approximately $13,100,000 in respect of issued and undrawn letters of credit, plus any accrued but unpaid interest thereon, fees, expenses (including attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition ABL Loan Documents), costs, charges, indemnities, and other Prepetition ABL Obligations incurred under the Prepetition ABL Loan Documents (whether arising before, on, or after the Petition Date) and have been guaranteed on a joint and several basis by the Prepetition ABL Loan Parties;

(ix)    *Validity of Prepetition Secured Obligations*.  The Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Obligors, as applicable, enforceable in accordance with the respective terms of the relevant Prepetition Debt Documents, and no portion of the Prepetition Secured Obligations or any payment made to the Prepetition Secured Parties or applied to or paid on account of the Prepetition Secured Obligations prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination (whether equitable, contractual, or otherwise), recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action (including any claims or avoidance actions under Chapter 5 of the

16

(Page | 17)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Bankruptcy Code or otherwise), choses in action, or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(x)      *Validity, Perfection, and Priority of Prepetition Cash Flow Liens.*  As of the Petition Date, pursuant to the Prepetition Cash Flow Documents, the Prepetition Cash Flow Loan Parties granted to the Prepetition Cash Flow Agent, for the benefit of the Prepetition Cash Flow Secured Parties, a security interest in and continuing lien (the "**Prepetition Cash Flow Liens**") on substantially all of their respective assets and property (subject to certain exclusions as set forth in the definition of "Excluded Assets" in the Prepetition Cash Flow Credit Agreement), including (a) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Fixed Asset Collateral (as defined in the Prepetition ABL Intercreditor Agreement), which, for the avoidance of doubt, includes certain Cash Collateral, any other assets or property of a type that would otherwise constitute Fixed Asset Collateral but for the commencement of these Chapter 11 Cases, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, (collectively, the "**Term/Notes Priority Collateral**"), and (b) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the ABL Collateral (as defined in the Prepetition ABL Intercreditor Agreement), which, for the avoidance of doubt, includes certain Cash Collateral, and all other assets or property of a type owned by any Debtor that would otherwise constitute ABL Collateral but for the commencement of these Chapter 11 Cases, whether or not a lien thereon in favor of the Prepetition ABL Secured Parties has been

(Page | 18)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

perfected, and all proceeds, products, accessions, rents, and profits thereof, in each case, whether then owned or existing or thereafter acquired or arising (collectively, the "**ABL Priority Collateral**," and together with the Term/Notes Priority Collateral, the "**Prepetition Collateral**"), in each case, *pari passu* with the Prepetition Secured Notes Liens (as defined below) and junior, subject, and subordinate only to (i) the liens of the Prepetition ABL Agent on the ABL Priority Collateral and (ii) the liens permitted by the Prepetition Cash Flow Documents, solely to the extent such permitted liens are (A) valid, perfected, and non-avoidable on the Petition Date or (B) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "**Prepetition Cash Flow Permitted Senior Liens**");

(xi)    *Validity, Perfection, and Priority of Prepetition Secured Notes Liens*.    As of the Petition Date, pursuant to the Prepetition Secured Notes Documents, the Prepetition Secured Notes Obligors granted to the Prepetition Secured Notes Trustee, for the benefit of the Prepetition Secured Notes Secured Parties, a security interest in and continuing lien (the "**Prepetition Secured Notes Liens**") on substantially all of their respective assets and property, including (a) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Term/Notes Priority Collateral and (b) a valid, binding, properly perfected, enforceable, non-avoidable priority security interest in and continuing lien on the ABL Priority Collateral, in each case, *pari passu* with the Prepetition Cash Flow Liens and junior, subject, and subordinate only to (i) the liens of the Prepetition ABL Agent

18

(Page | 19)
Debtors:            MULTI-COLOR CORPORATION, *et al*.
Case No.            26-10910 (MBK)
Caption of Order:   Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                    Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                    Administrative Expense Claims, (II) Granting Adequate Protection to
                    Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                    (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

on the ABL Priority Collateral and (ii) the liens permitted by the Prepetition Cash Flow

Documents, solely to the extent such permitted liens are (A) valid, perfected, and non-avoidable

on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent

to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively,

the "**Prepetition Senior Notes Permitted Senior Liens**").

(xii)     *Validity, Perfection, and Priority of Prepetition ABL Liens*. As of

the Petition Date, pursuant to the Prepetition ABL Loan Documents, the Prepetition Obligors

granted to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL

Secured Parties, a security interest in and continuing lien (the "**Prepetition ABL Liens**," and

together with the Prepetition Cash Flow Liens and the Prepetition Secured Notes Liens,

the "**Prepetition Liens**") on substantially all of their respective assets and property (subject to

certain exclusions as set forth in the definition of "Excluded Assets" in the Prepetition ABL Credit

Agreement), including (a) a valid, binding, properly perfected, enforceable, first priority security

interest in and continuing lien on the ABL Priority Collateral and (b) a valid, binding, properly

perfected, enforceable, junior priority security interest in and continuing lien on the Term/Notes

Priority Collateral, junior, subject, and subordinate only to (i) the Prepetition Cash Flow Liens and

the Prepetition Secured Notes Liens on the Term/Notes Priority Collateral and (ii) the liens

permitted by the Prepetition ABL Loan Documents, solely to the extent any such permitted liens

are (A) valid, perfected and non-avoidable on the Petition Date or (B) valid liens in existence on

the Petition Date that are perfected subsequent to the Petition Date in accordance with

19

(Page | 20)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

section 546(b) of the Bankruptcy Code (the "**Prepetition ABL Permitted Senior Liens**," and together with the Prepetition Cash Flow Permitted Senior Liens and the Prepetition Senior Notes Permitted Senior Liens, the "**Prepetition Permitted Senior Liens**");

(xiii)   *No Control.*  None of the Prepetition Secured Parties control (or have in the past controlled) any of the Debtors or their respective properties or operations, have authority to determine the manner in which any Debtor's operations are conducted, or are control persons or insiders of any Debtor by virtue of any actions taken with respect to, in connection with, related to or arising from any Prepetition Debt Documents; and

(xiv)   *Release.*  Each of the Debtors and each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present, and future subsidiaries, assigns, and Representatives (as defined below) (in each case, solely in their capacities as such) (collectively, the "**Releasing Parties**"), to the maximum extent permitted by applicable law, hereby absolutely, unconditionally and irrevocably releases and forever discharges, acquits, and covenants not to sue (a) the DIP Secured Parties and each of their respective Representatives (in each case, solely in their capacity as such) and, (b) subject to (i) the rights and limitations set forth in paragraph 21 hereof and (ii) entry of the Final Order granting such relief, and effective upon any such entry, the Prepetition Secured Parties that have consented or are deemed to have consented to the DIP Facility and the use of Cash Collateral provided for herein and in the Final Order, and each of their respective Representatives (in each case, solely in their capacity as such) (the entities in clauses (a) and (b), collectively, the "**Released Parties**"), and

20

(Page | 21)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

their respective property and assets, from any and all liability to the Releasing Parties (and their successors and assigns) and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have, or may come to have against the Released Parties, at law or in equity, by statute or common law, in contract or in tort, that exists as of the date hereof, arising out of, relating to, or in connection with the Debtors, the Chapter 11 Cases, or any of the Prepetition Debt Documents, the DIP Documents, or the respective negotiations thereof and the transactions and agreements reflected thereby, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, (c) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens of the Prepetition Secured Parties (including Avoidance Actions subject to and effective upon entry of the Final Order), and (d) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any

(Page | 22)
Debtors:            MULTI-COLOR CORPORATION, *et al.*
Case No.            26-10910 (MBK)
Caption of Order:   Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                    Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                    Administrative Expense Claims, (II) Granting Adequate Protection to
                    Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                    (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including, without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition Secured Obligations or the DIP Obligations; *provided* that the release set forth in this paragraph shall not release any rights or obligations under this Interim Order or under the DIP Documents.  The releases set forth in this paragraph are in addition to, and shall not in any way limit, any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties set forth in the chapter 11 plan contemplated by the Restructuring Support Agreement.

H.      *Findings Regarding the DIP Facility, Roll Up, and Use of Cash Collateral.*

(i)      Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the DIP Obligors to obtain financing pursuant to the DIP Documents.

(ii)      The Debtors have demonstrated an immediate and critical need to obtain the DIP Facility and to use Prepetition Collateral (including Cash Collateral) in order to permit, among other things, the orderly continuation of the operation of their business, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to satisfy other working capital and operational needs, and to fund administrative expenses of these Chapter 11 Cases. Access to sufficient working capital and liquidity under the DIP Documents and other financial

22

(Page | 23)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

accommodations provided under the DIP Documents, as well as through the use of Cash Collateral in accordance with the terms thereof, the Approved Budget (subject to permitted variances under the DIP Documents), and the terms of this Interim Order, is necessary for the avoidance of immediate irreparable harm to the Debtors' estates and for the preservation and maintenance of their going-concern value.

(iii)     As set forth in the DIP Declarations and the First Day Declaration, the Debtors are unable to obtain adequate, unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents in light of the facts and circumstances of these Chapter 11 Cases. The Debtors are also unable to obtain secured credit without granting, in each case subject to the Carve Out, to the DIP Secured Parties the DIP Liens and the DIP Superpriority Claims (each as defined below), and incurring the Adequate Protection Obligations (as defined below) on the terms and subject to the conditions set forth in this Interim Order and in the DIP Documents.

(iv)     The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated by the Prepetition Collateral, all of which constitutes the Prepetition Secured Parties' Cash Collateral under section 363(a) of the Bankruptcy Code. The Debtors desire and need to use the Prepetition Secured Parties' Cash Collateral to fund ongoing operations and for other general corporate purposes, subject to the terms of this Interim

(Page | 24)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Order, the DIP Documents, and the Approved Budget (subject to permitted variances under the DIP Documents).

(v)     Based on the DIP Motion, the First Day Declaration, the DIP Declarations, and the record and argument presented to the Court at the Interim Hearing, the terms of the DIP Facility, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraph 15 of this Interim Order (collectively, the "**Adequate Protection**"), and the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order, the DIP Documents, and the Approved Budget (subject to permitted variances under the DIP Documents) are consistent with the Bankruptcy Code, including section 506(b) thereof, are fair and reasonable, and reflect the DIP Obligors' exercise of prudent business judgment consistent with their fiduciary duties under the circumstances.

(vi)    This Interim Order, the DIP Documents, the Adequate Protection, and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties (each of whom acted in good faith in negotiating such documents), and all of the loans and other financial accommodations extended by the DIP Secured Parties to the DIP Obligors under, in respect of, or in connection with the DIP Facility and the DIP Documents (in each such case, including the granting of Adequate Protection and the Roll-Up DIP Loans), respectively, are, and will be deemed to have been, extended by the DIP Secured Parties, respectively, in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the

24

(Page | 25)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and their respective successors and assigns), the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Superpriority Claims, the Adequate Protection Liens (as defined below), the Adequate Protection 507(b) Claims (as defined below), and the Adequate Protection Obligations (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(vii)    The Prepetition Secured Parties have acted in good faith regarding the DIP Facility and the Debtors' continued use of the Prepetition Collateral (including Cash Collateral), including the granting of the Adequate Protection Liens and other Adequate Protection Obligations, and the Prepetition Secured Parties (and their respective successors and assigns) shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(viii)    The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of this Interim Order, the DIP Facility, and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, the

25

(Page | 26)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

DIP Documents, and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and the DIP Secured Parties shall be, and hereby are, indemnified (as applicable) to the extent and as provided in the Prepetition Debt Documents and the DIP Documents, as applicable, including, without limitation, Section 4.12 of the DIP Credit Agreement and Section 2.10 of the DIP Note Purchase Agreement; *provided, however*, that no such party shall be indemnified for any losses, claims, damages, liabilities, or related expenses to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the willful misconduct or actual fraud of such party.

(ix)     Subject to the Carve Out, the Prepetition Secured Parties are entitled to the Adequate Protection as and to the extent set forth herein pursuant to sections 105, 361, 362, 363 and 364 of the Bankruptcy Code. Based on the DIP Motion and on the record presented to the Court, the terms of the proposed Adequate Protection are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral, including Cash Collateral.

(x)     To the extent their consent is required, the requisite Prepetition Secured Parties have consented or are deemed to have consented to the use of Prepetition Collateral, including Cash Collateral, and the priming of the Prepetition Cash Flow Liens, the Prepetition Secured Notes Liens, and the Prepetition ABL Liens on the Term/Notes Priority Collateral by the DIP Liens, in each case on the terms set forth in this Interim Order and the DIP Documents;

(Page | 27)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

*provided* that nothing in this Interim Order or the DIP Documents shall (a) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in accordance with the DIP Facility and the Approved Budget (subject to permitted variances under the DIP Documents) authorized by this Interim Order, (b) be construed as a consent by any party to the terms of any other financing or any other lien encumbering Prepetition Collateral (whether senior or junior) other than as contemplated by this Interim Order, or (c) prejudice, limit, or otherwise impair the rights of any Prepetition Secured Party to seek new, different, or additional adequate protection or assert any other right, subject to the Intercreditor Agreements (as defined below), and the rights of any other party in interest, including the DIP Obligors, to object to such relief are hereby preserved.

(xi)     The Debtors have prepared and delivered to the advisors to the DIP Secured Parties and the Prepetition ABL Agent an initial budget (the "**Initial DIP Budget**"), attached hereto as **Schedule 1**.  The Initial DIP Budget reflects, among other things, the Debtors' anticipated operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each calendar week covered thereby.  The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Documents.  Each subsequent budget, once approved by the Required DIP Lenders in accordance with the DIP Documents (and the Prepetition ABL Agent, such consent not to be unreasonably withheld), shall modify, replace, supplement, or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget or the latest subsequently approved budget,

27

(Page | 28)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

the "**Approved Budget**"). The Debtors believe that the Initial DIP Budget is reasonable under the circumstances. In determining to extend postpetition financing under the DIP Documents and this Interim Order, the DIP Secured Parties are relying, in part, upon the DIP Obligors' agreement to comply with the Approved Budget (subject to permitted variances under, and to the extent required by, the DIP Documents, and such variances may only be amended with the written consent (not to be unreasonably withheld) of the Prepetition ABL Agent).

(xii) Subject to the entry of the Final Order granting such relief, each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

I. *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2). Absent the relief granted in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and continued use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

J. *Prepetition Permitted Senior Liens; Continuation of Prepetition Liens*. Nothing herein constitutes a finding or ruling by the Court that any alleged Prepetition Permitted Senior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein

28

(Page | 29)
Debtors:         MULTI-COLOR CORPORATION, *et al.*
Case No.         26-10910 (MBK)
Caption of Order:  Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                 Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                 Administrative Expense Claims, (II) Granting Adequate Protection to
                 Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                 (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

shall prejudice the rights of any party in interest, including, but not limited to, the Debtors, the DIP

Secured Parties, or the Prepetition Secured Parties to challenge the validity, priority,

enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted

Senior Lien.  For the avoidance of doubt, the right of a seller of goods to reclaim goods under

section 546(c) of the Bankruptcy Code does not constitute a Prepetition Permitted Senior Lien,

and such right is expressly subject to the DIP Liens, the Adequate Protection Liens, and the

Prepetition Liens.  The Prepetition Liens on the Prepetition Collateral, and the DIP Liens on the

DIP Collateral, are in each case valid and continuing liens and the Prepetition Collateral and the

DIP Collateral are and will continue to be encumbered by such liens, respectively.

K.      *Compliance with Prepetition Debt Documents*.  The DIP Documents and the

transactions contemplated thereunder and approved herein, as well as the agreements and ancillary

documents memorializing and effectuating the DIP Facility and subject to this Interim Order, and

the relief granted under this Interim Order, including, but not limited to, the Adequate Protection,

are consistent with, and in compliance with, the Prepetition Debt Documents.

L.      *DIP Roll-Up Loans*.  Upon entry of (i) this Interim Order (the "Interim Issuance

Date"), but subject to the provisions of paragraph 21 of this Interim Order, $125 million in the

aggregate of the Prepetition Secured Obligations held by the DIP Lenders (or affiliates thereof),

shall be rolled up and converted into an equivalent principal amount of Roll-Up DIP Loans deemed

to be made under the DIP Facility and (ii) the Final Order (the "Final Issuance Date"), but subject

to the provisions of paragraph 21 of this Interim Order, $125 million in the aggregate of the

29

(Page | 30)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Prepetition Secured Obligations held by the DIP Lenders (or affiliates thereof), shall be rolled up and converted into an equivalent principal amount of Roll-Up DIP Loans deemed to be made under the DIP Facility. The Prepetition Secured Parties that are also DIP Lenders (or affiliates thereof) would not have consented to extend the DIP Financing or other financial accommodations to the Debtors without the inclusion of the Roll-Up DIP Loans in the DIP Obligations. Thus, the Roll-Up DIP Loans are consideration for, and solely on account of, the agreement of the DIP Lenders to extend the New Money DIP Loans.

Based upon the DIP Motion, the foregoing findings and conclusions, and the overall record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. *Motion Granted.* The DIP Motion is granted on an interim basis on the terms and conditions set forth in this Interim Order and in the DIP Documents. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby overruled on the merits. This Interim Order shall become effective immediately upon its entry.

2. *Authorization of the DIP Facility and the DIP Documents.*

(a) The DIP Obligors are hereby authorized to execute, deliver, enter into, and perform all of their obligations under the DIP Documents and this Interim Order, including, subject to the Carve Out, the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens as permitted herein and under the DIP Documents, and perform such other acts as may be necessary, appropriate, or desirable in connection therewith, including, without

30

(Page | 31)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

limitation, syndicating to the Prepetition Cash Flow Lenders and the Holders of the Prepetition Secured Notes the opportunity to fund the DIP Loans as set forth in the DIP Documents. The Borrowers are hereby authorized to borrow up to $125 million in Interim New Money DIP Loans (upon entry of this Interim Order) and convert Prepetition Secured Obligations in an amount equal to the Interim Roll-Up Amount (as defined below) into Roll-Up DIP Loans pursuant to the DIP Documents upon entry of this Interim Order, and the DIP Guarantors are hereby authorized to guarantee the Borrowers' obligations, in each case, on account of the DIP Loans, subject to any limitations set forth in the DIP Documents. The proceeds of the DIP Loans may be used for all purposes permitted under the DIP Documents and this Interim Order, subject to and in accordance with the Approved Budget (subject to permitted variances under the DIP Documents).

(b)      On the Interim Issuance Date, $125 million (the "Interim Roll-Up Amount") in the aggregate of the Prepetition Secured Obligations held by the DIP Lenders (or affiliates thereof) shall be deemed rolled up and converted into an equivalent principal amount of Roll-Up DIP Loans deemed to be made under the DIP Documents, subject to the provisions of paragraph 21 hereof (the "Interim Roll-Up"). The Debtors are authorized to take such acts as shall be necessary or desirable to effect the Interim Roll-Up and conversion of the Prepetition Secured Obligations beneficially owned by the DIP Lenders (or affiliates thereof) in the Interim Roll-Up Amount.

(c)      The proceeds of the DIP Facility shall be used for all purposes permitted under the DIP Documents and this Interim Order, subject to and in accordance with the Approved

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Budget (subject to permitted variances under the DIP Documents, that may only be amended with the written consent (not to be unreasonably withheld) of the Prepetition ABL Agent). The entry of this Interim Order shall constitute final approval of 50% of the Backstop Premium to be paid to the applicable parties in accordance with the DIP Documents; *provided* that final approval of the remaining 50% of the Backstop Premium shall be subject to the Final Order granting such relief. The portion of the Backstop Premium being paid pursuant to this Interim Order has been fully and finally earned as a bargained for and integral part of the DIP Facility contemplated in these Chapter 11 Cases and shall be payable in accordance with and at the times specified in the DIP Documents.

(d)    In furtherance of the foregoing and without further approval of the Court, each DIP Obligor is authorized and directed to perform all acts, to make, execute, and deliver all instruments, certificates, agreements, charges, deeds, and documents, execute or record pledge and security agreements, mortgages, financing statements, and other similar documents, if any, and to pay all fees (including 50% of the Backstop Premium as set forth in this Interim Order), expenses, and indemnities in connection with or that may be reasonably required, necessary, or desirable in connection with for the DIP Facility, including, without limitation:

(i)    the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents, or other modifications to and under the DIP Documents, in each

32

(Page | 33)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

case, in such form as the requisite parties under the DIP Documents may agree, subject to the consent rights set forth in the Restructuring Support Agreement (it being understood that no further approval of the Court shall be required for any such amendments, waivers, consents, or other modifications or the payment of any fees, including attorneys', accountants', appraisers', and financial advisors' fees, and other expenses, charges, costs, indemnities and other like obligations in connection therewith, that do not shorten the maturity of the DIP Facility, increase the aggregate amount of the DIP Facility, increase the rate of interest or fees payable thereunder, or release any DIP Liens other than in accordance with the DIP Documents, or are not otherwise material and adverse to the Debtors).  Updates, modifications, and supplements to the Approved Budget and extension or waiver of any Milestones (as defined in the DIP Documents) shall not require any further approval of the Court;

(iii)     subject to the Carve-Out, the non-refundable payment to any of the DIP Secured Parties of any fees in connection with the DIP Facility and any amounts due in respect of any indemnification and expense reimbursement obligations, including, without limitation, reasonable and documented prepetition and postpetition fees and expenses of the Plan Sponsor Advisors and the Secured Ad Hoc Group Advisors (each as defined in the Restructuring Support Agreement) (collectively, the "**DIP Professional Fees**"), in each case, as provided in the DIP Documents and applicable fee letters, without the need to file any retention or fee applications; the payment of the foregoing amounts shall be irrevocable, and shall be deemed to have been approved upon entry of this Interim Order, whether any such obligations arose before or after the Petition

(Page | 34)

Debtors:          MULTI-COLOR CORPORATION, *et al*.

Case No.          26-10910 (MBK)

Caption of Order:  Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
Administrative Expense Claims, (II) Granting Adequate Protection to
Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
(IV) Scheduling a Final Hearing, and (V) Granting Related Relief

Date, and whether or not the transactions contemplated hereby are consummated, and upon
payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction,
defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance,
impairment, or other claim, cause of action, or other challenge of any nature under the Bankruptcy
Code or applicable non-bankruptcy law; and

(iv)     the performance of all acts required under or in connection with the
DIP Documents, including, without limitation, the granting, subject to the Carve Out, of the DIP
Liens and the DIP Superpriority Claims and perfection of the DIP Liens as permitted herein and
therein, and to perform such other and further acts as may be necessary, desirable, or appropriate
in connection therewith from time to time, in each case in accordance with the terms of the DIP
Documents.

(e)     Following the Final Issuance Date, the Borrowers are authorized to borrow
up to $150 million in Incremental New Money DIP Loans.  Notwithstanding anything to the
contrary herein or in the DIP Documents, the Incremental New Money DIP Loans shall have no
economics payable other than the principal amount and, for the avoidance of doubt, shall have no
interest rate, original issue discount, or other fees or commissions in any respect.  The Incremental
New Money DIP Loans shall be used to fund a paydown of outstanding Prepetition ABL
Obligations, professional fees, and/or other cash uses of the Debtors in connection with emergence
from these Chapter 11 Cases and, on such date of emergence, the Incremental New Money DIP
Loans shall be repaid in the form of cash or New Money Preferred Equity; *provided* that, at the

34

(Page | 35)
Debtors:          MULTI-COLOR CORPORATION, *et al.*
Case No.          26-10910 (MBK)
Caption of Order: Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                  Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                  Administrative Expense Claims, (II) Granting Adequate Protection to
                  Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                  (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

election of the Holders of the Incremental New Money DIP Loans, proceeds therefrom shall be

allocated towards New Money Preferred Equity subscription proceeds to the extent not applied

towards repayment of outstanding Prepetition ABL Obligations, professional fees, and/or other

cash uses of the Debtors in connection with emergence from these Chapter 11 Cases. The funding

date of the Incremental New Money DIP Loans, and the segregated account into which such

proceeds are funded and maintained, shall each be mutually determined by the Borrowers and

the Required DIP Backstop Parties.

3.      *DIP Obligations.* Upon the entry of this Interim Order and the execution and

delivery of the DIP Documents, but subject to the rights set forth in paragraph 21 hereof with

respect to the Roll-Up DIP Loans, the DIP Documents (including 50% of the Backstop Premium

as set forth in this Interim Order) shall constitute legal, valid, binding, and non-avoidable

obligations of the DIP Obligors, respectively, enforceable against each DIP Obligor and its estate

in accordance with their respective terms and this Interim Order, and any successors thereto,

including any trustee appointed in these Chapter 11 Cases, or in any case under chapter 7 of the

Bankruptcy Code upon conversion of any of these Chapter 11 Cases, or in any other proceedings

superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). With respect

to the DIP Documents, effective immediately upon entry of this Interim Order and the execution

and delivery of the DIP Documents, but subject to the rights set forth in paragraph 21 hereof with

respect to the Roll-Up DIP Loans, the DIP Obligations shall include all loans and any other

indebtedness or obligations, contingent or absolute, which may now or from time to time be owing

35

(Page | 36)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

by any of the DIP Obligors to any of the DIP Secured Parties, in such capacities, under the DIP Documents, and under this Interim Order or secured by the DIP Liens, including, without limitation, all principal, interest, costs, fees, expenses, premiums, indemnities, and other amounts. The DIP Obligors are jointly and severally liable for the DIP Obligations. Except as permitted hereby and subject to the rights set forth in paragraph 21 hereof as it relates to the DIP Obligations with respect to the Roll-Up DIP Loans, no obligation, payment, transfer, or grant of security under this Interim Order, including the Carve Out (which, for the avoidance of doubt, does not fall within the exception at the beginning of this sentence), or under the DIP Documents to the DIP Representatives and/or the other DIP Secured Parties (including, without limitation, any DIP Obligation or any DIP Lien), shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under chapter 5 of the Bankruptcy Code (including, without limitation, sections 502(d), 544, and 547 to 550 of the Bankruptcy Code), section 724(a) of the Bankruptcy Code, or any other provision with respect to avoidance actions under the Bankruptcy Code or otherwise under any applicable state law, including, without limitation, any state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute, or common law or foreign law equivalents), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity. For the avoidance of doubt, and

(Page | 37)
Debtors:            MULTI-COLOR CORPORATION, *et al*.
Case No.            26-10910 (MBK)
Caption of Order:   Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                    Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                    Administrative Expense Claims, (II) Granting Adequate Protection to
                    Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                    (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

notwithstanding anything herein to the contrary, the DIP Obligations with respect to the New Money DIP Loans owing to a DIP Lender may only be paid and satisfied in full in cash unless otherwise agreed to in writing by such DIP Lender.

4.      *Carve Out*.  Notwithstanding anything to the contrary in this Interim Order, the DIP Obligors' obligations to the DIP Secured Parties and the Prepetition Secured Parties, and the liens, security interests, and superpriority claims granted herein and under the DIP Documents and the Prepetition Debt Documents, including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Secured Obligations, the Adequate Protection Liens, and Adequate Protection Obligations, shall be subject in all respects and subordinate to the Carve-Out.

(a)      *Carve Out*.  As used in this Interim Order, the "**Carve Out**" means the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in sub-clause (iii) of this clause (a)); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in sub-clause (iii) of this clause (a)); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Creditors' Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code

37

(Page | 38)
Debtors:          MULTI-COLOR CORPORATION, *et al*.
Case No.          26-10910 (MBK)
Caption of Order: Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
Administrative Expense Claims, (II) Granting Adequate Protection to
Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
(IV) Scheduling a Final Hearing, and (V) Granting Related Relief

(the "**Committee Professionals**," and together with the Debtor Professionals, the "**Professional**

**Persons**") at any time before or on the first business day following delivery by the DIP

Representatives (acting at the direction of the Required DIP Lenders) or the Prepetition ABL

Agent (acting at the direction of the requisite Prepetition ABL Secured Parties) of a Carve Out

Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a

Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an

aggregate amount not to exceed $8,000,000 incurred after the first business day following delivery

by the DIP Representatives (acting at the direction of the Required DIP Lenders) or the Prepetition

ABL Agent (acting at the direction of the requisite Prepetition ABL Secured Parties) of the Carve

Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order,

or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice**

**Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice

delivered by email (or other electronic means) by either (A) the DIP Representatives (acting at the

direction of the Required DIP Lenders) or (B) or the Prepetition ABL Agent (acting at the direction

of the requisite Prepetition ABL Secured Parties) to the Debtors, their lead restructuring counsel,

the U.S. Trustee, and counsel to the Creditors' Committee (if any), which notice may be delivered,

(1) with respect to the DIP Representatives, following the occurrence and during the continuation

of an Event of Default (as defined in the DIP Credit Agreement), and acceleration of the DIP

Obligations under the DIP Facility or termination of the Debtors' right to use Cash Collateral, as

applicable, or (2) with respect to the Prepetition ABL Agent, following the occurrence and during

38

(Page | 39)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

the continuation of an ABL Cash Collateral Termination Event (as defined below) and termination of the Debtors' right to use ABL Cash Collateral, as applicable, in each case for clauses (1) and (2) stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b) *Delivery of Weekly Fee Statements*. Not later than 7:00 p.m. (New York time) on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, the "**Estimated Fees and Expenses**") incurred during the preceding week by such Professional Person (through Sunday of such week, the "**Calculation Date**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "**Weekly Statement**"); *provided* that, within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered promptly to the DIP Representatives). If any Professional Person fails to deliver a Weekly Statement within three (3) calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve Out Trigger Notice

(Page | 40)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the DIP Budget for such period for such Professional Person.

(c)    *Carve Out Reserves*.

(i)    Commencing on or before the Thursday of the week ending February 6, 2026, and on or before the Thursday of each week thereafter, the Debtors shall utilize all cash on hand as of such date and, to the extent insufficient, any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of (A) the greater of (1) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statements delivered on the immediately prior Wednesday to the Debtors and (2) the aggregate amount of unpaid Allowed Professional Fees contemplated to be incurred in the DIP Budget during such week, plus (B) the Post-Carve Out Trigger Notice Cap, plus (C) an amount equal to the amount of Allowed Professional Fees set forth in the DIP Budget for the two weeks occurring after the most recent Calculation Date.  The Debtors shall deposit and hold such amounts in a segregated account maintained by or on behalf of the Debtors in trust (the "**Funded Reserve Account**") to pay such Allowed Professional Fees (the "**Funded Reserves**") prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first from such Funded Reserve Account.

40

(Page | 41)
Debtors:              MULTI-COLOR CORPORATION, *et al.*
Case No.              26-10910 (MBK)
Caption of Order:     Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                      Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                      Administrative Expense Claims, (II) Granting Adequate Protection to
                      Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                      (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

       (ii)      On the day on which a Carve Out Trigger Notice is given by the DIP

Representatives (acting at the direction of the Required DIP Lenders) or the Prepetition ABL

Agent (acting at the direction of the requisite Prepetition ABL Secured Parties) to the Debtors with

a copy to counsel to the Creditors' Committee (if any) (the "**Termination Declaration Date**"),

the Carve Out Trigger Notice shall constitute a demand to the Debtors to, and the Debtors shall,

utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and any

available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid

amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a

segregated account maintained by or on behalf of the Debtors in trust to pay such then unpaid

Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any other

claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute

a demand to the Debtors to utilize all cash on hand as of such date, including cash in the Funded

Reserve Account, and any available cash thereafter held by any Debtor, after funding the Pre-

Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out

Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account

maintained by or on behalf of the Debtors in trust to pay such Allowed Professional Fees benefiting

from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**," and

together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any

and all other claims.  To fund the Carve Out Reserves, the Debtors shall first use cash that is not

41

(Page | 42)

| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
|---|---|
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

ABL Priority Collateral and, to the extent such cash is insufficient, the Debtors shall use any other cash on hand.

(d)     *Application of the Carve Out Reserves*.

(i)     All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (a)(i) through (a)(iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until the Pre-Carve Out Amounts are indefeasibly paid in full. If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to paragraph 4(d)(iii) below, all remaining funds shall be distributed first to the DIP Representatives on account of the DIP Obligations until indefeasibly paid in full, subject to paragraph 8(c) of this Interim Order, and thereafter to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date and as otherwise set forth in this Interim Order.

(ii)     All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (a)(iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**").  If the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to paragraph 4(d)(iii) below, all remaining funds shall be distributed to the DIP Representatives for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full and subject to paragraph 8(c) of this Interim Order, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.

42

(Page | 43)
Debtors:            MULTI-COLOR CORPORATION, *et al.*
Case No.            26-10910 (MBK)
Caption of Order:   Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                    Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                    Administrative Expense Claims, (II) Granting Adequate Protection to
                    Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                    (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

(iii)    Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in paragraph 4(c), then any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively (subject to the limits contained in the Post-Carve Out Trigger Notice Cap), shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in paragraph 4(c), prior to making any payments to the DIP Representatives or the Prepetition Secured Parties, as applicable.

(iv)    Notwithstanding anything to the contrary in the DIP Documents, the Prepetition Debt Documents, or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Representatives and the Prepetition Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a first-lien and automatically perfected security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Representatives for application in accordance with the DIP Documents and the Intercreditor Agreements.

(v)    Further, notwithstanding anything to the contrary in this Interim Order, (A) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (B) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (C) in no way shall the Initial DIP Budget, any

43

(Page | 44)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

subsequent DIP Budget, the Carve Out, the Post-Carve Out Trigger Notice Cap, or the Carve Out Reserves, or any of the foregoing, be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the Carve Out shall be senior to all liens and claims securing the DIP Obligations, the Adequate Protection Liens, the Prepetition Secured Obligations, the DIP Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations and the Prepetition Secured Obligations.

(e)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date.* Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(f)     *No Direct Obligation to Pay Allowed Professional Fees.* None of the DIP Representatives, the DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Representatives, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

44

(Page | 45)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(g)     *Payment of Allowed Professional Fees on or After the Termination Declaration Date*.   Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

5.     *DIP Superpriority Claims*.   Subject to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations, including the Roll-Up DIP Loans and 50% of the Backstop Premium as set forth in this Interim Order, shall constitute allowed superpriority administrative expense claims (the "**DIP Superpriority Claims**") against the DIP Obligors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the DIP Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a) (other than section 507(a)(1)), and 507(b) of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.   The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the DIP Obligors and all proceeds thereof (excluding (a) the Carve Out Reserves and any professional fee escrow account and any amounts held therein other than the Debtors' reversionary interest therein, (b) claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under

(Page | 46)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

the Bankruptcy Code (collectively, the "**Avoidance Actions**"), and (c) the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code (collectively, the "**Recovery Actions**") but, subject to the entry of the Final Order, including any proceeds or property recovered as a result of any Avoidance Actions or Recovery Actions, whether by judgment, settlement, or otherwise (the "**Avoidance/Recovery Proceeds**")), subject only to the Carve Out and junior, solely with respect to the ABL Priority Collateral, to the ABL 507(b) Claim (as defined below); *provided, however*, that the DIP Superpriority Claims shall not be payable from the ABL Priority Collateral until the Prepetition ABL Obligations (including any administrative expense claims granted in favor of the Prepetition ABL Secured Parties) are paid in full in cash.[4]  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

6.    *Intercreditor Agreements.*  Pursuant to section 510 of the Bankruptcy Code, the Prepetition Loans/Notes Intercreditor Agreement and the Prepetition ABL Intercreditor Agreement and any other applicable intercreditor or subordination provisions contained in any of the other Prepetition Debt Documents (collectively, the "**Intercreditor Agreements**") shall (a) remain in full force and effect, (b) continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights, and remedies of such parties with respect to replacement liens, administrative expense claims, and superpriority

---

[4]    All references herein to "payment in full" of the Prepetition ABL Obligations (or words of similar import) mean payment in full in cash of all Prepetition ABL Facility Obligations other than contingent indemnification obligations for which no claim has been asserted.

46

(Page | 47)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

administrative expense claims or amounts payable in respect thereof), and (c) not be deemed to be amended, supplemented, altered, or otherwise modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein or therein.

7.  *DIP Liens*.  As security for the DIP Obligations, effective and automatically properly perfected on the date this Interim Order is entered, and without the necessity of execution, recordation, or filing of any perfection document or instrument, or the possession or control by the DIP Representatives of, or over, any Collateral, without any further action by the DIP Secured Parties, the following valid, binding, continuing, fully perfected, enforceable, and non-avoidable security interests and liens (collectively, the "**DIP Liens**") are hereby granted to the DIP Representatives for the benefit of the DIP Secured Parties (all property identified in clauses (a) through (e) below, together with all other real and personal property of the Debtors of any kind, nature, or description whatsoever, wherever located, and whenever acquired or arising, and together with all additions and accessions to, substitutions for, and replacements, proceeds, rents, issues, profits, and products of the foregoing, but excluding "Excluded Assets" (as defined in the DIP Documents), being collectively referred to as the "**DIP Collateral**"), subject and subordinate only to the Carve Out and in accordance with the priorities set forth on **Exhibit 3** and not subject to any other liens other than as permitted by the DIP Documents:

(a)  *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve Out and in accordance with the priorities set forth on **Exhibit 3** and not subject to any other liens other than

47

(Page | 48)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

as permitted by the DIP Documents) all tangible and intangible prepetition and postpetition property of the DIP Obligors of any kind or nature whatsoever, whether existing on the Petition Date or thereafter acquired or arising and wherever located, and the proceeds, products, rents, and profits thereof, whether arising from section 552(b) of the Bankruptcy Code (subject to paragraph 21 of this Interim Order) from time to time, that, on or as of the Petition Date, is not subject to (i) a valid, perfected, and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than the Avoidance Actions, the Recovery Actions, the Carve Out Reserves, and any professional fee escrow account (and any amounts held therein), but including, upon and subject to entry of the Final Order, the Avoidance/Recovery Proceeds (collectively, the "**Unencumbered Property**"), and for the avoidance of doubt, the ABL Priority Collateral shall not be considered to be included among the Unencumbered Property.

(b)     *Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior priming security interest (subject to the Carve Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Obligors constituting Term/Notes Priority Collateral, regardless of where located.  Notwithstanding anything herein to the contrary, the DIP Liens shall not be subordinate to any lien, security interest, or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, and shall have such priority as set forth in **Exhibit 3** and shall not be subject to

48

(Page | 49)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

any other liens or encumbrances other than as permitted by the DIP Documents but shall be subject to the Carve Out.

(c) *Junior Liens Priming Certain Prepetition Secured Parties' Liens*. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected junior priority priming security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Obligors constituting ABL Priority Collateral, regardless of where located, which security interest and lien shall only prime the Prepetition Cash Flow Liens and the Prepetition Secured Notes Liens on the ABL Priority Collateral and for the avoidance of doubt, shall not and shall at all times be junior to the Prepetition ABL Liens and the ABL Adequate Protection Liens on the ABL Priority Collateral. Notwithstanding anything herein to the contrary, the DIP Liens shall not be subordinate to any lien, security interest, or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, and shall have such priority as set forth in **Exhibit 3** and shall not be subject to any other liens or encumbrances other than as permitted by the DIP Documents but shall be subject to the Carve Out.

(d) *Liens Junior to Certain Other Liens*. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest and lien upon all tangible and intangible prepetition and postpetition property of the DIP Obligors that, on or as of the Petition Date, is subject to Prepetition Permitted Senior Liens, which shall have

49

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

such priority as set forth in **Exhibit 3** and shall not be subject to any other liens or encumbrances other than as permitted by the DIP Documents but shall be subject to the Carve Out.

(e)     *No Senior Liens*.  Other than the Carve Out, the DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents, the Intercreditor Agreements, or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of the DIP Obligors, or (C) any intercompany liens, or (ii) unless otherwise provided for in this Interim Order, subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code.

8.      *Protection of DIP Secured Parties' and Prepetition Secured Parties' Rights.*

(a)     Subject to paragraph 8(c) hereof, so long as there are any DIP Obligations or the DIP Secured Parties shall have any outstanding commitments under the DIP Facility, the Prepetition Secured Parties shall, with respect to the DIP Collateral (but subject in all instances to the DIP Documents):  (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Debt Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens (subject to the rights of the

(Page | 51)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Prepetition ABL Agent to take those actions that the Prepetition ABL Agent is expressly permitted to take hereunder); (ii) not oppose or object to any transfer, disposition, or sale of, or release of liens on, any DIP Collateral to the extent such transfer, disposition, sale, or release is authorized under the DIP Documents; *provided* that, with respect to any ABL Priority Collateral, each Prepetition Secured Party other than the Prepetition ABL Secured Parties is hereby deemed to have consented, in accordance with this Interim Order and the Prepetition Intercreditor Agreements, to any such transfer, disposition, sale, or release of liens thereon that is authorized by the DIP Documents, this Interim Order and the Prepetition ABL Credit Facility Documents; (iii) not file any financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than (A) to perfect, or evidence the perfection of, the liens granted pursuant to this Interim Order or (B) as may be required by applicable state or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the cost and expense and at the reasonable request of the DIP Obligors or the DIP Secured Parties, any termination statements, releases, and/or assignments in favor of the DIP Secured Parties, or other documents necessary to effectuate and/or evidence the release, termination, and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition permitted by the DIP Documents or this Interim Order or any other order of the Court.

51

(Page | 52)

| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
|---|---|
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(b) Subject to paragraph 8(c) hereof and other than with respect to the Prepetition ABL Secured Parties' rights to the ABL Priority Collateral, to the extent any Prepetition Secured Party has possession of, or control over, any Prepetition Collateral or DIP Collateral, or has been listed as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, such Prepetition Secured Party shall be deemed to have such possession or be so listed or have such possession or control as a gratuitous bailee and/or gratuitous agent for the benefit of the DIP Secured Parties and such Prepetition Secured Party shall comply with the reasonable instructions of the DIP Representatives, acting at the direction of the requisite DIP Lenders under the DIP Documents with respect to any of the foregoing. Notwithstanding the foregoing, with respect to the ABL Priority Collateral (including, for the avoidance of doubt, Cash Collateral that constitutes ABL Priority Collateral), any DIP Secured Party or Prepetition Secured Party that has possession of, control over, or is noted as a secured party on any certificate of title for such ABL Priority Collateral shall be deemed to hold such ABL Priority Collateral (or such notation or control) solely as a gratuitous bailee or gratuitous agent for perfection for the benefit of the Prepetition ABL Secured Parties and shall comply with the instructions of the Prepetition ABL Agent with respect thereto, and each other Prepetition Secured Party (other than the Prepetition ABL Secured Parties) is deemed to have consented to such control by the Prepetition ABL Agent in accordance with this Interim Order and the Prepetition Intercreditor Agreements.

(Page | 53)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(c)     So long as there are any Prepetition ABL Obligations (including the ABL 507(b) Claim) outstanding and until all Prepetition ABL Obligations (including the ABL 507(b) Claim) have been paid in full, in cash (and all letters of credit issued or other asserted contingent obligations under the Prepetition ABL Credit Agreement have been cash collateralized in accordance with the terms of the Prepetition ABL Loan Documents), solely with respect to the ABL Priority Collateral, the enforcement rights of the DIP Secured Parties and the Prepetition Secured Parties (other than the Prepetition ABL Secured Parties) with respect to the ABL Priority Collateral shall be subject to the terms of the Prepetition ABL Intercreditor Agreement as if the DIP Representatives were party thereto as an Initial Additional Fixed Asset Collateral Agent (as defined in the Prepetition ABL Intercreditor Agreement).

(d)     Subject to paragraph 8(c) hereof, any proceeds of Prepetition Collateral received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise, shall be with respect to DIP Collateral (other than ABL Priority Collateral) segregated and held in trust for the benefit of, and forthwith paid over to, the DIP Representatives for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The DIP Representatives, as applicable, are each hereby authorized to make any such endorsements as agent for the applicable Prepetition Secured Parties. Notwithstanding the foregoing, any ABL Priority Collateral or any proceeds of ABL Priority Collateral or any other payment with respect thereto that is received by any person or entity,

53

(Page | 54)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

including, without limitation, a DIP Secured Party or Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the ABL Priority Collateral or otherwise received by a DIP Secured Party or Prepetition Secured Party, shall be segregated and such person or entity shall be deemed to have received, and shall hold, any such ABL Priority Collateral, proceeds thereof or any other payment in trust for the benefit of the Prepetition ABL Agent and the Prepetition ABL Secured Parties based on the rights and priorities set forth in Exhibit 3 hereto, and shall immediately turn over such property in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The Prepetition ABL Agent is hereby authorized to make any such endorsements as agent for any such DIP Secured Parties or Prepetition Secured Parties, as applicable.  The authorizations in this paragraph 8(d) are coupled with an interest and is irrevocable.

(e)    The DIP Obligors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents, this Interim Order, or any other order of the Court.  The DIP Obligors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the ABL Priority Collateral, except as otherwise permitted by this Interim Order or any other order of the Court (including, for the avoidance of doubt, in the ordinary course of business consistent with the Approved Budget (subject to permitted variances under the DIP Documents)).

54

(Page | 55)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

9. *Termination and Remedies*.

(a) Upon the occurrence and during the continuation of an Event of Default (as defined under the DIP Documents) that has not been waived by the requisite DIP Lenders under the DIP Documents and following delivery of written notice (in accordance with the DIP Documents) at the direction of the Required DIP Lenders (a "**DIP Termination Notice**") (including by e-mail) on not less than five (5) business days' notice (such five (5) business day period, as may be extended with the consent of the Required DIP Lenders (including by e-mail), the "**DIP Remedies Notice Period**") to lead restructuring counsel to the Debtors, lead restructuring counsel to each of the Prepetition Representatives, lead counsel to the Creditors' Committee, if any, and the U.S. Trustee (collectively, the "**Remedies Notice Parties**"), the DIP Representatives may (and any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order (including this paragraph) is hereby modified), without further notice to, hearing of, or order from the Court, to the extent necessary to permit the DIP Representatives to, unless the Court orders otherwise (*provided* that, during the DIP Remedies Notice Period, the Debtors, the Creditors' Committee (if any), and/or any party in interest shall be entitled to seek an emergency hearing (an "**DIP Emergency Hearing**") with the Court to seek any relief, including to contest whether, in fact, an Event of Default has occurred and is continuing, or to obtain non-consensual use of Cash Collateral; *provided, further* that, if a request for a DIP Emergency Hearing is made prior to the end of the DIP Remedies Notice Period, then the DIP Remedies Notice

(Page | 56)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Period shall be extended until such DIP Emergency Hearing has concluded and the Court has ruled with respect to the requested relief), but in each case subject to the obligations with respect to the Carve Out) and subject to paragraph 8(c) hereof (*provided* that, for the avoidance of doubt, the DIP Secured Parties may not exercise rights and remedies against any DIP Collateral that constitutes ABL Priority Collateral (including Cash Collateral constituting ABL Priority Collateral and cash proceeds thereof that shall be held within one or more segregated accounts upon which the Prepetition ABL Agent shall have a first priority, automatically perfected security interest in, and lien upon (collectively, the "**ABL Cash Collateral**") unless the Prepetition ABL Obligations and the related Adequate Protection Obligations have been paid in full in cash): (i) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Documents to use any Cash Collateral (subject to the Carve Out and related provisions); (ii) terminate the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (iii) declare all DIP Obligations to be immediately due and payable; (iv) invoke the right to charge interest at the default rate under the DIP Documents; (v) freeze monies or balances in the Debtors' accounts (unless such monies constitute ABL Priority Collateral or are used to fund the Carve Out Reserve); (vi) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Secured Parties against the DIP Obligations; (vii) enforce any and all rights against the DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral, occupying the Debtors' premises, and a sale or disposition of the DIP Collateral; and

(Page | 57)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(viii) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents or applicable law. After the expiration of the DIP Remedies Notice Period, and subject to any order of the Court in connection therewith, the Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral. Upon delivery of such DIP Termination Notice by the DIP Representatives at the direction of the Required DIP Lenders, without further notice or order of the Court, the DIP Secured Parties' and the Prepetition Secured Parties' consent to use Cash Collateral and the Debtors' ability to incur additional DIP Obligations hereunder will, subject to the expiration of the DIP Remedies Notice Period and unless the Court orders otherwise, automatically terminate and the DIP Secured Parties will have no obligation to provide any financial accommodations under the DIP Documents. During the DIP Remedies Notice Period, notwithstanding anything to the contrary set forth in this paragraph 9 (but subject to the terms of paragraph 9(c) herein), (i) the DIP Secured Parties and the Prepetition Secured Parties may not exercise any rights or remedies to satisfy the DIP Obligations, the Prepetition Secured Obligations, or the Adequate Protection Obligations, including any rights or remedies against the DIP Collateral or the Prepetition Collateral, as applicable, and, (ii) subject to the Term/Notes Cash Collateral Termination Events, the Debtors shall continue to have the right to use Cash Collateral solely to pay necessary expenses

(Page | 58)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

set forth in the Approved Budget to avoid immediate and irreparable harm to the Debtors' estates and fund the Carve Out.

(b) Upon the occurrence of any of the below events (each, a "**Term/Notes Cash Collateral Termination Event**"), the Prepetition Cash Flow Agent and the Prepetition Secured Notes Trustee, as applicable, at the direction of the requisite lenders or noteholders under the Prepetition Cash Flow Documents and the Prepetition Secured Notes Documents, as applicable, on not less than five (5) business days' notice to the Remedies Notice Parties (such five (5) business day period, as may be extended with the consent of the Required DIP Lenders (including by e-mail), the "**Term/Notes Cash Collateral Remedies Notice Period**"), and unless the Court orders otherwise (*provided* that during the Term/Notes Cash Collateral Remedies Notice Period, the Debtors, the Creditors' Committee (if any), and/or any party in interest shall be entitled to seek an emergency hearing (a "**Term/Notes Cash Collateral Emergency Hearing**") with the Court to seek any relief, including to contest whether, in fact, a Term/Notes Cash Collateral Termination Event has occurred and is continuing, or to obtain non-consensual use of Cash Collateral (other than ABL Cash Collateral); *provided, further* that, if a request for a Term/Notes Cash Collateral Emergency Hearing is made prior to the end of the Term/Notes Cash Collateral Remedies Notice Period, then the Term/Notes Cash Collateral Remedies Notice Period shall be extended until such Term/Notes Cash Collateral Emergency Hearing has concluded and the Court has ruled with respect to the requested relief), but in each case subject to the obligations with respect to the Carve Out)) may terminate its and the Prepetition Secured Parties' consent to the Debtors' use of Cash

(Page | 59)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Collateral (other than ABL Cash Collateral) constituting Prepetition Collateral: (i) an Event of Default (as defined in the DIP Documents) has occurred that has not been timely cured or for which no waiver or forbearance has been obtained, or the termination of all commitments under the DIP Facility; (ii) the Restructuring Support Agreement is terminated as to the Consenting First Lien Lenders in accordance with the applicable provisions thereof or shall no longer be in full force and effect; (iii) the DIP Facility has been repaid in full; or (iv) the failure to deliver any reports or other information to the Prepetition Cash Flow Agent or the Prepetition Secured Notes Trustee required pursuant to this Interim Order within five (5) business days after such reports or other information is required or otherwise to comply with the terms of the Adequate Protection Obligations owed to the Prepetition Cash Flow Agent or the Prepetition Secured Notes Trustee as provided for herein. After the expiration of the Term/Notes Cash Collateral Remedies Notice Period, and subject to any order of the Court in connection therewith, the Prepetition Cash Flow Secured Parties' and the Prepetition Secured Notes Secured Parties', as applicable, consent to the Debtors' use of Cash Collateral shall terminate, the automatic stay pursuant to Bankruptcy Code section 362 shall be automatically modified with respect to the Prepetition ABL Secured Parties without further notice or order of the Court, and the Prepetition Cash Flow Secured Parties and the Prepetition Secured Notes Secured Parties, as applicable, may exercise such rights and remedies with respect to the Prepetition Collateral in accordance with this Interim Order, the Prepetition Debt Documents, and the Prepetition Intercreditor Agreements unless (a) the Prepetition Cash Flow Agent and the Prepetition Secured Notes Trustee, at the direction of the requisite lenders or

(Page | 60)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

noteholders under the Prepetition Cash Flow Documents and Prepetition Secured Notes Documents, as applicable, elects otherwise in a written notice to the Debtors, and/or (b) the Court has determined that a Term/Notes Cash Collateral Termination Event has not occurred and/or is not continuing or the Court orders otherwise; *provided* that any such relief shall remain subject to the Carve Out and to any order of the Court entered after the emergency hearing. During the Term/Notes Cash Collateral Remedies Notice Period, notwithstanding anything to the contrary set forth in this paragraph (but subject to the terms of paragraph 9(c) herein), (i) the Prepetition Secured Parties may not exercise any rights or remedies to satisfy the Prepetition Secured Obligations or the Adequate Protection Obligations, including any rights or remedies against the DIP Collateral or the Prepetition Collateral, as applicable, and (ii) the Debtors shall continue to have the right to use Cash Collateral solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Debtors' estates and fund the Carve Out.

(c)    Upon the occurrence and during the continuation of any of the below events (each, a "**ABL Cash Collateral Termination Event**"), the Prepetition ABL Secured Parties may terminate their consent to the Debtors' use of ABL Cash Collateral in accordance with this paragraph 9(c) (unless the Prepetition ABL Facility Obligations and related Adequate Protection Obligations have been paid in full in cash) on not less than five (5) business days' notice (such five (5) business day period, as may be extended with the written consent of the Prepetition ABL Agent (including by e-mail), the "**ABL Remedies Notice Period**") to the Remedies Notice Parties, unless the Court orders otherwise (*provided* that, during the ABL Remedies Notice Period, the

60

(Page | 61)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Debtors, the Creditors' Committee (if any), and/or any party in interest shall be entitled to seek an emergency hearing (an "**ABL Emergency Hearing**") with the Court to seek any relief, including to contest whether, in fact, ABL Cash Collateral Termination Event has occurred and is continuing, or to obtain non-consensual use of ABL Cash Collateral; *provided*, *further* that, if a request for an ABL Emergency Hearing is made prior to the end of the ABL Remedies Notice Period, then the ABL Remedies Notice Period shall be extended until such ABL Emergency Hearing has concluded and the Court has ruled with respect to the requested relief), but in each case subject to the obligations with respect to the Carve Out): (i) the termination of the DIP Commitments, the occurrence of an Event of Default (as defined under the DIP Documents), or the failure of the Debtors to comply with any covenants or obligations to the ABL Secured Parties set forth in this Interim Order; (ii) the failure to make any payment to the Prepetition ABL Agent required pursuant to this Interim Order within five (5) business days after such payment becomes due and payable in accordance with the terms of this Interim Order; (iii) the failure to deliver any reports or other information to the Prepetition ABL Agent required pursuant to this Interim Order within five (5) business days after such reports or other information is required or otherwise to comply with the terms of the Adequate Protection Obligations owed to the Prepetition ABL Agent as provided for herein; (iv) the Debtors file with the Court a plan, or a motion for the sale of substantially all of the Debtors' assets under section 363 of the Bankruptcy Code, that does not provide for the payment in full in cash of the Prepetition ABL Obligations (including all Adequate Protection Obligations owing to the Prepetition ABL Secured Parties) upon the effective date of such plan or

61

(Page | 62)
Debtors:          MULTI-COLOR CORPORATION, *et al*.
Case No.          26-10910 (MBK)
Caption of Order:   Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                   Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                   Administrative Expense Claims, (II) Granting Adequate Protection to
                   Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                   (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

closing of such sale, as applicable; (v) with respect to an Approved Budget, the Debtors exceed

the variances permitted under the DIP Documents; or (vi) the failure to comply with any of the

Prepetition ABL Cash Collateral Covenants.  After the expiration of the ABL Remedies Notice

Period, and subject to any order of the Court in connection therewith, the Prepetition ABL Secured

Parties' consent to the Debtors' use of ABL Cash Collateral shall terminate, the automatic stay

pursuant to Bankruptcy Code section 362 shall be automatically modified with respect to the

Prepetition ABL Secured Parties without further notice or order of the Court, and the Prepetition

ABL Secured Parties may exercise such rights and remedies with respect to the ABL Priority

Collateral in accordance with this Interim Order, the Prepetition ABL Loan Documents, and the

Prepetition Intercreditor Agreements unless (a) the Prepetition ABL Agent (acting at the direction

of the applicable requisite lenders) elects otherwise in a written notice to the Debtors, and/or (b)

the Court has determined that an ABL Cash Collateral Termination Event has not occurred and/or

is not continuing or the Court orders otherwise; *provided* that any such relief shall remain subject

to the Carve Out and to any order of the Court entered after the emergency hearing.  During the

ABL Remedies Notice Period, notwithstanding anything to the contrary set forth in this paragraph

9(c), (i) the Prepetition ABL Secured Parties may not exercise any rights or remedies to satisfy the

Prepetition Secured Obligations or the Adequate Protection Obligations, including any rights or

remedies against the Prepetition Collateral, as applicable, and (ii) the Debtors shall continue to

have the right to use ABL Cash Collateral in the ordinary course in accordance with the terms of

this Interim Order and the Approved Budget (subject to permitted variances under the DIP

62

(Page | 63)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Documents), including to fund the Carve Out (*provided* that, to fund the Carve Out Reserves, the Debtors shall first use cash that is not ABL Priority Collateral and, to the extent such cash is insufficient, the Debtors shall use any other cash on hand).

(d)     Subject to the Remedies Notice Periods, no rights, protections, or remedies of the DIP Secured Parties or the Prepetition Secured Parties granted by this Interim Order or the DIP Documents, shall be limited, modified, or impaired in any way by: (i) any actual or purported withdrawal of the consent to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

(e)     Notwithstanding anything to the contrary in this Interim Order, the DIP Secured Parties and the Prepetition Secured Parties shall be stayed from enforcing any rights and remedies under this Interim Order until such time that a DIP Representative or the Prepetition ABL Agent, as applicable, delivers a Carve Out Trigger Notice and has complied with its respective obligations in connection with the issuance thereof or consents to such enforcement.

(f)     Notwithstanding anything to the contrary in this Interim Order, the DIP Documents, or the Loan Documents, (i) in no event shall a Qualifying Consenting Stakeholder Termination Event (as defined below) constitute (A) a "Default" or "Event of Default" under the DIP Documents, (B) a Term/Notes Cash Collateral Termination Event, or (C) otherwise a termination event with respect to the DIP Commitments, in each case for the duration of the

(Page | 64)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Cooperation Period; *provided, however*, that (x) the DIP Lenders shall not be required to fund the DIP Commitments upon the occurrence and during the continuation of any Default or Event of Default under the DIP Documents and (y) regardless of whether the Cooperation Period has been triggered, subject to the DIP Remedies Notice Period and Term/Notes Cash Collateral Remedies Notice Period, as applicable, the DIP Representatives (acting at the direction of the Required DIP Lenders) or the Prepetition Cash Flow Agent and Prepetition Secured Notes Trustee, as applicable, shall be entitled to exercise remedies with respect to any Default, Event of Default or Term/Notes Cash Collateral Termination Event, as applicable, in each case that is not a Qualifying Consenting Stakeholder Termination Event. As used in this paragraph 9(f), the term "Qualifying Consenting Stakeholder Termination Event" shall mean (x) any default or termination event that would constitute, or is substantially similar to, a Qualifying Consenting Stakeholder Termination Event (as defined in the Restructuring Support Agreement) and, (y) without limiting the foregoing, a breach of the milestones and the budget variance covenant set forth in the DIP Documents; *provided*, that, if the Restructuring Support Agreement is still in full force and effect and the Cooperation Period has not yet been triggered, the DIP Representatives shall not be permitted to exercise remedies with respect to a breach of the budget variance covenant set forth in the DIP Documents or with respect to the Prepetition ABL Agent exercising an ABL Cash Collateral Termination Event (to the extent it is a Default or Event of Default under the DIP Documents if the Prepetition ABL Agent exercises an ABL Cash Collateral Termination Event) unless the DIP

64

(Page | 65)
Debtors:          MULTI-COLOR CORPORATION, *et al.*
Case No.          26-10910 (MBK)
Caption of Order: Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                  Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                  Administrative Expense Claims, (II) Granting Adequate Protection to
                  Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                  (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

Representatives first accelerate the DIP Obligations in accordance with the terms of the DIP

Documents.

10.     *Use of ABL Cash Collateral.*  Subject to this Interim Order, including the Carve

Out, the Approved Budget (subject to permitted variances under the DIP Documents), and the

Debtors' adherence to the following covenants (the "**Prepetition ABL Cash Collateral**

**Covenants**"), each of which shall be included among the Adequate Protection Obligations (as

defined herein), the Debtors are authorized (and the Prepetition ABL Secured Parties consent) to

use of the ABL Cash Collateral:

(a)     Prepetition ABL Credit Agreement Covenants.  Notwithstanding anything

to the contrary in this Interim Order or any other DIP Documents, the covenants contained in

Sections 7.4, 7.5, 7.6 (except Section 7.6(b) with respect to appraisals and field examinations,

which shall be governed by paragraph 10(d) of this Interim Order), and 7.8 of the Prepetition ABL

Credit Agreement shall be applicable during these Chapter 11 Cases and the Debtors shall comply

with such covenants.

(b)     Approved Budget.  The Debtors shall obtain the Prepetition ABL Agent's

consent (not to be unreasonably withheld) in connection with the Approved Budget as set forth in

paragraph H(xi).

(c)     Cash Management.  The Debtors shall maintain their cash management

arrangements in a manner consistent with that described in the applicable "first day" order.

(Page | 66)
Debtors:          MULTI-COLOR CORPORATION, *et al*.
Case No.          26-10910 (MBK)
Caption of Order: Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                  Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                  Administrative Expense Claims, (II) Granting Adequate Protection to
                  Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                  (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

(d)      Appraisal and Field Examination.  On or after one hundred twenty (120) days of the Petition Date, the Prepetition ABL Agent shall be entitled to conduct one appraisal and one field examination, the costs of which shall be borne by the Debtors' estates.

(e)      ABL Priority Collateral Transfers.  ABL Priority Collateral including, without limitation, ABL Cash Collateral, shall not be transferred to non-Debtor subsidiaries in excess of $20,000,000 in the aggregate.

(f)      Consent Fee.  As consideration for the Prepetition ABL Secured Parties' agreement to permit the Debtors to use the ABL Cash Collateral in accordance with the terms of this Interim Order, the Debtors shall pay to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Secured Parties, upon entry of this Interim Order, a fee payable in kind in the amount of 75 bps of the ABL Commitments that shall be allocated 25 bps to the Prepetition ABL Agent and 50 bps (on a pro rata basis) among the Prepetition ABL Lenders; *provided* that such fee shall not be included for purposes of calculating Specified Availability (as defined below).

(g)      Reporting.[5]  For the duration of these Chapter 11 Cases, the Debtors shall provide the Prepetition ABL Agent, with copies to the DIP Representatives and counsel to the Creditors' Committee (if any), with (i) a modified Borrowing Base Certificate based on the estimated balances as of the 15th day of each month (a "**Mid-Month Borrowing Base Certificate**"), delivered by the 5th day of the following month, and (ii) a monthly Borrowing Base

---

[5]    For purposes of this paragraph, capitalized terms that are used but not defined herein have the meanings ascribed to them in the Prepetition ABL Credit Agreement.

66

(Page | 67)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Certificate, delivered by the 20th business day of the following month. The Borrowing Base in the Mid-Month Borrowing Base Certificate shall be based on an estimate of the Borrowing Base calculated as the sum of (A) Eligible Accounts in the prior month Borrowing Base Certificate, divided by gross Accounts, in the prior month Borrowing Base Certificate, multiplied by gross domestic Accounts as of the 15th day of each month, (B) Eligible Inventory in the prior month Borrowing Base Certificate, divided by gross Inventory in the prior month Borrowing Base Certificate, multiplied by gross domestic Inventory in the Debtors' SAP system as of the 15th day of each month, (C) Eligible Cash as of the delivery date of the Mid-Month Borrowing Base Certificate, less (D) Availability Reserves as of the prior month Borrowing Base Certificate. Both the Borrowing Base Certificate and the Mid-Month Borrowing Base shall include Eligible Cash[6] (to the extent it is ABL Priority Collateral) as of the respective delivery dates; *provided* that (1) any DIP cash proceeds on hand shall be included within Eligible Cash and for purposes of calculating Specified Availability so long as such DIP cash proceeds are subject to an automatically perfected security interest in, and lien in favor of the Prepetition ABL Agent and shall constitute ABL Priority Collateral and (2) all ABL Cash Collateral of any Debtor (irrespective of jurisdiction) (but subject to a cap of $10,000,000 with respect to foreign accounts and provided that the Prepetition ABL Secured Parties have a valid, binding, and perfected security interest in any such foreign account) shall be included within Eligible Cash and for purposes of calculating Specified

---

[6]     For the avoidance of doubt, cash used to fund the Carve Out shall not be considered as Eligible Cash for purposes of calculating the Borrowing Base.

(Page | 68)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Availability; *provided, further*, that, for the avoidance of doubt, the Borrowing Base that is required to be calculated as of January 30, 2026 and February 28, 2026 shall be delivered no later than three (3) and five (5) business days, respectively, from the date on which the Borrowing Base Certificate is otherwise due to the Prepetition ABL Agent, which deadline shall be further reasonably extended by the Prepetition ABL Agent to allow the Debtors' receipt of proceeds from the DIP Facility, if necessary. If, after delivering the monthly Borrowing Base Certificate, Specified Availability would be less than 7.5% of Availability, then the Debtors shall, within two (2) business days, deposit cash sufficient to cause Specified Availability to be at least 7.5% of Availability to be deposited into one or more segregated accounts with a bank that has entered into a uniform depository agreement with the U.S. Trustee, upon which the Prepetition ABL Agent shall have a first priority, automatically perfected security interest in, and lien (a "**True Up Deposit**"). If a subsequent monthly Borrowing Base Certificate shows excess Specified Availability of at least 7.5% of Availability, then the Debtors shall be entitled to remove the excess amount from the segregated account(s) holding the True Up Deposit. The True Up Deposit, if any, shall constitute ABL Priority Collateral. Notwithstanding the imposition of the automatic stay and the relief granted in this Interim Order, the Prepetition ABL Agent is permitted to take, and the Debtors shall reasonably cooperate with, any and all actions required under applicable foreign law to perfect the encumbrances granted in this Interim Order with respect to the aforementioned foreign accounts.

68

(Page | 69)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(h)    Notwithstanding anything in this Order to the contrary, the Debtors shall be deemed to first expend the proceeds of the DIP Loans before the ABL Cash Collateral, and any expenditures of the Debtors from pools of ABL Cash Collateral and other Cash Collateral (including, without limitation, commingled pools of ABL Cash Collateral and other Cash Collateral) shall be deemed to be expended first from Cash Collateral other than ABL Cash Collateral.

11.    *Limitation on Charging Expenses Against Collateral.*  Subject to the entry of the Final Order granting such relief, except to the extent of the Carve Out, no costs or expenses of administration of these Chapter 11 Cases or any Successor Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from any DIP Secured Party, any Prepetition Secured Party, any DIP Collateral, or any Prepetition Collateral (including Cash Collateral) pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Representatives, and/or each Prepetition Representative, as applicable, and no consent shall be implied from any action, inaction, or acquiescence by any of the DIP Secured Parties, or Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by any of the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

(Page | 70)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

12.     *Waivers*.  Subject to the entry of the Final Order granting such relief, in each case, the Prepetition Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and subject to the rights and protections of the Prepetition ABL Secured Parties with respect to the ABL Priority Collateral set forth in this Interim Order, in no event shall (a) the DIP Secured Parties or the Prepetition Secured Parties, as applicable, be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Adequate Protection Obligations, the Prepetition Secured Obligations, or the Prepetition Collateral, as applicable, or (b) the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties, the Prepetition Secured Obligations, or the Prepetition Collateral.

13.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Secured Parties or the Prepetition Secured Parties pursuant to the provisions of this Interim Order, the DIP Documents, the Prepetition Debt Documents, or any subsequent order of the Court shall be irrevocable and received free and clear of any claim, charge, assessment, or other liability, including, without limitation, subject to entry of the Final Order granting such relief, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors.

14.     *Use of Cash Collateral*.  The Debtors are hereby authorized, solely on the terms and conditions of this Interim Order, to use all Cash Collateral in accordance with this Interim

70

(Page | 71)

| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Order, the DIP Documents, and the Approved Budget (subject to permitted variances under the DIP Documents) to the extent required under the DIP Documents.

15. *Adequate Protection of Prepetition Secured Parties*. Pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral), to the extent of any Diminution in Value and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and the use of their Cash Collateral, as set forth herein, the Prepetition Secured Parties are granted the following Adequate Protection (collectively, the "**Adequate Protection Obligations**"):

(a) *Prepetition ABL Adequate Protection Liens*. The Prepetition ABL Agent is hereby granted, for the benefit of itself and the other Prepetition ABL Secured Parties, effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or other agreements, or by possession or control, to the extent of any of the Prepetition ABL Secured Parties' Diminution in Value, a valid, binding, non-avoidable, enforceable, and fully perfected replacement security interest and lien upon all of the DIP Collateral (collectively, the "**ABL Adequate Protection Liens**"), in each case in the order of priority set forth in **Exhibit 3** and not subject to any other liens.

(b) *Prepetition ABL Secured Parties' Section 507(b) Claim*. The Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, is hereby

71

(Page | 72)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

granted an allowed superpriority administrative expense claim against the DIP Obligors on a joint and several basis (without the need to file any proof of claim) to the extent of any of the Prepetition ABL Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "**ABL 507(b) Claim**"), which ABL 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions and Recovery Actions, but including, without limitation, subject to entry of the Final Order granting such relief, the Avoidance/Recovery Proceeds). The ABL 507(b) Claim shall be senior to all other claims against the DIP Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, subject and subordinate only to: (i) the Carve Out; (ii) the DIP Superpriority Claims except solely with respect to ABL Priority Collateral; and (iii) the Cash Flow 507(b) Claim and the Secured Notes 507(b) Claim, solely with respect to the Term/Notes Priority Collateral. The ABL 507(b) Claim shall be *pari passu* with the Cash Flow 507(b) Claim and the Secured Notes 507(b) Claim with respect to any DIP Collateral that does not constitute Term/Notes Priority Collateral or ABL Priority Collateral.

(c)    *Prepetition ABL Secured Parties Fees and Expenses.*    Subject and subordinate to the Carve Out, as further adequate protection, the DIP Obligors shall pay on a current basis to the Prepetition ABL Agent, in cash, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition ABL Agent as well as the

72

(Page | 73)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Prepetition ABL Agent's reasonable and documented prepetition and postpetition professional fees (postpetition fees shall be limited to one counsel (and, if necessary, one local counsel) and one financial advisor) to the extent permitted under the Prepetition ABL Loan Documents and/or any existing engagement letter (the "**ABL Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 20 of this Interim Order.

(d)     *Prepetition Cash Flow Adequate Protection Liens*.  The Prepetition Cash Flow Agent is hereby granted, for the benefit of itself and the other Prepetition Cash Flow Secured Parties, effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or other agreements, or by possession or control, to the extent of any of the Prepetition Cash Flow Secured Parties' Diminution in Value, a valid, binding, non-avoidable, enforceable, and fully perfected replacement security interest and lien upon all of the DIP Collateral (the "**Cash Flow Adequate Protection Liens**"), in each case in the order of priority as set forth in **Exhibit 3** and not subject to any other liens or encumbrances.

(e)     *Prepetition Cash Flow Secured Parties' 507(b) Claim*.  The Prepetition Cash Flow Agent, for the benefit of itself and the other Prepetition Cash Flow Secured Parties, is hereby granted an allowed superpriority administrative expense claim against the DIP Obligors on a joint and several basis (without the need to file any proof of claim) pursuant to section 507(b) of the Bankruptcy Code (the "**Cash Flow 507(b) Claim**") subject to the Prepetition Debt Documents and any turnover provisions contained therein, to the extent of any of the Prepetition Cash Flow

(Page | 74)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Secured Parties' Diminution in Value, which Cash Flow 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions and Recovery Actions, but including, without limitation, subject to entry of the Final Order granting such relief, the Avoidance/Recovery Proceeds). The Cash Flow 507(b) Claim shall be *pari passu* with the Secured Notes 507(b) Claim (as defined below) but senior to all other claims against the DIP Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in or ordered pursuant to sections 105, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a) (other than section 507(a)(1)), 507(b), 546(c), 1113, and 1114 of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, subject and subordinate only to: (i) the Carve Out; (ii) the DIP Superpriority Claims; and (iii) the ABL 507(b) Claim with respect to ABL Priority Collateral.

(f)     *Prepetition Cash Flow Secured Parties Fees and Expenses.* Subject and subordinate to the Carve Out, as further adequate protection, the DIP Obligors shall pay on a current basis to the Secured Ad Hoc Group Advisors and the Prepetition Cash Flow Agent, in cash, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Secured Ad Hoc Group Advisors and the Prepetition Cash Flow Agent and the reasonable and documented prepetition and postpetition professional fees of the professionals to the Prepetition Cash Flow Agent (postpetition fees shall be limited to one counsel (and, if necessary, one local counsel) and one financial advisor)) to the extent permitted under the Prepetition Cash Flow

74

(Page | 75)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Documents and/or any existing engagement letter (the "**Cash Flow Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 20 of this Interim Order.

(g)    *Prepetition Secured Notes Adequate Protection Liens*.  The Prepetition Secured Notes Trustee is hereby granted, for the benefit of itself and the other Prepetition Secured Notes Secured Parties, effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or other agreements, or by possession or control, to the extent of any of the Prepetition Secured Notes Secured Parties' Diminution in Value, a valid, perfected replacement security interest and lien upon all of the DIP Collateral (the "**Secured Notes Adequate Protection Liens**," and together with the ABL Adequate Protection Liens and the Cash Flow Adequate Protection Liens, the "**Adequate Protection Liens**"), in each case in the order of priority as set forth in **Exhibit 3** and not subject to any other liens or encumbrances.

(h)    *Prepetition Secured Notes Secured Parties' 507(b) Claim*.  The Prepetition Secured Notes Trustee, for the benefit of itself and the other Prepetition Secured Notes Secured Parties, is hereby granted an allowed superpriority administrative expense claim against the DIP Obligors on a joint and several basis (without the need to file any proof of claim) pursuant to section 507(b) of the Bankruptcy Code (the "**Secured Notes 507(b) Claim**," and together with the ABL 507(b) Claim and the Cash Flow 507(b) Claim, the "**Adequate Protection 507(b) Claims**"), subject to the Prepetition Debt Documents and any turnover provisions contained therein, to the extent of any of the Prepetition Secured Notes Secured Parties' Diminution in Value, which

75

(Page | 76)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Secured Notes 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions and Recovery Actions, but including, without limitation, subject to entry of the Final Order granting such relief, the Avoidance/Recovery Proceeds).  The Secured Notes 507(b) Claim shall be *pari passu* with the Cash Flow 507(b) Claim but senior to all other claims against the DIP Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in or ordered pursuant to sections 105, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a) (other than section 507(a)(1)), 507(b), 546(c), 1113, and 1114 of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, subject and subordinate only to:  (i) the Carve Out; (ii) the DIP Superpriority Claims; and (iii) the ABL 507(b) Claim with respect to ABL Priority Collateral. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, until the payment in full in cash of all Prepetition ABL Obligations and the Adequate Protection Obligations owing to the Prepetition ABL Secured Parties, no Adequate Protection 507(b) Claim (other than the ABL 507(b) Claim) shall be payable from, or have recourse to, the ABL Priority Collateral.

(i)      *Prepetition Secured Notes Secured Parties Fees and Expenses*.  Subject and subordinate to the Carve Out, as further adequate protection, the DIP Obligors shall currently pay to the Secured Ad Hoc Group Advisors and the Prepetition Secured Notes Trustee, in cash, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Secured Ad Hoc Group Advisors and the Prepetition Secured Notes Trustee and legal advisors

(Page | 77)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

counsel to the Prepetition Secured Notes Trustee (which shall be limited to one counsel (and, if necessary, one local counsel)) to the extent permitted under the Prepetition Secured Notes Documents (the "**Secured Notes Adequate Protection Fees and Expenses**"), subject to the review procedures set forth in paragraph 20 of this Interim Order.

(j)    Subject to paragraph 9(f), in the event the Restructuring Support Agreement is terminated in accordance with its terms, Holders of Prepetition Cash Flow Obligations or Prepetition Secured Notes Obligations who are signatories to the Restructuring Support Agreement shall be entitled to request additional or different adequate protection or to move to vacate the automatic stay, and the Debtors consent to any such relief being heard on an emergency basis; *provided* that the Debtors' rights to object to any such relief are fully preserved.  For the avoidance of doubt, nothing in this Interim Order shall prejudice, limit, or otherwise impair the right of the Prepetition ABL Secured Parties to request new, different, or additional adequate protection or assert any other right.

(k)    *Postpetition Interest Payments*.  Subject and subordinate to the Carve Out, as further adequate protection, from and after the Petition Date, (i) for the benefit of the Prepetition Cash Flow Agent and the Prepetition Secured Notes Trustee, on behalf of the applicable Prepetition Secured Parties, interest shall accrue, on a non-cash basis, on the Prepetition Cash Flow Obligations and the Prepetition Secured Notes Obligations, respectively, under the Prepetition Cash Flow Documents and the Prepetition Secured Notes Documents, respectively, in each case at the applicable non-default rate of interest provided for thereunder, and (ii) the Debtors shall pay

77

| (Page | 78) | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

in cash on a current basis the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, all interest accruing before or after the Petition Date at the default interest rate provided for under the Prepetition ABL Facility Credit Agreement.

16.     *Adequate Protection Information Rights*.   The Debtors shall provide to the Prepetition Representatives at the same time as such reporting is provided to the DIP Secured Parties all reporting required to be provided to the DIP Secured Parties under the DIP Documents, including, for the avoidance of doubt, reporting concerning the Approved Budget and any variances thereto permitted under the DIP Documents.  Upon any or all DIP Obligations being paid in full, the Prepetition Secured Parties shall continue to be entitled to such reporting rights unless and until the applicable Prepetition Secured Obligations of the applicable Prepetition Secured Party are also paid in full.

17.     *Maintenance of Collateral*.  The DIP Obligors shall continue to maintain and insure the Prepetition Collateral and the DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Debt Documents and the DIP Documents, as applicable.

18.     *Perfection of DIP Liens and Adequate Protection Liens*.

(a)     Without in any way limiting the validity of the automatic perfection of the DIP Liens and the Adequate Protection Liens by the entry of this Interim Order, the DIP Secured Parties and the Prepetition Secured Parties are hereby irrevocably authorized, but not required, to execute in the name of the DIP Obligors, the Debtors, or the Prepetition Obligors (as applicable), as their true and lawful attorneys (with full power of substitution, to the maximum extent permitted

78

(Page | 79)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

by law) and to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar perfection instruments in any jurisdiction, or take possession of and notate certificated securities or certificates of title, or take any other similar action in a manner not inconsistent herewith to document, validate, or perfect the liens and security interests granted to them hereunder in any jurisdiction (the "**Perfection Actions**").  All such Perfection Actions shall be deemed to have been taken on the date of entry of this Interim Order.  The automatic stay is hereby modified to the extent necessary to permit each of the DIP Representatives and each of the Prepetition Representatives to take any Perfection Action.  For the avoidance of doubt, the DIP Liens and the Adequate Protection Liens (including any liens granted as part of the Prepetition ABL Cash Collateral Covenants) are, and will be deemed to be, valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination, at the time and on the date of entry of this Interim Order, whether or not the DIP Secured Parties or the Prepetition Secured Parties take any such Perfection Actions.

(b)      A certified copy of this Interim Order may, in the discretion of the each DIP Representatives and each Prepetition Representative, be filed or recorded in the filing or recording offices in addition to or in lieu of any financing statements, mortgages, notices of lien, or similar instruments, and all filing and recording offices are hereby authorized to accept a certified copy of this Interim Order for filing and/or recording, as applicable.

79

| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
|---|---|
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

19. *Preservation of Rights Granted by and Under this Interim Order.*

(a) Other than the claims and liens expressly granted or permitted by this Interim Order, including, for the avoidance of doubt, the Carve Out, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as a result of operation of law or otherwise expressly provided in or permitted under this Interim Order or the DIP Documents, the DIP Liens, and the Adequate Protection Liens shall not be: (i) junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest heretofore or hereinafter granted in any of these Chapter 11 Cases or any Successor Cases, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date; or (iv) junior to any intercompany liens or security interests of the DIP Obligors.

(b) The occurrence and continuance of any Event of Default shall, after written notice by each DIP Representative (acting at the direction of the Required DIP Lenders) to the Borrowers, counsel to the Borrowers, the U.S. Trustee, and lead counsel to the Creditors' Committee (if any) constitute an event of default under this Interim Order and, upon such notice, default interest shall accrue and be payable as set forth in the DIP Documents. Notwithstanding any order that may be entered dismissing any of these Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting these Chapter 11 Cases to cases to a Successor Case: (i) each of

(Page | 81)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

the liens, claims, and security interests provided to the DIP Secured Parties or the Prepetition Secured Parties from time to time shall continue in full force and effect, shall maintain their priorities as provided in this Interim Order, and shall remain binding on all parties in interest until all of the DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash; (ii) the other rights and remedies granted by this Interim Order, including with respect to the Carve Out, shall not be affected; and (iii) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect: (i) the validity, priority, or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Representatives or the Prepetition Representatives, as applicable, of the effective date of such reversal, modification, vacatur, or stay; or (ii) the validity, priority, and enforceability of the DIP Liens, the Adequate Protection Liens, and the Carve Out.  Notwithstanding any such reversal, modification, vacatur, or stay, the DIP Obligations, DIP Liens, the Adequate Protection Obligations, the Adequate Protection Liens, the DIP Superpriority Claims, and the Adequate Protection 507(b) Claims incurred prior to the actual receipt of written notice by the DIP Representatives or the Prepetition Representatives, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the

(Page | 82)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges, and benefits arising under sections 364(e) and 363(m) of the Bankruptcy Code.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection 507(b) Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by this Interim Order and the DIP Documents, as well as the Carve Out, shall survive, and shall not be modified, impaired, or discharged by the entry of an order: (i) terminating the joint administration of these Chapter 11 Cases; (ii) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code; or (iii) confirming a chapter 11 plan in any of the cases.  The terms and provisions of this Interim Order and the DIP Documents shall continue in full force and effect in these Chapter 11 Cases and in any Successor Cases until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full in cash, and the commitments under the DIP Facility have been terminated.  Any confirmation order entered in these Chapter 11 Cases shall not discharge or otherwise affect in any way the joint and several obligations of the DIP Obligors to the DIP Secured Parties under the DIP Facility and the DIP Documents, other than after the indefeasible payment in full and in cash of all DIP Obligations and the termination of all commitments under the DIP Facility, respectively.

20.     *Payment of Fees and Expenses*.  The DIP Obligors are authorized and directed to pay the DIP Professional Fees, the ABL Adequate Protection Fees and Expenses, the Cash Flow Adequate Protection Fees and Expenses, and the Secured Notes Adequate Protection Fees and

(Page | 83)
Debtors:          MULTI-COLOR CORPORATION, *et al.*
Case No.          26-10910 (MBK)
Caption of Order:  Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                   Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                   Administrative Expense Claims, (II) Granting Adequate Protection to
                   Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                   (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

Expenses, which shall not be subject to allowance or review by the Court. Professionals with

respect to such fees and expenses shall not be required to comply with the U.S. Trustee fee

guidelines with respect to such fees and expenses, including, without limitation, with respect to

any DIP Professional Fees; *provided*, *however*, that any time that such professionals seek payment

of fees and expenses, which were incurred on or after the Petition Date, from the Debtors prior to

confirmation of a chapter 11 plan, each such professional shall provide summary copies of its

invoices (including aggregate amounts of fees and expenses and total amount of time on a

per-professional basis), which are not required to contain time detail and which may be redacted

or modified to the extent necessary to delete any information subject to the attorney-client

privilege, any information constituting attorney work product, or any other confidential

information, to the DIP Obligors, counsel to any statutory committee, and the U.S. Trustee

(collectively, the "**Review Parties**"); *provided, further*, *however*, that the provision of such

invoices shall not constitute a waiver of the attorney client privilege or of any benefits of the

attorney work product doctrine or any other evidentiary privilege or protection recognized under

applicable law. Any objections raised by any Review Party with respect to such invoices must be

in writing and state with particularity the grounds therefor and must be submitted to the applicable

professional within ten (10) calendar days after receipt (the "**Review Period**"). If no written

objection is received by 12:00 p.m., prevailing Eastern Time, on the last date of the Review Period,

the Debtors shall pay such invoices within five (5) business days thereafter. If an objection to a

professional's invoice is received within the Review Period, the Debtors shall pay the undisputed

83

(Page | 84)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

amount of the invoice within five (5) business days after the end of the Review Period without the necessity of filing formal fee applications, regardless of whether the invoiced amount arose or was incurred before or after the Petition Date, and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtors are authorized and directed to pay, on or prior to the Closing Date (as defined in the DIP Documents), any costs, fees, expenses (including reasonable and documented legal fees and expenses), and other compensation required by the DIP Documents. No attorney or advisor to any DIP Secured Party or Prepetition Secured Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Subject to entry of the Final Order granting such relief, any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to (i) the DIP Secured Parties in connection with the DIP Facility and (ii) the Prepetition Secured Parties in connection with these Chapter 11 Cases, are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement, or any similar form of recovery by the Debtors or any other person.

21.     *Effect of Stipulations on Third Parties*.  Subject to the Challenge Period (as defined below), the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including the releases set forth in paragraph G(xiv), shall be binding upon the Debtors in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in these

84

(Page | 85)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless (a) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than:  (i) the earlier of (A)(x) as to the Creditors' Committee, if any, and all other parties in interest (excluding the following sub-clause (y)) 75 calendar days after the entry of this Interim Order, and, (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (1) 75 calendar days after entry of this Interim Order or (2) the date that is 30 calendar days after their appointment and (B) the date of an order confirming the Debtors' chapter 11 plan; and (ii) any such later date as (A) has been agreed to in writing by the Prepetition ABL Agent with respect to the Prepetition ABL Obligations or the Prepetition ABL Liens, (B) has been agreed to in writing by the Prepetition Cash Flow Agent with respect to the Prepetition Cash Flow Obligations or the Prepetition Cash Flow Liens, (C) has been agreed to in writing by the Prepetition Secured Notes Trustee with respect to the Prepetition Secured Notes Obligations or the Prepetition Secured Notes Liens, or (D) has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(ii), the "**Challenge Period**"), (x) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Secured Obligations or the

(Page | 86)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Prepetition Liens or (y) asserting or prosecuting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, the "**Challenges**") against any Prepetition Secured Parties or any of their respective shareholders (regardless of whether such interests are held directly or indirectly), and each of such entity's current and former members, subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, independent contractors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, managed accounts or funds, management companies, fund advisors, partners (including both general and limited partners), and other professionals, and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "**Representatives**") in connection with or related to the Prepetition Debt Documents, the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Collateral, and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; *provided*, *however*, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever and fully waived, released, and barred. If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge then:  (i) the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order shall be binding on all parties in interest; (ii) the obligations of the Prepetition Obligors under the Prepetition Debt Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment,

(Page | 87)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

recharacterization, subordination (whether equitable, contractual, or otherwise, except as provided in the Intercreditor Agreements), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in these Chapter 11 Cases and any Successor Case(s); and (iii) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than as provided in the Intercreditor Agreements), or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives shall be deemed forever and fully waived, released, and barred. If any Challenge is timely filed during the

(Page | 88)
Debtors:              MULTI-COLOR CORPORATION, *et al*.
Case No.              26-10910 (MBK)
Caption of Order:     Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                      Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                      Administrative Expense Claims, (II) Granting Adequate Protection to
                      Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                      (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

Challenge Period, the stipulations, admissions, agreements, and releases contained in this Interim

Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this

paragraph) on each person or entity, except to the extent that such stipulations, admissions,

agreements, and releases were expressly and successfully challenged in such Challenge as set forth

in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order

vests or confers on any person or entity (each as defined in the Bankruptcy Code), including any

statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or

authority to pursue any claim or cause of action belonging to the Debtors or their estates, including,

without limitation, any Challenges with respect to the Prepetition Debt Documents, the Prepetition

Secured Obligations, the Prepetition Collateral, or the Prepetition Liens, and any ruling on

standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization

in these Chapter 11 Cases.  The Court may fashion any appropriate remedy following a successful

Challenge; *provided* that no such remedy shall affect the validity, priority, or any other aspect of

the DIP Obligations or the DIP Liens.

22.     *Limitation on Use of Proceeds of DIP Facility, Collateral, and Carve Out*.

Notwithstanding any other provision of this Interim Order or any other order entered by the Court,

without the prior written consent of (v) the Required DIP Lenders solely with respect to the DIP

Secured Parties, the DIP Obligations, and the DIP Liens, (w) the Required Lenders (as defined in

the Prepetition ABL Credit Agreement) solely with respect to the Prepetition ABL Secured Parties,

the Prepetition ABL Obligations, the Prepetition ABL Liens, and the related Adequate Protection

88

(Page | 89)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

granted in favor of the Prepetition ABL Secured Parties, (y) the Required Lenders (as defined in the Prepetition Cash Flow Documents) solely with respect to the Prepetition Cash Flow Secured Parties, the Prepetition Cash Flow Obligations, and the Prepetition Cash Flow Liens, and (z) the Prepetition Secured Notes Trustee (as defined in the Prepetition Secured Notes Documents) solely with respect to the Prepetition Secured Notes Secured Parties, the Prepetition Secured Notes Obligations, and the Prepetition Cash Flow Liens, in each case, as applicable, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral (including, without limitation, Cash Collateral), or any portion of the Carve Out or any professional fee escrow account (and any amounts therein), nor any of the loans, financial accommodations, or proceeds of any of the foregoing, may be used by any person or entity at any time, directly or indirectly, including, without limitation, through reimbursement of professional fees of any non-Debtor party, in connection with any: (a) investigation, threatened initiation, or prosecution of any claims, causes of action, adversary proceedings, contested matters, or other litigation, including, without limitation, any Challenge, (i) against any of the DIP Secured Parties or the Prepetition Secured Parties, or their respective Representatives, or any action purporting to do the foregoing in respect of the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Obligations, the Adequate Protection Liens, the Adequate Protection 507(b) Claims, or other Adequate Protection Obligations or (ii) challenging the amount, validity, perfection, priority, extent, or enforceability of, or asserting any defense, counterclaim, or offset with respect to, any of the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition Secured Obligations,

89

(Page | 90)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

the Prepetition Liens, or the Prepetition Debt Documents, and/or any of the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under the DIP Orders and the DIP Documents or the Prepetition Debt Documents in respect of the Prepetition Secured Obligations, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; *provided* that, notwithstanding anything to the contrary herein, the proceeds of the DIP Facility and Cash Collateral may each be used by the Creditors' Committee, if any, to investigate, but not to prosecute, (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action, or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $100,000; (b) attempts to prevent, hinder, or otherwise delay or interfere with any of the Prepetition Secured Parties' or the DIP Secured Parties' administration, enforcement, or realization on all or any portion of the Prepetition Secured Obligations, the Prepetition Collateral, the DIP Obligations, or the DIP Collateral, as applicable, or any of the liens, claims, and rights granted to such parties under the DIP Orders, the Prepetition Debt Documents, the DIP Documents or applicable law; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties or the DIP Secured Parties under this Interim Order, the Prepetition Debt Documents, the DIP Documents, as applicable, other than in accordance with this Interim Order; (d) attempts to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims permitted by the DIP Documents) or security interests in the DIP Collateral or any portion

90

(Page | 91)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

thereof that are senior to, or on parity with, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection 507(b) Claims, any other Adequate Protection Obligation, the Prepetition Liens, or any of the Prepetition Secured Obligations; or (e) attempts to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are authorized by the Court, including pursuant to any orders approving relief sought in "first day" motions, agreed to in writing by the Required DIP Lenders and the DIP Representatives, expressly permitted under this Interim Order or under the DIP Documents (including the Approved Budget, subject to permitted variances under the DIP Documents) and the DIP Documents, in each case unless all of the DIP Obligations, the Prepetition Secured Obligations, the Adequate Protection Obligations, and claims granted to the DIP Secured Parties and the Prepetition Secured Parties under this Interim Order, have been indefeasibly paid in full in cash or otherwise agreed to in writing by the Required DIP Lenders and the DIP Representatives (at the direction of the Required DIP Lenders).

23.     *Letters of Credit.*

(a)     The Debtors and any applicable letter of credit providers, including any Prepetition ABL Secured Parties, are authorized, but not required or directed, to extend, renew, or replace any letters of credit issued prior to the Petition Date that may expire during these Chapter 11 Cases or issue new letters of credit during these Chapter 11 Cases in accordance with the terms of the DIP Documents, and pursuant to, as applicable, the Prepetition ABL Loan Documents or any standalone letter of credit agreements with applicable issuers, including any

91

(Page | 92)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

Prepetition ABL Secured Parties. The Debtors are also authorized, but not directed, to take any reasonable related actions, including pledging cash collateral in an amount that is mutually agreed to by the Debtors and an Issuing Bank in support of any new letters of credit and granting any related security interests and paying any related fees. For the avoidance of doubt, no Prepetition ABL Secured Party or any other Prepetition Secured Party is required to extend, renew, or replace any letters of credit. To the extent the beneficiary of a Letter of Credit (as defined in the Prepetition ABL Credit Agreement) issued by an Issuing Bank (as defined in the Prepetition ABL Credit Agreement) draws on the Letter of Credit during the pendency of the Chapter 11 Cases, then the Issuing Bank is permitted, without either having to first seek relief from the automatic stay or any other form of supplementary relief from the Court, to exercise any and all remedies under the Prepetition ABL Loan Documents against any cash collateral that is pledged as contemplated by this paragraph 23(a) provided to the Prepetition ABL Agent in order to make itself whole with regard to any amounts it paid to the beneficiary of the subject Letter of Credit.

(b)     For the avoidance of doubt, the Debtors' obligations to the Prepetition ABL Secured Parties related to any such Letter of Credit shall be secured by the ABL Priority Collateral as well as any cash collateral provided by the Debtors pursuant to the terms of this Interim Order, which cash collateral shall be free and clear of any liens, except for liens in favor of the Prepetition ABL Secured Parties.

24.     *Interim Order Governs*. In the event of any inconsistency between the provisions of this Interim Order, the DIP Documents, or the Prepetition Debt Documents, the provisions of

92

(Page | 93)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

this Interim Order shall govern. Any authorization contained in any other order entered by the Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget (subject to any permitted variances under the DIP Documents).

25.    *Binding Effect; Successors and Assigns*.  Subject to paragraph 21 hereof, the DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties, the Debtors, and their respective successors and assigns; *provided* that none of the DIP Secured Parties or the Prepetition Secured Parties shall have any obligation to (and none of them are hereby agreeing or consenting to) permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee or chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

26.    *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral

93

(Page | 94)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(including Cash Collateral), or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the Prepetition Debt Documents, or applicable law, as applicable, none of the DIP Secured Parties or the Prepetition Secured Parties shall: (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective Representatives. The DIP Secured Parties and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or the Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and all risk of loss, damage or destruction of all or any portion of the DIP Collateral or the Prepetition Collateral shall be borne by the Debtors.

94

(Page | 95)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

27.      *Master Proofs of Claim*. Neither the Prepetition Representatives nor any other Prepetition Secured Parties shall be required to file proofs of claim in these Chapter 11 Cases or any Successor Cases in order to assert claims for payment of any of the Prepetition Secured Obligations, including, without limitation, any principal, unpaid interest, fees, expenses, and other amounts payable under the Prepetition Debt Documents. The description of claims and liens in respect of the Prepetition Secured Obligations set forth in this Interim Order is deemed to constitute timely proofs of claim in respect of such indebtedness and its secured status. However, without limiting the foregoing, in order to facilitate the processing of claims, each Prepetition Representative is authorized, but not directed or required, to file a master proof of claim in the Debtors' lead case *In re Multi-Color Corporation, et al., Case No. 26-10910*, on behalf of the applicable Prepetition Secured Parties (each, a "**Master Proof of Claim**"), which shall be deemed to have been filed against each Debtor. The provisions of this paragraph 27 and the filing of Master Proofs of Claim, if any, are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan filed in these Chapter 11 Cases. The Master Proofs of Claim shall not be required to include any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements, or other documents will be provided upon written request to counsel to the applicable Prepetition Representative. None of the DIP Secured Parties shall be required to file proofs of claim with respect to the DIP Obligations.

95

(Page | 96)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

28.    *Insurance.*  To the extent that any Prepetition Representative is listed as a loss payee under the insurance policies of any of the DIP Obligors, the DIP Representatives shall also be deemed to be a loss payee under such insurance policies until the indefeasible payment in full of the DIP Obligations (in each case, other than contingent indemnification obligations as to which no claim has been asserted) and termination of the commitments under the DIP Facility and shall act in that capacity and distribute any proceeds recovered or received in respect of such insurance policies, in each case, subject to the Carve Out and the ABL Intercreditor Agreement and in accordance with this Interim Order.

29.    *Credit Bidding*

(a)    DIP Obligations.  The DIP Representatives (acting at the direction of Required DIP Lenders under the DIP Documents) shall have the right to credit bid, up to the full amount of the DIP Obligations (except with respect to the Roll-Up DIP Loans, which shall occur upon the expiration of the Challenge Period and the rights set forth in paragraph 21 of this Interim Order with respect to such amounts) in any sale of the DIP Collateral (provided that any credit bid with respect to ABL Priority Collateral shall be subject to paragraph 8(c)), without the need for further Court order authorizing the same, whether any such sale is effectuated through section 363(k), 1123, or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

(b)    Prepetition Secured Obligations.  Subject to, (a) the entry of the Final Order granting such relief, (b) the terms and provisions of the Intercreditor Agreements and the lien

96

(Page | 97)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

priorities set forth herein and in the Intercreditor Agreements, and (c) the expiration of the Challenge Period and the rights set forth in paragraph 21 of this Interim Order, each Prepetition Representative shall have the right, consistent with the provisions of the Prepetition Debt Documents, as applicable (and providing for the DIP Obligations to be either (i) assumed or (ii) indefeasibly repaid in full in cash and the termination of all commitments under the DIP Facility, respectively), to credit bid, up to the full amount of the applicable Prepetition Secured Obligations, in the sale of the applicable Prepetition Collateral, without the need for further Court order authorizing the same, whether any such sale is effectuated through section 363(k), 1123, or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; *provided* that the Prepetition ABL Agent (at the direction of the requisite lenders under the Prepetition ABL Credit Agreement) shall have the exclusive right to credit bid the aggregate outstanding Prepetition ABL Facility Obligations, during any such sale, on a dollar-for-dollar basis in connection with any sale of ABL Priority Collateral.

(c)     If any sale includes both prepetition or postpetition ABL Priority Collateral and Term/Note Priority Collateral and the DIP Secured Parties and the applicable Prepetition Secured Parties are unable, after negotiating in good faith, to agree on the allocation of the purchase price between the prepetition or postpetition ABL Priority Collateral and Term/Note Priority Collateral, then any of their respective agents may apply to the Court to make a determination of such allocation consistent with the terms of the applicable Prepetition Intercreditor Agreements, this Interim Order, and the Final Order.

97

(Page | 98)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

(d)      The DIP Representatives and any of the Prepetition Agents shall have the absolute right to assign, sell, or otherwise dispose of their respective rights to credit bid as set forth in paragraph 29(a) or (b) to any acquisition entity or joint venture formed in connection with such bid.  Any of the DIP Representatives and the Prepetition Representatives, in their respective capacities as such, shall be deemed to be a qualified bidder (or such analogous term or capacity) in connection with any sale, and the Debtors shall not object to any of the DIP Representatives or the Prepetition Representatives credit bidding (to the extent of such right pursuant to paragraph 29(a) or (b)) the full amount of the then outstanding DIP Obligations or respective Prepetition Secured Obligations (including any Adequate Protection Obligations, as applicable), respectively.

30.      *Real Property Leases*.  Notwithstanding anything in this Order or the Loan Documents to the contrary, in no event shall DIP Collateral include:  (a) any leasehold interest in non-residential real property where the lease prohibits or restricts the granting of liens thereon, but shall include the proceeds of the sale or other disposition of such leases, (b) any security deposits held by a landlord under any non-residential real property lease or the Debtors' interest in any pre-paid rent under any such lease (but shall include the Debtor's reversionary interests therein), to the extent prohibited under such lease or applicable law, and (c) any insurance proceeds for damage to a landlord's property.

31.      *Modification of Automatic Stay*.  The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified to the extent necessary to effectuate all of the terms and

98

(Page | 99)
Debtors:          MULTI-COLOR CORPORATION, *et al.*
Case No.          26-10910 (MBK)
Caption of Order:   Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                  Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                  Administrative Expense Claims, (II) Granting Adequate Protection to
                  Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                  (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant

the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate

Protection 507(b) Claims; (b) permit the Debtors to perform such acts as the DIP Representatives

or the Prepetition Representatives may reasonably request to assure the perfection and priority of

the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP

Secured Parties and the Prepetition Secured Parties under this Interim Order; (d) authorize the

Debtors to pay, and the DIP Secured Parties and the Prepetition Secured Parties to retain and apply,

any payments made in accordance with the terms of this Interim Order; and (e) permit the DIP

Representatives and the Prepetition Representatives, subject to the terms of this Interim Order, to

exercise all rights and remedies provided for hereunder.

32.    *Effectiveness*.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d),

7062, or 9014, any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim

Order shall be immediately effective and enforceable upon its entry and there shall be no stay of

execution or effectiveness of this Interim Order.

33.    *Governing Order*.  Notwithstanding the relief granted in any other order by the

Court, (a) all payments and actions by any of the Debtors pursuant to the authority granted therein

shall be subject to this Interim Order, including compliance with the Approved Budget (subject to

permitted variances under the DIP Documents) and all other terms and conditions hereof, and

(b) to the extent there is any inconsistency between the terms of such other order and this Interim

99

(Page | 100)
Debtors:            MULTI-COLOR CORPORATION, *et al.*
Case No.            26-10910 (MBK)
Caption of Order:   Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                    Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                    Administrative Expense Claims, (II) Granting Adequate Protection to
                    Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                    (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

Order, this Interim Order shall control, in each case, except to the extent expressly provided otherwise in the other order.

34.    *Headings*.  Paragraph headings used herein are for convenience only and shall not affect the construction of, or to be taken into consideration in interpreting, this Interim Order.

35.    *Payments Held in Trust*.  Subject to the Carve Out and paragraph 8(c) hereof, except as expressly permitted in this Interim Order or the DIP Documents and except with respect to the DIP Obligors, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral, receives any DIP Collateral or any proceeds of the DIP Collateral, or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all commitments under the DIP Facility, such person or entity shall be deemed to have received, and shall hold, any such DIP Collateral or any payment on account or proceeds thereof in trust for the benefit of the DIP Secured Parties and shall immediately turn over such collateral or its proceeds to the DIP Representatives, or as otherwise instructed by the Court, for application in accordance with the DIP Documents and this Interim Order.

36.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

37.    *No Third-Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary, which rights are hereby expressly disclaimed.

100

(Page | 101)

| | |
|---|---|
| Debtors: | MULTI-COLOR CORPORATION, *et al*. |
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

38.    *Reservation of Rights*.  The Court's approval of the DIP financing does not constitute a final adjudication of any contractual disputes among lenders, nor does it foreclose the ability of parties to raise appropriate arguments in a proper forum to the extent those issues remain justiciable. The respective rights of the Excluded Lenders  and other similarly situated lenders to pursue available contract rights and remedies is expressly reserved hereunder.

39.    *Necessary Action*.  The Debtors, the DIP Secured Parties, and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Interim Order.  The automatic stay is modified to permit affiliates of the Debtors who are not debtors in these Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

40.    *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and such retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

41.    *Final Hearing*.  The Final Hearing to consider the relief requested in the DIP Motion on a final basis shall be held on **March 3, 2026, at 10:00 a.m.** (prevailing Eastern Time).

(Page | 102)

| Debtors: | MULTI-COLOR CORPORATION, *et al.* |
|---|---|
| Case No. | 26-10910 (MBK) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief |

42.    *Objections*.  Any objections or responses to the relief requested in the DIP Motion on a final basis shall be filed on or prior to February 24, 2026, at 4:00 p.m. (prevailing Eastern Time). Any party objecting to such relief shall file and serve (via e-mail) written objections, which objections shall be served upon (i) the Debtors, Multi-Color Corporation, 3284 Northside Parkway NW, Suite 400, Atlanta, Georgia 30327, Attn.:  Garrett Gabel (garrett.gabel@mcclabel.com) and Linn Harson (linn.harson@mcclabel.com); (ii) proposed co-counsel to the Debtors, (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Steven N. Serajeddini, P.C. (steven.serajeddini@kirkland.com), and Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attn.:  Rachael M. Bentley (rachael.bentley@kirkland.com), Peter A. Candel (peter.candel@kirkland.com), and Ashley L. Surinak (ashley.surinak@kirkland.com) and (b) Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn.: Michael D. Sirota (msirota@coleschotz.com), Warren A. Usatine (wusatine@coleschotz.com), and Felice R. Yudkin (fyudkin@coleschotz.com); (iii) counsel to any statutory committee appointed in these chapter 11 cases; (iv) counsel to the Sponsor and the Plan Sponsor, (a) Debevoise & Plimpton LLP, 66 Hudson Boulevard, New York, New York 10001, Attn.: Scott B. Selinger (sbselinger@debevoise.com) and Brett Novick (bmnovick@debevoise.com) and (b) Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020, Attn.: Ray C. Schrock (ray.schrock@lw.com), Ryan P. Dahl (ryan.dahl@lw.com), and Candace M.

(Page | 103)

Debtors:            MULTI-COLOR CORPORATION, *et al.*
Case No.            26-10910 (MBK)
Caption of Order:   Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition
                    Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority
                    Administrative Expense Claims, (II) Granting Adequate Protection to
                    Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay,
                    (IV) Scheduling a Final Hearing, and (V) Granting Related Relief

Arthur (candace.arthur@lw.com); (v) counsel to the Secured Ad Hoc Group, Milbank LLP, 55

Hudson Yards, New York, New York 1001, Attn.: Evan Fleck (efleck@milbank.com) and Matt

Brod (mbrod@milbank.com); (vi) counsel to the Prepetition ABL Agent and the Prepetition

Cash Flow Agent, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, New York 10005,

Attn.: Timothy B. Howell (thowell@cahill.com), Joel Moss (jmoss@cahill.com), Amit Trehan

(atrehan@cahill.com), and Jordan Wishnew (jwishnew@cahill.com); (vii) counsel to the DIP

Representatives, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York,

NY 10019, Attn.: Jeffrey R. Gleit (Jeffrey.gleit@afslaw.com); and (viii) the Office of the United

States Trustee for the District of New Jersey, One Newark Center, 1085 Raymond Boulevard,

Suite 2100, Newark, New Jersey 07102, Attn.: Jeffrey M. Sponder

(jeffrey.m.sponder@usdoj.gov) and Jane M. Leamy (jane.m.leamy@usdoj.gov).

43.      The Debtors shall promptly serve copies of this Interim Order (which shall

constitute adequate notice of the Final Hearing) on the parties having been given notice of the

Interim Hearing and to any party that has filed with the Court a request for notices in these

Chapter 11 Cases.

Dated: _____, 2026
        Trenton, New Jersey

                                    UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

## DIP Credit Agreement

Case 26-10900-MBK Doc 106 Filed 02/02/26 Entered 02/02/26 17:28:34 Desc Main

*Filing Version*

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

LABELS BUYER, LLC, as Topco Borrower

and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

LABL ACQUISITION CORPORATION, as Holdings

and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

LABL, INC., as Intermediate Holdings

and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
and

MCC MANUFACTURING, INC., and

MULTI-COLOR CORPORATION, each as a Subsidiary Borrower

and as Debtors and Debtors-In-Possession Under Chapter 11 of the Bankruptcy Code,

The Lenders
From Time to Time Party Hereto,

ACQUIOM AGENCY SERVICES LLC
and
SEAPORT LOAN PRODUCTS LLC,
as Co-Administrative Agents,

ACQUIOM AGENCY SERVICES LLC,
as Collateral Agent,

dated as of February 2, 2026

Table of Contents

Page

SECTION 1

DEFINITIONS

1.1   Defined Terms ................................................................................................. 2
1.2   Other Definitional and Interpretive Provisions .......................................... 57
1.3   Borrower Representative ............................................................................. 59

SECTION 2

AMOUNT AND TERMS OF COMMITMENTS

2.1   The Loans ..................................................................................................... 59
2.2   Notes ............................................................................................................ 62
2.3   Procedure for Term Loan Borrowing ......................................................... 62
2.4   Commitment to Backstop ............................................................................ 63
2.5   Borrowers Repayment of Loans .................................................................. 63
2.6   Syndication .................................................................................................. 64
2.7   Acceptable Plan. ......................................................................................... 67
2.8   Incremental Facility .................................................................................... 68

SECTION 3

[RESERVED]

SECTION 4

GENERAL PROVISIONS APPLICABLE TO LOANS

4.1   Interest Rates and Payment Dates .............................................................. 69
4.2   Conversion and Continuation Options ........................................................ 70
4.3   Minimum Amounts; Maximum Sets ........................................................... 71
4.4   Optional and Mandatory Prepayments ....................................................... 71
4.5   Administrative Agent's Fee; Other Fees and Premiums ............................. 74
4.6   Computation of Interest and Fees ............................................................... 74
4.7   Inability to Determine Interest Rate ........................................................... 75
4.8   Pro Rata Treatment and Payments .............................................................. 75
4.9   Illegality ...................................................................................................... 77
4.10  Requirements of Law .................................................................................. 77
4.11  Taxes ........................................................................................................... 79
4.12  Indemnity .................................................................................................... 84

(i)

Table of Contents
(Continued)

|  |  | Page |
|---|---|---|
| 4.13 | Certain Rules Relating to the Payment of Additional Amounts | 85 |
| 4.14 | [Reserved] | 87 |

## SECTION 5

## REPRESENTATIONS AND WARRANTIES

| 5.1 | [Reserved] | 87 |
|---|---|---|
| 5.2 | No Change | 87 |
| 5.3 | Corporate Existence; Compliance with Law | 88 |
| 5.4 | Corporate Power; Authorization; Enforceable Obligations | 88 |
| 5.5 | No Legal Bar | 88 |
| 5.6 | No Material Litigation | 89 |
| 5.7 | No Default | 89 |
| 5.8 | Ownership of Property; Liens | 89 |
| 5.9 | Intellectual Property | 89 |
| 5.10 | Taxes | 89 |
| 5.11 | Federal Regulations | 90 |
| 5.12 | ERISA | 90 |
| 5.13 | Collateral | 91 |
| 5.14 | Investment Company Act; Other Regulations | 91 |
| 5.15 | Subsidiaries | 91 |
| 5.16 | Use of Proceeds | 91 |
| 5.17 | Environmental Matters | 92 |
| 5.18 | No Material Misstatements | 92 |
| 5.19 | Labor Matters | 93 |
| 5.20 | Chapter 11 Cases; Orders | 93 |
| 5.21 | Anti-Terrorism | 94 |

## SECTION 6

## CONDITIONS PRECEDENT

| 6.1 | Conditions to the Closing Date; Interim Term Loans | 94 |
|---|---|---|
| 6.2 | Conditions to Final Term Loans; Final Borrowing Date | 96 |
| 6.3 | Conditions to Effectiveness of this Agreement | 97 |

## SECTION 7

## AFFIRMATIVE COVENANTS

| 7.1 | Financial Statements | 98 |
|---|---|---|
| 7.2 | Certificates; Other Information | 100 |

Table of Contents
(Continued)

Page

| | | |
|---|---|---|
| 7.3 | Payment of Taxes | 101 |
| 7.4 | Conduct of Business and Maintenance of Existence; Compliance with Contractual Obligations and Requirements of Law | 101 |
| 7.5 | Maintenance of Property; Insurance | 101 |
| 7.6 | Inspection of Property; Books and Records; Discussions | 102 |
| 7.7 | Notices | 102 |
| 7.8 | Environmental Laws | 104 |
| 7.9 | After-Acquired Subsidiaries | 104 |
| 7.10 | Use of Proceeds | 106 |
| 7.11 | Commercially Reasonable Efforts to Maintain Ratings | 106 |
| 7.12 | Accounting Changes | 106 |
| 7.13 | Post-Closing Obligations | 106 |
| 7.14 | Certain Bankruptcy Matters (Compliance with Orders) | 107 |
| 7.15 | Bankruptcy Notices | 107 |
| 7.16 | Insolvency Proceedings | 107 |
| 7.17 | Milestones | 108 |

## SECTION 8

## NEGATIVE COVENANTS

| | | |
|---|---|---|
| 8.1 | Limitation on Indebtedness | 108 |
| 8.2 | Limitation on Restricted Payments | 110 |
| 8.3 | Limitation on Restrictive Agreements | 112 |
| 8.4 | Limitation on Sales of Assets and Subsidiary Stock | 113 |
| 8.5 | Limitations on Transactions with Affiliates | 114 |
| 8.6 | Limitation on Liens | 115 |
| 8.7 | Limitation on Fundamental Changes | 116 |
| 8.8 | Limitation on Amendments | 116 |
| 8.9 | Limitation on Lines of Business | 116 |
| 8.10 | Priority of Liens and Claims | 116 |
| 8.11 | Additional Bankruptcy Matters | 117 |
| 8.12 | Budget Variance Covenant | 118 |
| 8.13 | Material Adverse Changes to Organizational Documents | 118 |

## SECTION 9

## EVENTS OF DEFAULT

| | | |
|---|---|---|
| 9.1 | Events of Default | 119 |
| 9.2 | Remedies Upon an Event of Default | 123 |

(iii)

Table of Contents
(Continued)

SECTION 10

THE AGENTS

| | | |
|---|---|---|
| 10.1 | Appointment | 124 |
| 10.2 | The Administrative Agent and Affiliates | 125 |
| 10.3 | Action by an Agent | 125 |
| 10.4 | Exculpatory Provisions | 125 |
| 10.5 | Acknowledgement and Representations by Lenders | 127 |
| 10.6 | Indemnity; Reimbursement by Lenders | 129 |
| 10.7 | Right to Request and Act on Instructions | 130 |
| 10.8 | Collateral Matters | 130 |
| 10.9 | Successor Agent | 132 |
| 10.10 | [Reserved] | 133 |
| 10.11 | Withholding Tax | 133 |
| 10.12 | Credit Bidding | 134 |
| 10.13 | Administrative Agent May File Proofs of Claim | 135 |
| 10.14 | Application of Proceeds | 135 |
| 10.15 | Certain ERISA Matters | 136 |
| 10.16 | Interest Rates | 137 |
| 10.17 | Direction of the Required Lenders; Direction of the Required Holders | 138 |

SECTION 11

MISCELLANEOUS

| | | |
|---|---|---|
| 11.1 | Amendments and Waivers | 138 |
| 11.2 | Notices | 141 |
| 11.3 | No Waiver; Cumulative Remedies | 143 |
| 11.4 | Survival of Representations and Warranties | 143 |
| 11.5 | Payment of Expenses and Taxes | 144 |
| 11.6 | Successors and Assigns; Participations and Assignments | 146 |
| 11.7 | Adjustments; Set-off; Calculations; Computations | 157 |
| 11.8 | Judgment | 158 |
| 11.9 | Counterparts | 159 |
| 11.10 | Severability | 159 |
| 11.11 | Integration | 159 |
| 11.12 | Governing Law | 159 |
| 11.13 | Submission to Jurisdiction; Waivers | 159 |
| 11.14 | Acknowledgements | 160 |
| 11.15 | Waiver of Jury Trial | 161 |
| 11.16 | Confidentiality | 161 |

Table of Contents
(Continued)

|  |  | Page |
|---|---|---|
| 11.17 | [Reserved] | 162 |
| 11.18 | USA PATRIOT Act Notice | 162 |
| 11.19 | Electronic Execution of Assignments and Certain Other Documents | 162 |
| 11.20 | Reinstatement | 162 |
| 11.21 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 163 |
| 11.22 | Joint and Several Liability; Postponement of Subrogation | 163 |
| 11.23 | Recognition of U.S. Special Resolution Regime | 164 |
| 11.24 | Acknowledgment Regarding any Supported QFCs | 165 |
| 11.25 | Orders Controls | 165 |

SCHEDULES

| | | |
|---|---|---|
| A-1 | -- | Loan Commitments |
| A-2 | | Backstop Commitments |
| 1.1(e) | -- | Existing Investments |
| 1.1(g) | -- | Existing Liens |
| 5.4 | -- | Consents Required |
| 5.6 | -- | Litigation |
| 5.9 | -- | Intellectual Property Claims |
| 5.15 | -- | Subsidiaries |
| 5.17 | -- | Environmental Matters |
| 7.2 | -- | Website Address for Electronic Financial Reporting |
| 7.13 | -- | Post-Closing Security Perfection |
| 8.1 | -- | Existing Indebtedness |
| 8.5 | -- | Affiliate Transactions |

EXHIBITS

| | | |
|---|---|---|
| A | -- | Form of Note |
| B | -- | [Reserved] |
| C | -- | [Reserved] |
| D-1 | -- | Form of U.S. Tax Compliance Certificate (for a foreign lender that is not a flow-through entity) |
| D-2 | -- | Form of U.S. Tax Compliance Certificate (for a foreign lender that is a flow-through entity) |
| E | -- | Form of Assignment and Acceptance |
| F | -- | Form of Secretary's Certificate |
| G | -- | Form of Officer's Certificate |
| K | -- | Form of Plan Sponsor Lender Assignment and Assumption |
| L | -- | Form of Borrowing Request |
| M | -- | Form of Initial Budget |
| N | -- | Form of Compliance Certificate |
| O-1 | -- | Form of Lender Subscription Form and Election Joinder for Use by Lenders under the Prepetition Cash Flow Credit Agreement |
| O-2 | -- | Form of Lender Subscription Form and Election Joinder for Use by Holders under the Prepetition Secured Notes |

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of February 2, 2026, among LABELS BUYER, LLC, a Delaware limited liability company ("Topco Borrower"), LABL, INC., a Delaware corporation ("Intermediate Holdings"), MULTI-COLOR CORPORATION, an Ohio corporation ("Parent Borrower"), MCC Manufacturing, Inc., a Delaware corporation (the "MCC Borrower" and, together with the Parent Borrower, collectively, the "Subsidiary Borrowers"; and the Subsidiary Borrowers together with the Topco Borrower, collectively, the "Borrowers", and each individually, a "Borrower" and each as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code), LABL Acquisition Corporation, a Delaware corporation ("Holdings"), the financial institutions from time to time party hereto as Lenders (as defined below) and ACQUIOM AGENCY SERVICES LLC ("Acquiom") and SEAPORT LOAN PRODUCTS LLC ("Seaport"), as Co-Administrative Agents, and Acquiom, as Collateral Agent for the Secured Parties (as defined in Subsection 1.1).

W I T N E S S E T H:

WHEREAS, on January 29, 2026 (the "Petition Date"), the Topco Borrower, Parent Borrower, Holdings, Intermediate Holdings, the Guarantors and certain other Subsidiaries (each a "Debtor" and collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each such case, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") and have continued in the possession and operation of their assets and management of their business pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, prior to the Closing Date, the Lenders (other than the Fronting Lender) party hereto (or Affiliates thereof) provided secured financing to the Borrowers pursuant to the Prepetition Debt Documents (as defined in the Interim DIP Order), which secured financing was guaranteed by certain of the Subsidiary Guarantors;

WHEREAS, the Borrowers have requested that the Lenders provide a superpriority secured debtor-in-possession term loan credit facility in an aggregate principal amount of not less than $507.5 million (this "DIP Facility") consisting of (Dollar Term Loans and Euro Term Loans, with all of the Borrowers' obligations under the DIP Facility to be guaranteed by each Guarantor.

WHEREAS, the priority of the DIP Facility with respect to the Collateral granted to secure the DIP Facility Obligations shall be as set forth in the Loan Documents and the Interim DIP Order and the Final DIP Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

WHEREAS, all of the claims and the Liens granted under the Orders and the Loan Documents to the Secured Parties in respect of the DIP Facility shall be subject to the Carve Out.

WHEREAS, the Borrowers and the Guarantors are engaged in related businesses, and each Guarantor will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement.

WHEREAS, the Lenders are willing to extend such credit to the Borrowers on the terms and subject to the conditions set forth herein

1

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

SECTION 1

Definitions

1.1 <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings:

"<u>ABL Priority Collateral</u>": the "ABL Collateral" as defined in the Prepetition ABL/Cash Flow Intercreditor Agreement whether or not the same remains in full force and effect.

"<u>ABR Loans</u>": Loans to which the rate of interest applicable is based upon the Alternate Base Rate.

"<u>ABR Term SOFR Determination Day</u>": as defined in clause (b) of the definition of "Term SOFR Rate".

"<u>Accelerated</u>": as defined in <u>Subsection 9.1(e)</u>.

"<u>Acceleration</u>": as defined in <u>Subsection 9.1(e)</u>.

"<u>Acceptable Plan</u>" means a Chapter 11 Plan that is (i) in form and substance materially consistent with the RSA and the exhibits thereto or (ii) otherwise reasonably acceptable to the Required Consenting First Lien Lenders and the Plan Sponsor in accordance with the RSA.

"<u>Acceptable Plan Definitive Documentation</u>" means any definitive documentation, that is in form and substance satisfactory to the Required Consenting First Lien Lenders and the Plan Sponsor, which effectuates an Acceptable Plan.

"<u>Acknowledging Party</u>": as defined in <u>Subsection 11.21</u>.

"<u>Acquiom</u>": as defined in the Preamble.

"<u>Acquired Indebtedness</u>": Indebtedness of a Person (<u>i</u>) existing at the time such Person becomes a Subsidiary or (<u>ii</u>) assumed in connection with the acquisition of assets from such Person, in each case other than Indebtedness Incurred in connection with, or in contemplation of, such Person becoming a Subsidiary or such acquisition of assets. Acquired Indebtedness shall be deemed to be Incurred on the date of the related acquisition of assets from any Person or the date the acquired Person becomes a Subsidiary.

"<u>Adjusted EURIBOR Rate</u>": with respect to any Borrowing of Euro Term Loans for any Interest Period, an interest rate per annum determined by the Administrative Agent (acting at the Direction of the Required Lenders) to be equal to the higher of (<u>i</u>) (<u>x</u>) the EURIBOR Screen Rate for such Borrowing of Euro Term Loans in effect for such Interest Period <u>divided</u> by (<u>y</u>) 1 <u>minus</u> the Statutory Reserves (if any) for such Borrowing of Euro Term Loans for such Interest Period and (<u>ii</u>) 0.00%.

2

"Administrative Agent": as defined in the definition of "Co-Administrative Agents."

"Administrative Agent Fee Letter": the Fee Letter, dated on or about the Effective Date, by and among the Administrative Agent and the Borrowers, as may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Affected EURIBOR Rate": as defined in Subsection 4.7.

"Affected Financial Institution": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affected Loans": as defined in Subsection 4.9.

"Affected Term SOFR Rate": as defined in Subsection 4.7.

"Affiliate": as to any specified Person, any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Affiliate Transaction": as defined in Subsection 8.5(a).

"Agents": the collective reference to the Administrative Agent and the Collateral Agent, and "Agent" shall mean any of them.

"Agreement": this Credit Agreement, as amended, supplemented, waived or otherwise modified from time to time.

"Alternate Base Rate": for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 0.50% and (c) the sum of 1.0% plus the Term SOFR Rate for an Interest Period of one month on such day;

Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Subsection 4.7, then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above.

"Applicable Margin": in respect of (a) Dollar Term Loans (i) with respect to ABR Loans, 5.75% per annum, and (ii) with respect to Term SOFR Rate Loans, 6.75% per annum and (b) Euro Term Loans, 6.75% per annum.

"Approved Bankruptcy Court Order" means (a) each of the Orders, as such order is amended and in effect from time to time in accordance with this Agreement and (b) any order

entered by the Bankruptcy Court regarding, relating to or impacting (i) any rights or remedies of any Secured Party, (ii) the Loan Documents (including the Loan Parties' obligations thereunder), (iii) the Collateral, any Liens thereon or any Superpriority Claims (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), (iv) use of Cash Collateral, (v) debtor-in-possession financing, (vi) adequate protection granted with respect to, or otherwise relating to, any Prepetition Indebtedness, (vii) any Chapter 11 Plan or order approving a sale of all, substantially all or a material portion of the assets of any Loan Party pursuant to section 363 of the Bankruptcy Code, (viii) the assumption or rejection of contracts, and (ix) ordinary course unsecured claims, in the case of each of the foregoing clauses (i) through (vi), that (A) is in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent, as applicable (solely with respect to its own rights, obligations, liabilities, duties and treatment) and the Required Lenders, (B) has not been vacated, reversed, or stayed, and (C) has not been amended or modified except as reasonably satisfactory to the Required Lenders, and (f) with respect to any other order (including with respect to the foregoing clauses vii through (ix)), an order entered by the Bankruptcy Court that (i) is in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent, as applicable (solely with respect to its own rights, obligations, liabilities, duties and treatment) and the Required Lenders, (ii) has not been vacated, reversed, or stayed and not cured within ten (10) Business Days, and (iii) has not been amended or modified in a manner adverse to the rights of the Required Lenders in any material respect except as agreed to in writing by the Required Lenders.

"Approved Budget" means, initially, the Initial Budget, and, thereafter, the most recent Updated Budget accepted by the Required Lenders in accordance with Section 7.1(f).

"Approved Commercial Bank": a commercial bank with a consolidated combined capital and surplus of at least $5,000,000,000.

"Approved Fund": as defined in Subsection 11.6(b).

"Asset Disposition": any sale, lease, transfer, Division or other disposition of shares of Capital Stock of a Restricted Subsidiary (other than directors' qualifying shares, or (in the case of a Foreign Subsidiary) to the extent required by any applicable Requirement of Law), property or other assets (each referred to for the purposes of this definition as a "disposition") by Holdings, the, Borrowers or any of their Restricted Subsidiaries (including any disposition by means of a merger, consolidation or similar transaction) other than (i) a disposition to Borrowers, Parent Entities or Restricted Subsidiaries; provided, that any disposition from a Loan Party to a Subsidiary that is not a Loan Party shall be subject to the Non-Loan Party Investment Cap, (ii) (x) dispositions of Inventory in the ordinary course of business, (y) dispositions in connection with any factoring agreement or similar arrangements in the ordinary course of business and consistent with past practices; provided that the aggregate amount of unpaid receivables subject to third party factoring at any time shall not exceed $25,000,000 and (z) any disposition made pursuant to any order of the Bankruptcy Court, in form and substance satisfactory to the Required Lenders, (iii) a disposition of Cash Equivalents, Investment Grade Securities or Temporary Cash Investments, (iv) [reserved], (v) any Restricted Payment Transaction, (vi) a transfer constituting a transfer of all or substantially all of the assets of Intermediate Holdings that is governed by Subsection 8.7, (vii) [reserved], (viii) any "fee in lieu" or other disposition of assets to any Governmental Authority that continue in use by Intermediate Holdings or any Restricted Subsidiary, so long as Intermediate

4

Holdings or any Restricted Subsidiary may obtain title to such assets upon reasonable notice by paying a nominal fee, (ix) any exchange of property pursuant to or intended to qualify under Section 1031 (or any successor section) of the Code, or any exchange of equipment to be leased, rented or otherwise used in a Related Business, (x) the Belgian Sale/Leaseback Transaction; *provided* that the proceeds therefrom are applied towards growth capital expenditures in the United States in accordance with the Approved Budget, (xi) [reserved], (xii) [reserved], (xiii) [reserved], (xiv) a disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than Intermediate Holdings or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired, or from whom such Restricted Subsidiary that is not a Subsidiary Guarantor acquired its business and assets (having been newly formed in connection with such acquisition), entered into in connection with such acquisition, (xv) [reserved], (xvi) any disposition or series of related dispositions for aggregate consideration not to exceed $1,000,000, (xvii) the abandonment or other disposition of any patent, trademark or other intellectual property or application that is, in the good faith determination of the Parent Borrower, no longer economically reasonable to maintain or useful in the conduct of the business of Intermediate Holdings and its Subsidiaries taken as a whole, (xviii) any license, sublicense or other grant of rights in or to any trademark, copyright, patent or other Intellectual Property, (xix) [reserved] or (xx) the creation or granting of any Lien permitted under this Agreement.

"Assignee": as defined in Subsection 11.6(b)(i).

"Assignment and Acceptance": an Assignment and Acceptance, substantially in the form of Exhibit E hereto.

"Avoidance Action" has the meaning assigned to such term in the Interim DIP Order or the Final DIP Order, as applicable.

"Avoidance Proceeds" has the meaning assigned to such term in the Interim DIP Order or the Final DIP Order, as applicable.

"Backstop Commitments": the commitments set forth on Schedule A-2.

"Backstop Lender": as defined in Section 2.6(a).

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation": (a) with respect to any EEA Member Country implementing Article 55 of the Bank Recovery and Resolution Directive, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule or (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their Affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bank Products Agreement": any agreement pursuant to which a bank or other financial institution or other Person agrees to provide (a) treasury services, (b) credit card, debit

card, merchant card, purchasing card, stored value card, non-card electronic payable or other similar services (including the processing of payments and other administrative services with respect thereto), (c) cash management or related services (including controlled disbursements, automated clearinghouse transactions, return items, netting, overdrafts, depository, lockbox, stop payment, electronic funds transfer, information reporting, wire transfer and interstate depository network services) and (d) other banking, financial or treasury products or services as may be requested by Intermediate Holdings or any Restricted Subsidiary (other than letters of credit and other than loans and advances except Indebtedness arising from services described in clauses (a) through (c) of this definition), including, for the avoidance of doubt, bank guarantees.

"Bank Products Obligations": of any Person means the obligations of such Person pursuant to any Bank Products Agreement.

"Bank Recovery and Resolution Directive": Directive 2014/59/EU of the European Parliament and of the Council of the European Union.

"Belgian Sale/Leaseback Transaction": means the sale/leaseback transaction to be consummated at any time prior to the Maturity Date in which certain assets of MCC Verstraete NV, a Belgian *Naamloze vennootschap*, shall be sold to, and leased back from, an unaffiliated third party.

"Benchmark Replacement Conforming Changes": with respect to either the use or administration of the Term SOFR Rate, SOFR or any replacement rate adopted in accordance with the terms of this Agreement or the use, administration or implementation of any such replacement rate, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day", the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent (acting at the Direction of the Required Lenders) decides with the consent of the Borrower Representative may be appropriate to reflect the adoption and implementation of any such rate or to permit the use, administration or implementation thereof by the Administrative Agent (acting at the Direction of the Required Lenders) in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent (acting at the Direction of the Required Lenders) determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent (acting at the Direction of the Required Lenders) decides with the consent of the Borrower Representative is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Beneficiary Designation Notice": a written notice delivered by a Lender to the Administrative Agent, which written notice shall (a) designate an Affiliate or Related Fund of such Lender that is a holder of the Prepetition First Lien Claims to be the Designated Beneficiary of the amount of Term Loans or Term Loan Commitments specified therein (for the avoidance of doubt, not to exceed the aggregate amount of Term Loans or Term Loan Commitments to which such

Lender is entitled as of the Final Borrowing Date pursuant to <u>Section 2.1</u> and <u>Section 2.6)</u> and (b) attach a signature page to this Agreement duly executed by such Designated Beneficiary (which the Administrative Agent may thereafter affix to this Agreement upon the consummation of the syndication without any further action by any other party hereto) and upon the Syndication Consummation Date such Designated Beneficiary shall be a Lender hereunder.

"<u>Benefit Plan</u>": any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"<u>Benefited Lender</u>": as defined in <u>Subsection 11.7(a)</u>.

"<u>BHC Act Affiliate</u>": the meaning assigned to the term "affiliate" in, and shall be interpreted in accordance with, 12 U.S.C. § 1841(k).

"<u>Bloomberg Key Cross Currency Rates Page</u>": the website identifying currency cross rates managed by Bloomberg L.P. and currently located at https://www.bloomberg.com/markets/currencies/cross-rates, or any successor source for currency cross rates identified by the Administrative Agent (acting at the Direction of the Required Lenders) from time to time.

"<u>Board</u>": the Board of Governors of the Federal Reserve System.

"<u>Board of Directors</u>": for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the board of directors or other governing body of such entity, or, in either case, any committee thereof duly authorized to act on behalf of such board of directors or other governing body. Unless otherwise provided, "<u>Board of Directors</u>" means the Board of Directors of the Parent Borrower.

"<u>Borrower Representative</u>": the Parent Borrower.

"<u>Borrowers</u>" or "<u>Borrower</u>": as defined in the Preamble hereto.

"<u>Borrowing</u>": the borrowing of one Type of Loan of a single Tranche and currency from all the Lenders having Commitments or other commitments of the respective Tranche on a given date (or resulting from a conversion or conversions on such date) having, in the case of Term SOFR Rate Loans and EURIBOR Loans, the same Interest Period.

"<u>Borrowing Date</u>": any Business Day on which the Borrower Representative requests the Lenders to make Loans hereunder, which may be the Closing Date or the Final Borrowing Date.

"<u>Borrowing Request</u>": means a notice of a Borrowing substantially in the form of <u>Exhibit L</u>.

"Budget" means any 13-week consolidated weekly operating budget of the Debtors and their respective Subsidiaries setting forth, among other things, projected receipts, disbursements, liquidity and net cash flow for the period described therein prepared by management of Intermediate Holdings or any Borrower, in form and level of detail substantially consistent with the Initial Budget.

"Budget Variance Report" means, for any Budget Variance Test Period, a bi-weekly variance report prepared by or on behalf of the Parent Borrower, comparing for such Budget Variance Test Period the actual results against anticipated results under the Approved Budget, on an aggregate basis and in the same level of detail set forth in the applicable Approved Budget, together with a written explanation for all variances of greater than the applicable permitted variance for any given testing period in accordance with Section 8.12.

"Budget Variance Test Date" means each Friday that occurs every other week (commencing with the Friday of the third full calendar week occurring after the Petition Date) or, to the extent such Friday is not a Business Day, the next Business Day thereafter.

"Budget Variance Test Period" means, with respect to (i) the initial Budget Variance Test Date, the two-week period ending on the Sunday of the week immediately preceding the initial Budget Variance Test Date and (ii) any other Budget Variance Test Date, the rolling two-week period, in each case, ending on the Sunday of the week immediately preceding the applicable Budget Variance Test Date; provided, that it is understood and agreed that the second week of any such two-week period shall be based off of the Approved Budget as updated during such week, with the first week based off of the immediately preceding Approved Budget.

"Business Day": a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close, except that (a) when used in connection with a Term SOFR Rate Loan and in relation to the calculation or computation of the Term SOFR Rate, "Business Day" shall mean a U.S. Government Securities Business Day and (b) when used in connection with a EURIBOR Loan, "Business Day" shall mean any Business Day that is a TARGET Day.

"Capital Expenditures": for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under leases evidencing Financing Lease Obligations) by Intermediate Holdings and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of Intermediate Holdings.

"Capital Stock": as to any Person, any and all shares or units of, rights to purchase, warrants or options for, or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"Carve Out" has the meaning assigned to such term in the Interim DIP Order or the Final DIP Order, as applicable.

"Cash Collateral" has the meaning assigned to such term in the Interim DIP Order or the Final DIP Order, as applicable.

8

"Cash Equivalents": any of the following: (a) money, (b) securities issued or fully guaranteed or insured by the United States of America, Canada, the United Kingdom, Japan, Switzerland or a member state of the European Union or any agency or instrumentality of any thereof, (c) time deposits, certificates of deposit or bankers' acceptances of (i) any bank or other institutional lender under this Agreement, the Prepetition ABL Agreement or any Affiliate thereof or (ii) any commercial bank having capital and surplus in excess of $250,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and the commercial paper of the holding company of which is rated at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's (or, if at such time neither is issuing ratings, a comparable rating of another nationally recognized rating agency), (d) repurchase obligations with a term of not more than 10 days for underlying securities of the types described in clauses (b) and (c) above entered into with any financial institution meeting the qualifications specified in clause (c)(i) or (c)(ii) above, (e) money market instruments, commercial paper or other short-term obligations rated at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's (or, if at such time neither is issuing ratings, a comparable rating of another nationally recognized rating agency), (f) investments in money market funds subject to the risk limiting conditions of Rule 2a-7 or any successor rule of the SEC under the Investment Company Act of 1940, as amended, (g) investment funds investing at least 90.0% of their assets in cash equivalents of the types described in clauses (a) through (f) above (which funds may also hold cash pending investment and/or distribution) and (h) investments similar to any of the foregoing denominated in foreign currencies approved by the Board of Directors.

"Cash Management Order": an order of the Bankruptcy Court entered in the Chapter 11 Cases, together with all extensions, modifications and amendments thereto, in form and substance reasonably acceptable to the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements or such other arrangements as shall be reasonably acceptable to the Required Lenders in all material respects.

"CD&R": Clayton, Dubilier & Rice, LLC, a Delaware limited liability company, and any successor in interest thereto, and any successor to its investment management business.

"CDD Rule": the Customer Due Diligence Requirements for Financial Institutions issued by the U.S. Department of Treasury Financial Crimes Enforcement Network under the Bank Secrecy Act (such rule published May 11, 2016 and effective May 11, 2018, as amended from time to time).

"Central Bank Rate": With respect to any Euro Term Loan, the greater of one of the following three rates as may be selected by the Administrative Agent (acting at the Direction of the Required Lenders) plus the Central Bank Rate Adjustment: (1) the fixed rate for the main refinancing operations of the European Central Bank (or any successor thereto), or, if that rate is not published, the minimum bid rate for the main refinancing operations of the European Central Bank, each as published by the European Central Bank from time to time, (2) the rate for the marginal lending facility of the European Central Bank, as published by the European Central Bank from time to time or (3) the rate for the deposit facility of the central banking system of the Participating Member States, as published by the European Central Bank from time to time.

9

"Central Bank Rate Adjustment": for any day, for any Loan denominated in Euro, a rate equal to the difference (which may be a positive or negative value or zero) of (i) the average of the EURIBOR Screen Rate for the five most recent Business Days preceding such day for which the EURIBOR Screen Rate was available (excluding, from such averaging, the highest and the lowest EURIBOR Rate applicable during such period of five Business Days) minus (ii) the Central Bank Rate in respect of Euro in effect on the last Business Day in such period. For purposes of this definition, (x) the term Central Bank Rate shall be determined disregarding clause (B) of the definition of such term and (y) the EURIBOR Screen Rate on any day shall be based on the EURIBOR Screen Rate on such day at approximately the time referred to in the definition of such term for deposits in Euro for a maturity of one month (or, in the event the EURIBOR Screen Rate for deposits in Euro is not available for such maturity of one month, shall be based on the Interpolated Rate, as of such time); provided that if such rate shall be less than the 0.00%, such rate shall be deemed to be 0.00%.

"Central Bank Rate Loans": Loans to which the rate of interest applicable is based upon the Central Bank Rate.

"Change in Law": as defined in Subsection 4.11(a).

"Change of Control": (i) Topco shall cease to collectively own, directly or indirectly, 100.0% of the Capital Stock of Holdings; (ii) Holdings shall cease to collectively own, directly or indirectly, 100.0% of the Capital Stock of (x) Intermediate Holdings or (y) the Parent Borrower; (iii) a "Change of Control" as defined under any of the agreements governing the Prepetition Debt shall have occurred. Notwithstanding anything to the contrary in the foregoing, the Restructuring Transactions shall not constitute or give rise to a Change of Control.

"Chapter 11 Cases" has the meaning assigned to such term in the preamble herein.

"Chapter 11 Plan" means a plan of reorganization in any or all of the Chapter 11 Cases.

"Claim": the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"Closing Date" or "Interim Term Loan Borrowing Date": the date on which all the conditions precedent set forth in Subsection 6.1 shall be satisfied or waived.

"Co-Administrative Agents": collectively, Acquiom and Seaport, in their capacities as co-administrative agents under any of the Loan Documents, or any successor administrative agent, and "Co-Administrative Agent" and "Administrative Agent" shall mean any one or both of them, as the context may require.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": means all of the "Collateral", "DIP Collateral" or words of similar intent as defined in the Interim DIP Order (and, when applicable, the Final DIP Order) or in any of the Security Documents, and shall, subject to the Orders, include all present and after acquired assets and property, whether real, personal, tangible, intangible or mixed of the Loan Parties, wherever located, on which Liens are or are purported to be granted pursuant to the Orders or any

10

Security Document in favor of the Collateral Agent, on behalf of the Secured Parties, to secure any of the Obligations; *provided* that in no case shall "Collateral" include Excluded Assets.

"Collateral Agent": Acquiom Agency Services LLC, in its capacity as collateral agent for the Secured Parties under any of the Loan Documents and shall include any successor to the Collateral Agent appointed pursuant to Subsection 10.9.

"Collateral Agreement": the Senior Secured Super-Priority Debtor-In-Possession Collateral Agreement to the Collateral Agent as of the Closing Date, in a form mutually agreed by the parties thereto, as the same may be amended, supplemented, waived or otherwise modified from time to time, in favor the Secured Parties.

"Commitment": as to any Lender, such Lender's Term Loan Commitments.

"Commodities Agreement": in respect of a Person, any commodity futures contract, forward contract, option or similar agreement or arrangement (including derivative agreements or arrangements) as to which such Person is a party or beneficiary.

"Commonly Controlled Entity": an entity, whether or not incorporated, that is under common control with Intermediate Holdings within the meaning of Section 4001 of ERISA or is part of a group that includes Intermediate Holdings and that is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Sections 414(m) and (o) of the Code.

"Compliance Certificate": as defined in Subsection 7.2(a).

"Conduit Lender": any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument delivered to the Administrative Agent (a copy of which shall be provided by the Administrative Agent to the Borrower Representative on request); provided that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations under this Agreement, including its obligation to fund a Loan if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender; provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to any provision of this Agreement, including Subsection 4.10, 4.11 or 4.12, than the designating Lender would have been entitled to receive in respect of the Extensions of Credit made by such Conduit Lender if such designating Lender had not designated such Conduit Lender hereunder, (b) be deemed to have any Commitment or (c) be designated if such designation would otherwise increase the costs of any Facility or Tranche to any Borrower.

"Consolidation": the consolidation of the accounts of each of Intermediate Holdings and its Subsidiaries in accordance with GAAP. The term "Consolidated" has a correlative meaning.

"Contingent Obligation": with respect to any Person, any obligation of such Person guaranteeing any obligation that does not constitute Indebtedness (a "primary obligation") of any

other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (<u>1</u>) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (<u>2</u>) to advance or supply funds (<u>a</u>) for the purchase or payment of any such primary obligation or (<u>b</u>) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor or (<u>3</u>) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"<u>Contractual Obligation</u>": as to any Person, any provision of any material security issued by such Person or of any material agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"<u>Covered Entity</u>": any of the following: (<u>i</u>) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (<u>ii</u>) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Covered Liabilities</u>": as defined in <u>Subsection 11.21</u>.

"<u>Cured Default</u>": as defined in <u>Subsection 1.2(c)</u>.

"<u>Currency Agreement</u>": in respect of a Person, any foreign exchange contract, currency swap agreement or other similar agreement or arrangements (including derivative agreements or arrangements), as to which such Person is a party or a beneficiary.

"<u>Default</u>": any of the events specified in <u>Subsection 9.1</u>, whether or not any requirement for the giving of notice (other than, in the case of <u>Subsection 9.1(e)</u>, a Default Notice), the lapse of time, or both, or any other condition specified in <u>Subsection 9.1</u>, has been satisfied.

"<u>Default Notice</u>": as defined in <u>Subsection 9.1(e)</u>.

"<u>Default Right</u>": has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. § 252.81, 47.2 or 382.1, as applicable.

"<u>Defaulting Lender</u>": any Lender or Agent whose circumstances, acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of "Lender Default".

"<u>Deposit Account</u>": any deposit account (as such term is defined in Article 9 of the UCC).

"<u>Designated Beneficiary</u>": as defined in Section 2.6(h).

"<u>Designation Date</u>": as defined in <u>Subsection 2.10(f)</u>.

"<u>DIP Facility Obligations</u>": obligations of Borrowers and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during (or that would accrue but

for) the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations Incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Borrowers and the other Loan Parties under this Agreement and the other Loan Documents.

"DIP Note Holders" means the "Holders" as defined in the DIP Note Purchase Agreement.

"DIP Note Purchase Agreement" shall mean that certain Senior Secured, Super-Priority Debtor-In-Possession Note Purchase Agreement, dated as of or around the Closing Date, among the Borrowers, the DIP Note Holders and the other parties party from time to time party thereto.

"DIP Note Documents" shall mean the DIP Note Purchase Agreement and the other "Note Documents" (as defined in the DIP Note Purchase Agreement) (as in effect on the date hereof).

"DIP Pro Rata Allocation" means, with respect to any Lender, Syndication Eligible Prepetition Lender or Electing Lender, the quotient, expressed as a percentage of (A) the Prepetition First Lien Claims (calculated as of the Petition Date) owed to such Lender, Syndication Eligible Prepetition Lender or Electing Lender (or, in each case, Affiliate thereof to the extent also not a Lender, Syndication Eligible Prepetition Lender or Electing Lender, as applicable), as applicable, and held as of the Subscription Record Date divided by (B) all Prepetition First Lien Claims outstanding as of the Petition Date. For the avoidance of doubt, such principal Prepetition First Lien Claims shall be calculated to include accrued and unpaid interest and fees and any amounts thereon that were actually paid-in-kind as of the Petition Date.

"DIP Remedies Notice Period" shall have the meaning assigned to such term in the Orders.

"DIP Secured Notes" shall mean the Notes issued pursuant to the DIP Notes Purchase Agreement.

"Direction of the Required Backstop Lenders" or "direction of the Required Backstop Lenders" means a written direction or instruction from the Required Backstop Lenders which may be in the form of an email or other form of written communication and which may come from legal counsel engaged by such Required Backstop Lenders. Any such email or other written communication from any such legal counsel shall be conclusively presumed to have been authorized by a written direction or instruction from the Required Backstop Lenders and such legal counsel shall be conclusively presumed to have acted on behalf and at the written direction or instruction from the Required Backstop Lenders (and the Agents shall be entitled to rely on such presumption). For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory", "acceptable", "reasonably satisfactory" or

13

"reasonably acceptable" (or any expression of similar import) to the Required Backstop Lenders such determination may be communicated by a Direction of the Required Backstop Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Required Backstop Lenders, such consent, approval or determination may be communicated by a Direction of the Required Backstop Lenders as contemplated above. Each Agent shall be entitled to rely upon, and shall not Incur any liability for relying upon, any written direction or instruction that is purported to be a Direction of the Required Backstop Lenders, and no Agent shall have any responsibility to independently determine whether such direction or instruction has in fact been authorized by the Required Backstop Lenders.

"Direction of the Required Consenting First Lien Lenders" or "direction of the Required Consenting First Lien Lenders" means a written direction or instruction from the Required Consenting First Lien Lenders which may be in the form of an email or other form of written communication and which may come from legal counsel engaged by such Required Consenting First Lien Lenders. Any such email or other written communication from any such legal counsel shall be conclusively presumed to have been authorized by a written direction or instruction from the Required Consenting First Lien Lenders and such legal counsel shall be conclusively presumed to have acted on behalf and at the written direction or instruction from the Required Consenting First Lien Lenders (and the Agents shall be entitled to rely on such presumption). For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory", "acceptable", "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Required Consenting First Lien Lenders such determination may be communicated by a Direction of the Required Consenting First Lien Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Required Consenting First Lien Lenders, such consent, approval or determination may be communicated by a Direction of the Required Consenting First Lien Lenders as contemplated above. Each Agent shall be entitled to rely upon, and shall not Incur any liability for relying upon, any written direction or instruction that is purported to be a Direction of the Required Consenting First Lien Lenders, and no Agent shall have any responsibility to independently determine whether such direction or instruction has in fact been authorized by the Required Consenting First Lien Lenders.

"Direction of the Required Lenders" or "direction of the Required Lenders" means a written direction or instruction from Lenders constituting the Required Lenders which may be in the form of an email or other form of written communication and which may come from any of the Secured Ad Hoc Group Advisors. Any such email or other written communication from any of the Secured Ad Hoc Group Advisors shall be conclusively presumed to have been authorized by a written direction or instruction from the Required Lenders (other than the Fronting Lender) and such Secured Ad Hoc Group Advisor shall be conclusively presumed to have acted on behalf and at the written direction or instruction from the Required Lenders (other than the Fronting Lender) (and the Agents shall be entitled to rely on such presumption). For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory", "acceptable", "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Required Lenders such determination may be communicated by a Direction of the Required Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Required Lenders, such consent, approval or determination may be communicated by a Direction of the Required Lenders as contemplated

14

above Each Agent shall be entitled to rely upon, and shall not Incur any liability for relying upon, any written direction or instruction that is purported to be a Direction of the Required Lenders, and no Agent shall have any responsibility to independently determine whether such direction or instruction has in fact been authorized by the Required Lenders.

"Discharge": to repay, repurchase, redeem, defease or otherwise acquire, retire or discharge; and the term "Discharged" shall have a correlative meaning.

"Discharge of ABL Collateral Obligations": the "Discharge of Revolving Credit Obligations" as defined in the Prepetition ABL/Cash Flow Intercreditor Agreement.

"Disinterested Directors": with respect to any Affiliate Transaction, one or more members of the Board of Directors of the Parent Borrower, or one or more members of the Board of Directors of a Parent Entity, having no material direct or indirect financial interest in or with respect to such Affiliate Transaction. A member of any such Board of Directors shall not be deemed to have such a financial interest by reason of such member's holding Capital Stock of the Parent Borrower or any Parent Entity or any options, warrants or other rights in respect of such Capital Stock or by reason of such member receiving any compensation from the Parent Borrower or any Parent Entity, as applicable, on whose Board of Directors such member serves in respect of such member's role as director.

"disposition": as defined in the definition of "Asset Disposition" in this Subsection 1.1.

"Disqualified Party": (i) any competitor of Intermediate Holdings and its Restricted Subsidiaries that is in the same or a similar line of business as Intermediate Holdings and its Restricted Subsidiaries or any Affiliate of such competitor, (ii) any Person whose principal Investment strategy is investing in distressed debt or the pursuance of loan-to-own strategies, (iii) any Person designated in writing by Intermediate Holdings or CD&R to the Administrative Agent on or prior to the Closing Date or (c) following the Closing Date with the consent of the Required Lenders; provided, that in no event shall any notice given pursuant to this clause (iii)(c) apply to retroactively disqualify any Person who previously acquired and continues to hold, any Loans, Commitments or participations prior to the receipt of such notice and (iv) any Person designated in writing by the Borrower Representative and/or the Sponsor to the Administrative Agent as provided in Subsection 11.6(c).

"Disqualified Stock": with respect to any Person, any Capital Stock (other than Management Stock) that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event (other than following the occurrence of a Change of Control or other similar event described under such terms as a "change of control" or an Asset Disposition or other disposition) (i) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (ii) is convertible or exchangeable for Indebtedness or Disqualified Stock or (iii) is redeemable at the option of the holder thereof (other than following the occurrence of a Change of Control or other similar event described under such terms as a "change of control" or an Asset Disposition or other disposition), in whole or in part, in each case on or prior to the Maturity Date; provided that Capital Stock issued to any Benefit Plan, or by any such Plan to any employees of Intermediate Holdings or any Subsidiary, shall not

15

constitute Disqualified Stock solely because it may be required to be repurchased or otherwise acquired or retired in order to satisfy applicable statutory or regulatory obligations.

"Division": as defined in Subsection 1.2(k).

"Dollar Equivalent": with respect to any amount denominated in Dollars, the amount thereof and, with respect to the principal amount of any Loan made or outstanding in Euros, at any date of determination thereof, an amount in Dollars equivalent to such principal amount or such other amount calculated on the basis of the Spot Rate of Exchange.

"Dollars" and "$": dollars in lawful currency of the United States of America.

"Domestic Guarantor": any Guarantor other than a Foreign Guarantor.

"Domestic Loan Party": any Loan Party other than a Foreign Loan Party.

"Domestic Subsidiary": any Restricted Subsidiary of the Parent Borrower other than a Foreign Subsidiary.

"EEA Financial Institution": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition and is subject to the supervision of an EEA Resolution Authority, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision of an EEA Resolution Authority with its parent.

"EEA Member Country": any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date": the date on which all the conditions precedent set forth in Subsection 6.3 shall be satisfied or waived.

"Eligible Assignee": any Assignee permitted by Subsection 11.6(b) hereunder.

"Environmental Costs": any and all costs or expenses (including attorney's and consultant's fees, investigation and laboratory fees, response costs, court costs and litigation expenses, fines, penalties, damages, settlement payments, judgments and awards), of whatever kind or nature, known or unknown, contingent or otherwise, arising out of, or in any way relating to, any actual or alleged violation of, noncompliance with or liability under any Environmental Laws. Environmental Costs include any and all of the foregoing, without regard to whether they arise out of or are related to any past, pending or threatened proceeding of any kind.

"Environmental Laws": any and all U.S. or foreign, federal, state, provincial, territorial, local or municipal laws, rules, orders, enforceable guidelines and orders-in-council, regulations, statutes, ordinances, codes, decrees, and such requirements of any Governmental Authority properly promulgated and having the force and effect of law or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health (as it relates to exposure to Materials of Environmental Concern) or the environment, as have been, or now or at any relevant time hereafter are, in effect.

"Environmental Permits": any and all permits, licenses, registrations, notifications, exemptions and any other authorization required under any Environmental Law.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"EU Bail-In Legislation Schedule": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"EURIBOR Loans": Loans that bear interest at a rate based on the EURIBOR Screen Rate.

"EURIBOR Rate": the EURIBOR Screen Rate with tenor equal to such Interest Period.

"EURIBOR Screen Rate": the euro interbank offered rate administered by the European Money Markets Institute (or any other person which takes over the administration of that rate) for the relevant period displayed on page EURIBOR01 of the Thomson Reuters screen (or any replacement Thomson Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters as of 11:00 a.m. Brussels time two Business Days prior to the commencement of such Interest Period. If such page or service ceases to be available, the Administrative Agent may specify another page or service displaying the relevant rate after consultation with the Borrower Representative; provided that, if the EURIBOR Screen Rate as so determined would be less than 0.00%, such rate shall be deemed to be 0.00% for the purposes of this Agreement.

If at any time the Administrative Agent determines (at the Direction of the Required Lenders) (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in Subsection 4.7 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Subsection 4.7 have not arisen but the supervisor for the administrator of the euro interbank offered rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the euro interbank offered rate shall no longer be used for determining interest rates for loans in Euro, then the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower Representative shall endeavor to establish an alternate rate of interest to the EURIBOR Screen Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (including amendments to the Applicable Margin

17

to preserve the terms of the economic transactions initially agreed to among the Borrowers, on the one hand, and the Lenders on the other hand (including with respect to impact of any "floors")). Notwithstanding anything to the contrary herein, such amendment shall become effective without any further action or consent of any other party to this Agreement.

"Euro" and "€": the single currency of the Participating Member States introduced in accordance with the Economic and Monetary Union Legislation.

"Event of Default": any of the events specified in Subsection 9.1, provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Exchange Act": the Securities Exchange Act of 1934, as amended from time to time.

"Excluded Assets": as defined in the Collateral Agreement.

"Excluded Information": as defined in Subsection 4.4(l)(i).

"Excluded Liability": any liability that is excluded under the Bail-In Legislation from the scope of any Bail-In Action including, without limitation, any liability excluded pursuant to Article 44 of the Bank Recovery and Resolution Directive.

"Excluded Subsidiary": at any date of determination, shall mean any Subsidiary of the Parent Borrower:

(a)    that is prohibited by Requirement of Law or Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from Guaranteeing, or granting Liens to secure, the DIP Facility Obligations or if Guaranteeing, or granting Liens to secure, the DIP Facility Obligations would require governmental (including regulatory) consent, approval, license or authorization unless such consent, approval, license or authorization has been received;

(b)    with respect to which the Borrower Representative and the Administrative Agent (acting at the Direction of the Required Lenders) reasonably agree that the burden or cost or other consequences of providing a Guarantee of the DIP Facility Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom;

(c)    with respect to which the provision of such Guarantee of the DIP Facility Obligations would result in material adverse tax consequences that are not de minimis to Topco Borrower or any of its Subsidiaries (or at the election of Topco Borrower in connection with an initial public offering or other restructuring of Topco Borrower , any Parent Entity, the Parent Borrower or any of its Subsidiaries) (as determined by the Parent Borrower in good faith, and the Borrower Representative shall take commercially reasonable efforts to promptly notify the Administrative Agent of any such determination, but failure to so notify the Administrative Agent shall not invalidate such determination);

18

(d)      that is a bona fide joint venture;

(e)      that is a Foreign Subsidiary (unless such Foreign Subsidiary has Guaranteed or borrowed any of the obligations under the Prepetition ABL Documents); and

(f)      that is a Subsidiary of a Foreign Subsidiary (unless such Foreign Subsidiary has Guaranteed or borrowed any of the obligations under the Prepetition ABL Documents);

provided that, notwithstanding the foregoing, (x) any Subsidiary that Guarantees the payment of or is a borrower or obligor in respect of the Prepetition Debt shall not be an Excluded Subsidiary and (y) no Borrower shall be an Excluded Subsidiary.

"Excluded Taxes": (a) any Taxes measured by or imposed upon the net income of any Agent or Lender and all franchise Taxes and branch profits Taxes, in each case imposed: (i) by the jurisdiction under the laws of which such Agent or Lender, or its applicable lending office, is organized or is located, or any nation within which such jurisdiction is located or any political subdivision thereof; or (ii) by reason of any connection between the jurisdiction imposing such Tax and such Agent or Lender, applicable lending office, branch or Affiliate other than a connection arising solely from such Agent or Lender having executed, delivered or performed its obligations under, or received payment under or enforced, this Agreement or any Notes, and (b) any Tax imposed by FATCA.

"Extension of Credit": as to any Lender, the making of a Term Loan.

"Facility": each of (a) the Interim New Money Dollar Term Loan Commitments and the Extensions of Credit made thereunder (the "Interim New Money Dollar Term Loan Facility"), (b) the Interim New Money Euro Term Loan Commitments and the Extensions of Credit made thereunder (the "Interim New Money Euro Term Loan Facility" and, together with the Interim New Money Dollar Term Loan Facility, the "Interim New Money Term Loan Facility"), (c) the Interim Roll-up Dollar Term Loan Commitments and the Extensions of Credit made thereunder (the "Interim Roll-up Dollar Term Loan Facility"), (d) the Interim Roll-up Euro Term Loan Commitments and the Extensions of Credit made thereunder (the "Interim Roll-up Euro Term Loan Facility" and, together with the Interim Roll-up Dollar Term Loan Facility, the "Interim Roll-up Term Loan Facility" and, together with the Interim New Money Term Loan Facility, the "Interim Term Loan Facility"), (e) the Final New Money Dollar Term Loan Commitments and the Extensions of Credit made thereunder (the "Final New Money Dollar Term Loan Facility"), (f) the Final New Money Euro Term Loan Commitments and the Extensions of Credit made thereunder (the "Final New Money Euro Term Loan Facility" and, together with the Final New Money Dollar Term Loan Facility, the "Final New Money Term Loan Facility"), (g) the Final Roll-up Dollar Term Loan Commitments and the Extensions of Credit made thereunder (the "Final Roll-up Dollar Term Loan Facility") and (h) the Final Roll-up Euro Term Loan Commitments and the Extensions of Credit made thereunder (the "Final Roll-up Euro Term Loan Facility" and, together with the Final Roll-up Dollar Term Loan Facility, the "Final Roll-up Term Loan Facility" and, together with the Final New Money Term Loan Facility, the "Final Term Loan Facility") and, together with any other "facility" hereunder, collectively the "Facilities."

"Fair Market Value": with respect to any asset or property, the fair market value of such asset or property as determined in good faith by the Parent Borrower or the Board of Directors.

"FATCA": Sections 1471 through 1474 of the Code as in effect on the Closing Date (and any amended or successor provisions that are substantively comparable), any regulations or other administrative authority promulgated thereunder, any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with any of the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement.

"Federal District Court": as defined in Subsection 11.13(a).

"Federal Funds Effective Rate": for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depository institutions (as determined in such manner as the NYFRB shall set forth on its public website from time to time) and published on the next succeeding Business Day by the NYFRB as the federal funds effective rate; provided that, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Final Borrowing Date": the date on which all the conditions precedent set forth in Subsection 6.2 shall be satisfied or waived; provided that such date shall be no later than five (5) Business Days after the Milestone set forth in Section 7.17(b), as may be extended with the consent of the Fronting Lender (not to be unreasonably withheld, conditioned or delayed).

"Final DIP Order" means the final order of the Bankruptcy Court that is in form and substance satisfactory to the Required Lenders (and as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders (with an email from counsel being sufficient) which may be withheld in their sole discretion).

"Final Dollar Term Loan Commitment": collectively, the Final New Money Dollar Term Loan Commitments and the Final Roll-up Dollar Term Loan Commitments.

"Final Dollar Term Loan Facility": as defined in the definition of "Facility."

"Final Euro Term Loan Commitment": collectively, the Final New Money Euro Term Loan Commitments and the Final Roll-up Euro Term Loan Commitments.

"Final Euro Term Loan Facility": as defined in the definition of "Facility."

"Final New Money Euro Term Loan": as defined in Subsection 2.1(b)(ii).

"Final New Money Dollar Term Loan": as defined in Subsection 2.1(b).

"Final New Money Dollar Term Loan Commitments": as to any Lender, its obligation to make Final New Money Dollar Term Loans to the Borrowers pursuant to Subsection 2.1(b)(i) in an aggregate amount not to exceed at any one time outstanding the amount set forth

20

opposite such Lender's name in <u>Schedule A-1</u> under the heading "Final New Money Dollar Term Loan Commitment"; collectively, as to all the Lenders, the "<u>Final New Money Dollar Term Loan Commitments</u>." The original aggregate principal amount of the Final New Money Dollar Term Loan Commitments on the Closing Date is $108,416,768.00[1].

"<u>Final New Money Euro Term Loan Commitments</u>": as to any Lender, its obligation to make Final New Money Euro Term Loans to the Borrowers pursuant to <u>Subsection 2.1(b)(ii)</u> in an aggregate amount not to exceed at any one time outstanding the amount set forth opposite such Lender's name in <u>Schedule A-1</u> under the heading "Final New Money Euro Term Loan Commitment"; collectively, as to all the Lenders, the "<u>Final New Money Euro Term Loan Commitments</u>." The original aggregate principal amount of the Final New Money Euro Term Loan Commitments on the Closing Date is €0.

"<u>Final New Money Term Loan</u>": as defined in <u>Subsection 2.1(b)(ii)</u>.

"<u>Final New Money Term Loan Commitments</u>": collectively, the Final New Money Dollar Term Loan Commitments and the Final New Money Euro Term Loan Commitments.

"<u>Final Roll-up Dollar Term Loan</u>": as defined in <u>Subsection 2.1(b)</u>.

"<u>Final Roll-up Dollar Term Loan Commitment</u>": as to any Lender, its obligation to make Final Roll-up Dollar Term Loans to the Borrowers pursuant to <u>Subsection 2.1(b)</u> in an aggregate amount not to exceed at any one time outstanding the amount set forth opposite such Lender's name in <u>Schedule A-1</u> under the heading "Final Roll-Up Dollar Term Loan Commitment"; collectively, as to all the Lenders, the "Final Roll-up Dollar Term Loan Commitments." The original aggregate principal amount of the Final Roll-up Dollar Term Loan Commitments on the Closing Date is $108,416,768.00[2].

"<u>Final Roll-up Euro Term Loan Commitment</u>": as to any Lender, its obligation to make Final Roll-up Euro Term Loans to the Borrowers pursuant to <u>Subsection 2.1(b)</u> in an aggregate amount not to exceed at any one time outstanding the amount set forth opposite such Lender's name in <u>Schedule A-1</u> under the heading "Final Roll-Up Euro Term Loan Commitment"; collectively, as to all the Lenders, the "Final Roll-up Euro Term Loan Commitments." The original aggregate principal amount of the Final Roll-up Euro Term Loan Commitments on the Closing Date is €0.

"<u>Final Roll-up Euro Term Loans</u>": as defined in <u>Subsection 2.1(b)</u>.

"<u>Final Roll-up Term Loan Commitment</u>": Final Roll-up Dollar Term Loan Commitment and the Final Roll-up Euro Term Loan Commitment.

"<u>Final Term Loan Commitment</u>": the Final New Money Term Loan Commitments and the Final Roll-up Term Loan Commitments.

---

[1] Amount to be automatically updated by the amount set forth in Schedule A-1, including on the Closing Date.
[2] Amount to be automatically updated by the amount set forth in Schedule A-1, including on the Closing Date.

"Final Term Loans": as defined in Subsection 2.1(b).

"Financing Lease": any lease of property, real or personal, the obligations of the lessee in respect of which are required to be classified and accounted for as a financing lease (and not, for the avoidance of doubt, as an operating lease) on the balance sheet of such lessee for financial reporting purposes in accordance with GAAP prior to the adoption of Accounting Standards Update No. 2016-02, Leases (Topic 842) by the Financial Accounting Standards Board (and all calculations and deliverables under this Agreement (other than those made under Subsection 7.1) shall be made or delivered, as applicable, based on GAAP as in effect prior to such adoption). The Stated Maturity of any Financing Lease Obligation shall be the date of the last payment of rent or any other amount due under the related lease.

"Financing Lease Obligation": an obligation under any Financing Lease.

"First Day Orders": an order entered by the Bankruptcy Court approving the relief requested in the First Day Pleadings (as defined in the RSA).

"Fiscal Month": each monthly accounting period of Intermediate Holdings calculated in accordance with the fiscal calendar of Intermediate Holdings.

"Fiscal Quarter": each quarterly accounting period of Intermediate Holdings calculated in accordance with the fiscal calendar of Intermediate Holdings, or as otherwise designated by the Borrower Representative in accordance with Subsection 7.12.

"Fixed GAAP Date": the Closing Date; provided that at any time after the Closing Date, the Borrower Representative may by written notice to the Administrative Agent elect to change the Fixed GAAP Date to be the date specified in such notice, and upon such notice, the Fixed GAAP Date shall be such date for all periods beginning on and after the date specified in such notice.

"Fixed GAAP Terms": (a) the definitions of the terms "Capital Expenditures", "Consolidation", "Financing Lease", "Inventory" and "Receivable", (b) all defined terms in this Agreement to the extent used in or relating to any of the foregoing definitions, and all ratios and computations based on any of the foregoing definitions, and (c) any other term or provision of this Agreement or the Loan Documents that, at the Parent Borrower's election, may be specified by the Borrower Representative by written notice to the Administrative Agent from time to time.

"Foreign Guarantor": any Guarantor that is organized under the laws of any jurisdiction outside of the United States of America, including any Guarantor which is organized and existing under the laws of Puerto Rico or any other territory of the United States of America.

"Foreign Loan Party": any Loan Party that is organized under the laws of any jurisdiction outside of the United States of America, including any Loan Party which is organized and existing under the laws of Puerto Rico or any other territory of the United States of America.

"Foreign Pension Plan": a registered pension plan which is subject to applicable pension legislation other than ERISA or the Code, which a Restricted Subsidiary sponsors or maintains, or to which it makes or is obligated to make contributions.

"Foreign Plan": each Foreign Pension Plan, deferred compensation or other retirement or superannuation plan, fund, program, agreement, commitment or arrangement whether oral or written, funded or unfunded, sponsored, established, maintained or contributed to, or required to be contributed to, or with respect to which any liability is borne, outside the United States of America, by Intermediate Holdings or any of its Restricted Subsidiaries, other than any such plan, fund, program, agreement or arrangement sponsored by a Governmental Authority.

"Foreign Subsidiary": any Subsidiary of Holdings (a) that is organized under the laws of any jurisdiction outside of the United States of America and any Subsidiary of such Foreign Subsidiary or (b) that is a Foreign Subsidiary Holdco. Any Subsidiary of Holdings which is organized and existing under the laws of Puerto Rico or any other territory of the United States of America shall be a Foreign Subsidiary.

"Foreign Subsidiary Holdco": any Restricted Subsidiary of Holdings, so long as such Restricted Subsidiary has no material assets other than shares, equity interests, Capital Stock or other securities or Indebtedness of one or more Foreign Subsidiaries (or Subsidiaries thereof), Intellectual Property relating to such Foreign Subsidiaries (or Subsidiaries thereof), and/or other assets (including cash, Cash Equivalents and Temporary Cash Investments) relating to an ownership interest in any such securities, Indebtedness, Intellectual Property or Subsidiaries. Any Subsidiary which is a Foreign Subsidiary Holdco that fails to meet the foregoing requirements as of the last day of the period for which consolidated financial statements of Intermediate Holdings are available shall continue to be deemed a "Foreign Subsidiary Holdco" hereunder until the date that is 60 days following the date on which such annual or quarterly financial statements were required to be delivered pursuant to Subsection 7.1 with respect to such period.

"Fronting Fee Letter" means that certain letter agreement, dated as of the Effective Date, between the Borrowers and the Fronting Lender, as the same may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time.

"Fronting Lender" means Jefferies Capital Services, LLC.

"GAAP": generally accepted accounting principles in the United States of America as in effect on the Fixed GAAP Date (for purposes of the Fixed GAAP Terms) and as in effect from time to time (for all other purposes of this Agreement), including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession, and subject to the following sentence. If at any time the SEC permits or requires U.S. domiciled companies subject to the reporting requirements of the Exchange Act to use IFRS in lieu of GAAP for financial reporting purposes, Intermediate Holdings (or, any Parent Entity whose financial statements satisfy Intermediate Holdings' financial reporting obligations under Subsection 7.1) may elect by written notice to the Administrative Agent to so use IFRS in lieu of GAAP and, upon any such notice, references herein to GAAP shall thereafter be construed to mean (a) for periods beginning on and after the date specified in such notice, IFRS as in effect on the date specified in such notice (for purposes of the Fixed GAAP Terms) and as in effect from time to time (for all other purposes of this Agreement) and (b) for

prior periods, GAAP as defined in the first sentence of this definition. All ratios and computations based on GAAP contained in this Agreement shall be computed in conformity with GAAP.

"Governmental Authority": the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"Guarantee": any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantee Agreement": the Senior Secured Super-Priority Debtor-In-Possession Guarantee delivered to the Administrative Agent, in a form mutually agreed by the parties thereto, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any such obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Parent Borrower in good faith.

"Guarantors": the collective reference to Holdings, Intermediate Holdings and each Subsidiary Guarantor; each individually, a "Guarantor."

"Hedge Agreements": collectively, Interest Rate Agreements, Currency Agreements and Commodities Agreements.

"Hedging Obligations": as to any Person, the obligations of such Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodities Agreement.

"Holdback": has the meaning assigned to the term "DIP Holdback" as defined in the RSA.

"Holdings": as defined in the Preamble hereto, and any successor in interest thereto permitted hereunder.

"IFRS": International Financial Reporting Standards and applicable accounting requirements set by the International Accounting Standards Board or any successor thereto (or the Financial Accounting Standards Board, the Accounting Principles Board of the American Institute of Certified Public Accountants, or any successor to either such board, or the SEC, as the case may be), as in effect from time to time.

"Impacted Interest Period": has the meaning specified in the definition of "EURIBOR Screen Rate".

"Incur": issue, assume, enter into any guarantee of, incur or otherwise become liable for; and the terms "Incurs", "Incurred" and "Incurrence" shall have a correlative meaning; provided that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Subsidiary at the time it becomes a Subsidiary. Accrual of interest, the accretion of accreted value, the payment of interest in the form of additional Indebtedness, and the payment of dividends on Capital Stock constituting Indebtedness in the form of additional shares of the same class of Capital Stock, will be deemed not to be an Incurrence of Indebtedness. Any Indebtedness issued at a discount (including Indebtedness on which interest is payable through the issuance of additional Indebtedness) shall be deemed Incurred at the time of original issuance of the Indebtedness at the initial accreted amount thereof.

"Indebtedness": with respect to any Person on any date of determination (without duplication):

(i)     the principal of indebtedness of such Person for borrowed money;

(ii)    the principal of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(iii)   all reimbursement obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments (the amount of such obligations being equal at any time to the aggregate then undrawn and unexpired amount of such letters of credit, bankers' acceptances or other instruments plus the aggregate amount of drawings thereunder that have not then been reimbursed) (except to the extent such reimbursement obligations relate to Trade Payables and such obligations are expected to be satisfied within 30 days of becoming due and payable);

25

(iv)    the principal component of all obligations of such Person to pay the deferred and unpaid purchase price of property (except Trade Payables), which purchase price is due more than one year after the date of placing such property in final service or taking final delivery and title thereto;

(v)    all Financing Lease Obligations of such Person;

(vi)    the redemption, repayment or other repurchase amount of such Person with respect to any Disqualified Stock of such Person or (if such Person is a Subsidiary of Intermediate Holdings other than a Subsidiary Borrower or a Subsidiary Guarantor) any Preferred Stock of such Subsidiary, but excluding, in each case, any accrued dividends (the amount of such obligation to be equal at any time to the maximum fixed involuntary redemption, repayment or repurchase price for such Capital Stock, or if less (or if such Capital Stock has no such fixed price), to the involuntary redemption, repayment or repurchase price therefor calculated in accordance with the terms thereof as if then redeemed, repaid or repurchased, and if such price is based upon or measured by the fair market value of such Capital Stock, such fair market value shall be as determined in good faith by senior management of the Parent Borrower, the Board of Directors of the Parent Borrower or the Board of Directors of the issuer of such Capital Stock);

(vii)    all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; provided that the amount of Indebtedness of such Person shall be the lesser of (A) the fair market value of such asset at such date of determination (as determined in good faith by the Parent Borrower) and (B) the amount of such Indebtedness of such other Persons;

(viii)    all Guarantees by such Person of Indebtedness of other Persons, to the extent so Guaranteed by such Person; and

(ix)    to the extent not otherwise included in this definition, net Hedging Obligations of such Person (the amount of any such obligation to be equal at any time to the termination value of such agreement or arrangement giving rise to such Hedging Obligation that would be payable by such Person at such time); provided that, Indebtedness shall not include (p) any obligations whatsoever in respect of Vendor Financing Arrangements to the extent in excess of $2,500,000, (q) asset retirement obligations and obligations in respect of workers' compensation (including pensions and retiree medical care) that are not overdue by more than 60 days, (r) accrued expenses and royalties that are not overdue by more than one hundred and five (105) days and are not owed to an Affiliate of the Parent Borrower (for the avoidance of doubt, excluding trade payables), (s) prepaid or deferred revenue arising in the ordinary course of business, (t) any obligations attributable to the exercise of dissenters' or appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, (u) any liability for federal, state, local or other taxes owed or owing to any government or other taxing authority, (v) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (w) obligations, to the extent such obligations constitute Indebtedness, under any agreement that has been defeased or satisfied and discharged pursuant to the terms of such agreement,

(x) Contingent Obligations incurred in the ordinary course of business or consistent with past practice, (y) in connection with the purchase by Intermediate Holdings or any Restricted Subsidiary of any business, any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing (so long as (i) at the time of closing, the amount of any such payment is not determinable and (ii) to the extent such payment thereafter becomes fixed and determined, the amount is paid in a timely manner) or (z) for the avoidance of doubt, any obligations or liabilities which would be required to be classified and accounted for as an operating lease for financial reporting purposes in accordance with GAAP prior to the adoption of Accounting Standards Update No. 2016-02, Leases (Topic 842) by the Financial Accounting Standards Board.

The amount of Indebtedness of any Person at any date shall be determined as set forth above or as otherwise provided for in this Agreement, or otherwise shall equal the amount thereof that would appear as a liability on a balance sheet of such Person (excluding any notes thereto) prepared in accordance with GAAP.

"Indemnified Liabilities": as defined in Subsection 11.5(d).

"Indemnitee": as defined in Subsection 11.5(d).

"Initial Budget" means the initial Budget for the 13-week period commencing on or about the Petition Date, in form and substance acceptable to the Required Lenders, a copy of which is attached as Exhibit M.

"Initial Default": as defined in Subsection 1.2(c).

"Initial Lien": as defined in Subsection 8.6.

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insurance Subsidiary": any Subsidiary of Intermediate Holdings (i) that is a captive insurance Subsidiary or (ii) whose primary purpose and activity is the assumption of self-insurance risks and activities reasonably related thereto.

"Intellectual Property": as defined in Subsection 5.9.

"Interest Payment Date": (a) with respect to any ABR Loan, the last day of each calendar month, (b) with respect to any Term SOFR Rate Loan or EURIBOR Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Term SOFR Rate Loan or EURIBOR Loan with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period; provided that, with respect to any such Term SOFR Rate or EURIBOR Loan, (i) if any such date would be a day other than a Business Day, such date shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such date shall be the next

27

preceding Business Day and (ii) the Interest Payment Date with respect to any Borrowing that occurs on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in any applicable calendar month) shall be the last Business Day of any such succeeding applicable calendar month.

"Interest Period": with respect to any Term SOFR Rate Loan or EURIBOR Loan:

(a)      initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Term SOFR Rate Loan or EURIBOR Loan and ending one or three months in the case of Term SOFR Rate Loans or EURIBOR Loans thereafter; and

(b)      thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Term SOFR Rate Loan or EURIBOR Loan and ending one or three months; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)      if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)      any Interest Period that would otherwise extend beyond the applicable Maturity Date shall (for all purposes other than Subsection 4.12) end on the applicable Maturity Date; and

(iii)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Interest Rate Agreement": with respect to any Person, any interest rate protection agreement, future agreement, option agreement, swap agreement, cap agreement, collar agreement, hedge agreement or other similar agreement or arrangement (including derivative agreements or arrangements), as to which such Person is a party or a beneficiary.

"Interim DIP Order" means an interim order of the Bankruptcy Court that is in form and substance satisfactory to the Required Lenders (and as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders (with an email from counsel being sufficient) which may be withheld in their sole discretion).

"Interim Dollar Term Loan Commitment": collectively, the Interim New Money Term Loan Commitments and the Interim Roll-up Term Loan Commitments.

"Interim Dollar Term Loan Facility": as defined in the definition of "Facility."

28

"Interim Euro Term Loan Facility": as defined in the definition of "Facility."

"Interim New Money Dollar Term Loan": as defined in Subsection 2.1(a).

"Interim New Money Dollar Term Loan Commitments": as to any Lender, its obligation to make Interim New Money Term Loans to the Borrowers pursuant to Subsection 2.1(a) in an aggregate amount not to exceed at any one time outstanding the amount set forth opposite such Lender's name in Schedule A-1 under the heading "Interim New Money Dollar Term Loan Commitment"; collectively, as to all the Lenders, the "Interim New Money Term Loan Commitments." The original aggregate principal amount of the Interim New Money Dollar Term Loan Commitments on the Closing Date is $106,324,544.48[3].

"Interim New Money Euro Term Loan": as defined in Subsection 2.1(a)(ii).

"Interim New Money Euro Term Loan Commitments": as to any Lender, its obligation to make Interim New Money Euro Loans to the Borrowers pursuant to Subsection 2.1(a) in an aggregate amount not to exceed at any one time outstanding the amount set forth opposite such Lender's name in Schedule A-1 under the heading "Interim New Money Euro Term Loan Commitment"; collectively, as to all the Lenders, the "Interim New Money Euro Term Loan Commitments." The original aggregate principal amount of the Interim New Money Euro Term Loan Commitments on the Closing Date is €2,185,192.88[4].

"Interim New Money Term Loan Commitments": collectively, the Interim New Money Dollar Term Loan Commitments and the Interim New Money Euro Term Loan Commitments.

"Interim Roll-up Dollar Term Loan": as defined in Subsection 2.1(a).

"Interim Roll-up Dollar Term Loan Commitment": as to any Lender, its obligation to make Interim Dollar Term Loans to the Borrowers pursuant to Subsection 2.1(a) in an aggregate amount not to exceed at any one time outstanding the amount set forth opposite such Lender's name in Schedule A-1 under the heading "Interim Roll-Up Dollar Term Loan Commitment"; collectively, as to all the Lenders, the "Interim Roll-up Dollar Term Loan Commitments." The original aggregate principal amount of the Interim Roll-up Dollar Term Loan Commitments on the Closing Date is $106,324,544.48[5].

"Interim Roll-up Euro Term Loan Commitment": as to any Lender, its obligation to make Interim Euro Term Loans to the Borrowers pursuant to Subsection 2.1(a) in an aggregate amount not to exceed at any one time outstanding the amount set forth opposite such Lender's name in Schedule A-1 under the heading "Interim Roll-Up Euro Term Loan Commitment"; collectively, as to all the Lenders, the "Interim Roll-up Euro Term Loan Commitments." The

---

[3] Amount to be automatically updated by the amount set forth in Schedule A-1, including on the Closing Date.
[4] Amount to be automatically updated by the amount set forth in Schedule A-1, including on the Closing Date.
[5] Amount to be automatically updated by the amount set forth in Schedule A-1, including on the Closing Date.

original aggregate principal amount of the Interim Roll-up Euro Term Loan Commitments on the Closing Date is €1,748,154.30[6].

"Interim Roll-up Euro Term Loans": as defined in Subsection 2.1(a).

"Interim Term Loan Commitments": collectively, the Interim New Money Dollar Term Loan Commitments and the Interim New Money Euro Term Loan Commitments.

"Interim Term Loans": as defined in Subsection 2.1(a).

"Interpolated Rate": at any time, for any Interest Period, the rate per annum (rounded to the same number of decimal places as the EURIBOR Screen Rate) determined by the Administrative Agent (acting at the Direction of the Required Lenders) (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Term EURIBOR Screen Rate that is shorter than the Impacted Interest Period; and (b) the EURIBOR Screen Rate for the shortest period (for which the EURIBOR Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time. Notwithstanding the foregoing, if the Interpolated Rate, determined as set forth above, shall be less than 0.00%, such rate shall be deemed to be 0.00% for all purposes of this Agreement.

"Inventory": goods held for sale, lease or use by a Person in the ordinary course of business, net of any reserve for goods that have been segregated by such Person to be returned to the applicable vendor for credit, as determined in accordance with GAAP.

"Investment": in any Person by any other Person, any direct or indirect advance, loan or other extension of credit (other than to customers, dealers, distributors, licensees, franchisees, suppliers, consultants, directors, officers or employees of any Person in the ordinary course of business) or capital contribution (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others) to, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such Person. The amount of any Investment outstanding at any time shall be the original cost of such Investment (determined, in the case of any Investment made with assets of any Loan Party, based on the Fair Market Value of the assets invested and without taking into account subsequent increases or decreases in value).

"Investment Company Act": the Investment Company Act of 1940, as amended from time to time.

"Investment Grade Rating": a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or any equivalent rating by any other nationally recognized rating agency.

"Investment Grade Securities": (i) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents); (ii) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among Intermediate

---

[6] Amount to be automatically updated by the amount set forth in Schedule A-1, including on the Closing Date.

30

Holdings and its Subsidiaries; (iii) Investments in any fund that invests exclusively in Investments of the type described in clauses (i) and (ii) above, which fund may also hold cash pending Investment or distribution; and (iv) corresponding instruments in countries other than the United States customarily utilized for high quality Investments.

"Judgment Conversion Date": as defined in Subsection 11.8(a).

"Judgment Currency": as defined in Subsection 11.8(a).

"Junior Debt": any Subordinated Obligations.

"Lender Default": (a) the refusal (which may be given verbally or in writing and has not been retracted) or failure of any Lender to make available its portion of any incurrence of Loans, which refusal or failure is not cured within two Business Days after the date of such refusal or failure, (b) the failure of any Lender to pay over to the Administrative Agent, or any Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute, (c) a Lender has notified the Borrower Representative or the Administrative Agent that it does not intend to comply with its funding obligations hereunder, (d) a Lender has failed, within 10 Business Days after request by the Administrative Agent, to confirm that it will comply with its funding obligations hereunder (provided that such Lender Default pursuant to this clause (d) shall cease to be a Lender Default upon receipt of such confirmation by the Administrative Agent) or (e) an Agent or a Lender has admitted in writing that it is insolvent or such Agent or Lender becomes subject to a Lender-Related Distress Event or Bail-In Action.

"Lender-Related Distress Event": with respect to any Agent or Lender (each, a "Distressed Person"), a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person to be, insolvent or bankrupt; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Agent or Lender or any person that directly or indirectly controls such Agent or Lender by a Governmental Authority or an instrumentality thereof; provided, further, that the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to an Agent or Lender or any other person that directly or indirectly controls such Agent or Lender under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation) shall not be deemed to be a "Lender-Related Distress Event" with respect to such Agent or Lender or any person that directly or indirectly controls such Agent or Lender.

"Lenders": the several lenders from time to time parties to this Agreement together with, in the case of any such lender that is a bank or financial institution, any Affiliate of any such bank or financial institution through which such bank or financial institution elects, by notice to the Administrative Agent and the Borrower Representative, to make any Loans available to the Borrowers, provided that for all purposes of voting or consenting with respect to (a) any

31

amendment, supplement or modification of or to any Loan Document, (b) any waiver of any of the requirements of any Loan Document or any Default or Event of Default and its consequences or (c) any other matter as to which a Lender may vote or consent pursuant to Subsection 11.1, the bank or financial institution making such election shall be deemed the "Lender" rather than such Affiliate, which shall not be entitled to so vote or consent.

"Liabilities": collectively, any and all claims, obligations, liabilities, causes of action, actions, suits, proceedings, investigations, judgments, decrees, losses, damages, fees, costs and expenses (including interest, penalties and fees and disbursements of attorneys, accountants, investment bankers and other professional advisors), in each case whether Incurred, arising or existing with respect to third parties or otherwise at any time or from time to time.

"Lien": any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof).

"Loan": each Term Loan, as the context shall require; collectively, the "Loans."

"Loan Documents": this Agreement, any Notes, the Guarantee Agreement, the Collateral Agreement, the Prepetition ABL/Cash Flow Intercreditor Agreement and any other Security Documents, each as amended, restated, supplemented, waived or otherwise modified from time to time.

"Loan Parties": Holdings, Intermediate Holdings, the Borrowers and the Subsidiary Guarantors; each individually, a "Loan Party."

"Management Advances": (1) loans or advances made to directors, management members, officers, employees or consultants of any Parent Entity, Intermediate Holdings or any Restricted Subsidiary (x) in respect of travel, entertainment or moving related expenses Incurred in the ordinary course of business, (y) in respect of moving related expenses Incurred in connection with any closing or consolidation of any facility, or (z) in the ordinary course of business, not exceeding amounts set forth in the Approved Budget for clauses (x), (y) and (z) combined, (2) promissory notes of Management Investors acquired in connection with the issuance of Management Stock to such Management Investors, (3) Management Guarantees, or (4) other Guarantees of borrowings by Management Investors in connection with the purchase of Management Stock, which Guarantees are permitted under Subsection 8.1.

"Management Guarantees": Guarantees made on behalf of, or in respect of loans or advances made to, directors, officers, employees, management members or consultants of any Parent Entity, Intermediate Holdings or any Restricted Subsidiary (1) in respect of travel, entertainment and moving related expenses Incurred in the ordinary course of business, or (2) in the ordinary course of business not exceeding amounts set forth the in the Approved Budget for clauses (1) and (2) combined at any time.

"Management Investors": the current or former management members, officers, directors, employees and other members of the management of any Parent Entity, Intermediate Holdings or any of their respective Subsidiaries, or family members or relatives of any of the foregoing, or trusts, partnerships or limited liability companies for the benefit of any of the

foregoing, or any of their heirs, executors, successors and legal representatives, who at any date beneficially own or have the right to acquire, directly or indirectly, Capital Stock of Intermediate Holdings, any of its Subsidiaries or any Parent Entity (including any options, warrants or other rights in respect thereof).

"Management Stock": Capital Stock of Intermediate Holdings, any Restricted Subsidiary or any Parent Entity (including any options, warrants or other rights in respect thereof) held by any of the Management Investors.

"Master Consent to Assignment": means that certain Master Consent to Assignment, dated as of the Closing Date among certain of the Borrowers, the Fronting Lender and the Administrative Agent, as the same may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time.

"Material Adverse Effect": means a material adverse effect on (i) the business, financial condition, or results of operations of Holdings and its Subsidiaries, taken as a whole, (ii) the ability of the Loan Parties (taken as a whole) to perform their respective obligations under the Loan Documents, or (iii) the rights or remedies of the Agents or the Lenders under the Loan Documents (taken as a whole) (other than, in the case of this clause (iii), solely as a result of any action taken by the Agents or the Lenders (excluding any action against any Agent or Lender taken by Holdings, the Parent Borrower, their respective Subsidiaries or their respective Affiliates)); *provided* that Material Adverse Effect shall expressly exclude the effect of (A) the filing of the Chapter 11 Cases, the events and conditions resulting from or leading up thereto and/or typically resulting from the filing of cases under chapter 11 of the Bankruptcy Code or (B) any action required to be taken under the Loan Documents or the Orders and (C) any matters publicly disclosed prior to the filing of the Chapter 11 Cases.

"Material Intellectual Property": any Intellectual Property owned by Intermediate Holdings or any Restricted Subsidiary that is material to the operations of the business of Intermediate Holdings and its Restricted Subsidiaries, taken as a whole.

"Material Property": property or assets (other than Material Intellectual Property), whether or not Collateral, that are material to the business operations of Intermediate Holdings and its Restricted Subsidiaries, taken as a whole.

"Material Subsidiaries": Restricted Subsidiaries of the Parent Borrower constituting, individually or in the aggregate (as if such Restricted Subsidiaries constituted a single Subsidiary), a "significant subsidiary" in accordance with Rule 1-02 under Regulation S-X.

"Materials of Environmental Concern": any pollutants, contaminants, hazardous or toxic substances or materials or wastes defined, listed, or regulated as such in or under, or which may give rise to liability under, any applicable Environmental Law, including gasoline, petroleum (including crude oil or any fraction thereof), petroleum products or by-products, asbestos, per-and polyfluoroalkyl substances and polychlorinated biphenyls.

"Maturity Date": subject to the Orders, the date that is the earliest of (a) the date that is ten (10) months after the entry of the Interim DIP Order; *provided* that this clause (a) may be extended with the consent of the Required Lenders, (b) the effective date of a plan of

reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (c) the acceleration of the DIP Facility Obligations in accordance with the terms hereof, (d) dismissal of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to one or more cases under chapter 7 of the Bankruptcy Code (solely with respect to dismissal, without the consent of the Required Lenders), and (e) the sale of all or substantially all of the Debtors' assets, taken as a whole, under section 363 of the Bankruptcy Code.

"Moody's": Moody's Investors Service, Inc., and its successors.

"Multiemployer Plan": a Plan which is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Available Cash": from an Asset Disposition or Recovery Event (each, a "NAC Event") an amount equal to the cash payments received (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to the properties or assets that are the subject of such NAC Event or received in any other non-cash form) therefrom, in each case net of (i) all legal, title and recording tax expenses, commissions and other fees and expenses Incurred and (without duplication) all federal, state, provincial, foreign and local taxes required to be paid or to be accrued as a liability under GAAP, in each case, as a consequence of, or in respect of, such Asset Disposition or Recovery Event (including as a consequence of any transfer of funds in connection with the application thereof in accordance with Subsection 8.4), (ii) all payments made, and all installment payments required to be made, on any Indebtedness (other than Indebtedness secured by Liens on the Collateral that are required by the express terms of this Agreement to be *pari passu* with or junior to the Liens on the Collateral securing the DIP Facility Obligations) (x) that is secured by any assets subject to such NAC Event or involved in such NAC Event, in accordance with the terms of any Lien upon such assets, or (y) that must by its terms, or in order to obtain a necessary consent to such NAC Event, or by applicable law, be repaid out of the proceeds from such NAC Event, (iii) all distributions and other payments required to be made to minority interest holders in Subsidiaries or joint ventures as a result of such NAC Event, or to any other Person (other than Intermediate Holdings or a Restricted Subsidiary) owning a beneficial interest in the assets disposed of in such NAC Event or subject to such NAC Event, (iv) any liabilities or obligations associated with the assets disposed of in such NAC Event or involved in such NAC Event and retained, indemnified or insured by Intermediate Holdings or any Restricted Subsidiary after such NAC Event, including pension and other post-employment benefit liabilities, liabilities related to environmental matters, and liabilities relating to any indemnification obligations associated with such NAC Event, (v) in the case of an Asset Disposition, the amount of any purchase price or similar adjustment (x) claimed by any Person to be owed by Intermediate Holdings or any Restricted Subsidiary, until such time as such claim shall have been settled or otherwise finally resolved, or (y) paid or payable by Intermediate Holdings or any Restricted Subsidiary, in each case in respect of such Asset Disposition and (vi) in the case of any Recovery Event, any amount thereof that constitutes or represents reimbursement or compensation for any amount previously paid or to be paid by Intermediate Holdings or any of its Subsidiaries.

"Net Available Cash Amount": as defined in Subsection 8.4(a)(ii).

34

"Net Cash Proceeds": with respect to any issuance or sale of any securities of, or the Incurrence of Indebtedness by, the Parent Borrower or any Subsidiary, or any capital contribution to the Parent Borrower or any Subsidiary, the cash proceeds of such issuance, sale, Incurrence or contribution received by the Parent Borrower or such Subsidiary net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees actually Incurred in connection with such issuance, sale, contribution or Incurrence and net of all taxes paid or payable as a result, or in respect, thereof.

"New York Courts": as defined in Subsection 11.13(a).

"New York Supreme Court": as defined in Subsection 11.13(a).

"Non-Consenting Lender": as defined in Subsection 11.1(g).

"Non-Excluded Taxes": all Taxes other than Excluded Taxes.

"Non-Loan Party Investment Cap": $20,000,000 in the aggregate with respect to (x) all Investments in non-Loan Parties incurred pursuant to (x) the following clauses of "Permitted Investments": (i), (ii), (xviii) and (xii), (y) all Indebtedness of any Restricted Subsidiary that is not a Loan Party owing to any Loan Party pursuant to Section 8.1(b)(ii), and all Guarantees by or for the benefit of non-Loan Parties under Section 8.1(b)(vi) and (z) all dispositions from a Loan Party to a non-Loan Party which are excluded pursuant to clause (i) of "Asset Disposition".

"Note": as defined in Subsection 2.2.

"NYFRB": the Federal Reserve Bank of New York.

"Obligation Currency": as defined in Subsection 11.8(a).

"Obligations": with respect to any Indebtedness, any principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to Intermediate Holdings or any Restricted Subsidiary whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, Guarantees of such Indebtedness (or of obligations in respect thereof), other monetary obligations of any nature and all other amounts payable thereunder or in respect thereof.

"OFAC": as defined in clause (c) of the first sentence of Subsection 5.21.

"OID Premium": as defined in Subsection 4.5(d).

"Orders" means individually or collectively, as the context may require, the Interim DIP Order and the Final DIP Order and any other such order of the Bankruptcy Court relating to the treatment of this Agreement under the Chapter 11 Cases.

"Organizational Documents": with respect to any Person, (a) the articles of incorporation, certificate of incorporation or certificate of formation (or the equivalent

35

organizational documents) of such Person and (b) the by-laws, operating agreement or partnership agreement (or the equivalent governing documents) of such Person.

"Overnight Bank Funding Rate": for any day, the rate comprised of both overnight federal funds and overnight eurodollar borrowings by U.S.-managed banking offices of depository institutions (as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time) and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"Parent Borrower": as defined in the Preamble hereto, and any successor in interest thereto permitted hereunder.

"Parent Entity": any of Topco, Topco Borrower, Holdings, Intermediate Holdings and any other Person that is a Subsidiary of Topco and of which the Parent Borrower is a Subsidiary, in each case, solely for so long as the Parent Borrower remains a Subsidiary of such Person. The Parent Borrower shall not in any event be deemed to be a "Parent Entity."

"Participant": as defined in Subsection 11.6(c)(i).

"Participant Register": as defined in Subsection 11.6(b)(v).

"Patriot Act": as defined in Subsection 11.18.

"Payment": as defined in Subsection 10.5(b).

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor thereto).

"Permitted Affiliated Assignee": (i) CD&R, any investment fund managed or controlled by CD&R or (ii) any special purpose vehicle established by CD&R or by one or more of such investment funds managed or controlled by CD&R.

"Permitted Investment": an Investment by Topco Borrower or any Restricted Subsidiary in, or consisting of, any of the following:

(i)     a Restricted Subsidiary, Topco Borrower, or a Person that will, upon the making of such Investment, become a Restricted Subsidiary (and any Investment held by such Person that was not acquired by such Person, or made pursuant to a commitment by such Person that was not entered into, in contemplation of so becoming a Restricted Subsidiary) in an aggregate amount outstanding at any time not to exceed the Non-Loan Party Investment Cap;

(ii)     another Person if as a result of such Investment such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, or is liquidated into, Intermediate Holdings or a Restricted Subsidiary (and, in each case, any Investment held by such other Person that was not acquired by such Person, or made pursuant to a commitment by such Person that was not entered into, in contemplation of

36

such merger, consolidation or transfer); <u>provided</u> that the aggregate amount of Investments in non-Loan Party Restricted Subsidiaries shall not exceed the Non-Loan Party Investment Cap;

(iii)     Temporary Cash Investments, Investment Grade Securities or Cash Equivalents;

(iv)     receivables owing to Intermediate Holdings or any Restricted Subsidiary, if created or acquired in the ordinary course of business;

(v)     any securities or other Investments received as consideration in, or retained in connection with, sales or other dispositions of property or assets;

(vi)     securities or other Investments received in settlement of debts created in the ordinary course of business and owing to, or of other claims asserted by Intermediate Holdings or any Restricted Subsidiary, or as a result of foreclosure, perfection or enforcement of any Lien, or in satisfaction of judgments, including in connection with any bankruptcy proceeding or other reorganization of another Person;

(vii)     Investments in existence or made pursuant to legally binding written commitments in existence on the Closing Date and, for any such Investment or legally binding written commitment in an aggregate amount outstanding on the Closing Date in excess of $500,000, set forth on <u>Schedule 1.1(e)</u>, and, in each case, any extension, modification, replacement, reinvestment or renewal thereof; <u>provided</u> that the amount of any such Investment may be increased in such extension, modification, replacement, reinvestment or renewal only (<u>x</u>) as required by the terms of such Investment or binding commitment as in existence on the Closing Date (including as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities) or (<u>y</u>) as otherwise permitted by this Agreement;

(viii)     Currency Agreements, Interest Rate Agreements, Commodities Agreements and related Hedging Obligations, which obligations are Incurred in compliance with <u>Subsection 8.1</u>;

(ix)     pledges or deposits (<u>x</u>) with respect to leases or utilities provided to third parties in the ordinary course of business or (<u>y</u>) otherwise described in the definition of "Permitted Liens" or made in connection with Liens permitted under <u>Subsection 8.6</u>;

(x)     [reserved];

(xi)     [reserved];

(xii)     [reserved];

(xiii)     [reserved];

(xiv)     Management Advances;

(xv)     Investments in Related Businesses in an aggregate amount outstanding at any time not to exceed $2,500,000;

(xvi)    any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Subsection 8.5(b) (except transactions described in clauses (i), (ii)(4), (iii) and (ix)), including any Investment pursuant to any transaction described in Subsection 8.5(b)(ii) (whether or not any Person party thereto is at any time an Affiliate of Intermediate Holdings);

(xvii)   [reserved];

(xviii)  other Investments in an aggregate amount outstanding at any time not to exceed $2,500,000; provided that the aggregate amount of Investments in non-Loan Party Restricted Subsidiaries shall not exceed the Non-Loan Party Investment Cap;

(xix)    Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and similar deposits entered into as a result of the operations of the business of Intermediate Holdings and its Subsidiaries in the ordinary course of business or consistent with past practice;

(xx)     [reserved];

(xxi)    [reserved]; and

(xxii)   Investments made in the ordinary course of business or consistent with past practice in connection with obtaining, maintaining or renewing client contracts and loans or advances made to distributors in the ordinary course of business or consistent with past practice to the extent included in the Approved Budget; provided that the aggregate amount of Investments in non-Loan Party Restricted Subsidiaries shall not exceed the Non-Loan Party Investment Cap.

"Permitted Liens":

(a)     Liens for taxes, assessments or other governmental charges or claims not yet delinquent or the nonpayment of which in the aggregate would not reasonably be expected to have a Material Adverse Effect on Intermediate Holdings and its Restricted Subsidiaries, taken as a whole, or that are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of Intermediate Holdings or a Subsidiary thereof, as the case may be, in accordance with GAAP and Liens arising from the nonpayment of Taxes, the nonpayment of which is permitted or required by the Bankruptcy Code;

(b)     Liens with respect to outstanding motor vehicle fines and carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other like Liens arising in the ordinary course of business in respect of obligations that are not known to be overdue for a period of more than 60 days or that are bonded or that are being contested in good faith and by appropriate proceedings or which in the aggregate would not reasonably

38

be expected to have a Material Adverse Effect on Intermediate Holdings and its Restricted Subsidiaries, taken as a whole;

(c)    pledges, deposits or Liens in connection with workers' compensation, professional liability insurance, insurance programs, unemployment insurance and other social security and other similar legislation or other insurance-related obligations (including pledges or deposits securing liability to insurance carriers under insurance or self-insurance arrangements);

(d)    pledges, deposits or Liens to secure the performance of bids, tenders, trade, government or other contracts (other than for borrowed money), obligations for utilities, leases, licenses, statutory obligations, completion Guarantees, surety, judgment, appeal or performance bonds, other similar bonds, instruments or obligations, and other obligations of a like nature Incurred in the ordinary course of business;

(e)    (i) easements (including reciprocal easement agreements), rights-of-way, building, zoning and similar restrictions, utility agreements, covenants, reservations, restrictions, encroachments, charges, and other similar encumbrances or title defects or irregularities Incurred, (ii) any other matters that would be disclosed in an accurate survey affecting real property or (iii) leases or subleases granted, licenses or sublicenses granted, or occupancy agreements granted to others, whether or not of record and whether now in existence or hereafter entered into which do not in the aggregate materially interfere with the ordinary conduct of the business of Intermediate Holdings and its Subsidiaries, taken as a whole;

(f)    Liens existing on the Closing Date and, for any such Lien registered in the United States (or any jurisdiction of the foreign Loan Parties which has a lien search registry similar to the UCC registry in the United States) or written arrangement securing Indebtedness or other obligations in an aggregate amount outstanding on the Closing Date in excess of $250,000, set forth on Schedule 1.1(g), or (in the case of any such Liens securing Indebtedness of Intermediate Holdings or any of its Subsidiaries existing or arising under written arrangements existing on the Closing Date); provided that with respect to Liens that are not registered in the United States, to the extent there is a UCC equivalent registry in the applicable foreign registry, the Loan Parties may supplement such Schedule 1.1(g) by the date that is no later than the 30th day following the Closing Date, and such Liens shall be treated hereunder as if they were set forth on such Schedule as of the Closing Date;

(g)    (i) mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by any developer, landlord or other third party on property over which Intermediate Holdings or any Restricted Subsidiary of Intermediate Holdings has easement rights or on any leased property and subordination or similar agreements relating thereto and (ii) any condemnation, eminent domain or compulsory purchase rights or proceedings affecting any real property;

39

(h)    Liens securing Indebtedness (including Liens securing any Obligations in respect thereof) consisting of Purchase Money Obligations or Financing Lease Obligations Incurred in compliance with Subsection 8.1;

(i)    Liens arising out of judgments, decrees, orders or awards in respect of which Intermediate Holdings or any Restricted Subsidiary shall in good faith be prosecuting an appeal or proceedings for review, which appeal or proceedings shall not have been finally terminated, or if the period within which such appeal or proceedings may be initiated shall not have expired;

(j)    leases, subleases, licenses, sublicenses or occupancy agreements to or from third parties;

(k)    Liens securing Indebtedness (including Liens securing any Obligations in respect thereof) consisting of Indebtedness Incurred in compliance with Subsection 8.1(b)(i) pursuant to (a) this Agreement and the other Loan Documents, (b) the DIP Secured Notes, (c) the Prepetition First Lien Debt and (d) the Prepetition ABL Agreement, subject to the terms of the Prepetition ABL/Cash Flow Intercreditor Agreement;

(l)    [Reserved];

(m)    Liens on Capital Stock, Indebtedness or other securities of any joint venture that secure Indebtedness or other obligations of such joint venture;

(n)    any encumbrance or restriction (including, but not limited to, pursuant to put and call agreements or buy/sell arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(o)    [reserved];

(p)    Liens (1) arising by operation of law (or by agreement to the same effect) in the ordinary course of business, including Liens arising under or by reason of the Perishable Agricultural Commodities Act of 1930, as amended from time to time, (2) on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets, (3) [reserved], (4) [reserved], (5) securing or arising by reason of any netting or set-off or customer deposit arrangement entered into in the ordinary course of banking or other trading activities (including in connection with purchase orders and other agreements with customers), (6) in favor of Intermediate Holdings or any Subsidiary (other than Liens on property or assets of a Borrower or any Subsidiary Guarantor in favor of any Subsidiary that is not a Subsidiary Guarantor), (7) arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business, (8) on Inventory or other goods and proceeds securing obligations in respect of bankers' acceptances issued or created to facilitate the purchase, shipment or storage of such Inventory or other goods, (9) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft, cash pooling or similar obligations Incurred in the ordinary course of business, (10) attaching to commodity trading or other brokerage accounts Incurred in the ordinary course of business, (11) [reserved], (12)

40

[reserved], (13) arising in the ordinary course of business on any amounts (including the proceeds of the applicable Indebtedness and any cash, Cash Equivalents and Temporary Cash Investments deposited to cover interest and premium in respect of such Indebtedness) held by a trustee or escrow agent under any indenture or other debt agreement governing Indebtedness issued in escrow pursuant to customary escrow arrangements (as determined by Intermediate Holdings in good faith) pending the release thereof, or on the proceeds deposited to discharge, redeem or defease Indebtedness under any indenture or other debt agreement pursuant to customary discharge, redemption or defeasance provisions (as determined by Intermediate Holdings in good faith), pending such discharge, redemption or defeasance and after irrevocable notice thereof has been delivered to the applicable trustee or agent, (14) on equipment of Intermediate Holdings or any of its Restricted Subsidiaries granted in the ordinary course of business to Intermediate Holdings' or a Restricted Subsidiary's customers, (15) [reserved] or (16) arising in connection with overage provisions in respect of any purchase of any interest in real property permitted under this Agreement;

(q)　　other Liens securing Indebtedness or other obligations that in the aggregate at any time outstanding do not exceed $2,500,000 at the time of Incurrence of such Indebtedness or other obligations;

(r)　　[reserved];

(s)　　[reserved];

(t)　　[reserved]; and

(u)　　Liens on (x) Vendor Collateral securing Vendor Financing Arrangements and (y) Inventory and Accounts Receivable (in each case, as defined in the Collateral Agreement) (together with, in each case, the proceeds thereof, including any proceeds thereof held in any Deposit Accounts) securing Vendor Financing Arrangements, which Liens in the case of this clause (y) shall be permitted on a junior priority to the Liens securing the DIP Facility Obligations and the Obligations (as defined in the Prepetition ABL Agreement) (such Inventory and Accounts Receivable (and proceeds thereof), "Designated Vendor Priority Collateral"); provided that the Collateral Agent and the applicable agent and/or lender(s), as the case may be, under each such Vendor Financing Arrangement shall be subject to intercreditor arrangements reasonably satisfactory to the Required Lenders; and

(v)　　any Lien mandatorily required under applicable law to be granted in favor of creditors as a consequence of the termination of a domination and/or profit and loss pooling agreement; and

For purposes of determining compliance with this definition, a Lien need not be Incurred solely by reference to one category of Permitted Liens described in this definition but may be Incurred under any combination of such categories (including in part under one such category and in part under any other such category).

"Permitted Payment": as defined in Subsection 8.2(b).

41

"Person": an individual, partnership, corporation, company, limited liability company, business trust, trust, joint stock company, unincorporated organization, association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": at a particular time, any benefit plan which is covered by ERISA and in respect of which Intermediate Holdings or a Commonly Controlled Entity is an "employer" as defined in Section 3(5) of ERISA.

"Plan Sponsor": certain Affiliates of CD&R constituting Permitted Affiliated Assignees.

"Plan Sponsor Advisors": Latham & Watkins LLP, Debevoise & Plimpton LLP, Lowenstein Sandler LLP and Moelis & Company LLC.

"Plan Sponsor Lender": any Lender that is a Plan Sponsor.

"Plan Sponsor Lender Assignment and Assumption": as defined in Subsection 11.6(h)(i)(1).

"Platform": Intralinks, SyndTrak Online, Debtdomain or any other similar electronic distribution system.

"Post-Petition": any time after the Petition is filed.

"Preferred Stock": as applied to the Capital Stock of any corporation or company, Capital Stock of any class or classes (however designated) that by its terms is preferred as to the payment of dividends, or as to the distribution, sale, disposition or any other transfer of assets upon any voluntary or involuntary liquidation or dissolution of such corporation or company, over Capital Stock of any other class of such corporation or company.

"Prepayment Date": as defined in Subsection 4.4(h).

"Prepetition 2024 Senior Secured Notes": 8.625% Senior Secured Notes due 2031 of Intermediate Holdings issued on October 8, 2024, as the same may be exchanged for substantially similar senior secured notes that have been registered under the Securities Act, and as the same or such substantially similar notes may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Prepetition 9.500% Senior Secured Notes": 9.500% Senior Secured Notes due 2028 of Intermediate Holdings issued under the Prepetition 9.500% Supplemental Indenture, as the same may be exchanged for substantially similar senior secured notes that have been registered under the Securities Act, and as the same or such substantially similar notes may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Prepetition 9.500% Supplemental Indenture": the Fourth Supplemental Indenture to the Prepetition Senior Secured Notes Indenture, dated as of April 3, 2023, under which the 9.500% Senior Secured Notes are issued, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Prepetition ABL Agent": Barclays Bank PLC, in its capacity as administrative agent and collateral agent under the Prepetition ABL Facility Documents, or any successor administrative agent and/or collateral agent under the Prepetition ABL Facility Documents.

"Prepetition ABL Agreement": the ABL Credit Agreement, dated as of October 29, 2021 (as amended from time to time), among Intermediate Holdings, the foreign borrowers and U.S. subsidiary borrowers party thereto from time to time, the lenders party thereto from time to time and Barclays Bank PLC (and/or one of its Affiliates), as administrative agent and collateral agent thereunder, as such agreement may be amended, supplemented, waived or otherwise modified from time to time.

"Prepetition ABL Documents": the "Loan Documents" as defined in the Prepetition Senior ABL Agreement, as the same may be amended, supplemented, waived or otherwise modified from time to time or refunded, refinanced, restructured, replaced, renewed, repaid, increased, decreased or extended from time to time.

"Prepetition ABL Loans": the loans borrowed under the Prepetition Senior ABL Agreement.

"Prepetition ABL/Cash Flow Intercreditor Agreement": the ABL Intercreditor Agreement, dated as of July 1, 2019, between Barclays Bank PLC (as successor in interest to Bank of America, N.A.), as collateral agent for the holders of the Revolving Credit Obligations (as defined therein), Barclays Bank PLC (as successor in interest to Bank of America, N.A.), as collateral agent for the holders of the Initial Fixed Asset Obligations (as defined therein) and Wilmington Trust, National Association, as collateral agent for the holders of the Initial Additional Fixed Asset Obligations (as defined therein) and acknowledged by certain of the Loan Parties, , as the same may be further amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof and thereof.

"Prepetition Cash Flow Credit Agreement" means that certain Cash Flow Credit Agreement dated as of October 29, 2021 as amended from time to time, among Intermediate Holdings, the Borrowers, the several banks and other financial institutions from time to time party thereto and Barclays Bank PLC, as administrative agent and collateral agent.

"Prepetition Cash Flow Debt Documents" means the "Loan Documents" as defined in the Prepetition Cash Flow Credit Agreement, as the same may be amended, supplemented, waived or otherwise modified from time to time or refunded, refinanced, restructured, replaced, renewed, repaid, increased, decreased or extended from time to time.

"Prepetition Debt" means the Prepetition Secured Debt and the Prepetition Unsecured Debt.

"Prepetition Existing Unsecured Notes": the senior notes issued under the Prepetition Existing Unsecured Notes Indenture.

"Prepetition Existing Unsecured Notes Documents": the Prepetition Existing Unsecured Notes Indenture and all other documents executed and delivered with respect to the Prepetition Existing Unsecured Notes or the Prepetition Existing Unsecured Notes Indenture, as

the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time in accordance with the terms hereof and thereof.

"Prepetition Existing Unsecured Notes Indenture": the Indenture, dated as of July 1, 2019 (as amended, restated, supplemented or otherwise modified from time to time), by and among Holdings, LABL Escrow Issuer, LLC, as issuer, Intermediate Holdings, the other guarantors party thereto and Wilmington Trust, National Association, as trustee, pursuant to which $690,000,000 aggregate principal amount of 10.50% senior notes due 2027 were issued.

"Prepetition First Lien Claims": any Claim arising under, derived from, or on account of the Prepetition Secured Notes and Prepetition Cash Flow Credit Agreement.

"Prepetition First Lien Debt" means any secured Indebtedness of any Debtor outstanding on the Petition Date under any of the Prepetition Secured Notes and Prepetition Cash Flow Credit Agreement.

"Prepetition First Lien Debt Documents"" the Prepetition Secured Note Documents and the Prepetition Cash Flow Debt Documents.

"Prepetition Secured Debt" means any secured Indebtedness of any Debtor outstanding on the Petition Date under any of the Prepetition ABL Agreement, Prepetition Secured Notes and Prepetition Cash Flow Credit Agreement.

"Prepetition Secured Notes" means any of the Prepetition 2024 Senior Secured Notes, Prepetition 9.500% Senior Secured Notes or the Prepetition Senior Secured Notes.

"Prepetition Senior Secured Notes": 5.875% Senior Secured Notes due 2028 of Intermediate Holdings issued on October 29, 2021, as the same may be exchanged for substantially similar senior secured notes that have been registered under the Securities Act, and as the same or such substantially similar notes may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Prepetition Senior Secured Notes Documents": the Prepetition Senior Secured Notes Indenture and all other instruments, agreements and other documents evidencing or governing the Prepetition Senior Secured Notes or providing for any Guarantee, obligation, security or other right in respect thereof, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Prepetition Senior Secured Notes Indenture": the Indenture dated as of October 29, 2021 (as amended from time to time), under which the Prepetition Senior Secured Notes are issued, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Prepetition Senior Unsecured Notes": 8.250% Senior Notes due 2029 of Intermediate Holdings issued on October 29, 2021, as the same may be exchanged for substantially similar senior unsecured notes that have been registered under the Securities Act, and as the same or such substantially similar notes may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Prepetition Senior Unsecured Notes Documents": the Prepetition Senior Unsecured Notes Indenture and all other instruments, agreements and other documents evidencing or governing the Prepetition Senior Unsecured Notes or providing for any Guarantee, obligation, security or other right in respect thereof, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Prepetition Senior Unsecured Notes Indenture": the Indenture dated as of the October 29, 2021 (as amended from time to time), under which the Prepetition Senior Unsecured Notes are issued, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Prepetition Unsecured Debt": means any Indebtedness of any Debtor outstanding on the Petition Date under any of the Prepetition Senior Unsecured Notes and Prepetition Existing Unsecured Notes.

"Prime Rate": the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent (acting at the Direction of the Required Lenders)) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent (acting at the Direction of the Required Lenders)).

"Professional Fee Disbursements" means the disbursements of the type identified as "Professional Fees" (or any similar term) provided under the Initial Budget and subsequent Approved Budget.

"PTE": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Purchase Money Obligations": any Indebtedness Incurred to finance or refinance the acquisition, leasing, construction or improvement of property (real or personal) or assets, and whether acquired through the direct acquisition of such property or assets or the acquisition of the Capital Stock of any Person owning such property or assets, or otherwise.

"QFC": as defined in Subsection 11.24(b).

"QFC Credit Support": as defined in Subsection 11.24.

"Receivable": a right to receive payment pursuant to an arrangement with another Person pursuant to which such other Person is obligated to pay, as determined in accordance with GAAP.

"Recipient": as defined in Subsection 10.5(b).

"Recovery Event": any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrowers or any Restricted Subsidiary constituting Collateral giving rise to Net Available Cash to

Intermediate Holdings or such Restricted Subsidiary, as the case may be, in excess of $10.0 million, to the extent that such settlement or payment does not constitute reimbursement or compensation for amounts previously paid by Intermediate Holdings or any Restricted Subsidiary in respect of such casualty or condemnation.

"refinance": refinance, refund, replace, renew, repay, modify, restate, defer, substitute, supplement, reissue, resell or extend (including pursuant to any defeasance or discharge mechanism); and the terms "refinances", "refinanced" and "refinancing" as used for any purpose in this Agreement shall have a correlative meaning.

"Register": as defined in Subsection 11.6(b)(iv).

"Regulation D": Regulation D of the Board as in effect from time to time.

"Regulation S-X": Regulation S-X promulgated by the SEC as in effect on the Closing Date.

"Regulation T": Regulation T of the Board as in effect from time to time.

"Regulation U": Regulation U of the Board as in effect from time to time.

"Regulation X": Regulation X of the Board as in effect from time to time.

"Related Business": those businesses in which Intermediate Holdings or any of its Subsidiaries is engaged on the Petition Date, or that are similar, related or extensions, developments or expansions thereof.

"Related Fund": with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender (or by an Affiliate of such investment advisor).

"Related Parties": with respect to any Person, such Person's Affiliates and the partners, officers, directors, trustees, employees, equity holders, shareholders, members, attorneys and other advisors, agents and controlling persons of such Person and of such Person's Affiliates and "Related Party" shall mean any of them.

"Related Taxes": (x) any taxes, charges or assessments, including but not limited to sales, use, transfer, rental, ad valorem, value added, stamp, property, consumption, franchise, license, capital, net worth, gross receipts, excise, occupancy, intangibles or similar taxes, charges or assessments (other than federal, state or local taxes measured by income and federal, state or local withholding imposed by any government or other taxing authority on payments made by any Parent Entity other than to another Parent Entity), required to be paid by any Parent Entity by virtue of its being incorporated or having Capital Stock outstanding (but not by virtue of owning stock or other equity interests of any corporation or other entity other than Intermediate Holdings, any of its Subsidiaries), or being a holding company parent of Intermediate Holdings, any of its Subsidiaries or receiving dividends from or other distributions in respect of the Capital Stock of Intermediate Holdings, any of its Subsidiaries or any Parent Entity, or having guaranteed any obligations of Intermediate Holdings or any Subsidiary thereof, or having received any payment

46

in respect of any of the items for which Intermediate Holdings or any of its Subsidiaries is permitted to make payments to any Parent Entity pursuant to Subsection 8.2, or acquiring, developing, maintaining, owning, prosecuting, protecting or defending its intellectual property and associated rights (including but not limited to receiving or paying royalties for the use thereof), or assertions of infringement, misappropriation, dilution or other violation of third-party intellectual property or associated rights, to the extent relating to the business or businesses of Intermediate Holdings or any Subsidiary thereof, (y) any taxes attributable to any taxable period (or portion thereof) ending on or prior to the Closing Date, or to the consummation of any of the Transactions, or to any Parent Entity's receipt of (or entitlement to) any payment in connection with the Transactions, including any payment received after the Closing Date pursuant to any agreement related to and contemplated by the Transactions or (z) any other federal, state, or local taxes measured by net income for which Topco Borrower is liable up to an amount not to exceed, the amount of any such taxes that Intermediate Holdings and its Subsidiaries would have been required to pay on a consolidated basis as if Intermediate Holdings had filed a consolidated return on behalf of an affiliated group (as defined in Section 1504 of the Code) consisting only of Intermediate Holdings and its Subsidiaries of which it were the common parent. Taxes include all interest, penalties and additions relating thereto.

"Reportable Event": any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period is waived under Section 21, 22, 23, 24, 25, 27 or 28 of PBGC Regulation Section 4043 or any successor regulation thereto.

"Required Backstop Lenders": Backstop Lenders holding in excess of 50.0% of the aggregate Backstop Commitments (inclusive of such Loans funded by such Backstop Commitments); provided that any Backstop Lender that is also a Plan Sponsor Lender shall be deemed to have voted its interest as a Backstop Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Backstop Lenders who are not such Plan Sponsor Lenders.

"Required Consenting First Lien Lenders": has the meaning assigned to the term in the RSA.

"Required Lenders": Lenders (together with DIP Note Holders) the Total Credit Percentages of which aggregate to greater than 50.0%; provided that any determination of the Required Lenders with respect to the Collateral Agent shall be subject to the terms of the Collateral Agreement.

"Required Majority in Interest Lenders": Lenders of any Tranche or Lenders of any group of affected Lenders, as applicable, the Total Credit Percentages of which aggregate to greater than 50.0% of the Total Credit Percentages of such Tranche or Lenders of such group of affected Lenders.

"Requirement of Law": as to any Person, the Organizational Documents of such Person, and any law, statute, ordinance, code, decree, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its material property or to which such Person or any of its material

property is subject, including laws, ordinances and regulations pertaining to zoning, occupancy and subdivision of real properties; provided that the foregoing shall not apply to any non-binding recommendation of any Governmental Authority.

"Resolution Authority": an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer": as to any Person, any of the following officers of such Person: (a) the chief executive officer or the president of such Person and, with respect to financial matters, the chief financial officer, chief accounting officer, the treasurer or the controller of such Person, (b) any vice president of such Person or, with respect to financial matters, any assistant treasurer or assistant controller of such Person, in each case who has been designated in writing to the Administrative Agent or the Collateral Agent as a Responsible Officer by such chief executive officer or president of such Person or, with respect to financial matters, by such chief financial officer of such Person, (c) with respect to the fifth and sixth sentences of Subsection 1.2(c), Subsection 7.7 and ERISA matters and without limiting the foregoing, the general counsel (or substantial equivalent) of such Person, (d) with respect to any Person that does not have officers, the officer listed in clauses (a) through (c) of a Person that has the authority to act on behalf of such Person and (e) any other individual designated as a "Responsible Officer" for the purposes of this Agreement by the Board of Directors or equivalent body of such Person.

"Restricted Payment": as defined in Subsection 8.2(a).

"Restricted Payment Transaction": any Restricted Payment permitted pursuant to Subsection 8.2, any Permitted Payment, any Permitted Investment, or any transaction specifically excluded from the definition of the term "Restricted Payment" (including pursuant to the exception contained in clause (i) of such definition and the parenthetical exclusions contained in clauses (ii) and (iii) of such definition).

"Restricted Subsidiary": any Subsidiary of Holdings (which may be a Borrower).

"Restructuring Transactions": as defined in the RSA.

"Rights Offering Procedures": Multi-Color Corporation DIP Rights Offering Procedures issued in connection with the syndication of the Syndication DIP Interim Loans and the Final Term Loan Commitments as set forth in Section 2.6.

"RSA" means that certain Restructuring Support Agreement, dated as of January 25, 2026 among certain of the Loan Parties and certain of the Lenders (or their Affiliates), among others.

"S&P": Standard & Poor's Financial Services LLC, a division of S&P Global, Inc., and its successors.

"Sanctions": as defined in clause (c) of the first sentence of Subsection 5.21.

"SEC": the United States Securities and Exchange Commission or any successor thereto.

"Secured Ad Hoc Group" means that certain ad hoc group of holders of claims with respect to the Prepetition Secured Facilities (other than the Prepetition ABL Agreement), represented by Milbank LLP, PJT Partners LP, and Alvarez & Marsal North America, LLC.

"Secured Ad Hoc Group Advisors" means, collectively, (a) Milbank LLP, (b) PJT Partners LP, (c) Alvarez & Marsal North America, LLC, (d) any local counsel, and (e) such other professionals and/or consultants retained by or on behalf of the Secured Ad Hoc Group (including the retention of any such professional made by Milbank LLP) and that have executed a Fee Letter with (i) Milbank LLP and such fee letter has been provided to the Company Parties (as defined in the RSA) or (ii) the Company Parties; provided that any foreign local counsel retained by the Secured Ad Hoc Group shall not be required to execute a Fee Letter (as defined in the RSA).

"Secured Parties": the "Secured Parties" as defined in the Collateral Agreement.

"Securities Act": the Securities Act of 1933, as amended from time to time.

"Security Documents": the collective reference to the Collateral Agreement and all other similar security documents hereafter delivered to the Collateral Agent granting or perfecting a Lien on any asset or assets of any Loan Party to secure the obligations and liabilities of the Loan Parties hereunder and/or under any of the other Loan Documents or to secure any Guarantee by any Guarantor of any such obligations and liabilities, including any security documents executed and delivered or caused to be delivered to the Collateral Agent pursuant to this Agreement and any other Loan Document, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time.

"Set": the collective reference to Term SOFR Rate Loans or EURIBOR Loans of a single Tranche, the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Term SOFR Rate Loans or EURIBOR Loans shall originally have been made on the same day).

"Settlement Service": as defined in Subsection 11.6(b).

"Single Employer Plan": any Plan which is covered by Title IV or Section 302 of ERISA or Section 412 of the Code, but which is not a Multiemployer Plan.

"SOFR": with respect to any U.S. Government Securities Business Day, a rate per annum equal to the secured overnight financing rate for such U.S. Government Securities Business Day published by the SOFR Administrator on the SOFR Administrator's Website on the immediately succeeding U.S. Government Securities Business Day.

"SOFR Administrator": the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website": the NYFRB's website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"Sponsor": CD&R.

49

"Spot Rate of Exchange": on any date of determination, with respect to any currency (including Euros) other than Dollars (for purposes of determining the Dollar Equivalent), the rate at which such currency may be exchanged into Dollars, as set forth at approximately 11:00 A.M., New York City time, on such date on the applicable Bloomberg Key Cross Currency Rates Page. In the event that any such rate does not appear on any Bloomberg Key Cross Currency Rates Page, the Spot Rate of Exchange shall be determined by reference to such other publicly available service for displaying or publication of general circulation which publishes exchange rates as may be agreed upon by the Required Lenders and the Borrower Representative,; provided that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent (acting at the Direction of the Required Lenders), after consultation with the Borrower Representative, may use any other reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"Stated Maturity": with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase or repayment of such Indebtedness at the option of the holder thereof upon the happening of any contingency).

"Statutory Reserves": for any day as applied to a EURIBOR Loan, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained during such Interest Period under Regulation D by member banks of the United States Federal Reserve System in New York City with deposits exceeding $1,000,000,000 against "Eurocurrency liabilities" (as such term is used in Regulation D). EURIBOR Loans shall be deemed to constitute Eurocurrency liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under Regulation D.

"Subordinated Obligations": Indebtedness for borrowed money of the Borrowers or any of the Loan Parties that by its terms is unsecured or secured by any Liens on the Collateral on a junior basis to, or contractually subordinated in right of payment to, the DIP Facility Obligations arising under the Loans or the Guarantee of the DIP Facility Obligations (including, the Prepetition Debt).

"Subscription Expiration Deadline": as defined in the Rights Offering Procedures.

"Subscription Record Date" as defined in the Rights Offering Procedures.

"Subsidiary": to any Person, any corporation, partnership, limited liability company, unlimited liability company, joint venture, association or entity (a) that is, at the time any determination is made, controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent or (b) of which securities or other ownership interests representing at least 50% of the economic interests or at least 50% of the ordinary voting power (or board representation, including through block voting arrangements) or at least 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, controlled or held by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent or (c) the financial results of which are (or

50

are expected to be) consolidated with those of the parent and its subsidiaries in the financial statements of the parent and its subsidiaries. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Topco Borrower.

"Subsidiary Borrower": as defined in the Preamble hereto, and any successor in interest thereto permitted hereunder.

"Subsidiary Guarantor": each Subsidiary (other than any Excluded Subsidiary) of Topco Borrower (other than a Subsidiary Borrower) which executes and delivers a Subsidiary Guaranty pursuant to Subsection 7.9 or otherwise, in each case, unless and until such time as the respective Subsidiary Guarantor (a) ceases to constitute a Subsidiary of Topco Borrower in accordance with the terms and provisions hereof or (b) is released from all of its obligations under the Subsidiary Guaranty in accordance with the terms and provisions thereof .

"Subsidiary Guaranty": the guaranty of the DIP Facility Obligations of the Borrowers under the Loan Documents provided pursuant to the Guarantee Agreement or pursuant to a guaranty in such other form as may be agreed between the Borrower Representative and the Administrative Agent (acting at the Direction of the Required Lenders).

"Superpriority Claims" means any claim having superpriority administrative expense claim status in the Chapter 11 Cases having a priority over any and all claims against the Loan Parties of any kind whatsoever, including, without limitation, all administrative expenses or any claims of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code

"Supported QFC": as defined in Subsection 11.23.

"Syndication Consummation Date": has the meaning assigned to such term in Section 2.6 hereof.

"Syndication DIP Interim Loans": has the meaning assigned to such term in Section 2.6 hereof.

"Syndication Eligible Claimholders": has the meaning assigned to such term in Section 2.6 hereof.

"Syndication Procedures": the syndication procedures described in Section 2.6 hereof.

"Syndication Transactions": has the meaning assigned to such term in Section 2.6 hereof.

"TARGET Day": any day on which the Trans-European Automated Real-time Gross Settlement Express Transfer (TARGET) payment system (or, if such payment system ceases to be operative, such other payment system, if any, determined by the Administrative Agent to be a suitable replacement) is open for the settlement of payments in Euro.

"Taxes": any and all present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Temporary Cash Investments": any of the following: (i) any Investment in (x) direct obligations of the United States of America, Canada, Japan, the United Kingdom, Switzerland, a member state of the European Union or any country in whose currency funds are being held pending their application in the making of an Investment or Capital Expenditure by Intermediate Holdings or a Restricted Subsidiary in that country or with such funds, or any agency or instrumentality of any thereof, or obligations Guaranteed by the United States of America, Canada, the United Kingdom, Switzerland or a member state of the European Union or any country in whose currency funds are being held pending their application in the making of an Investment or Capital Expenditure by Intermediate Holdings or a Restricted Subsidiary in that country or with such funds, or any agency or instrumentality of any of the foregoing, or obligations guaranteed by any of the foregoing or (y) direct obligations of any foreign country recognized by the United States of America rated at least "A" by S&P or "A2" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (ii) overnight bank deposits, and Investments in time deposit accounts, certificates of deposit, bankers' acceptances and money market deposits (or, with respect to foreign banks, similar instruments) maturing not more than one year after the date of acquisition thereof issued by (x) any bank or other institutional lender under this Agreement, the Prepetition ABL Agreement or any Affiliate thereof or (y) a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital and surplus aggregating in excess of $250,000,000 (or the foreign currency equivalent thereof) and whose long term debt is rated at least "A" by S&P or "A2" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization) at the time such Investment is made, (iii) repurchase obligations for underlying securities or instruments of the types described in clause (i) or (ii) above entered into with a bank meeting the qualifications described in clause (ii) above, (iv) Investments in commercial paper, maturing not more than 24 months after the date of acquisition, issued by a Person (other than that of Topco Borrower or any of its Subsidiaries), with a rating at the time as of which any Investment therein is made of "P-2" (or higher) according to Moody's or "A-2" (or higher) according to S&P (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (v) Investments in securities maturing not more than 24 months after the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "BBB-" by S&P or "Baa3" by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (vi) Indebtedness or Preferred Stock (other than of Topco Borrower or any of its Subsidiaries) having a rating of "A" or higher by S&P or "A2" or higher by Moody's (or, in either case, the equivalent of such rating by such organization or, if no rating of S&P or Moody's then exists, the equivalent of such rating by any nationally recognized rating organization), (vii) investment funds investing at least 90.0% of their assets in securities of the type described in clauses (i) through (vi) above (which funds may also

hold cash pending Investment and/or distribution), (viii) any money market deposit accounts issued or offered by a domestic commercial bank or a commercial bank organized and located in a country recognized by the United States of America, in each case, having capital and surplus in excess of $250,000,000 (or the foreign currency equivalent thereof), or Investments in money market funds subject to the risk limiting conditions of Rule 2a-7 (or any successor rule) of the SEC under the Investment Company Act of 1940, as amended and (ix) similar Investments approved by the Board of Directors in the ordinary course of business.

"Term Credit Percentage": as to any Lender at any time, the percentage of the aggregate outstanding Term Loans (if any) of the Lenders (including, without limitation, in the case of Term Loans denominated in Euros, the Dollar Equivalent of the aggregate unpaid principal amount thereof) and aggregate unused Term Loan Commitments of the Lenders (if any) then constituted by such Lender's outstanding Term Loans (if any) (including, without limitation, in the case of Term Loans made by such Lender in Euros, the Dollar Equivalent of the aggregate unpaid principal amount thereof) and such Lender's unused Term Loan Commitments (if any).

"Term EURIBOR Screen Rate": the longest period for which the EURIBOR Screen Rate is available for the applicable currency.

"Term Lender": any Lender holding a Term Loan or Commitment.

"Term Loan Commitment": as to any Lender, the aggregate of its Interim Term Loan Commitments and Final Term Loan Commitments; collectively as to all Lenders the "Term Loan Commitments."

"Term Loans": means the Interim Term Loans, the Final Term Loans and the Incremental Term Loans, as the context may require.

"Term SOFR Administrator": the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent (acting at the Direction of the Required Lenders)).

"Term SOFR Rate":

(a)     for any calculation with respect to a Term SOFR Rate Loan, the Term SOFR Reference Rate at approximately 5:00 p.m. (New York City time) (such time, the "Periodic Term SOFR Determination Time") for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of the Periodic Term SOFR Determination Time on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Term SOFR Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR Rate will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator as of the Periodic Term SOFR Determination Time on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S.

Government Securities Business Day is not more than three U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)    for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate at approximately 5:00 p.m. (New York City time) (such time, the "ABR Term SOFR Determination Time") for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of the ABR Term SOFR Determination Time on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Term SOFR Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR Rate will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator as of the ABR Term SOFR Determination Time on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day;

provided that (i) with respect to the Interim Term Loans, if Term SOFR Rate determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than 0.50%, then Term SOFR Rate shall be deemed to be 0.50%.

If at any time the Administrative Agent determines (acting at the Direction of the Required Lenders) (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in Subsection 4.7 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Subsection 4.7 have not arisen but the Term SOFR Administrator or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which Term SOFR Rate shall no longer be used or be representative for determining interest rates for Loans in Dollars (such date, the "Term SOFR Replacement Date"), then the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower Representative shall endeavor to establish an alternate rate of interest to Term SOFR Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement, including Benchmark Replacement Conforming Changes, as may be applicable (including amendments to the Applicable Margin to preserve the terms of the economic transactions initially agreed to among the Borrowers, on the one hand, and the Lenders on the other hand). Notwithstanding anything to the contrary herein, such amendment shall become effective without any further action or consent of any other party to this Agreement.

"Term SOFR Rate Loan": a Loan that bears interest at a rate based on the Term SOFR Rate, other than, for the avoidance of doubt, pursuant to clause (c) of the definition of "Alternate Base Rate".

"Term SOFR Reference Rate": the forward-looking term rate based on SOFR.

"Term SOFR Replacement Date": as defined in the definition of "Term SOFR Rate".

"Topco": CD&R Labels Holdings, L.P., a Delaware limited partnership, and any successor in interest thereto.

"Topco Borrower": as defined in the Preamble hereto, and any successor in interest thereto permitted hereunder.

"Total Credit Percentage": as to any Lender (or DIP Note Holder) at any time, the percentage which (a) such Lender's then outstanding Term Loans (or DIP Secured Notes) (if any) (including, without limitation, in the case of Euro Term Loans (or DIP Secured Notes), the Dollar Equivalent of the aggregate unpaid principal amount thereof) and such Lender's unused Term Loan Commitments (if any) then outstanding constitutes of (b) the aggregate outstanding Term Loans (if any) and DIP Secured Notes of all Lenders and DIP Note Holders then outstanding (including, without limitation, in the case of Euro Term Loans (or "euro" DIP Secured Notes), the Dollar Equivalent of the aggregate unpaid principal amount thereof) and aggregate unused Term Loan Commitments of all Lenders (if any) then outstanding.

"Trade Payables": with respect to any Person, any accounts payable or any Indebtedness or monetary obligation to trade creditors created, assumed or guaranteed by such Person arising in the ordinary course of business in connection with the acquisition of goods or services.

"Trading Price": as defined in Subsection 11.6(m)(iv)(A)(3)(z).

"Tranche": when used with respect to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing are Interim New Money Dollar Term Loans, Interim New Money Euro Term Loans, Interim Roll-up Dollar Term Loans, Interim Roll-up Euro Term Loans, Final New Money Dollar Term Loans, Final New Money Euro Term Loans, Final Roll-up Dollar Term Loans or Final Roll-up Euro Term Loans or any other "tranche" of loans hereunder, (b) any Commitment, refers to whether such Commitment is an Interim New Money Dollar Term Loan Commitment, Interim New Money Euro Term Loan Commitment, Interim Roll-up Dollar Term Loan Commitment, Interim Roll-up Euro Term Loan Commitment, Final New Money Dollar Term Loan Commitment, Final New Money Euro Term Loan Commitment, Final Roll-up Dollar Term Loan Commitment or Final Roll-up Euro Term Loan Commitment and (c) any Lender, refers to whether such Lender has a Loan or Commitment of a particular Tranche; provided that once funded (x) the Interim New Money Term Loans and the Final New Money Term Loans shall all be deemed to be part of the same Tranche of Loans for all purposes under this Agreement, (y) the Interim Roll-up Term Loans and the Final Roll-up Term Loans shall all be deemed to be part of the same Tranche of Loans for all purposes under this Agreement and (z) the New Money Term Loans shall be deemed to be a separate Tranche of Loans from any Roll-up Term Loans for all purposes under this Agreement.

"Transaction Costs" shall mean the fees, premiums, commissions and expenses payable by Holdings and its Subsidiaries, the Secured Ad Hoc Group, the Secured Ad Hoc Group Advisors, the Plan Sponsor and the Plan Sponsor Advisors in connection with the Transactions.

"Transactions" means, collectively, (a) the execution, delivery and performance of the Loan Parties of the Loan Documents to which they are a party and the making of Term Loans hereunder and (b) the payment of the Transaction Costs.

"Transferee": any Participant or Assignee.

"Type": the type of Loan determined based on the interest option applicable thereto, with there being Types of Loans hereunder, namely Central Bank Rate Loans, Term SOFR Rate Loans, ABR Loans or EURIBOR Loans.

"UCC": the Uniform Commercial Code as in effect in the State of New York from time to time.

"UK Financial Institution": any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain Affiliates of such credit institutions or investment firms.

"UK Resolution Authority": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States Person": any United States person within the meaning of Section 7701(a)(30) of the Code.

"Updated Budget" has the meaning set forth in Section 7.1(f).

"Updated Budget Delivery Date" has the meaning set forth in Section 7.1(f).

"U.S. Government Securities Business Day": any day except for (i) a Saturday, (ii) (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Special Resolution Regime": as defined in Section 11.24(a).

"U.S. Tax Compliance Certificate": as defined in Subsection 4.11(b)(ii)(2).

"Vendor Collateral": with respect to a Vendor Financing Arrangement, the goods, services or equipment (and any proceeds thereof) of any Borrower or the Subsidiary Guarantors, now owned or hereafter acquired, that were financed with such Vendor Financing Arrangement.

"Vendor Financing Arrangement": any supply chain financing arrangement, structured vendor payable program, payables financing arrangement, reverse factoring arrangement or any other similar arrangement or program, entered into in the ordinary course and for a bona fide business purpose, pursuant to which Intermediate Holdings or any of its Restricted

56

Subsidiaries provides a vendor an option to factor such vendor's receivables from Intermediate Holdings or such Restricted Subsidiary to a bank or financial institution.

"Wholly Owned Subsidiary": as to any Person, any Subsidiary of such Person of which such Person owns, directly or indirectly through one or more Wholly Owned Subsidiaries, all of the Capital Stock of such Subsidiary other than directors qualifying shares or shares held by nominees.

"Write-Down and Conversion Powers": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, the powers of the applicable Resolution Authority in each case under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2     Other Definitional and Interpretive Provisions.

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any Notes, any other Loan Document or any certificate or other document made or delivered pursuant hereto.

(b)     As used herein and in any Notes and any other Loan Document, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to Topco Borrower, Intermediate Holdings and their respective Restricted Subsidiaries not defined in Subsection 1.1 and accounting terms partly defined in Subsection 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Subsection, Schedule and Exhibit references are to this Agreement unless otherwise specified. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." Any reference herein to any Person shall be construed to include such Person's successors and assigns permitted hereunder. Any reference herein to the financial statements (or any component thereof) of Intermediate Holdings shall be construed to include the financial statements (or the applicable component thereof) of Intermediate Holdings or any Parent Entity whose financial statements satisfy Intermediate Holdings' financial reporting obligations under Subsection 7.1. With respect to any Default or Event of Default, the words "exists," "is continuing" or similar expressions with respect thereto shall mean that such Default or Event of Default has occurred and has not yet been cured or waived. If any Default or Event of Default has occurred hereunder (any such Default or Event of Default, an "Initial Default") and is subsequently cured (a "Cured Default"), any other Default, Event of Default or failure of a condition precedent that resulted or may have resulted from (i) the making

57

or deemed making of any representation or warranty by any Loan Party or (ii) any act or omission by any Loan Party or any Subsidiary of any Loan Party, in each case which subsequent Default, Event of Default or failure would not have arisen had the Cured Default not been continuing at the time of such representation, warranty, action or omission, shall be deemed to automatically be cured or satisfied, as applicable, upon, and simultaneously with, the cure of the Cured Default, so long as at the time of such representation, warranty, action or omission, no Responsible Officer of Intermediate Holdings had knowledge of any such Initial Default. To the extent not already so notified, the Borrower Representative will provide prompt written notice of any such automatic cure to the Administrative Agent after a Responsible Officer of Intermediate Holdings knows of the occurrence of any such automatic cure. Any time period in this Agreement to cure any actual or alleged Default or Event of Default may be extended or stayed by a court of competent jurisdiction to the extent such actual or alleged Default or Event of Default is the subject of litigation.

(d)     [reserved].

(e)     [reserved].

(f)     Any financial ratios required to be maintained pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (rounding up if there is no nearest number).

(g)     Any references in this Agreement to "cash and/or Cash Equivalents", "cash, Cash Equivalents and/or Temporary Cash Investments" or any similar combination of the foregoing shall be construed as not double counting cash or any other applicable amount which would otherwise be duplicated therein.

(h)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(i)     [reserved].

(j)     [reserved].

(k)     Any reference herein or in any other Loan Document to (i) a transfer, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company or a limited partnership, as applicable, or an allocation of assets to a series of a limited liability company (collectively, a "Division"), as if it were a transfer, assignment, sale or transfer, or similar term, as applicable, to a separate Person, and (ii) a merger, consolidation, amalgamation or consolidation, or similar term, shall be deemed to apply to the division of or by a limited liability company, or an allocation of assets to a series of a limited liability company, or the unwinding of such a division or allocation, as if it were a merger, consolidation, amalgamation or consolidation or similar term, as applicable, with a separate Person.

(l)     [Reserved].

(m)     [Reserved].

(n)     Subject to <u>Subsection 8.1(d)</u>, when determining compliance with any basket, threshold, ratio or other amounts under this Agreement or the other Loan Documents, the Dollar Equivalent shall be calculated as at the date of the incurrence or making of the relevant disposition, acquisition, Investment, Indebtedness or Restricted Payment or taking other relevant action.

(o)     Except as otherwise provided in this Agreement, when the payment of any obligation or the performance of any covenant, duty, or obligation is stated to be due or performance required on (or before) a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

1.3     <u>Borrower Representative</u>. Each Borrower hereby designates Parent Borrower as the Borrower Representative. The Borrower Representative will be acting as agent on each of the Borrowers' behalf for the purposes of issuing notices of Borrowing and notices of conversion/continuation of any Loans pursuant to <u>Section 2</u> and <u>Section 4</u> or similar notices, giving instructions with respect to the disbursement of the proceeds of the Loans, selecting interest rate options, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or the Borrowers under the Loan Documents. The Borrower Representative hereby accepts such appointment. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

SECTION 2

Amount and Terms of Commitments

2.1     <u>The Loans</u>.

(a)     <u>Interim Term Borrowings</u>.

(i)     <u>Interim New Money Dollar Borrowings</u>. Subject to the terms and conditions set forth herein and the Orders, each Term Lender holding an Interim New Money Dollar Term Loan Commitment severally agrees to make a single Loan denominated in Dollars to the Subsidiary Borrowers on the Closing Date in an amount not to exceed such Term Lender's Interim New Money Dollar Term Commitment (the "<u>Interim New Money Dollar Term Loan</u>"); *provided* that it is understood and agreed that the Fronting Lender shall initially provide all of the Interim New Money Dollar Term Loan on the Closing Date and thereafter such Interim New Money Dollar Term Loan shall be assigned as promptly as practicable by the Fronting Lender to the Backstop Lenders (including any of their Affiliates or Related Funds) as contemplated under the Master Consent to Assignment and, thereafter, to the applicable parties as contemplated by the

59

Syndication Procedures.  For the avoidance of doubt, the Topco Borrower shall not be a Borrower of the Term Loans contemplated by this Subsection 2.1.

(ii)      Interim New Money Euro Borrowings Subject to the terms and conditions set forth herein and the Orders, each Term Lender holding an Interim Euro Term Loan Commitment severally agrees to make a single Loan denominated in Euros to the Subsidiary Borrowers on the Closing Date in an amount not to exceed such Term Lender's Interim New Money Euro Term Commitment (the "Interim New Money Euro Term Loan" and, together with the Interim New Money Dollar Term Loan, the "Interim New Money Term Loan"); *provided* that it is understood and agreed that the Fronting Lender shall initially provide all of the Interim New Money Euro Term Loan on the Closing Date and thereafter such Interim New Money Euro Term Loan shall be assigned as promptly as practicable by the Fronting Lender to the Backstop Lenders (including any of their Affiliates or Related Funds) as contemplated under the Master Consent to Assignment and, thereafter, to the applicable parties as contemplated by the Syndication Procedures.

(iii)      Interim Roll-up Dollar Borrowings Subject solely to the terms and conditions set forth in the Orders, and notwithstanding anything to the contrary contained in the applicable Prepetition First Lien Debt Documents (including in respect of pro rata sharing, sharing of payment or any waterfall), on the Closing Date, each Term Lender holding an Interim Roll-up Dollar Term Loan Commitment severally agrees to make a single Loan denominated in Dollars to the Subsidiary Borrowers and roll-up and exchange a portion of the Prepetition First Lien Debt held by such Term Lender immediately prior to the Closing Date for Interim Roll-up Dollar Term Loans in an aggregate principal amount not to exceed such Term Lender's Interim Roll-up Dollar Term Loan Commitment (the "Interim Roll-up Dollar Term Loan"), which shall be effected by means of a "cashless roll" by each such Term Lender, and subject (if applicable) to the Syndication Procedures.

(iv)      Interim Roll-up Euro Borrowings Subject solely to the terms and conditions set forth in the Orders, and notwithstanding anything to the contrary contained in the applicable Prepetition First Lien Debt Documents (including in respect of pro rata sharing, sharing of payment or any waterfall), on the Closing Date, each Term Lender holding an Interim Roll-up Euro Term Loan Commitment severally agrees to make a single Loan denominated in Euros to the Subsidiary Borrowers and roll-up and exchange a portion of the Prepetition First Lien Debt held by such Term Lender immediately prior to the Closing Date for Interim Roll-up Euro Term Loans in an aggregate principal amount not to exceed such Term Lender's Interim Roll-up Euro Term Loan Commitment (the "Interim Roll-up Euro Term Loan" and, together with the Interim Roll-up Dollar Term Loan, the "Interim Roll-up Term Loan," and, together with the Interim New Money Term Loan, the "Interim Term Loan"), which shall be effected by means of a "cashless roll" by each such Term Lender, and subject (if applicable) to the Syndication Procedures.

(b)      Final Term Borrowings.

(i)      Final New Money Dollar Borrowings. Subject to the terms and conditions set forth herein and the Orders, each Term Lender holding a Final New Money Dollar Term Loan Commitment severally agrees to make a single Loan denominated in Dollars to the Subsidiary Borrowers on the Final Borrowing Date in an amount  not to exceed such Term

60

Lender's Final New Money Dollar Term Commitment (the "Final New Money Dollar Term Loan"); *provided* that it is understood and agreed that the Fronting Lender shall initially provide all of the Final New Money Dollar Term Loan on the Final Borrowing Date and thereafter such Final New Money Dollar Term Loan shall be assigned as promptly as practicable by the Fronting Lender to the Backstop Lenders (including any of their Affiliates or Related Funds) as contemplated under the Master Consent to Assignment and, thereafter, (if applicable) to other parties as contemplated by the Syndication Procedures.

(ii)     Final New Money Euro Borrowings Subject to the terms and conditions set forth herein and the Orders, each Term Lender holding a Final Euro Term Loan Commitment severally agrees to make a single Loan denominated in Euros to the Subsidiary Borrowers on the Final Borrowing Date in an amount not to exceed such Term Lender's Final New Money Euro Term Commitment (the "Final New Money Euro Term Loan" and, together with the Final New Money Dollar Term Loan, the "Final New Money Term Loan" and, together with the Interim New Money Term Loan, the "New Money Term Loan"); *provided* that it is understood and agreed that the Fronting Lender shall initially provide all of the Final New Money Euro Term Loan on the Final Borrowing Date and thereafter such Final New Money Euro Term Loan shall be assigned as promptly as practicable by the Fronting Lender to the Backstop Lenders (including any of their Affiliates or Related Funds) as contemplated under the Master Consent to Assignment and, thereafter, (if applicable) to other parties as contemplated by the Syndication Procedures.

(iii)     Final Roll-up Dollar Borrowings Subject solely to the terms and conditions set forth in the Orders, and notwithstanding anything to the contrary contained in the applicable Prepetition First Lien Debt Documents (including in respect of pro rata sharing, sharing of payment or any waterfall), each Term Lender holding a Final Roll-up Dollar Term Loan Commitment severally agrees to make a single Loan denominated in Dollars to the Subsidiary Borrowers and roll-up and exchange a portion of the Prepetition First Lien Debt held by such Term Lender immediately prior to the Final Borrowing Date for Final Roll-up Dollar Term Loans in an aggregate principal amount not to exceed such Term Lender's Final Roll-up Dollar Term Loan Commitment (the "Final Roll-up Dollar Term Loan"), which shall be effected by means of a "cashless roll" by each such Term Lender, and subject to the Syndication Procedures.

(iv)     Final Roll-up Euro Borrowings Subject solely to the terms and conditions set forth in the Orders, and notwithstanding anything to the contrary contained in the applicable Prepetition First Lien Debt Documents (including in respect of pro rata sharing, sharing of payment or any waterfall), each Term Lender holding a Final Roll-up Euro Term Loan Commitment severally agrees to make a single Loan denominated in Euros to the Subsidiary Borrowers and roll-up and exchange a portion of the Prepetition First Lien Debt held by such Term Lender immediately prior to the Final Borrowing Date for Final Roll-up Euro Term Loans in an aggregate principal amount not to exceed such Term Lender's Final Roll-up Euro Term Loan Commitment (the "Final Roll-up Euro Term Loan" and, together with the Final Roll-up Dollar Term Loan, the "Final Roll-up Term Loan," and, (x) such Final Roll-up Term Loan, together with the Interim Roll-up Term Loan, the "Roll-up Term Loan" and (y) such Final Roll-up Term Loan, together with the Final New Money Term Loan, the "Final Term Loan" and, together with the Interim Term Loan, the "Term Loan"), which shall be effected by means of a "cashless roll" by each such Term Lender, subject to the Syndication Procedures.

61

(v)      Notwithstanding anything to the contrary in this Agreement, the Required Backstop Lenders may, following the funding of the Roll-up Term Loans in accordance with this Section 2.1, revise Schedule A in consultation with the Administrative Agent to reflect the Roll-up Term Loans held by each Lender on the date the Final DIP Order is entered upon the funding of the Roll-up Term Loans and after giving effect to the transactions contemplated by the Syndication Procedures, in each case, without further action by any other party hereto.

(vi)      For the avoidance of doubt, it is understood and agreed that all portions of Prepetition First Lien Debt that are rolled up and exchanged into Roll-up Term Loans in accordance with this Section 2.1 shall be deemed to be automatically cancelled without any further action of any party notwithstanding any failure by the Administrative Agent (as defined in the Prepetition Cash Flow Credit Agreement) or by the trustee under any of the Prepetition Secured Notes to make any modifications reflecting the foregoing to the Register (as defined in the Prepetition Cash Flow Credit Agreement) or the book-entry position of any such Prepetition Secured Notes.  The roll up and exchange into Interim Roll-up Term Loans under this Section 2.1 shall be automatic upon the issuance of the Interim DIP Order and there shall be no other conditions precedent to such automatic issuance of the Interim Roll-up Term Loans hereunder. The roll up and exchange into Final Roll-up Term Loans under this Section 2.1 shall be automatic upon the issuance of the Final DIP Order and there shall be no other conditions precedent to such automatic issuance of the Final Roll-up Term Loans hereunder.

2.2      Notes. Each Subsidiary Borrower agrees that, upon the request to the Administrative Agent by any Lender made on or prior to the Closing Date or in connection with any assignment pursuant to Subsection 11.6(b), in order to evidence such Lender's Loan, the applicable Subsidiary Borrower shall execute and deliver to such Lender a promissory note substantially in the form of Exhibit A hereto (each, as amended, supplemented, replaced or otherwise modified from time to time, a "Note", and, collectively, the "Notes"), in each case with appropriate insertions therein as to payee, date and principal amount, payable to such Lender and in a principal amount equal to the unpaid principal amount of the applicable Loans made (or acquired by assignment pursuant to Subsection 11.6(b)) by such Lender to the applicable Subsidiary Borrower. Each Note shall be dated the Closing Date and shall be payable as provided in Subsection 2.5 and provide for the payment of interest in accordance with Subsection 4.1.

2.3      Procedure for Term Loan Borrowing. The Borrower Representative shall have given the Administrative Agent (and, if so funding, the Fronting Lender) notice (which notice must have been received by the Administrative Agent (and, if so funding, the Fronting Lender) prior to: 12:00 P.M., New York City time, at least two (2) Business Days (or such shorter period as agreed by the Administrative Agent and the Fronting Lender) prior to the Borrowing Date, which notice may be revoked (with Subsection 4.12 applying thereto, if applicable) at any time prior to funding, specifying the amount of the Dollar Term Loans and the Euro Term Loans to be borrowed by each applicable Subsidiary Borrower. Upon receipt of such notice, the Administrative Agent shall promptly notify each applicable Lender thereof. Each Lender having a Commitment will make the amount of its pro rata share of the applicable Commitments available to the Administrative Agent, in each case for the account of the applicable Subsidiary Borrower at the office of the Administrative Agent specified in Subsection 11.2 prior to (x) in the case of Dollar Term Loans, 10:00 A.M., New York City time on the Closing Date and (y) in the case of Euro Term Loans, on the Business Day immediately prior to the Closing Date, in each case in funds

immediately available to the Administrative Agent. The Administrative Agent shall on such date credit the account of each applicable Subsidiary Borrower on the books of the Administrative Agent with the aggregate of the amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent.

2.4     Commitment to Backstop. As a consideration for the Backstop Premium, each Backstop Lender will be bound to acquire its share of the Term Loans from the Fronting Lender after the funding of the Interim New Money Term Loans or the funding of the Final New Money Term Loans, as the case may be, in an aggregate amount not to exceed the amount set forth opposite such Backstop Lender's name in Schedule A-2 under the heading "Backstop Commitments" by assignment from the Fronting Lender in accordance with Section 2.1(a), Section 2.1(b) and Section 11.6 and subject to the syndication pursuant to Section 2.6; *provided* that each such Backstop Lender may allocate a portion of its Backstop Commitments to any of its Affiliates or Related Parties upon written notice to the Administrative Agent, subject to any administrative requirements of the Administrative Agent in order to cause such Person to become a Lender hereunder.

2.5     Borrowers Repayment of Loans. (a) The Borrowers hereby, jointly and severally, unconditionally promise to pay to the Administrative Agent in the currency in which the applicable Term Loans are denominated for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender made to the applicable Borrowers, on the Maturity Date (or such earlier date on which the Term Loans become due and payable pursuant to Section 9); *provided* that, for the avoidance of doubt, on the Maturity Date, the Term Loans shall be subject to Subsection 2.7 and which may allow for the satisfaction of certain DIP Facility Obligations with "take-back" debt or as otherwise in accordance with an Acceptable Plan. The Borrowers hereby, jointly and severally, further agree to pay interest (which payments shall be payable in the same currency in which the respective Term Loan is denominated) on the unpaid principal amount of such Term Loans from time to time outstanding from the Closing Date until payment in full thereof at the rates per annum, and on the dates, set forth in Subsection 4.1.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing Indebtedness of each of the Borrowers to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent shall maintain the Register pursuant to Subsection 11.6(b), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder, including the Type thereof, the Tranche thereof, the currency of such Loan and each Interest Period, if any, applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Subsidiary Borrowers or the Topco Borrower, as applicable, to each applicable Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Subsidiary Borrowers or the Topco Borrower, as applicable, and each applicable Lender's share thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Subsection 2.5(c) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of each of the Borrowers therein

63

recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrowers to repay (with applicable interest) the Term Loans made to the Borrowers by such Lender in accordance with the terms of this Agreement.

2.6     Syndication.

(a)     Each Lender party hereto as of the Closing Date other than the Fronting Lender (collectively, the "Backstop Lenders") and the Borrowers hereby acknowledge and agree that each Person that holds Prepetition First Lien Claims that is not a Backstop Lender (or an Affiliate or Approved Fund of a Backstop Lender) (collectively, the "Syndication Eligible Claimholders") may participate to provide (via assignment) its DIP Pro Rata Allocation multiplied by (I) the result of (x) the aggregate principal amount of the Interim Term Loans minus (y) the sum of the Interim New Money Term Loans that represent the Backstop Premium and the amounts constituting the Holdback (the "Syndication DIP Interim Loans") and (II) the Final Term Loan Commitments (such Syndication Eligible Claimholders' DIP Pro Rata Allocation of Syndication DIP Interim Loans and the Final Term Loan Commitments, collectively its "Potential DIP Portion"), in accordance with this Section 2.6, in each case, by complying with the requirements set forth in the Rights Offering Procedures and delivering (i) in the case of a holder of Prepetition First Lien Claims under the Prepetition Cash Flow Credit Agreement, an executed Lender Subscription Form and Election Joinder in the form of Exhibit O-1 and (ii) in the case of a holder of Prepetition First Lien Claims under the Prepetition Secured Notes, an executed Noteholder Election Joinder in the form of Exhibit O-2 (each, a "Subscription Form") (which, in each case, for the avoidance of doubt shall include attached thereto a joinder to the RSA duly executed by the Syndication Eligible Claimholder (pursuant to which such Syndication Eligible Claimholder shall become party thereto, or otherwise agrees to be bound by the terms and obligations thereof)) (any such Syndication Eligible Claimholder that so delivers an Subscription Form and complies with the Rights Offering Procedures in respect thereof and such joinder agreement or acknowledgment and acceptance to the RSA, an "Electing Lender"; such portion assumed by any such Electing Lender, its "DIP Portion"; any such Syndication Eligible Prepetition Claimholder that does not so deliver a Subscription Form and such joinder agreement or acknowledgement and acceptance to the RSA, a "Declining Claimholder"); provided that any Electing Lender shall be allocated an equal portion of Interim New Money Term Loans and Interim Roll-up Term Loans, an equal portion of Final New Money Term Loan Commitments and Final Roll-up Term Loan Commitment; provided further, after the funding of the Final New Money Term Loan Commitments by the Fronting Lender on or about the Final Borrowing Date, on a date agreed to between the Fronting Lender and such Electing Lender, the Fronting Lender and such Electing Lender shall enter into a secondary trade for the sale and assignment of such Electing Lender's portion of Final New Money Term Loans. To the extent that not all Syndication Eligible Claimholders submit Subscription Forms in respect of their DIP Pro Rata Allocation on or prior to the Subscription Expiration Deadline in accordance with the terms of the Rights Offering Procedures, the Administrative Agent (acting at the Direction of the Required Backstop Lenders) shall deliver written notice on the Business Day immediately following the Subscription Expiration Deadline to each Backstop Lender of the aggregate amount of Potential DIP Portion of the Syndication DIP Interim Loans and/or the Final Term Loan (or Final Term Loan Commitments) of the Declining Claimholders based on their DIP Pro Rata Allocation (such amounts, the "Remaining Subscription Amounts") and each Backstop Lender shall be allocated a

portion of such Remaining Subscription Amounts in an amount proportionate to the percentage of its Backstop Commitment over the aggregate amount of Backstop Commitments of all Backstop Lenders. For the avoidance of doubt, and notwithstanding anything herein to the contrary, pursuant to Section 2.1(a), the Fronting Lender shall have initially provided all of the Interim New Money Term Loan on the Closing Date and thereafter such Interim New Money Term Loans shall be assigned by the Fronting Lender (pursuant to an Assignment and Acceptance) to the Backstop Lenders (including any of their Affiliates or Related Funds) as contemplated under the Master Consent to Assignment and, thereafter by the Backstop Lenders to any Electing Lenders, as applicable, and all accrued interest prior to the settlement of such assignments shall be for the account of the Fronting Lender.

(b)    Subject to the satisfaction of the conditions and terms set forth in the following subclauses (c), (d) and (e) and delivery of the applicable Subscription Forms in accordance with subclause (a) and the making (for the benefit of the Fronting Lender, the Selling Lenders and the Administrative Agent) of the representations and warranties set forth therein, on the date of the settlement of the syndication in accordance with the terms of the Rights Offering Procedures (or such other date as may be consented to in writing by the Required Backstop Lenders and the Fronting Lender) (the "Syndication Consummation Date") (each of the following transactions, the **"**Syndication Transactions"):

(i)    each Electing Lender (or its Designated Beneficiary, as applicable) shall assume its DIP Pro Rata Allocation of the Final Term Loan Commitments as of the Syndication Consummation Date, with such assumption being effectuated by an automatic assignment, by each existing Lender (as of such date) of such Tranche (each a "Commitment Assigning Lender") of unused Commitments of such Tranche in an individual amount equal to (x) the applicable DIP Portion of such Tranche of such Electing Lender multiplied by (y)(1) the aggregate amount of unused Commitments of such Tranche held by such Commitment Assigning Lender as of such date divided by (2) the aggregate amount of unused Commitments of such Tranche as of such date (each such Commitment assigned and assumed, an "Assumed Commitment"). For the avoidance of doubt,  and notwithstanding anything herein to the contrary, pursuant to Section 2.1(b), the Fronting Lender shall fund all of the Final New Money Term Loans on the Final Borrowing Date and thereafter such Final New Money Term Loans shall be assigned by the Fronting Lender (pursuant to an Assignment and Acceptance) to the Backstop Lenders (including, any of their Affiliates or Related Funds) and, if applicable, to any Electing Lenders, in each case as contemplated under the Master Consent to Assignment and, if applicable, the Rights Offering  Procedures;

(ii)    each Electing Lender (or its Designated Beneficiary, as applicable) shall purchase its applicable DIP Portion of the Syndication DIP Interim Loans as of the Syndication Consummation Date, with such purchase being effectuated by an automatic assignment, by each existing Lender (as of such date) of such Tranche (each a "Loan Assigning Lender", and together with each Commitment Assigning Lender, a "Selling Lender"), of outstanding Syndication DIP Interim Loans in an individual amount equal to (x) the applicable DIP Portion of the Syndication DIP Interim Loans of such Electing Lender multiplied by (y)(1) the aggregate amount of outstanding Syndication DIP Interim Loans held by such Loan Assigning Lender as of such date divided by (2) the aggregate amount of

outstanding Syndication DIP Interim Loans as of such date (each such purchased Loan, a "Purchased Loan"); and

(iii)      each Electing Lender (or its Designated Beneficiary, as applicable) shall purchase, and each applicable Selling Lender shall sell all accrued and unpaid interest on the Purchased Loans (such purchased interest, "Purchased Interest", and together with the Purchased Loans and Assumed Commitments, the "Purchased Obligations").   For the avoidance of doubt, this Subsection 2.6(b)(iii) shall not apply to the assignment of the Interim New Money Term Loans and the Final New Money Term Loans by the Fronting Lender.

(c)      No consideration (other than the opportunity to participate in the syndication provided by this Section 2.6) shall be payable by any party in connection with the assignment and assumption of the Assumed Commitments.  The purchase price payable by each Electing Lender (or its Designated Beneficiary, as applicable) to each Loan Assigning Lender in respect of the Purchased Loans shall equal (A) the amount of Purchased Loans constituting Interim New Money Term Loans of the applicable Loan Assigning Lender sold to such Electing Lender, minus (B) the amount of such Purchased Loans that represents the OID on the Closing Date.  The purchase price payable by each Electing Lender (or its Designated Beneficiary, as applicable) to the respective Selling Lender in respect of the Purchased Interest shall equal the amount of Purchased Interest sold by such Selling Lender.  The calculation of the foregoing consideration (as well as the amounts of the applicable Purchased Obligations) shall be determined by the Required Lenders no later than five (5) Business Days prior to the Syndication Consummation Date and shall control in the absence of manifest error (it being understood and agreed that the Required Lenders shall deliver notice to the Electing Lenders and Selling Lenders of such amounts no later than three (3) Business Days after the Subscription Expiration Deadline). For the avoidance of doubt, this Subsection 2.6 (c) shall not apply to the assignment of the Interim New Money Term Loans and the Final New Money Term Loans by the Fronting Lender.

(d)      Each Electing Lender (or its Designated Beneficiary, as applicable) shall transfer to the applicable Loan Assigning Lenders, in Dollars or Euros, as the case may be, and immediately available funds, the consideration set forth in clause (c) above in respect of the Purchased Obligations of the Loan Assigning Lenders on the Syndication Consummation Date.

(e)      Each Electing Lender (or its Designated Beneficiary, as applicable) that is not an existing Lender at such time shall make available to the Administrative Agent, concurrently with the delivery of its Subscription Form, a completed administrative questionnaire and any applicable tax forms.

(f)      Subject to the satisfaction of the conditions and terms set forth in the foregoing subclauses (c), (d) and (e) and delivery of the applicable Subscription Form in accordance with subclause (a) and making (for the benefit of the Selling Lenders and the Administrative Agent) of the representations and warranties set forth therein, and notwithstanding anything to the contrary contained in Section 11.6, the Syndication Transactions shall automatically and without any further action by any party occur on the Syndication Consummation Date, provided that, for the avoidance of doubt, the assignments by the Fronting Lender shall occur in the ordinary course.

66

(g)     Each Electing Lender (or its Designated Beneficiary, as applicable) hereby acknowledges and agrees that the sale, assignment and assumption of the Purchased Obligations are without any representation or warranty by any Selling Lender, and no Electing Lender (or its Designated Beneficiary, as applicable) shall have any recourse against any Selling Lender in connection with the Syndication Transactions.

(h)     Notwithstanding anything to the contrary contained in this Agreement, (A) the Required Backstop Lenders (in consultation with the Administrative Agent, the Borrowers and the applicable Selling Lender) may modify Schedule A-1, and direct the Administrative Agent to update the Register, to evidence the consummation of the Syndication Transactions on the Syndication Consummation Date, and (B) the Required Backstop Lenders and the Administrative Agent may modify this Section 2.6 (other than the following subclause (i) hereof) without the consent of the Borrower; provided that any modification with respect to the Fronting Lender shall require the Fronting Lender's consent to such modification, (C) each Electing Lender may allocate its Purchased Obligations to any of its Affiliates or Related Funds to be the beneficiary of its Purchased Obligations (a "Designated Beneficiary") by the delivery of a Beneficiary Designation Notice to the Administrative Agent and (D) the Required Backstop lenders may, following the Subscription Expiration Deadline, in accordance with this Section 2.6, revise Schedule A-1 in consultation with the Administrative Agent to reflect the Term Loans and Term Loan Commitments held by each Lender on the entry date of the Final DIP Order upon consummation of the syndication, without further action by any other party hereto; provided that Schedule A-1 may be revised with respect to the Interim New Money Term Loans and the Final New Money Term Loans held by the Fronting Lender only after settlement of the applicable assignment.

(i)     From the period commencing with the Closing Date and ending on the Syndication Consummation Date, the Borrowers shall use commercially reasonable efforts to facilitate the syndication contemplated by this Section 2.6, including (A) obtaining a true and correct copy of the Register (including holding amounts and contact information) for the Prepetition First Lien Debt and (B) to the extent requested in writing by the Required Lenders, instructing its financial advisor to assist in such syndication, preparing customary marketing materials in respect thereof and directing any prepetition agent or trustee in respect of the Prepetition First Lien Debt; *provided* that the foregoing shall not require any officer or director of the Borrowers to violate any applicable fiduciary duty.

(j)     For the avoidance of doubt, each Backstop Lender agrees to consummate the transactions pursuant to this Section 2.6. Notwithstanding anything contained in these procedures, each Backstop Lender will be deemed to have exercised their right to participate as an Electing Lender for their applicable DIP Pro Rata Allocation under these Syndication Procedures.

2.7     Acceptable Plan.

Notwithstanding anything to the contrary herein (including in Section 11.1), (i) no Lender shall object to the treatment of their DIP Facility Obligations upon emergence by the Loan Parties from the Chapter 11 Cases to the extent such treatment is in accordance with an Acceptable Plan and each Lender hereby agrees to accept such treatment and (ii) each Lender shall execute and deliver (and direct the Administrative Agent and Collateral Agent to execute and deliver) any

applicable Acceptable Plan Definitive Documentation in accordance with the applicable Acceptable Plan.

2.8 <u>Incremental Facility</u>.

(a) So long as the Final Borrowing Date shall have occurred, prior to the Maturity Date, the Topco Borrower shall, in consultation with the Required Backstop Lenders, request incremental term loans (the "<u>Incremental Term Loans</u>") hereunder in an aggregate principal amount not to exceed $150,000,000 from Term Lenders hereunder; <u>provided</u> that, notwithstanding anything herein to the contrary, the terms and form of such Incremental Term Loans shall constitute and/or be subject to the following requirements:

(i) the participating lenders (the "<u>Incremental Lenders</u>") shall be mutually determined by Topco Borrower and the Required Backstop Lenders, and may be offered on a non-*pro rata* basis to any of the Lenders hereunder;

(ii) such Incremental Term Loans shall constitute a separate Tranche of Term Loans;

(iii) such Incremental Term Loans shall have no economics payable other than the principal amount and interest that is payable in kind (i.e., no cash interest, OID premium, or other fees or commissions in any respect); *provided* that such payable in kind interest (i) shall have a fixed interest rate of 1.00% per annum, (ii) shall accrete and be capitalized semi-annually (with the first payment date being the six-month anniversary of the funding date of the Incremental Term Loans) and (iii) if the Loan Parties are to emerge from the Chapter 11 Cases or the Maturity Date were to occur, in either case, prior to such first payment, then any outstanding accrued and unpaid interest shall not be capitalized or added to the principal of such Incremental Term Loans upon the Maturity Date or the occurrence of the Loan Parties emerging from the Chapter 11 Cases;

(iv) the funding date of such Incremental Term Loans shall be mutually determined by the Topco Borrower and the Required Backstop Lenders;

(v) the proceeds from such Incremental Term Loans shall be deposited into a segregated account (the "<u>Incremental Proceeds Account</u>") and shall be subject to escrow arrangements until the Maturity Date on terms reasonably acceptable to the Required Backstop Lenders and Topco Borrower;

(vi) on the Maturity Date (or the date upon which the Loan Parties were to emerge from the Chapter 11 Cases, whichever is earlier), the proceeds of the Incremental Proceeds Account shall (and shall constitute a permitted "use of proceeds" hereunder) be applied towards repayment of any of the Prepetition ABL Loans, professional fees and/or other cash uses of the Topco Borrower and its Subsidiaries on the Maturity Date; <u>provided</u> that, at the election of such Incremental Lenders, proceeds therefrom shall be allocated towards new money preferred equity subscriptions to the extent not applied towards repayment of Prepetition ABL Loans, professional fees, and/or other such cash uses of the Loan Parties on the date on which the Loan Parties emerge from the Chapter 11 Cases; and

(vii)    on the date on which the Loan Parties emerge from the Chapter 11 Cases (or the Maturity Date), the principal on the Incremental Term Loans shall be repaid at the Topco Borrower's election, in the form of cash or new money preferred equity.

(b)      The documentation and procedures to effect such Incurrence of Incremental Term Loans shall be as reasonably agreed amongst Topco Borrower, such Incremental Lenders, the Required Backstop Lenders and the Administrative Agent (acting at the Direction of the Required Backstop Lenders) and may be effected with or without an amendment to this Agreement; provided that any such amendment may effected with the consent of the foregoing parties only, provided that such amendment does not adversely or disproportionately harm any other Lender hereunder without its consent.

SECTION 3

[Reserved]

SECTION 4

General Provisions Applicable to Loans

4.1      Interest Rates and Payment Dates. (a) Each Term SOFR Rate Loan or EURIBOR Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to (i) in the case of Euro Term Loans, the Adjusted EURIBOR Rate determined for such day plus the Applicable Margin in effect for such day and (ii) in the case of Term SOFR Rate Loans, the Term SOFR Rate determined for such day plus the Applicable Margin in effect for such day.

(b)      Each ABR Loan shall bear interest for each day that it is outstanding at a rate per annum equal to the Alternate Base Rate in effect for such day plus the Applicable Margin in effect for such day.

(c)      Upon expiration of the DIP Remedies Notice Period, if all or a portion of (i) the principal amount of any Loan, (ii) any interest payable thereon or (iii) any other amount payable hereunder shall not be paid when due (whether at the Stated Maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum which is (x) in the case of overdue principal, the rate that would otherwise be applicable thereto pursuant to the relevant foregoing provisions of this Subsection 4.1, plus 2.00% (y) in the case of overdue interest, the rate that would otherwise be applicable to principal of the related Loan pursuant to the relevant foregoing provisions of this Subsection 4.1, plus 2.00% and (z) in the case of other amounts, the rate described in clause (b) of this Subsection 4.1 for ABR Loans accruing interest at the Alternate Base Rate plus 2.00%, in each case from the date of such nonpayment until such amount is paid in full; provided that (1) no amount shall be payable pursuant to this Subsection 4.1(f) to a Defaulting Lender so long as such Lender shall be a Defaulting Lender and (2) no amounts shall accrue pursuant to this Subsection 4.1(f) on any overdue amount or other amount payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

69

(d)     Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to clause (f) of this Subsection 4.1 shall be payable from time to time on demand exercised in accordance with Subsection 9.2.

(e)     It is the intention of the parties hereto to comply strictly with applicable usury laws; accordingly, it is stipulated and agreed that the aggregate of all amounts which constitute interest under applicable usury laws, whether contracted for, charged, taken, reserved, or received, in connection with the Indebtedness evidenced by this Agreement or any Notes, or any other document relating or referring hereto or thereto, now or hereafter existing, shall never exceed under any circumstance whatsoever the maximum amount of interest allowed by applicable usury laws.

(f)     For the avoidance of doubt, notwithstanding anything to the contrary contained herein, it is understood and agreed that after giving effect to the Syndication Consummation Date, (i) in the event any Interim Roll-up Term Loan is reallocated from a Backstop Lender to an Electing Lender by operation of Section 2.1 and the revisions to Schedule A permitted hereunder (including pursuant to Schedule 2.1(b)(v)), all accrued and unpaid interest on such Interim Roll-up Term Loan shall also be reallocated and payable to such Electing Lender and not such Backstop Lender and (ii) in the event any New Money Term Loan is assigned from a Backstop Lender to an Electing Lender as permitted hereunder and in accordance with the Syndication Procedures, all accrued and unpaid interest, which began to accrue from the date the Backstop Lender purchased such New Money Term Loan from the Fronting Lender until the date such New Money Term Loan is assigned from the Backstop Lender to the Electing Lender, shall be deducted from the purchase price so that such accrued and unpaid interest shall be payable to the Electing Lender.

4.2     Conversion and Continuation Options. (a) Subject to its obligations pursuant to Subsection 4.12(c), the Borrower Representative may elect from time to time to convert outstanding Loans of a given Tranche denominated in Dollars from Term SOFR Rate Loans to ABR Loans, in each case by giving the Administrative Agent irrevocable notice of such election prior to 1:00 P.M., New York City time, two Business Days prior to such election. The Borrower Representative may elect from time to time to convert outstanding Loans of a given Tranche from ABR Loans to Term SOFR Rate Loans denominated in Dollars, in each case by giving the Administrative Agent irrevocable notice of such election prior to 1:00 P.M., New York City time, at least three Business Days prior to such election. Any such notice of conversion to Term SOFR Rate Loans or EURIBOR Loans shall specify the length of the initial Interest Period or Interest Periods therefor. Upon receipt of any such notice the Administrative Agent shall promptly notify each affected Lender thereof. All or any part of outstanding Term SOFR Rate Loans or ABR Loans may be converted as provided herein, provided that (i) (unless the Required Lenders otherwise consent) no Loan may be converted into a Term SOFR Rate Loan or EURIBOR Loan when any Default or Event of Default has occurred and is continuing and, in the case of any Default (other than a Default under Subsection 9.1(f)), the Administrative Agent has given notice to the Borrower Representative that no such conversions may be made and (ii) no Loan may be

converted into a Term SOFR Rate Loan or EURIBOR Loan after the date that is one month prior to the applicable Maturity Date.

(b)    Any Term SOFR Rate Loan or EURIBOR Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower Representative giving notice to the Administrative Agent of the length of the next Interest Period to be applicable to such Term SOFR Rate Loan or EURIBOR Loan, determined in accordance with the applicable provisions of the term "Interest Period" set forth in Subsection 1.1, provided that with respect to EURIBOR Loans, if the Borrower Representative shall fail to give any required notice as described above in this clause (b), such EURIBOR Loans shall be automatically continued as EURIBOR Loans with an Interest Period of one month. Upon receipt of any such notice of continuation pursuant to this Subsection 4.2(b), the Administrative Agent shall promptly notify each affected Lender thereof.

4.3    Minimum Amounts; Maximum Sets. All Borrowings, conversions and continuations of Loans hereunder and all selections of Interest Periods hereunder shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of the Term SOFR Rate Loans outstanding in Dollars comprising each Set shall be equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof, the aggregate principal amount of the EURIBOR Loans outstanding in Euro comprising each Set shall be equal to €5,000,000 or a whole multiple of €1,000,000 in excess thereof (provided that, notwithstanding the foregoing (x) any Loan may be borrowed in an amount equal to the aggregate amount of the Commitments in respect of such Loan and (y) any Loan may be converted or continued in its entirety), and so that there shall not be more than 20 Sets at any one time outstanding.

4.4    Optional and Mandatory Prepayments. (a) Optional Prepayment of Term Loans. The Borrowers may at any time and from time to time prepay the Term Loans, in whole, but not in part, subject to Subsection 4.12, without premium or penalty, upon notice by the Borrower Representative to the Administrative Agent prior to 1:00 P.M., New York City time, at least three Business Days  prior to the date of prepayment (in the case of Term SOFR Rate Loans or EURIBOR Loans), or prior to 12:00 P.M., New York City time, on the date of prepayment (in the case of ABR Loans). Such notice shall specify, in the case of any prepayment of Term Loans, the applicable Tranche being repaid, and if a combination thereof, the principal amount allocable to each, the date and amount of prepayment, the currency of the Term Loans to be prepaid and whether the prepayment is of Term SOFR Rate Loans, EURIBOR Loans, ABR Loans or a combination thereof, and, in each case if a combination thereof, the principal amount allocable to each. Any such notice may state that such notice is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked or extended by the Borrower Representative (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied or waived. Upon the receipt of any such notice the Administrative Agent shall promptly notify each affected Lender thereof. If any such notice is given and not revoked, the amount specified in such notice shall be due and payable on the date specified therein, together with (if a Term SOFR Rate Loan or EURIBOR Loan is prepaid other than at the end of the Interest Period applicable thereto) any amounts payable pursuant to Subsection 4.12. Partial prepayments pursuant to this Subsection 4.4(a) shall be in multiples of $1,000,000, in the case of Term Loans

denominated in Dollars and €1,000,000, in the case of Term Loans denominated in Euro; provided that, notwithstanding the foregoing, any Term Loan may be prepaid in its entirety.

(b)    [Reserved]

(c)    [Reserved]

(d)    [Reserved]

(e)    Mandatory Prepayment of Term Loans. (i) The Borrowers shall, in accordance with Subsection 4.4(g), prepay the Term Loans (other than the Incremental Term Loans) to the extent required by Subsection 8.4(b), (ii) if on or after the Closing Date, Holdings or any of its Restricted Subsidiaries shall Incur Indebtedness for borrowed money (excluding Indebtedness permitted pursuant to Subsection 8.1), the Borrowers shall, in accordance with Subsection 4.4(g), prepay the Term Loans (other than the Incremental Term Loans) in an amount equal to 100.0% of the Net Cash Proceeds thereof minus the portion of such Net Cash Proceeds applied or offered (to the extent Intermediate Holdings or any of its Subsidiaries is required by the terms thereof) to prepay, repay or purchase Indebtedness under the DIP Note Purchase Agreement on a pro rata basis with the Term Loans (other than the Incremental Term Loans), in each case with such prepayment to be made on or before the second Business Day following notice given to each Lender of the Prepayment Date, as contemplated by Subsection 4.4(h) . Nothing in this Subsection 4.4(e) shall limit the rights of the Agents and the Lenders set forth in Section 9.

(f)    [Reserved].

(g)    Subject to the last sentence of Subsection 4.4(h), each prepayment of Term Loans (other than Incremental Term Loans) pursuant to Subsection 4.4(e) or (j) shall be allocated pro rata among the Term Loans (other than the Incremental Term Loans) and the DIP Secured Notes.

(h)    The Borrower Representative shall give notice to the Administrative Agent of any mandatory prepayment of the Term Loans (other than the Incremental Term Loans) (x) pursuant to Subsection 4.4(e)(iii), three Business Days prior to the date on which such payment is due and (y) pursuant to any other provision of Subsection 4.4(e), promptly (and in any event within five Business Days) upon becoming obligated to make such prepayment. Such notice shall state that the Borrowers are offering to make or will make such mandatory prepayment (i) in the case of mandatory prepayments pursuant to Subsection 4.4(e)(i), on or before the date specified in Subsection 8.4(b) and (ii) in the case of mandatory prepayments pursuant to any other clause of Subsection 4.4(e), on or before the date specified in such clause, as the case may be (each, a "Prepayment Date"). Subject to the following sentence, once given, such notice shall be irrevocable and all amounts subject to such notice shall be due and payable on the Prepayment Date (except as otherwise provided in the last sentence of this Subsection 4.4(h)). Any such notice of prepayment pursuant to Subsection 4.4(e) may state that such notice is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked or extended by the Borrower Representative (by written notice to the Administrative Agent, on or prior to the specified effective date) if such condition is not satisfied or waived. Upon receipt by the Administrative Agent of

72

such notice, the Administrative Agent shall immediately give notice to each Lender of the prepayment and the Prepayment Date. The Borrower Representative (in its sole discretion) may give each Lender the option (in its sole discretion) to elect to decline any such prepayment by giving notice of such election in writing to the Administrative Agent by 11:00 A.M., New York City time, on the date that is three Business Days prior to the Prepayment Date. Upon receipt by the Administrative Agent of such notice, the Administrative Agent shall immediately notify the Borrower Representative of such election. Any amount so declined by any Lender (the "Term Loan Declined Amount") maybe retained by Intermediate Holdings and its Restricted Subsidiaries and/or applied by Intermediate Holdings or any of its Restricted Subsidiaries in any manner not inconsistent with the Approved Budget.

(i)     Such amounts prepaid may not be reborrowed.

(j)     Notwithstanding the foregoing provisions of this Subsection 4.4, if at any time any prepayment of Loans pursuant to Subsection 4.4(a) or (e) would result, after giving effect to the procedures set forth in this Agreement, in the Borrowers incurring breakage costs under Subsection 4.12 as a result of Loans being prepaid other than on the last day of an Interest Period with respect thereto, then the Borrowers may, so long as no Default or Event of Default shall have occurred and be continuing, in their sole discretion, initially (i) deposit a portion (up to 100.0%) of the amounts that otherwise would have been paid in respect of such Loans with the Administrative Agent (which deposit must be equal in amount to the amount of such Loans not immediately prepaid), to be held as security for the obligations of the Borrowers to make such prepayment pursuant to a cash collateral agreement to be entered into on terms reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) with such cash collateral to be directly applied upon the first occurrence thereafter of the last day of an Interest Period with respect to such Loans (or such earlier date or dates as shall be requested by the Borrower Representative) or (ii) make a prepayment of Loans in accordance with Subsection 4.4(g) with an amount equal to a portion (up to 100.0%) of the amounts that otherwise would have been paid in respect of such Loans (which prepayment, together with any deposits pursuant to clause (i) above, must be equal in amount to the amount of such Loans not immediately prepaid); provided that, in the case of either clause (i) or (ii) above, such unpaid Loans shall continue to bear interest in accordance with Subsection 4.1 until such unpaid Loans or the related portion of such Loans, as the case may be, have or has been prepaid. In addition, if the Required Lenders determine in good faith, that repatriating any amounts attributable to Foreign Subsidiaries that are required to be applied to prepay Term Loans (other than the Incremental Term Loans) pursuant to Subsection 4.4(e)(i) or 4.4(e)(iii) (x) would result in material adverse tax consequences that are not de minimis to Topco or any of its Subsidiaries  or (y) (1) could reasonably be expected to be prohibited or delayed by or violate or conflict with applicable local law, (2) is restricted by applicable organizational documents or any agreement, (3) is subject to other organizational or administrative impediments from being repatriated to the United States or (4) conflicts with the fiduciary duties of the applicable directors, or results in, or could reasonably be expected to result in, a material risk of personal or criminal liability for any applicable officer, director or manager, then, in each case the Borrowers shall not be required to prepay such amounts as required thereunder, and such amounts may be retained by the applicable Foreign Subsidiary; provided that, in the case of this clause (y), the Borrowers shall take commercially reasonable actions to cause the applicable Foreign Subsidiary to take all actions reasonably required by the applicable local law, the applicable organizational documents or agreements, the applicable organizational

impediments or other impediment to permit repatriation of the proceeds subject to such prepayments.

4.5    Administrative Agent's Fee; Other Fees and Premiums. (a) The Borrowers agree to pay to the Administrative Agent the fees set forth in Administrative Agent Fee Letter.

(b)    Backstop Premium. On the Closing Date, the Borrowers agree to pay to the Fronting Lender, for the account of each Backstop Lender, a backstop premium in an amount equal to 3.00% of the aggregate amount of such Backstop Lender's New Money Term Loan Commitments, which shall (x) be fully earned upon the effectiveness of the New Money Term Loan Commitments, fully approved upon the entry of the Interim DIP Order and paid in kind in the form of New Money Term Loans (including with respect to Final New Money Term Loan Commitments) on the date that the Interim New Money Term Loans are funded hereunder (the "Backstop Premium"); provided that, of such aggregate amount of Backstop Premium payable on the Closing Date in-kind in the form of New Money Term Loans, only 50% of such additional Backstop Premium shall be fully earned, approved and paid in kind on the Closing Date, with the issuance of the remaining portion of such Backstop Premium subject to an additional Order of the Bankruptcy Court, which may be the Final DIP Order and (y) be assigned by the Fronting Lender to each Backstop Lender (or such Lender's nominee or designee, subject to reasonable and customary eligibility requirements) in an amount equal to such Backstop Lender's pro rata share of the New Money Term Loan Commitments as soon as practicable after the Closing Date.  For the avoidance of doubt, no Backstop Premium shall be payable on any Roll-Up Term Loan. The Administrative Agent shall have no obligation to monitor or confirm the amount of the Backstop Premium to be assigned to each Backstop Lender and shall update the Register solely on the basis of the applicable Assignment and Acceptance delivered to it. For the avoidance of doubt, the Loan Parties intend to treat the Backstop Premium as "put" premium for U.S. federal, and applicable state and local, income tax purposes.  The Loan Parties shall file all tax returns consistent with, and take no position inconsistent with, this tax treatment (whether in any audit, tax return or otherwise), unless required to do so pursuant to a change in law following the date hereof or a "determination" as defined under Section 1313(a) of the Internal Revenue Code.

(c)    Fronting Lender Fee.  The Borrowers agree to pay to the Fronting Lender, for its own account, the fees described in the Fronting Fee Letter, on the terms and in the amounts set forth therein.

(d)    OID.  The Borrowers agree, jointly and severally, to pay (or cause to be paid) on the Closing Date and the Final Borrowing Date to each Term Lender, a funding fee in cash in an amount equal to 2.00% (the "OID Premium") of the aggregate principal amount of such Term Lender's New Money Term Loan funded on such date, which such payment shall be treated as original issue discount.

4.6    Computation of Interest and Fees. (a) Interest (other than interest based on the Prime Rate) and the commitment fees payable pursuant to Subsection 4.5(c) shall be calculated on the basis of a 360-day year for the actual days elapsed; and interest based on the Prime Rate, shall be calculated on the basis of a 365-day year (or 366-day year, as the case may be) for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower Representative and the affected Lenders of each determination of a Term SOFR Rate or an

Adjusted EURIBOR Rate. Any change in the interest rate on a Loan resulting from a change in the Alternate Base Rate or the Statutory Reserves shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower Representative and the affected Lenders of the effective date and the amount of each such change in interest rate.

(b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on each of the Borrowers and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower Representative or any Lender, deliver to the Borrower Representative or such Lender a statement showing in reasonable detail the calculations used by the Administrative Agent in determining any interest rate pursuant to Subsection 4.1, excluding any ABR Loan which is based upon the Alternate Base Rate.

4.7    Inability to Determine Interest Rate.

(a)    If, prior to the first day of any Interest Period, the Administrative Agent shall have determined (acting at the Direction of the Required Lenders) (which determination shall be conclusive and binding upon each of the Borrowers) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Adjusted EURIBOR Rate with respect to any EURIBOR Loan (the "Affected EURIBOR Rate") or the Term SOFR Rate with respect to any Term SOFR Rate Loan for such Interest Period (the "Affected Term SOFR Rate"), the Administrative Agent (acting at the Direction of the Required Lenders) shall give facsimile or telephonic notice thereof to the Borrower Representative and the Lenders as soon as practicable thereafter. If such notice is given, (a) any Term SOFR Rate Loans the rate of interest applicable to which is based on the Affected Term SOFR Rate requested to be made on the first day of such Interest Period shall be made as ABR Loans and (b) any EURIBOR Loans the rate of interest applicable to which is based on the Affected EURIBOR Rate requested to be made on the first day of such Interest Period shall be made as Central Bank Rate Loans in Euros. Until such notice has been withdrawn by the Administrative Agent, no further Term SOFR Rate Loans or EURIBOR Loans the rate of interest applicable to which is based upon the Affected Term SOFR Rate or Affected EURIBOR Rate shall be made or continued as such, nor shall the Borrower Representative have the right to convert ABR Loans to Term SOFR Rate Loans.

(b)    In connection with the use, implementation or administration of Term SOFR Rate or SOFR, the Administrative Agent (acting at the Direction of the Required Lenders) will have the right to make the Benchmark Replacement Conforming Changes from time to time with the consent of the Borrower Representative and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments adopting or implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower Representative and the Lenders of the effectiveness of any Benchmark Replacement Conforming Changes.

4.8    Pro Rata Treatment and Payments.

75

(a)      Except as expressly otherwise provided herein (including in Subsection 11.6(m)), each Borrowing of Loans by a Borrower from the Lenders hereunder shall be made, each payment by a Borrower (except as provided in, 4.13(d) or 11.1(g)) of the Commitments of the Lenders shall be allocated by the Administrative Agent pro rata according to the respective Commitment of the Lenders. Except as expressly otherwise provided herein, each payment (including each prepayment, but excluding payments made pursuant to Subsections 4.5(b), 4.9, 4.10, 4.11, 4.12, 4.13(d), 11.1(g) or 11.6) by a Borrower on account of principal of and interest on account of any Loans of a given Tranche (other than (x) payments in respect of any difference in the Applicable Margin, Term SOFR Rate, Adjusted EURIBOR Rate or Alternate Base Rate in respect of any Tranche and (y) any payments pursuant to Subsection 4.4(e) to the extent declined by any Lender in accordance with Subsection 4.4(h). All payments (including prepayments) to be made by a Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without set-off or counterclaim and shall be made on or prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 P.M., New York City time), on the due date thereof to the Administrative Agent for the account of the Lenders holding the relevant Loans, the Lenders, or the Administrative Agent, as the case may be, at the Administrative Agent's office specified in Subsection 11.2, in Dollars or, in the case of Loans outstanding in Euros, Euros and, whether in Dollars or Euros, in immediately available funds. The Administrative Agent shall distribute such payments to such Lenders if any such payment is received (i) in the case of payments received in Dollars, prior to 2:00 P.M., New York City time, on a Business Day, and (ii) in the case of payments received in Euros, prior to 7:00 A.M., New York City time, on a Business Day, in each case, in like funds as received prior to the end of such Business Day and otherwise the Administrative Agent shall distribute such payment to such Lenders on the next succeeding Business Day. If any payment hereunder (other than payments on the Term SOFR Rate Loans or EURIBOR Loans) becomes due and payable on a day other than a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension. If any payment on a Term SOFR Rate Loan or EURIBOR Loan becomes due and payable on a day other than a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day (and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension) unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. This Subsection 4.8(a) may be amended in accordance with Subsection 11.1(d) to the extent necessary to reflect differing amounts payable, and priorities of payments, to Lenders participating in any new Tranches added pursuant to Subsections 2.8.

(b)      Unless the Administrative Agent shall have been notified in writing by any Lender prior to a Borrowing that such Lender will not make the amount that would constitute its share of such Borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may (but is under no obligation to), in reliance upon such assumption, make available to the applicable Borrower in respect of such Borrowing a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent on demand, such amount with interest thereon at a rate equal to (i) for amounts denominated in Dollars, the daily average Federal

76

Funds Effective Rate, and (ii) for amounts denominated in Euros, the rate customary in Euros for settlement of similar interbank obligations as determined by the Administrative Agent (acting at the Direction of the Required Lenders), in each case for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Subsection 4.8(b) shall be conclusive in the absence of manifest error. If such Lender's share of such Borrowing is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing Date, (x) the Administrative Agent shall notify the Borrower Representative of the failure of such Lender to make such amount available to the Administrative Agent and the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans hereunder on demand from the Borrowers; provided that the foregoing notice and recovery provisions shall not apply to the funding of Term Loans on the Closing Date and (y) then any Borrower may, without waiving or limiting any rights or remedies it may have against such Lender hereunder or under applicable law or otherwise, borrow a like amount on an unsecured basis from any commercial bank for a period ending on the date upon which such Lender does in fact make such Borrowing available.

4.9    Illegality. Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof in each case occurring after the Closing Date shall make it unlawful for any Lender to make or maintain any Term SOFR Rate Loans or EURIBOR Loans as contemplated by this Agreement ("Affected Loans"), (a) such Lender shall promptly give written notice of such circumstances to the Borrower Representative and the Administrative Agent (which notice shall be withdrawn whenever such circumstances no longer exist), (b) the commitment of such Lender hereunder to make Affected Loans, continue Affected Loans as such and convert an ABR Loan to an Affected Loan shall forthwith be cancelled and, until such time as it shall no longer be unlawful for such Lender to make or maintain such Affected Loans, such Lender shall then have a commitment only to make an ABR Loan when an Affected Loan is requested, (c) such Lender's Loans then outstanding as Affected Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Affected Loans or within such earlier period as required by law and (d) such Lender's then outstanding Affected Loans, if any, not converted to ABR Loans pursuant to clause (c) of this Subsection 4.9 shall, at the option of the Borrower Representative (i) be prepaid with accrued interest thereon on the last day of the then current Interest Period with respect thereto (or such earlier date as may be required by any such Requirement of Law) or (ii) bear interest at an alternate rate which reflects such Lender's cost of funding such Loans (which rate, if less than zero, shall be deemed zero for purposes of this Agreement), as reasonably determined by the Administrative Agent (acting at the Direction of the Required Lenders), plus the Applicable Margin hereunder. If any such conversion or prepayment of an Affected Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrowers shall pay to such Lender such amounts, if any, as may be required pursuant to Subsection 4.12.

4.10    Requirements of Law. (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof applicable to any Lender, or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority, in each case made subsequent to the Closing Date (or, if later, the date on which such Lender becomes a Lender):

77

(i)     shall subject such Lender to any Tax of any kind whatsoever with respect to any Term SOFR Rate Loans or EURIBOR Loans made or maintained by it or its obligation to make or maintain Term SOFR Rate Loans or EURIBOR Loans, or change the basis of taxation of payments to such Lender in respect thereof, in each case, except for Non-Excluded Taxes and Excluded Taxes; or

(ii)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender which is not otherwise included in the determination of the EURIBOR Rate, hereunder;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender deems to be material, of making, converting into, continuing or maintaining Term SOFR Rate Loans or EURIBOR Loans or to reduce any amount receivable hereunder in respect thereof, then, in any such case, upon notice to the Borrower Representative from such Lender, through the Administrative Agent in accordance herewith, the Borrowers shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable with respect to such Term SOFR Rate Loans or EURIBOR Loans; provided that, in any such case, the Borrower Representative may elect to convert the Term SOFR Rate Loans hereunder to ABR Loans, as applicable, by giving the Administrative Agent at least one Business Day's notice of such election, in which case the Borrowers shall promptly pay to such Lender, upon demand, without duplication, amounts theretofore required to be paid to such Lender pursuant to this Subsection 4.10(a) and such amounts, if any, as may be required pursuant to Subsection 4.12. If any Lender becomes entitled to claim any additional amounts pursuant to this Subsection 4.10(a), it shall provide prompt notice thereof to the Borrower Representative, through the Administrative Agent, certifying (x) that one of the events described in this clause (a) has occurred and describing in reasonable detail the nature of such event, (y) as to the increased cost or reduced amount resulting from such event and (z) as to the additional amount demanded by such Lender and a reasonably detailed explanation of the calculation thereof. Such a certificate as to any additional amounts payable pursuant to this Subsection 4.10(a) submitted by such Lender, through the Administrative Agent, to the Borrower Representative shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Subsection 4.10(a), the Borrowers shall not be required to compensate a Lender  pursuant to this Subsection 4.10(a) (i) for any amounts Incurred more than six months prior to the date that such Lender notifies the Borrower Representative of such Lender's intention to claim compensation therefor or (ii) for any amounts, if such  Lender  is applying this provision to the Borrowers in a manner that is inconsistent with its application of "increased cost" or other similar provisions under other syndicated credit agreements to similarly situated borrowers. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(b)     If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or liquidity or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy or liquidity (whether or not having the force of law) from any Governmental Authority, in each case, made subsequent to the Closing Date,

78

does or shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of such Lender's obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy or liquidity) by an amount deemed by such Lender to be material, then from time to time, within ten Business Days after submission by such Lender to the Borrower Representative (through the Administrative Agent) of a written request therefor certifying ($\underline{x}$) that one of the events described in this clause (b) has occurred and describing in reasonable detail the nature of such event, ($\underline{y}$) as to the reduction of the rate of return on capital resulting from such event and ($\underline{z}$) as to the additional amount or amounts demanded by such Lender or corporation and a reasonably detailed explanation of the calculation thereof, the Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or corporation for such reduction. Such a certificate as to any additional amounts payable pursuant to this Subsection 4.10(b) submitted by such Lender, through the Administrative Agent, to the Borrower Representative shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Subsection 4.10(b), the Borrowers shall not be required to compensate a Lender pursuant to this Subsection 4.10(b) (i) for any amounts Incurred more than six months prior to the date that such Lender notifies the Borrower Representative of such Lender's intention to claim compensation therefor or (ii) for any amounts, if such Lender is applying this provision to the Borrowers in a manner that is inconsistent with its application of "increased cost" or other similar provisions under other syndicated credit agreements to similarly situated borrowers. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(c)     Notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, regulations, guidelines and directives promulgated thereunder or issued in connection therewith, and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, in each case shall be deemed to have been enacted, adopted or issued, as applicable, subsequent to the Closing Date for all purposes herein.

4.11    Taxes. (a) Except as provided below in this Subsection 4.11 or as required by law (which for purposes of this Subsection 4.11 shall include FATCA), all payments made by the Borrowers or the Agents under this Agreement and any Notes shall be made free and clear of, and without deduction or withholding for or on account of any Taxes; provided that if any Non-Excluded Taxes are required to be withheld from any amounts payable by any Borrower to any Agent or any Lender hereunder or under any Notes, the amounts so payable by such Borrower shall be increased to the extent necessary to yield to such Agent or such Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder equal to the sum it would have received had no such deduction or withholding for Non-Excluded Taxes been made; provided, however, that the Borrowers shall be entitled to deduct and withhold, and the Borrowers shall not be required to indemnify for, any Non-Excluded Taxes, and any such amounts payable by any Borrower to or for the account of any Agent or Lender shall not be increased ($\underline{x}$) if such Agent or Lender fails to comply with the requirements of clause (b), (c), (d) or (e) of this Subsection 4.11, or ($\underline{y}$) with respect to any Non-Excluded Taxes imposed in connection with the payment of any fees paid under this Agreement unless such Non-Excluded Taxes are imposed as a result of a Change in Law, or ($\underline{z}$) with respect to any Non-Excluded Taxes imposed by the United

States, unless such Non-Excluded Taxes are imposed as a result of a change in treaty, law or regulation that occurred after such Agent became an Agent hereunder or such Lender became a Lender hereunder (any such change, at such time, a "Change in Law"). Whenever any Non-Excluded Taxes are payable by any Borrower pursuant to this Subsection 4.11, as promptly as possible thereafter the Borrower Representative shall send to the Administrative Agent for its own account or for the account of the respective Lender or Agent, as the case may be, a certified copy of an original official receipt received by such Borrower showing payment thereof. If any Borrower fails to pay any Non-Excluded Taxes when due to the appropriate Governmental Authority in accordance with applicable law or the Borrower Representative fails to remit to the Administrative Agent the required receipts or other required documentary evidence, such Borrower or the Borrower Representative, as applicable, shall indemnify the Administrative Agent, the Lenders and the Agents for any incremental Taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of any such failure. The agreements in this Subsection 4.11 shall survive the termination of this Agreement and the payment of the Term Loans and all other amounts payable hereunder.

(b)     Each Agent and each Lender that is not a United States Person shall, to the extent legally entitled to do so:

(i)     (1) on or before the date of any payment by any Borrower under this Agreement or any Notes to, or for the account of, such Agent or Lender, deliver to the Borrower Representative and the Administrative Agent (A) two accurate and complete copies of signed Internal Revenue Service Forms W-8BEN-E or W-8BEN (certifying that it is a resident of the applicable country within the meaning of the income tax treaty between the United States and that country) or Forms W-8ECI, or successor applicable form, as the case may be, in each case certifying that it is entitled to receive all payments under this Agreement and any Notes without or at a reduced rate of deduction or withholding of any U.S. federal income taxes, and (B) such other forms, documentation or certifications, as the case may be, certifying that it is entitled to an exemption from or reduction of United States backup withholding tax with respect to payments under this Agreement and any Notes;

(2)     deliver to the Borrower Representative and the Administrative Agent two further accurate and complete copies of signed forms or certifications provided in Subsection 4.11(b)(i)(1) on or before the date that any such form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form or certificate previously delivered by it to the Borrower Representative or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so;

(3)     [reserved]; and

(4)     deliver, to the extent legally entitled to do so, upon reasonable request by the Borrower Representative, to the Borrower Representative and the Administrative Agent such other forms as may be reasonably required in order to establish the legal entitlement of such Agent or such Lender to an exemption from, or reduction of, withholding with

80

respect to payments under this Agreement and any Notes, provided that, in determining the reasonableness of a request under this clause (4), such Lender shall be entitled to consider the cost (to the extent unreimbursed by any Loan Party) which would be imposed on such Lender of complying with such request; or

(ii) in the case of any such Lender that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and is claiming the so-called "portfolio interest exemption",

(1) represent to the Borrowers and the Administrative Agent that it is not (A) a bank within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code;

(2) on or before the date of any payment by any Borrower under this Agreement or any Notes to, or for the account of, such Lender, deliver to the Borrower Representative and the Administrative Agent, (A) two certificates substantially in the form of Exhibit D-1 or D-2 hereto, as applicable (any such certificate a "U.S. Tax Compliance Certificate") and (B) two accurate and complete copies of signed Internal Revenue Service Forms W-8BEN-E or W-8BEN, or successor applicable form, certifying to such Lender's legal entitlement at the date of such form to an exemption from U.S. withholding tax under the provisions of Section 871(h) or Section 881(c) of the Code with respect to payments to be made under this Agreement and any Notes and (C) such other forms, documentation or certifications, as the case may be certifying that it is entitled to an exemption from United States backup withholding tax with respect to payments under this Agreement and any Notes (and shall also deliver to the Borrower Representative and the Administrative Agent two further accurate and complete copies of signed forms or certificates on or before the date it expires or becomes obsolete and after the occurrence of any event requiring a change in the most recently provided form or certificate or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so); and

(3) deliver, to the extent legally entitled to do so, upon reasonable request by the Borrower Representative, to the Borrower Representative and the Administrative Agent such other forms as may be reasonably required in order to establish the legal entitlement of such Lender to an exemption from, or reduction of, withholding with respect to payments under this Agreement and any Notes, provided that, in determining the reasonableness of a request under this clause (3), such Lender shall be entitled to consider the cost (to the extent unreimbursed by the Borrowers) which would be imposed on such Lender of complying with such request; or

(iii)    in the case of any such Agent or Lender that is a non-U.S. intermediary or flow-through entity for U.S. federal income tax purposes,

(1)    on or before the date of any payment by any Borrower under this Agreement or any Notes to, or for the account of, such Agent or Lender, deliver to the Borrower Representative and the Administrative Agent two accurate and complete copies of signed Internal Revenue Service Forms W-8IMY, or successor applicable form; and

(A)    with respect to each beneficiary or member of such Agent or Lender that is not claiming the so-called "portfolio interest exemption", also deliver to the Borrower Representative and the Administrative Agent (I) two accurate and complete copies of signed Internal Revenue Service Forms W-8BEN-E or W-8BEN (certifying that such beneficiary or member is a resident of the applicable country within the meaning of the income tax treaty between the United States and that country), Forms W-8ECI, Forms W-8IMY and/or Forms W-9, or successor applicable form, as the case may be, in each case so that each such beneficiary or member is entitled to receive all payments under this Agreement and any Notes without deduction or withholding of any U.S. federal income taxes and (II) such other forms, documentation or certifications, as the case may be, certifying that each such beneficiary or member is entitled to an exemption from United States backup withholding tax with respect to all payments under this Agreement and any Notes; and

(B)    with respect to each beneficiary or member of such Lender that is claiming the so-called "portfolio interest exemption", (I) represent to the Borrowers and the Administrative Agent that such beneficiary or member is not (1) a bank within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and (II) also deliver to the Borrower Representative and the Administrative Agent two U.S. Tax Compliance Certificates from each beneficiary or member and two accurate and complete copies of signed Internal Revenue Service Forms W-8BEN-E or W-8BEN, or successor applicable form, certifying to such beneficiary's or member's legal entitlement at the date of such certificate to an exemption from U.S. withholding tax under the provisions of Section 871(h) or Section 881(c) of the Code with respect to payments to be made under this Agreement and any Notes, and (III) also deliver to the Borrower Representative and the Administrative Agent such other forms, documentation or certifications, as the case may be, certifying that it is entitled to an

82

exemption from United States backup withholding tax with respect to payments under this Agreement and any Notes;

(2) deliver to the Borrower Representative and the Administrative Agent two further accurate and complete copies of signed forms, certificates or certifications referred to above on or before the date any such form, certificate or certification expires or becomes obsolete, or any beneficiary or member changes, and after the occurrence of any event requiring a change in the most recently provided form, certificate or certification or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so; and

(3) deliver, to the extent legally entitled to do so, upon reasonable request by the Borrower Representative, to the Borrower Representative and the Administrative Agent such other forms as may be reasonably required in order to establish the legal entitlement of such Agent or Lender (or beneficiary or member) to an exemption from, or reduction of, withholding with respect to payments under this Agreement and any Notes, provided that in determining the reasonableness of a request under this clause (3) such Agent or Lender shall be entitled to consider the cost (to the extent unreimbursed by the Borrowers) which would be imposed on such Agent or Lender (or beneficiary or member) of complying with such request;

unless, in any such case (other than with respect to United States backup withholding tax), there has been a Change in Law which renders all such forms inapplicable or which would prevent such Agent or such Lender (or such beneficiary or member) from duly completing and delivering any such form with respect to it and such Agent or such Lender so advises the Borrower Representative and the Administrative Agent.

(c) Each Lender and each Agent, in each case that is a United States Person, shall, on or before the date of any payment by any Borrower under this Agreement or any Notes to such Lender or Agent, deliver to the Borrower Representative and the Administrative Agent two accurate and complete original signed Internal Revenue Service Forms W-9, or successor applicable form, certifying that such Lender or Agent is a United States Person and that such Lender or Agent is entitled to complete exemption from United States backup withholding tax.

(d) Notwithstanding the foregoing, if the Administrative Agent is not a United States Person, on or before the date of any payment by any Borrower under this Agreement or any Notes to the Administrative Agent, the Administrative Agent shall:

(i) deliver to the Borrower Representative (A) two accurate and complete copies of signed Internal Revenue Service Forms W-8ECI, or successor applicable form, with respect to any amounts payable to the Administrative Agent for its own account, (B) two accurate and complete copies of signed Internal Revenue Service Forms W-8IMY, or successor applicable form, with respect to any amounts payable to the Administrative Agent for the account of others, certifying that it is a "U.S. branch" and that the payments it receives for the account of

others are not effectively connected with the conduct of its trade or business in the United States and that it is using such form as evidence of its agreement with the Borrowers to be treated as a U.S. person with respect to such payments (and the Borrowers and the Administrative Agent agree to so treat the Administrative Agent as a U.S. person with respect to such payments as contemplated by U.S. Treasury Regulation § 1.1441-1(b)(2)(iv)) or a qualified intermediary that has agreed to assume primary withholding obligations for Chapter 3 and Chapter 4 of the Code, as applicable and (C) such other forms or certifications as may be sufficient under applicable law to establish that the Administrative Agent is entitled to receive any payment by any Borrower under this Agreement or any Notes (whether for its own account or for the account of others) without deduction or withholding of any U.S. federal income taxes;

unless in any such case (other than with respect to United States backup withholding tax) there has been a Change in Law which renders all such forms inapplicable or which would prevent the Administrative Agent from duly completing and delivering any such form with respect to it and the Administrative Agent so advises the Borrower Representative.

(e)     If a payment made to an Agent or a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Agent or such Lender were to fail to comply with the applicable reporting requirements of FATCA, such Agent or such Lender shall deliver to the Administrative Agent and the Borrower Representative, at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Agent or the Borrower Representative, such documentation prescribed by applicable law and such additional documentation reasonably requested by the Administrative Agent or the Borrower Representative as may be necessary for the Administrative Agent and the Borrowers to comply with their respective obligations (including any applicable reporting requirements) under FATCA, to determine whether such Agent or such Lender has complied with such Agent's or such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. For the avoidance of doubt, the Borrowers and the Administrative Agent shall be permitted to withhold any Taxes imposed by FATCA.

4.12    <u>Indemnity</u>. The Borrowers agree, jointly and severally, to indemnify each Lender in respect of Extensions of Credit made, or requested to be made, to the Borrowers, and to hold each such Lender harmless from any loss or expense which such Lender may sustain or Incur (other than through such Lender's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable decision) as a consequence of (<u>a</u>) default by the Borrowers in making a Borrowing of, conversion into or continuation of Term SOFR Rate Loans or EURIBOR Loans after the Borrower Representative has given a notice requesting the same in accordance with the provisions of this Agreement, (<u>b</u>) default by the Borrowers in making any prepayment or conversion of Term SOFR Rate Loans or EURIBOR Loans after the Borrower Representative has given a notice thereof in accordance with the provisions of this Agreement or (<u>c</u>) the making of a payment or prepayment of Term SOFR Rate Loans or EURIBOR Loans or the conversion of Term SOFR Rate Loans or EURIBOR Loans on a day which is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (<u>i</u>) the amount of interest which would have accrued on the amount so prepaid, or converted, or not so borrowed, converted or continued, for the period from the date of such prepayment or conversion or of such failure to borrow, convert or continue to the last day of the applicable Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest

Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Term SOFR Rate Loans or EURIBOR Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) <u>over</u> (<u>ii</u>) the amount of interest (as reasonably determined by such Lender) which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. If any Lender becomes entitled to claim any amounts under the indemnity contained in this <u>Subsection 4.12</u>, it shall provide prompt notice thereof to the Borrower Representative, through the Administrative Agent, certifying (<u>x</u>) that one of the events described in clause (a), (b) or (c) above has occurred and describing in reasonable detail the nature of such event, (<u>y</u>) as to the loss or expense sustained or Incurred by such Lender as a consequence thereof and (<u>z</u>) as to the amount for which such Lender seeks indemnification hereunder and a reasonably detailed explanation of the calculation thereof. Such a certificate as to any indemnification pursuant to this <u>Subsection 4.12</u> submitted by such Lender, through the Administrative Agent, to the Borrower Representative shall be conclusive in the absence of manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within five Business Days after receipt thereof. This covenant shall survive the termination of this Agreement and the payment of the Term Loans and all other amounts payable hereunder.

4.13 <u>Certain Rules Relating to the Payment of Additional Amounts</u>. (a) Upon the request, and at the expense of each applicable Borrower, each Lender and Agent to which any Borrower is required to pay any additional amount pursuant to <u>Subsection 4.10</u> or <u>4.11</u>, and any Participant in respect of whose participation such payment is required, shall reasonably afford any Borrower the opportunity to contest, and reasonably cooperate with such Borrower in contesting, the imposition of any Non-Excluded Tax giving rise to such payment; <u>provided</u> that (<u>i</u>) such Lender or Agent shall not be required to afford any Borrower the opportunity to so contest unless such Borrower shall have confirmed in writing to such Lender or Agent its obligation to pay such amounts pursuant to this Agreement and (<u>ii</u>) the Borrowers shall reimburse such Lender or Agent for its reasonable attorneys' and accountants' fees and disbursements Incurred in so cooperating with any Borrower in contesting the imposition of such Non-Excluded Tax; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing no Lender or Agent shall be required to afford any Borrower the opportunity to contest, or cooperate with any Borrower in contesting, the imposition of any Non-Excluded Taxes, if such Lender or Agent in its reasonable discretion in good faith determines that to do so would have an adverse effect on it.

(b) If a Lender changes its applicable lending office (other than pursuant to clause (c) below) and the effect of such change, as of the date of such change, would be to cause any Borrower to become obligated to pay any additional amount under <u>Subsection 4.10</u> or <u>4.11</u>, such Borrower shall not be obligated to pay such additional amount.

(c) If a condition or an event occurs which would, or would upon the passage of time or giving of notice, result in the payment of any additional amount to any Lender or Agent by any Borrower pursuant to <u>Subsection 4.10</u> or <u>4.11</u> or result in Affected Loans or commitments to make Affected Loans being automatically converted to ABR Loans or Loans bearing an alternate rate of interest or commitments to make ABR Loans or Loans bearing an alternate rate of interest, as the case may be, pursuant to <u>Subsection 4.9</u>, such Lender or Agent shall promptly notify the Borrower Representative and the Administrative Agent and shall take such steps as may reasonably be available to it to mitigate the effects of such condition or event (which shall include

85

efforts to rebook the Loans and Commitments held by such Lender at another lending office, or through another branch or an Affiliate, of such Lender); provided that such Lender or Agent shall not be required to take any step that, in its reasonable judgment, would be materially disadvantageous to its business or operations or would require it to Incur additional costs (unless the Borrowers agree to reimburse such Lender or Agent for the reasonable incremental out-of-pocket costs thereof).

(d)     If any Borrower shall become obligated to pay additional amounts pursuant to Subsection 4.10 or 4.11 and any affected Lender shall not have promptly taken steps necessary to avoid the need for payments under Subsection 4.10 or 4.11 or if Affected Loans or commitments to make Affected Loans are automatically converted to ABR Loans or Loans bearing an alternate rate of interest or commitments to make ABR Loans or Loans bearing an alternate rate of interest, as the case may be, under Subsection 4.9 and any affected Lender shall not have promptly taken steps necessary to avoid the need for such conversion under Subsection 4.9, the Borrower Representative shall have the right, for so long as such obligation remains, (i) with the assistance of the Administrative Agent to seek one or more substitute Lenders reasonably satisfactory to the Administrative Agent and the Borrower Representative to purchase the Affected Loan or Commitment, in whole or in part, at an aggregate price no less than such Loan's or Commitment's principal amount plus accrued interest, and assume the affected obligations under this Agreement, or (ii) so long as no Event of Default under Subsection 9.1(a) or (f) then exists or will exist immediately after giving effect to the respective prepayment, upon notice to the Administrative Agent to prepay the Affected Loan, in whole or in part, subject to Subsection 4.12, without premium or penalty. In the case of the substitution of a Lender, then, the Borrower Representative, the Administrative Agent, the affected Lender, and any substitute Lender shall execute and deliver an appropriately completed Assignment and Acceptance pursuant to Subsection 11.6(b) to effect the assignment of rights to, and the assumption of obligations by, the substitute Lender; provided that any fees required to be paid by Subsection 11.6(b) in connection with such assignment shall be paid by the Borrowers or the substitute Lender. In the case of a prepayment of an Affected Loan, the amount specified in the notice shall be due and payable on the date specified therein, together with any accrued interest to such date on the amount prepaid. In the case of each of the substitution of a Lender and of the prepayment of an Affected Loan, the Borrowers shall first pay the affected Lender any additional amounts owing under Subsections 4.10 and 4.11 (as well as any commitment fees and other amounts then due and owing to such Lender, including any amounts under this Subsection 4.13) prior to such substitution or prepayment. In the case of the substitution of a Lender pursuant to this Subsection 4.13(d), if the Lender being replaced does not execute and deliver to the Administrative Agent a duly completed Assignment and Acceptance and/or any other documentation necessary to reflect such replacement by the later of (a) the date on which the Assignee executes and delivers such Assignment and Acceptance and/or such other documentation and (b) the date as of which all obligations of the Borrowers owing to such replaced Lender relating to the Loans and participations so assigned shall be paid in full by the Assignee and/or the Borrowers to such Lender being replaced, then the Lender being replaced shall be deemed to have executed and delivered such Assignment and Acceptance and/or such other documentation as of such date and the Borrower Representative shall be entitled (but not obligated) to execute and deliver such Assignment and Acceptance and/or such other documentation on behalf of such Lender.

86

(e)      If any Agent or any Lender receives a refund directly attributable to Taxes for which any Borrower has made additional payments pursuant to Subsection 4.10(a) or 4.11(a), such Agent or such Lender, as the case may be, shall promptly pay such refund (but only to the extent of indemnity payments made under Subsection 4.10(a) or 4.11(a) with respect to the Taxes giving rise to such refund) (together with any interest with respect thereto received from the relevant taxing authority, but net of any reasonable cost Incurred in connection therewith) to such Borrower; provided, however, that such Borrower agrees promptly to return such refund (together with any interest with respect thereto due to the relevant taxing authority) (free of all Non-Excluded Taxes) to such Agent or the applicable Lender, as the case may be, upon receipt of a notice that such refund is required to be repaid to the relevant taxing authority. Notwithstanding anything to the contrary in this paragraph (e), in no event will any Agent or any Lender be required to pay any amount to any Borrower pursuant to this paragraph (h) the payment of which would place such Agent or such Lender in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Borrower or any other Person.

(f)      The obligations of any Agent, Lender or Participant under this Subsection 4.13 shall survive the termination of this Agreement and the payment of the Term Loans and all amounts payable hereunder.

4.14      [Reserved].

SECTION 5

Representations and Warranties

To induce each Lender to make the Extensions of Credit requested to be made by it on the Closing Date and on each other date thereafter on which an Extension of Credit is made, each of the Borrowers, Holdings, Intermediate Holdings with respect to itself and its Restricted Subsidiaries, hereby represents and warrants, on the Closing Date, in each case after giving effect to the Transactions (solely to the extent required to be true and correct for such Extension of Credit pursuant to Subsection 6.1), and on every other date thereafter on which an Extension of Credit is made, to the Administrative Agent and each Lender that:

5.1      [Reserved].

5.2      No Change. Since the Petition Date, there has been no development or event relating to or affecting any Loan Party which has had or would be reasonably expected to have a Material Adverse Effect (after giving effect to (i) the consummation of the Transactions, (ii) the making of the Extensions of Credit to be made on the Closing Date and on each subsequent borrowing date hereunder and the application of the proceeds thereof as contemplated hereby and the Approved Budget, and (iii) the payment of actual or estimated fees, expenses, financing costs and tax payments related to the Transactions contemplated hereby).

5.3    Corporate Existence; Compliance with Law. Each of the Loan Parties (a) is duly organized, validly existing and (to the extent applicable in the relevant jurisdiction) in good standing under the laws of the jurisdiction of its incorporation or formation, except (other than with respect to the Borrowers), to the extent that the failure to be organized, existing and (to the extent applicable) in good standing would not reasonably be expected to have a Material Adverse Effect, (b) has the legal right to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, except to the extent that the failure to have such legal right would not be reasonably expected to have a Material Adverse Effect, (c) is duly qualified as a foreign corporation or limited liability company and (to the extent applicable in the relevant jurisdiction) in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, other than in such jurisdictions where the failure to be so qualified and (to the extent applicable) in good standing would not be reasonably expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith would not, in the aggregate, be reasonably expected to have a Material Adverse Effect.

5.4    Corporate Power; Authorization; Enforceable Obligations. Each Loan Party has the corporate or other organizational power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of each Borrower, to obtain Extensions of Credit hereunder, and each such Loan Party has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of each Borrower, to authorize the Extensions of Credit to it, if any, on the terms and conditions of this Agreement and any Notes. No consent or authorization of, filing with, notice to or other similar act by or in respect of, any Governmental Authority or any other Person is required to be obtained or made by or on behalf of any Loan Party in connection with the execution, delivery, performance, validity or enforceability of the Loan Documents to which it is a party or, in the case of each Borrower, with the Extensions of Credit to it, if any, hereunder, except for (a) consents, authorizations, notices and filings described in Schedule 5.4, all of which have been obtained or made on or prior to the Closing Date, (b) filings to perfect the Liens created by the Security Documents and (c) consents, authorizations, notices and filings which the failure to obtain or make would not reasonably be expected to have a Material Adverse Effect. This Agreement has been duly executed and delivered by each Borrower, and each other Loan Document to which any Loan Party is a party will be duly executed and delivered on behalf of such Loan Party. This Agreement constitutes a legal, valid and binding obligation of each Borrower and each other Loan Document to which any Loan Party is a party when executed and delivered will constitute a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms, in each case except as enforceability may be limited by applicable domestic or foreign bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

5.5    No Legal Bar. The execution, delivery and performance of the Loan Documents by any of the Loan Parties, the Extensions of Credit hereunder and the use of the proceeds thereof (a) will not violate any Requirement of Law or Contractual Obligation of such Loan Party in any respect that would reasonably be expected to have a Material Adverse Effect, (b) will not result in, or require the creation or imposition of any Lien (other than Liens securing

88

the DIP Facility Obligations or otherwise permitted hereby) on any of its properties or revenues pursuant to any such Requirement of Law or Contractual Obligation and (c) will not violate any provision of the Organizational Documents of such Loan Party or any of the Restricted Subsidiaries, except (other than with respect to the Borrowers) as would not reasonably be expected to have a Material Adverse Effect.

5.6    No Material Litigation. No litigation, investigation or proceeding by or before any arbitrator or Governmental Authority is pending or, to the knowledge of Topco Borrower, threatened by or against Topco Borrower or any of its Restricted Subsidiaries or against any of their respective properties or revenues, (a) except as described on Schedule 5.6, which is so pending or threatened at any time on or prior to the Closing Date and relates to any of the Loan Documents or any of the transactions contemplated hereby or thereby or (b) which would be reasonably expected to have a Material Adverse Effect.

5.7    No Default. Neither Topco Borrower nor any of its Restricted Subsidiaries is in default under or with respect to any of its Contractual Obligations in any respect which would be reasonably expected to have a Material Adverse Effect. Since the Closing Date, no Default or Event of Default has occurred and is continuing.

5.8    Ownership of Property; Liens. Each of Topco Borrower and its Restricted Subsidiaries has good title in fee simple to, or a valid leasehold interest in, all its material real property located in the United States of America, and good title to, or a valid leasehold interest in, all its other Material Property located in the United States of America, except those for which the failure to have such good title or such leasehold interest would not be reasonably expected to have a Material Adverse Effect, and none of such real or other property is subject to any Lien, except for Liens permitted hereby (including Permitted Liens).

5.9    Intellectual Property. Holdings and each of its Restricted Subsidiaries owns beneficially, or has the legal right to use, all United States and foreign patents, patent applications, trademarks, trademark applications, design registrations and applications, trade names, copyrights, and rights in know-how and trade secrets necessary for each of them to conduct its business as currently conducted (the "Intellectual Property") except for those for which the failure to own or have such legal right to use would not be reasonably expected to have a Material Adverse Effect. Except as provided on Schedule 5.9, to the knowledge of Topco Borrower, (1) no claim has been asserted and is pending by any Person against Topco Borrower or any of its Restricted Subsidiaries challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property and (2) the use of such Intellectual Property by Topco Borrower and its Restricted Subsidiaries does not infringe on the rights of any Person, except (in each case under the preceding clauses (1) and (2)) for such claims and infringements which in the aggregate, would not be reasonably expected to have a Material Adverse Effect.

5.10    Taxes. To the knowledge of Topco Borrower, (1) Topco Borrower and each of its Restricted Subsidiaries has filed or caused to be filed all material tax returns which are required to be filed by it and has paid or caused to be paid (a) all Taxes shown to be due and payable on such returns and (b) all Taxes shown to be due and payable on any assessments of which it has received notice made against it or any of its property and all other Taxes imposed on it or any of its property or income by any Governmental Authority; and (2) no Liens for Taxes

89

have been filed (except for Liens for Taxes not yet due and payable), and no claim is being asserted in writing, with respect to any such Taxes (in each case under the preceding clauses (1) and (2) other than in respect of any such (i) Taxes with respect to which the failure to pay, in the aggregate, would not have a Material Adverse Effect or (ii) Taxes the amount or validity of which are currently being contested in good faith by appropriate proceedings diligently conducted and with respect to which reserves in conformity with GAAP have been provided on the books of Topco Borrower or its Restricted Subsidiaries, as the case may be).

5.11    Federal Regulations. No part of the proceeds of any Extensions of Credit will be used for any purpose which violates the provisions of the Regulations of the Board, including Regulation T, Regulation U or Regulation X of the Board. If requested by any Lender or the Administrative Agent, the Borrower Representative will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, referred to in said Regulation U.

5.12    ERISA. (a) During the five year period prior to each date as of which this representation is made, or deemed made, with respect to any Plan, none of the following events or conditions, either individually or in the aggregate, has resulted or is reasonably likely to result in a Material Adverse Effect: (i) a Reportable Event, (ii) a failure to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA), (iii) any material noncompliance with the applicable provisions of ERISA or the Code, (iv) a termination of a Single Employer Plan (other than a standard termination pursuant to Section 4041(b) of ERISA), (v) a Lien on the property of Topco Borrower or its Restricted Subsidiaries in favor of the PBGC or a Plan, (vi) a complete or partial withdrawal from any Multiemployer Plan by Topco Borrower or any Commonly Controlled Entity, (vii) the Insolvency of any Multiemployer Plan or (viii) any transactions that resulted or could reasonably be expected to result in any liability to Topco Borrower or any Commonly Controlled Entity under Section 4069 of ERISA or Section 4212(c) of ERISA.

(b)    With respect to any Foreign Plan, none of the following events or conditions exists and is continuing that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect: (i) substantial non-compliance with its terms or with the requirements of any applicable laws, statutes, rules, regulations and orders, (ii) failure to be maintained, where required, in good standing with applicable regulatory authorities, (iii) any obligation of Topco Borrower or its Restricted Subsidiaries in connection with the termination or partial termination of, or withdrawal from, any Foreign Plan, (iv) any Lien on the property of Topco Borrower or its Restricted Subsidiaries in favor of a Governmental Authority as a result of any action or inaction regarding a Foreign Plan, (v) for each Foreign Plan which is a funded or insured plan, failure to be funded or insured on an ongoing basis to the extent required by applicable non-U.S. law (using actuarial methods and assumptions which are consistent with the valuations last filed with the applicable Governmental Authorities, if applicable), (vi) any facts that, to the best knowledge of Topco Borrower or any of its Restricted Subsidiaries, exist that would reasonably be expected to give rise to a dispute and any pending or threatened disputes that, to the best knowledge of Topco Borrower or any of its Restricted Subsidiaries, would reasonably be expected to result in a material liability to Topco Borrower or any of its Restricted Subsidiaries concerning the assets of any Foreign Plan (other than individual claims for the payment of benefits)

and (vii) failure to make all contributions in a timely manner to the extent required by applicable non-U.S. law.

5.13    Collateral. Upon execution and delivery thereof by the parties thereto, each of the Guarantee and the Collateral Agreement will be effective to create (to the extent described therein and subject to the Orders) in favor of the Collateral Agent for the benefit of the Secured Parties, a valid and enforceable security interest in or liens on the Collateral described therein, except as to enforcement, as may be limited by applicable domestic or foreign bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing. When (a) all Filings (as defined in the Collateral Agreement) have been completed, (b) all applicable Instruments, Chattel Paper and Documents (each as described in the Collateral Agreement) constituting Collateral a security interest in which is perfected by possession have been delivered to, and/or are in the continued possession of, the Collateral Agent (or its respective agent appointed for purposes of perfection), in accordance with the Prepetition ABL/Cash Flow Intercreditor Agreement and (c) all Deposit Accounts and Pledged Stock (as defined in the Collateral Agreement) a security interest in which is required by the Security Documents to be perfected by "control" (as described in the Uniform Commercial Code as in effect in each applicable jurisdiction (in the case of Deposit Accounts) and the State of New York (in the case of Pledged Stock (as defined in the Collateral Agreement)) from time to time) are under the "control" of the Collateral Agent or the Administrative Agent (or their respective agents appointed for purposes of perfection), in accordance with the Prepetition ABL/Cash Flow Intercreditor Agreement, the security interests and liens granted pursuant to the Collateral Agreement shall constitute (to the extent described therein) a perfected security interest in (to the extent intended to be created thereby and required to be perfected under the Loan Documents), all right, title and interest of each pledgor party thereto in the Collateral described therein (excluding Commercial Tort Claims, as defined in the Collateral Agreement, other than such Commercial Tort Claims set forth on Schedule 6 thereto (if any)) with respect to such pledgor. Notwithstanding any other provision of this Agreement, capitalized terms that are used in this Subsection 5.13 and not defined in this Agreement are so used as defined in the applicable Security Document.

5.14    Investment Company Act; Other Regulations. No Subsidiary Borrower is required to be registered as an "investment company", or a company "controlled" by an entity required to be registered as an "investment company", within the meaning of the Investment Company Act. No Subsidiary Borrower is subject to regulation under any federal or state statute or regulation (other than Regulation X of the Board) which limits its ability to Incur Indebtedness as contemplated hereby.

5.15    Subsidiaries. Schedule 5.15 sets forth all the Subsidiaries of Topco Borrower as of the Closing Date (after giving effect to the Transactions), the jurisdiction of their organization and the direct or indirect ownership interest of Topco Borrower therein.

5.16    Use of Proceeds. Subject to the Orders, the proceeds of the Term Loans will be used in accordance with, and as provided in, the Approved Budget (subject to permitted variances) (a) to pay costs, fees and expenses related to the Chapter 11 Cases, including the Carve Out and costs and expenses related to the DIP Facility and (b) to fund general corporate purposes

91

and the working capital needs and expenditures of the Debtors during the Chapter 11 Cases in accordance with the Approved Budget (subject to permitted variances), including, for the avoidance of doubt, the claims of prepetition creditors, which may include, without limitation, employees, customers, lienholders, insurers, vendors and taxing authorities, in each case, to the extent authorized by the Interim DIP Order or the Final DIP Order (as applicable) and consistent with the Approved Budget (subject to permitted variances) and (c) any other purpose set forth in the Approved Budget (subject to permitted variances).

5.17     Environmental Matters. Except as disclosed on Schedule 5.17 or as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)     Topco Borrower and its Restricted Subsidiaries: (i) are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws; (ii) hold all Environmental Permits (each of which is in full force and effect) required for any of their current operations or for any property owned, leased, or otherwise operated by any of them; and (iii) are, and within the period of all applicable statutes of limitation have been, in compliance with all of their Environmental Permits.

(b)     Materials of Environmental Concern have not been transported, disposed of, emitted, discharged, or otherwise released, to, at or from any real property presently or, to the knowledge of Topco Borrower or any of its Restricted Subsidiaries, formerly owned, leased or operated by Topco Borrower or any of its Restricted Subsidiaries or at any other location, which would reasonably be expected to (i) give rise to liability or other Environmental Costs of Topco Borrower or any of its Restricted Subsidiaries under any applicable Environmental Law or (ii) interfere with the planned or continued operations of Topco Borrower and its Restricted Subsidiaries.

(c)     There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under any Environmental Law to which Topco Borrower or any of its Restricted Subsidiaries is, or to the knowledge of Topco Borrower or any of its Restricted Subsidiaries is reasonably likely to be, named as a party that is pending or, to the knowledge of Topco Borrower or any of its Restricted Subsidiaries, threatened.

(d)     Neither Topco Borrower nor any of its Restricted Subsidiaries has received any written request for information, or been notified that it is a potentially responsible party, under the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or received any other written request for information from any Governmental Authority with respect to any Materials of Environmental Concern.

(e)     Neither Topco Borrower nor any of its Restricted Subsidiaries has entered into or agreed to any consent decree, order, or settlement or other agreement, nor is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum, relating to compliance with or liability under any Environmental Law.

5.18     No Material Misstatements. The written information, reports, financial statements, exhibits and schedules furnished by or on behalf of the Borrower Representative to the Administrative Agent or the Lenders on or prior to the Closing Date in connection with the

negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, did not contain as of the Closing Date any material misstatement of fact and did not omit to state as of the Closing Date any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading in their presentation of Topco Borrower and its Restricted Subsidiaries taken as a whole. It is understood that (a) no representation or warranty is made concerning the forecasts, estimates, pro forma information, projections and statements as to anticipated future performance or conditions, and the assumptions on which they were based or concerning any information of a general economic nature or general information about Topco Borrower's and its Subsidiaries' industry, contained in any such information, reports, financial statements, exhibits or schedules, except that, in the case of such forecasts, estimates, pro forma information, projections and statements, as of the date such forecasts, estimates, pro forma information, projections and statements were generated, (i) such forecasts, estimates, pro forma information, projections and statements were based on the good faith assumptions of the management of Topco Borrower and (ii) such assumptions were believed by such management to be reasonable and (b) such forecasts, estimates, pro forma information, projections and statements, and the assumptions on which they were based, may or may not prove to be correct.

5.19    Labor Matters. There are no strikes pending or, to the knowledge of Topco Borrower, reasonably expected to be commenced against Topco Borrower or any of its Restricted Subsidiaries which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. The hours worked and payments made to employees of Topco Borrower and each of its Restricted Subsidiaries have not been in violation of any applicable laws, rules or regulations, except where such violations would not reasonably be expected to have a Material Adverse Effect.

5.20    Chapter 11 Cases; Orders.

(a)      The Chapter 11 Cases were commenced on the Petition Date and proper notice was given for (i) the motion seeking approval of the Loan Documents, the Interim DIP Order and Final DIP Order, (ii) the hearing for the entry of the Interim DIP Order, and (iii) the hearing for the entry of the Final DIP Order. The Loan Parties that are Debtors shall give on a timely basis as specified in the Interim DIP Order or the Final DIP Order, as applicable, all notices required to be given to all parties specified in the Interim DIP Order or the Final DIP Order, as applicable.

(b)      After the entry of the Interim DIP Order, and pursuant to and to the extent permitted in the Orders, as applicable, the DIP Facility Obligations of the Debtors will constitute allowed Superpriority Claims in the Chapter 11 Cases, subject to (i) the Carve Out and (ii) the priorities set forth in the Interim DIP Order or Final DIP Order, as applicable.

(c)      The Interim DIP Order (with respect to the period on and after entry of the Interim DIP Order and prior to entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after entry of the Final DIP Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Required Lenders' consent (with an email from counsel being sufficient), modified or amended. The Loan Parties are in compliance in all material respects with the Orders.

93

5.21     Anti-Terrorism. To the extent applicable, except as would not reasonably be expected to have a Material Adverse Effect, Holdings, Topco Borrower and each Restricted Subsidiary is in compliance with (a) the PATRIOT Act, (b) the Trading with the Enemy Act, as amended and (c) any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"), U.S. Department of State, United Nations Security Council, European Union or Her Majesty's Treasury (collectively, "Sanctions") and any other enabling legislation or executive order relating thereto. Neither any Loan Party nor, except as would not reasonably be expected to have a Material Adverse Effect, (i) any Restricted Subsidiary that is not a Loan Party or (ii) to the knowledge of Topco Borrower, any director, officer or employee of Holdings, Topco Borrower or any Restricted Subsidiary, is the target of any Sanctions. None of Holdings, Topco Borrower or any Restricted Subsidiary will knowingly use the proceeds of the Loans for the purpose of funding or financing any activities or business of or with any Person, or in any country or territory, that at the time of such funding or financing is restricted under Sanctions.

SECTION 6

Conditions Precedent

6.1     Conditions to the Closing Date; Interim Term Loans. The agreement of each Lender to make its Interim Term Loans requested to be made by it on the Closing Date is subject to the satisfaction or waiver by the affected party of the following conditions precedent:

(a)     Loan Documents. The Administrative Agent shall have received the following Loan Documents, executed and delivered as required below:

(i)     this Agreement, executed and delivered by a duly authorized officer of Holdings, Intermediate Holdings and each Borrower and the Lenders;

(ii)     the Collateral Agreement, executed and delivered by a duly authorized officer of each Domestic Loan Party required to be a signatory thereto on the Closing Date; provided that each Foreign Subsidiary required to become a Loan Party shall deliver a joinder thereto by no later than the date that is the 10th Business Day following the Closing Date and any such failure to so deliver shall constitute an immediate Event of Default (unless waived or extended by the Required Backstop Lenders);

(iii)     the Guarantee Agreement, executed and delivered by a duly authorized officer of each Loan Party required to be a signatory thereto on the Closing Date;

(b)     Officer's Certificate. The Administrative Agent shall have received a certificate from the Borrower Representative, dated the Closing Date, substantially in the form of Exhibit G hereto.

(c)     Perfected Liens. Loan Parties shall have granted to the Collateral Agent, for the benefit of the Secured Parties, valid and perfected liens, satisfactory to the Required Lenders, via entry of, and pursuant to, the Interim DIP Order, on the security interests in the Collateral of the Loan Parties as set forth in the Interim DIP Order.

(d)     Fees. The Lenders, including the Fronting Lender and the Backstop Lender, and the Agents, respectively, shall have received all fees related to the Transactions payable to them to the extent due (which may be offset against the proceeds of the DIP Facility), including, without limitation, (i) fronting fees payable to the Fronting Lender and legal fees payable to Mandel, Katz & Brosnan LLP, as legal counsel to the Fronting Lender, (ii) backstop fees payable to the Backstop Lender, (iii) the OID Premium payable to each Term Lender and (iv) agency fees payable to the Agents and legal counsel fees payable to Arentfox Schiff LLP, as legal counsel to the Agents.

(e)     Secretary's Certificate. The Administrative Agent shall have received a certificate from each Domestic Loan Party, dated as of the Closing Date, substantially in the form of Exhibit F hereto, with appropriate insertions and attachments of resolutions or other actions, evidence of incumbency and the signature of authorized signatories and Organizational Documents, executed by a Responsible Officer and the Secretary or any Assistant Secretary or other authorized representative of such Loan Party; provided that each Foreign Subsidiary required to become a Loan Party shall deliver the same (or local law equivalent, to the extent applicable) by no later than the date that is the 10th Business Day following the Closing Date and any such failure to so deliver shall constitute an immediate Event of Default (unless waived or extended by the Required Backstop Lenders).

(f)     Patriot Act. The Administrative Agent, the Fronting Lender and the other Backstop Lenders shall have received, at least three (3) Business Days (or such shorter period as the Administrative Agent, the Fronting Lender, and the other Backstop Lenders, as applicable, otherwise agree) prior to the Closing Date, all documentation and other information about the Loan Parties mutually agreed to be required by applicable regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the CDD Rule, that has been reasonably requested in writing at least ten (10) Business Days prior to the Closing Date.

(g)     Borrowing Notice. With respect to the Interim Term Loans, the Administrative Agent and the Fronting Lender shall have received a notice of such Borrowing.

(h)     Representations and Warranties. Each of the representations and warranties made by any Loan Party pursuant to this Agreement or any other Loan Document (or in any amendment, modification or supplement hereto or thereto) to which it is a party, and each of the representations and warranties contained in any certificate furnished at any time by or on behalf of any Loan Party pursuant to this Agreement or any other Loan Document shall, except to the extent that they relate to a particular date, be true and correct in all material respects on and as of such date as if made on and as of such date.

(i)     No Default. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Interim Term Loans requested to be made on the Closing Date.

(j)     The Petition Date shall have occurred, and the Borrowers and each other Loan Party that is a Debtor as of the Closing Date shall be a debtor and a debtor-in-possession in the Chapter 11 Cases.

95

(k)     Since the Petition Date, other than as a result of the commencement of the Chapter 11 Cases, there has not been any event, change, occurrence or circumstance that has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(l)     The Chapter 11 Cases of any of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(m)     The Administrative Agent and the Lenders shall have received the Initial Budget.

(n)     The Fronting Lender shall have received the Master Consent to Assignment duly executed by the Subsidiary Borrowers and the Administrative Agent.

(o)     No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

(p)     The RSA shall be in full force and effect and shall not have been amended or modified (other than in accordance with its terms) and shall not have been terminated.

(q)     The Interim DIP Order, upon entry, shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or modified without the consent of the Required Lenders.

(r)     To the extent not satisfied in Subsection 6.3, the Fronting Lender shall have received (i) a duly executed copy of this Agreement and (ii) the Fronting Fee Letter duly executed by the Borrowers.

(s)     To the extent not satisfied in Subsection 6.3, the Administrative Agent shall have a receive a duly executed copy of the Administrative Agent Fee Letter.

6.2     <u>Conditions to Final Term Loans; Final Borrowing Date</u>. The agreement of each Lender to make its Final Term Loans requested to be made by it on the Final Borrowing Date is subject to the satisfaction or waiver by the affected party of the following conditions precedent:

(a)     <u>Borrowing Notice</u>. With respect to the Final Term Loans, the Administrative Agent and the Fronting Lender shall have received a notice of such Borrowing.

(b)     <u>Representations and Warranties</u>. Each of the representations and warranties made by any Loan Party pursuant to this Agreement or any other Loan Document (or in any amendment, modification or supplement hereto or thereto) to which it is a party, and each of the representations and warranties contained in any certificate furnished at any time by or on behalf of any Loan Party pursuant to this Agreement or any other Loan Document shall, except to the extent that they relate to a particular date, be true and correct in all material respects on and as of such date as if made on and as of such date.

(c)     <u>No Default</u>. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Final Term Loans requested to be made on the Final Borrowing Date.

(d)     Since the Petition Date, other than as a result of the commencement of the Chapter 11 Cases, there has not been any event, change, occurrence or circumstance that has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)     The Chapter 11 Cases of any of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(f)     No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

(g)     The RSA shall be in full force and effect and shall not have been amended or modified (other than in accordance with its terms) and shall not have been terminated.

(h)     The Final DIP Order, upon entry, shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or modified without the consent of the Required Lenders.

6.3     <u>Conditions to Effectiveness of this Agreement</u>. This Agreement shall become effective on the date on which the following conditions precedent shall have been satisfied or waived:

(a)     <u>Credit Agreement</u>. There shall have been delivered to the Administrative Agent executed counterparts to this Agreement, executed and delivered by (i) a duly authorized officer of Holdings, Intermediate Holdings and each Borrower and (ii) the Backstop Lenders and the Fronting Lender.

(b)     <u>KYC</u>. The Administrative Agent shall have received the information reasonably requested in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules, regulations and policies (including, to the extent the Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230, a customary certification for the Borrower regarding beneficial ownership in relation to the Borrower, in form and substance satisfactory to Administrative Agent and the Lenders), in each case, prior to the Effective Date provided and to the extent that such information is requested in writing at least ten Business Days prior to the Effective Date.

(c)     <u>Representations and Warranties</u>. Each of the representations and warranties made by any Loan Party pursuant to this Agreement shall, except to the extent that they relate to a particular date, be true and correct in all material respects on and as of such date as if made on and as of such date.

(d)     <u>No Default</u>. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to this Agreement.

(e)     Petition Date. The Petition Date shall have occurred, and the Borrowers and each other Loan Party that is a Debtor as of the Effective Date shall be a debtor and a debtor-in-possession in the Chapter 11 Cases and this Agreement shall have been approved by the Interim DIP Order.

(f)     The Administrative Agent shall have a receive a duly executed copy of the Administrative Agent Fee Letter.

(g)     The Fronting Lender shall have received (i) a duly executed copy of this Agreement and (ii) the Fronting Fee Letter duly executed by the Borrowers.

SECTION 7

Affirmative Covenants

Topco Borrower hereby agrees that, from and after the Closing Date and thereafter until payment in full of the Loans and all other DIP Facility Obligations then due and owing to any Lender or any Agent hereunder, the Topco Borrower shall and shall cause each of its Restricted Subsidiaries to:

7.1     Financial Statements. Furnish to the Administrative Agent for delivery to each Lender (and the Administrative Agent agrees to make and so deliver such copies):

(a)     (i) within 120 days after the end of the fiscal year of Intermediate Holdings ended December 31, 2025 and (ii) within 75 days after the end of each fiscal year of Intermediate Holdings thereafter (which period for delivery may be extended by the Administrative Agent (acting at the Direction of the Required Lenders) by up to 30 days), starting with the fiscal year ended December 31, 2026, a consolidated balance sheet of Intermediate Holdings and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of any independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards;

(b)     within 45 days after the end of each of the first three Fiscal Quarters of each fiscal year of Intermediate Holdings, starting with the Fiscal Quarter ending March 31, 2026, a consolidated balance sheet of Intermediate Holdings and its Subsidiaries as at the end of such Fiscal Quarter, and the related consolidated statements of income or operations and cash flows for such Fiscal Quarter and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of Intermediate Holdings as fairly presenting in all material respects the financial condition, results of operations and cash flows of Intermediate Holdings and its Subsidiaries in accordance with GAAP in all material respects, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)     [reserved];

98

(d)     within 30 days after the end of each of the first two Fiscal Months of each Fiscal Quarter of Intermediate Holdings, starting with the Fiscal Month ending January 31, 2026, a consolidated balance sheet of Intermediate Holdings and its Subsidiaries as at the end of such Fiscal Month, and the related consolidated statements of income or operations for such Fiscal Month and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Month of the previous fiscal year and the corresponding portion of the previous fiscal year, and including revenue by (i) the Americas, (ii) all jurisdictions outside of the Americas and (iii) corporate, all in reasonable detail and certified by a Responsible Officer of Intermediate Holdings as fairly presenting in all material respects the financial condition and results of operations of Intermediate Holdings and its Subsidiaries in accordance with GAAP in all material respects, subject only to normal year-end audit adjustments and the absence of footnotes;

(e)     all such financial statements delivered pursuant to Subsection 7.1(a), or (b) or (d) shall be certified by a Responsible Officer of Intermediate Holdings to fairly present in all material respects the financial condition of Intermediate Holdings and its Subsidiaries in conformity with GAAP;

(f)     not later than 5:30 p.m. (New York time) on every second Friday (or, to the extent that any Friday is not a Business Day, the next Business Day thereafter) occurring after the Petition Date (each, an "Updated Budget Delivery Date"), commencing with the Friday of the second full calendar week occurring after the Petition Date, a Budget and cash flow forecast for the rolling 13-week period commencing on the Monday immediately preceding the applicable Updated Budget Delivery Date (each, an "Updated Budget"), in form and substance acceptable to the Required Lenders; provided that:

(i)     the form of any Updated Budget the form of which is substantially consistent with the Initial Budget shall be deemed to be in a form acceptable to the Required Lenders; and

(ii)     for the avoidance of doubt, upon (and subject to) the acceptance by the Required Lenders of any Updated Budget, such Updated Budget shall constitute the "Approved Budget".

(g)     not later than 5:30 pm (New York time) on every second Friday (or, to the extent that such Friday is not a Business Day, the next Business Day thereafter) occurring after the Petition Date, commencing with the Friday of the third full calendar week occurring after the Petition Date, a Budget Variance Report for the most recently ended Budget Variance Test Period.

Notwithstanding anything in clause (a), (b) or (d) of this Subsection 7.1 to the contrary, in no event shall any annual, quarterly or monthly financial statements delivered pursuant to clause (a) or (b) of this Subsection 7.1 be required to (x) include any segment reporting, reporting with respect to non-consolidated Subsidiaries, separate consolidating financial information with respect to any Borrower, any Subsidiary Guarantor or any other Affiliate of Intermediate Holdings, or any segment reporting, reporting with respect to non-consolidated Subsidiaries, separate financial statements or information for any Borrower, any Subsidiary Guarantor or any other Affiliate of Intermediate Holdings, (y) comply with Section 302, Section

99

404 and Section 906 of the Sarbanes-Oxley Act of 2002, as amended, or related items 307, 308 and 308T of Regulation S-K under the Securities Act or (z) comply with Rule 3-03(e), Rule 3-05, Rule 3-09, Rule 3-10 and Rule 3-16 of Regulation S-X under the Securities Act.

7.2     Certificates; Other Information. Furnish to the Administrative Agent for delivery to each Lender (other than items delivered pursuant to Subsection 7.2(d)(y), which may be delivered to each such requesting Lender directly) (and the Administrative Agent agrees to make and so deliver such copies):

(a)     commencing with the financial statements for the Fiscal Quarter ending March 31, 2026, concurrently with the delivery of the financial statements and reports referred to in Subsections 7.1(a) and (b), a certificate signed by a Responsible Officer of Intermediate Holdings in substantially the form of Exhibit N hereto or such other form as may be agreed between the Borrower Representative and the Administrative Agent (a "Compliance Certificate") stating that, to the best of such Responsible Officer's knowledge, each of Intermediate Holdings and its Restricted Subsidiaries during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement or the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default, except, in each case, as specified in such certificate;

(b)     within five Business Days after the same are filed, copies of all financial statements and periodic reports which Intermediate Holdings may file with the SEC or any successor or analogous Governmental Authority;

(c)     within two Business Days after the same are filed, copies of all registration statements and any amendments and exhibits thereto, which any of the Borrowers or Parent Entity may file with the SEC or any successor or analogous Governmental Authority;

(d)     subject to the last sentence of Subsection 7.6, (x) promptly, such additional financial and other information regarding the Loan Parties as any Agent or the Required Lenders through the Administrative Agent may from time to time reasonably request and (y) from time to time, such information and documentation about the Loan Parties reasonably requested by the Administrative Agent or any Lender as may be required by applicable regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the CDD Rule; and

(e)     promptly upon reasonable request from the Administrative Agent (acting at the Direction of the Required Lenders) calculations of Fixed GAAP Terms as reasonably requested by the Administrative Agent promptly following receipt of a written notice from the Borrower Representative electing to change the Fixed GAAP Date, which calculations shall show the calculations of the respective Fixed GAAP Terms both before and after giving effect to the change in the Fixed GAAP Date and identify the material change(s) in GAAP giving rise to the change in such calculations.

Documents required to be delivered pursuant to Subsection 7.1 or this Subsection 7.2 may at the Borrower Representative's option be delivered electronically and, if so delivered,

shall be deemed to have been delivered on the date (i) on which Intermediate Holdings or the Borrower Representative posts such documents, or provides a link thereto on Intermediate Holdings' or the Borrower Representative's (or any Parent Entity's) website on the Internet at the website address listed on Schedule 7.2 (or such other website address as Intermediate Holdings or the Borrower Representative may specify by written notice to the Administrative Agent from time to time); or (ii) on which such documents are posted on Intermediate Holdings or the Borrower Representative's (or any Parent Entity's) behalf on an Internet or intranet website to which each Lender and the Administrative Agent have access (whether a commercial, third-party website (including any website maintained by the SEC) or whether sponsored by the Administrative Agent). Following the electronic delivery of any such documents by posting such documents to a website in accordance with the preceding sentence (other than the posting by Intermediate Holdings or the Borrower Representative of any such documents on any website maintained for or sponsored by the Administrative Agent), Intermediate Holdings or the Borrower Representative shall promptly provide the Administrative Agent notice of such delivery (which notice may be by facsimile or electronic mail) and the electronic location at which such documents may be accessed.

7.3    Payment of Taxes. Subject to the Orders and any required approval by the Bankruptcy Court, pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all taxes except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings diligently conducted and reserves in conformity with GAAP with respect thereto have been provided on the books of Topco Borrower or any of its Restricted Subsidiaries, as the case may be, or except to the extent that (a) failure to do so, in the aggregate, would not reasonably be expected to have a Material Adverse Effect or (b) the nonpayment of which is permitted by or required by the Bankruptcy Code.

7.4    Conduct of Business and Maintenance of Existence; Compliance with Contractual Obligations and Requirements of Law. Preserve, renew and keep in full force and effect its existence and take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of the business of Topco Borrower and its Restricted Subsidiaries, taken as a whole, except as otherwise permitted pursuant to Subsection 8.4 or 8.7, provided that Topco Borrower and its Restricted Subsidiaries shall not be required to maintain any such rights, privileges or franchises and Topco Borrower and its Restricted Subsidiaries shall not be required to maintain such existence, if the failure to do so would not reasonably be expected to have a Material Adverse Effect; and comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith, in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

7.5    Maintenance of Property; Insurance. (i) Keep all property necessary in the business of Holdings and its Restricted Subsidiaries, taken as a whole, in good working order and condition, except where failure to do so would not reasonably be expected to have a Material Adverse Effect; (ii) use commercially reasonable efforts to maintain with financially sound and reputable insurance companies (or any Insurance Subsidiary) insurance on, or self-insure, all property material to the business of Holdings and its Restricted Subsidiaries, taken as a whole, in at least such amounts and against at least such risks (but including in any event public liability and business interruption) as are consistent with past practice of Holdings and its Restricted Subsidiaries or usually insured against in the same general area by companies engaged in the same or a similar business; (iii) furnish to the Administrative Agent, upon written request acting at the

101

Direction of the Required Lenders, information in reasonable detail as to the insurance carried; (iv) use commercially reasonable efforts to maintain property and liability policies that provide that in the event of any cancellation thereof during the term of the policy, either by the insured or by the insurance company, the insurance company shall provide to the secured party at least 30 days prior written notice thereof, or in the case of cancellation for non-payment of premium, ten days prior written notice thereof; (v) in the event of any material change in any of the property or liability policies referenced in the preceding clause (iv), use commercially reasonable efforts to provide the Administrative Agent with at least 30 days' prior written notice thereof; and (vi) use commercially reasonable efforts to ensure that, subject to the Prepetition ABL/Cash Flow Intercreditor Agreement and at all times the Collateral Agent, for the benefit of the applicable Secured Parties, shall be named as an additional insured with respect to liability policies maintained by Holdings and each Subsidiary Guarantor, and the Collateral Agent for the benefit of the Secured Parties shall be named loss payee with respect to the property insurance maintained by Holdings and each Subsidiary Guarantor; provided that, unless an Event of Default shall have occurred and be continuing, subject to the Orders, (A) the Collateral Agent shall turn over to Intermediate Holdings any amounts received by it as an additional insured or loss payee under any property insurance maintained by Holdings and its Subsidiaries, (B) the Collateral Agent agrees that Intermediate Holdings and/or its applicable Subsidiary shall have the sole right to adjust or settle any claims under such insurance and (C) all proceeds from a Recovery Event shall be paid to Intermediate Holdings.

7.6     Inspection of Property; Books and Records; Discussions. In the case of Intermediate Holdings, keep proper books and records in a manner to allow financial statements to be prepared in conformity with GAAP consistently applied in respect of all material financial transactions and matters involving the material assets and business of Holdings and its Restricted Subsidiaries, taken as a whole; and permit representatives of the Administrative Agent (or its designee) to visit and inspect any of its properties and examine and, to the extent reasonable, make abstracts from any of its books and records and to discuss the business, operations, properties and financial and other condition of Holdings and its Restricted Subsidiaries with officers of Holdings and its Restricted Subsidiaries and with its independent certified public accountants, in each case at any reasonable time, upon reasonable notice; provided that (a) except during the continuation of an Event of Default, only one such visit per year shall be at the Borrowers' expense, and (b) during the continuation of an Event of Default, the Administrative Agent or its representatives may do any of the foregoing at the Borrowers' expense; provided, further, that representatives of Intermediate Holdings may be present during any such visits, discussions and inspections. Notwithstanding anything to the contrary in Subsection 7.2(d) or in this Subsection 7.6 or any other provision in any Loan Document, none of Intermediate Holdings or any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or the Lenders (or their respective representatives) is prohibited by Requirement of Law or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

7.7     Notices. Promptly give notice to the Administrative Agent and each Lender of:

(a)    as soon as reasonably practicable after a Responsible Officer of Intermediate Holdings knows thereof, the occurrence of any Default or Event of Default or breach or default under the RSA; provided that such breach has not been cured within one (1) Business Day;

(b)    as soon as possible after a Responsible Officer of Intermediate Holdings knows thereof, any default or event of default under any Contractual Obligation of Intermediate Holdings or any of its Restricted Subsidiaries, other than as previously disclosed in writing to the Lenders, which would reasonably be expected to have a Material Adverse Effect;

(c)    as soon as possible after a Responsible Officer of Intermediate Holdings knows thereof, the occurrence of (i) any default or event of default under the Prepetition ABL Agreement, (ii) any default or event of default under the Prepetition Senior Unsecured Notes Indenture or the Prepetition Existing Unsecured Notes Indenture or (iii) any payment default under any agreement or document governing other Indebtedness, in each case under this clause (c) relating to Indebtedness in an aggregate principal amount equal to or greater than $1,000,000;

(d)    as soon as possible after a Responsible Officer of Intermediate Holdings knows thereof, any litigation, investigation or proceeding affecting Holdings or any of its Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect;

(e)    the following events, as soon as possible and in any event within 30 days after a Responsible Officer of Intermediate Holdings knows thereof: (i) the occurrence of any Reportable Event (or similar event) with respect to any Single Employer Plan (or Foreign Plan), a failure to make any required contribution to a Single Employer Plan, Multiemployer Plan or Foreign Plan, the creation of any Lien on the property of Intermediate Holdings or its Restricted Subsidiaries in favor of the PBGC, a Plan or a Foreign Plan or any withdrawal from, or the full or partial termination or Insolvency of, any Multiemployer Plan or Foreign Plan; or (ii) the institution of proceedings by the PBGC or Intermediate Holdings or any of its Restricted Subsidiaries or any Commonly Controlled Entity or any Multiemployer Plan which would reasonably be expected to result in the withdrawal from, or the termination or Insolvency of, any Single Employer Plan, Multiemployer Plan or Foreign Plan; provided, however, that no such notice will be required under clause (i) or (ii) above unless the event giving rise to such notice, when aggregated with all other such events under clause (i) or (ii) above, would be reasonably expected to result in a Material Adverse Effect;

(f)    as soon as possible after a Responsible Officer of Intermediate Holdings knows thereof, (i) any release or discharge by Intermediate Holdings or any of its Restricted Subsidiaries of any Materials of Environmental Concern required to be reported under applicable Environmental Laws to any Governmental Authority, unless Intermediate Holdings reasonably determines that the total Environmental Costs arising out of such release or discharge would not reasonably be expected to have a Material Adverse Effect, (ii) any condition, circumstance, occurrence or event not previously disclosed in writing to the Administrative Agent that would reasonably be expected to result in liability or expense under applicable Environmental Laws, unless Intermediate Holdings reasonably determines that the total Environmental Costs arising out of such condition, circumstance, occurrence or event would not reasonably be expected to have a Material Adverse Effect, or would not reasonably be expected to result in the imposition of any

lien or other material restriction on the title, ownership or transferability of any facilities and properties owned, leased or operated by Intermediate Holdings or any of its Restricted Subsidiaries that would reasonably be expected to result in a Material Adverse Effect and (iii) any proposed action to be taken by Intermediate Holdings or any of its Restricted Subsidiaries that would reasonably be expected to subject Intermediate Holdings or any of its Restricted Subsidiaries to any material additional or different requirements or liabilities under Environmental Laws, unless Intermediate Holdings reasonably determines that the total Environmental Costs arising out of such proposed action would not reasonably be expected to have a Material Adverse Effect; and

(g)     as soon as possible after a Responsible Officer of Intermediate Holdings knows thereof, any loss, damage, or destruction to a significant portion of the Collateral, whether or not covered by insurance.

Each notice pursuant to this Subsection 7.7 shall be accompanied by a statement of a Responsible Officer of the Borrower Representative setting forth details of the occurrence referred to therein and stating what action Intermediate Holdings (or, if applicable, the relevant Restricted Subsidiary) proposes to take with respect thereto.

7.8     Environmental Laws. (a) (i) Comply substantially with, and require substantial compliance by all tenants, subtenants, contractors, and invitees with, all applicable Environmental Laws; (ii) obtain, comply substantially with and maintain any and all Environmental Permits necessary for its operations as conducted and as planned; and (iii) require that all tenants, subtenants, contractors, and invitees obtain, comply substantially with and maintain any and all Environmental Permits necessary for their operations as conducted and as planned, with respect to any property leased or subleased from, or operated by Intermediate Holdings or its Restricted Subsidiaries. For purposes of this Subsection 7.8(a), noncompliance shall not constitute a breach of this covenant, provided that, upon learning of any actual or suspected noncompliance, Intermediate Holdings and any such affected Restricted Subsidiary shall promptly undertake and diligently pursue reasonable efforts, if any, to achieve compliance, and provided, further, that in any case such noncompliance would not reasonably be expected to have a Material Adverse Effect.

(b)     Promptly comply, in all material respects, with all orders and directives of all Governmental Authorities regarding Environmental Laws, other than such orders or directives (i) as to which the failure to comply would not reasonably be expected to result in a Material Adverse Effect or (ii) as to which: (x) appropriate reserves have been established in accordance with GAAP; (y) an appeal or other appropriate contest is or has been timely and properly taken and is being diligently pursued in good faith; and (z) if the effectiveness of such order or directive has not been stayed, the failure to comply with such order or directive during the pendency of such appeal or contest would not reasonably be expected to have a Material Adverse Effect.

7.9     After-Acquired Subsidiaries.

(a)     [reserved].

(b)     With respect to any Subsidiary (other than an Excluded Subsidiary) (i) created or acquired subsequent to the Closing Date by Holdings or any of its Subsidiaries or (ii)

104

that becomes a Subsidiary as a result of a Permitted Investment or a transaction pursuant to, and permitted by, Subsection 8.2 or 8.7 (other than an Excluded Subsidiary), promptly notify the Administrative Agent of such occurrence and promptly (i) cause the Loan Party to (A) deliver a Guarantee Agreement to the Administrative Agent and (B) grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest (as and to the extent provided in the Collateral Agreement) in the Capital Stock of such new Subsidiary owned directly by any Loan Party and to execute and deliver a Supplemental Agreement (as defined in the Collateral Agreement) to the extent required pursuant to Subsection 8.15 of the Collateral Agreement, (ii) [reserved], and (iii) cause such new Subsidiary (A) to become a party to the Collateral Agreement and (B) to take all actions reasonably deemed by the Collateral Agent to be necessary or advisable to cause the Lien created by the Collateral Agreement in such new Subsidiary's Collateral to be duly perfected in accordance with all applicable Requirements of Law (as and to the extent provided in the Collateral Agreement) which shall be limited to the filing of financing statements in such jurisdictions as may be reasonably requested by the Collateral Agent. In addition, Holdings may cause any Subsidiary that is not required to become a Subsidiary Guarantor to become a Subsidiary Guarantor by executing and delivering a Subsidiary Guaranty (which Subsidiary Guaranty shall be accompanied by all documentation and other information about such Subsidiary as shall be mutually agreed to be required by applicable regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the CDD Rule); provided that in the case of any Foreign Subsidiary, notwithstanding anything to the contrary in this Agreement or any other Loan Document, such Foreign Subsidiary shall Guarantee the DIP Facility Obligations pursuant to the Guarantee Agreement, execute the Collateral Agreement and enter such other documentation and take such other actions to the extent required by clause (e) of this Section 7.9.

(c)     [Reserved];

(d)     At its own expense, execute, acknowledge and deliver, or cause the execution, acknowledgement and delivery of, and thereafter register, file or record in an appropriate governmental office, any document or instrument reasonably deemed by the Collateral Agent to be necessary or desirable for the creation, perfection and priority and the continuation of the validity, perfection and priority of the foregoing Liens or any other Liens created pursuant to the Security Documents (to the extent the Collateral Agent determines (acting at the Direction of the Required Lenders) that such action is required to ensure the perfection or the enforceability as against third parties of its security interest in such Collateral) in each case in accordance with, and to the extent required by, the Collateral Agreement.

(e)     Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no Loan Party or any Affiliate thereof shall be required to take any action in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction in order to create any security interests in assets located or titled outside of the U.S. or to perfect any security interests (it being understood that there shall be no guarantee agreements, security agreements, pledge agreements or other similar agreements governed under the laws of any non-U.S. jurisdiction); provided, that, at any time on or after the four (4) month anniversary of the Closing Date, the Required Lenders may reasonably request that the Loan Parties enter into such non-U.S. law governed security agreements and/or take such non-U.S. perfection actions consistent with those taken under the Prepetition ABL Agreement, and in each case, the Loan Parties shall be afforded

ninety (90) days from the date of receipt of such request to enter such agreement(s) and/or take such perfection action(s) (it being understood so long as the Loan Parties shall have used commercially reasonable efforts, any failure to implement such request shall not result in a Default or Event of Default).

(f)     Notwithstanding any provision of this Subsection 7.9 or Subsection 7.13 to the contrary, prior to the Discharge of ABL Collateral Obligations, (i) the requirements of this Subsection 7.9 and of Subsection 7.13 to deliver any ABL Priority Collateral to the Collateral Agent shall be deemed satisfied by the delivery of such ABL Priority Collateral to the Prepetition ABL Agent in respect of the ABL Priority Collateral and (ii) the Prepetition ABL Agent in respect of the ABL Priority Collateral shall have sole discretion (in consultation with Intermediate Holdings, if applicable) with respect to any determination concerning ABL Priority Collateral as to which the Agent would have authority to exercise under this Subsection 7.9 or Subsection 7.13.

(g)     Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, (i) it is understood and agreed that the Orders and the filing of UCC-1 financing statements in the applicable jurisdictions of formation of the Domestic Loan Parties are sufficient to perfect the security interest of the Collateral Agent (for the benefit of the Secured Parties) in the Collateral and (ii) in no circumstance shall mortgages, intellectual property security agreements or filings (whether governed by U.S. law or non-U.S. law and whether involving Domestic Loan Parties or Foreign Loan Parties), control agreements, delivery of physical collateral, annotations on certificates of title, or any other perfection actions (other than as required in clause (e) above) be required to perfect a security interest in any Collateral.

(h)     Notwithstanding anything to the contrary in this Agreement or any other Loan Document, the foregoing requirements shall be subject to the terms of the Prepetition ABL/Cash Flow Intercreditor Agreement and, in the event of any conflict with such terms, the terms of the Prepetition ABL/Cash Flow Intercreditor Agreement, shall, subject to the Orders, control.

7.10     Use of Proceeds. Use the proceeds of Loans only for the purposes set forth in Subsection 5.16.

7.11     Commercially Reasonable Efforts to Maintain Ratings. Intermediate Holdings shall use commercially reasonable efforts to maintain from and after the date this is sixty (60) days following the Closing Date, ratings (but not any particular rating) of the Term Loans and a corporate rating (but not any particular rating) and corporate family rating (but not any particular rating), as applicable, for Intermediate Holdings by each of S&P and Moody's.

7.12     Accounting Changes. Intermediate Holdings will, for financial reporting purposes, maintain Intermediate Holdings' and each of its Subsidiaries' fiscal years to end on December 31st of each calendar year.

7.13     Post-Closing Obligations. The Borrower Representative agrees to deliver or cause to be delivered such documents and instruments, and take or cause to be taken such other actions within the applicable time periods as set forth on Schedule 7.13, as such time periods may be extended by the Administrative Agent (acting at the Direction of the Required Lenders).

Notwithstanding any other provision of this <u>Subsection 7.13</u> or <u>Subsection 7.9</u>, of <u>Schedule 7.13</u> or of any Security Document, the Borrower Representative shall not be obligated to take, or cause to be taken, any action that is dependent on an action that the Required Lenders have failed to take, for so long as the Required Lenders have failed to take such action.

7.14    <u>Certain Bankruptcy Matters (Compliance with Orders)</u>. The Loan Parties and the Subsidiaries shall comply in all material respects (i) after entry thereof, with all of the requirements and obligations set forth in the Orders, as each such order is amended and in effect from time to time in accordance thereof and with this Agreement, (ii) after entry thereof, with each order of the type referred to in clause (b) of the definition of "Approved Bankruptcy Court Order", as each such order is amended and in effect in accordance with this Agreement (including, for the avoidance of doubt, the requirements set forth in clause (b) of the definition of "Approved Bankruptcy Court Order") and (iii) after entry thereof, the First Day Orders (to the extent not covered by clause (i) or (ii) above) and the orders approving the Debtors' "second day" relief and any pleadings seeking to establish material procedures for administration of the Chapter 11 Cases or approving significant or material outside the ordinary course of business transactions obtained in the Chapter 11 Cases, as each such order is amended and in effect in accordance with this Agreement (including, for the avoidance of doubt, the requirements set forth in clause (c) of the definition of "Approved Bankruptcy Court Order").

7.15    <u>Bankruptcy Notices</u>.

(a)    The Borrowers will furnish to the Secured Ad Hoc Group Advisors and the Plan Sponsor Advisors, to the extent reasonably practicable, at least two (2) calendar days prior to filing with the Bankruptcy Court, or, if two (2) calendar days' notice is not reasonably practicable, as soon as reasonably practicable thereafter, all First Day Pleadings, the proposed Final DIP Order and all other proposed orders and pleadings relating to the Term Loans and the Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course having a value in excess of $1,0000,000, cash management, adequate protection, any Chapter 11 Plan, and/or any disclosure statement or supplemental document related thereto.

(b)    The Borrowers will furnish to the Secured Ad Hoc Group Advisors and Plan Sponsor Advisors, at least two (2) calendar days prior to filing with the Bankruptcy Court or, if two (2) calendar days' notice is not reasonably practicable, as soon as reasonably practicable thereafter, all other material filings, motions, pleadings, other papers or material notices to be filed with the Bankruptcy Court relating to any request (x) to approve any compromise and settlement of claims whether under Rule 9019 of the Federal Rules of Bankruptcy Procedure or otherwise or (y) for relief under section 363 of the Bankruptcy Code, in each case other than notices, filings, motions, pleadings or other information concerning less than $250,000 in value.

7.16    <u>Insolvency Proceedings</u>. If any Loan Party or any of its Subsidiaries institutes or consents to the institution of any insolvency proceeding (other than the Chapter 11 Cases), the Borrowers and the Loan Parties shall or shall cause such Loan Party or Subsidiary to become a Debtor under the Chapter 11 Cases (unless such Loan Party or Subsidiary is already a Debtor under the Chapter 11 Cases).

7.17    Milestones. The Loan Parties shall implement the Restructuring Transactions in accordance with the following milestones ("Milestones"), each of which may be extended or waived by the Required Lenders in writing (including by email from the Secured Ad Hoc Group Advisors in accordance with the RSA) and any such extension or waiver of the Milestones under the RSA shall automatically apply here:

(a)    no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order on an interim basis;

(b)    no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order on a final basis;

(c)    no later than sixty (60) days after the Petition Date, the Bankruptcy Court shall have entered (a) the Confirmation Order (as defined in the RSA) and (b) an order approving the Debtors' entry into the New Debt (as defined in the RSA), the Backstop Commitment Agreement (as defined in the RSA), including approval of the New Debt Backstop Premium (as defined in the RSA) and the New Preferred Equity Investment Backstop Commitment Premium (as defined in the RSA) which, for the avoidance of doubt, may be the Confirmation Order; and

(d)    no later than ninety (90) days after the Petition Date, the Restructuring Transactions shall have been implemented and the Plan Effective Date shall have occurred; provided that, if necessary regulatory approvals associated with the Restructuring Transactions remain pending as of such date, this Milestone shall automatically extend once for another thirty (30) days.

Notwithstanding anything to the contrary herein, all capitalized terms used in this Section 7.17 but not defined herein shall have the meanings ascribed to such terms in the RSA.

SECTION 8

Negative Covenants

Topco Borrower hereby agrees that, from and after the Closing Date and thereafter, until payment in full of the Loans and all other DIP Facility Obligations then due and owing to any Lender or any Agent hereunder and termination:

8.1    Limitation on Indebtedness. (a) Topco Borrower will not, and will not permit any Restricted Subsidiary to, directly or indirectly, Incur any Indebtedness;

(b)    Notwithstanding the foregoing Subsection 8.1(a), Intermediate Holdings and its Restricted Subsidiaries may Incur the following Indebtedness:

(i)    Indebtedness Incurred (A) pursuant to this Agreement and the other Loan Documents, (B) the DIP Secured Notes and (C) pursuant to Prepetition Debt; provided that the aggregate principal amount of loans, notes or advances outstanding under the foregoing clause (C) (excluding the Prepetition ABL Agreement) shall not exceed the aggregate principal amount outstanding thereunder, as of the Petition Date and the aggregate principal amount of commitments

108

outstanding under the foregoing clause (C) in respect of the Prepetition ABL Agreement shall not exceed the aggregate principal amount of commitments thereunder, as of the Petition Date.

(ii)     Indebtedness (A) of any Restricted Subsidiary to Intermediate Holdings, or (B) of Intermediate Holdings or any Restricted Subsidiary to any Restricted Subsidiary; provided that in the case of any Indebtedness of any Restricted Subsidiary that is not a Loan Party owing to any Loan Party, such Indebtedness shall not exceed the Non-Loan Party Investment Cap; and provided, further, that any Indebtedness of any Loan Party to any Restricted Subsidiary that is not a Loan Party must be expressly subordinated in right of payment to the DIP Facility Obligations;

(iii)     any Indebtedness (other than the Indebtedness pursuant to this Agreement and the other Loan Documents described in Subsection 8.1(b)(i)) outstanding (or Incurred pursuant to any commitment outstanding) on the Closing Date and for any such Indebtedness in an aggregate amount outstanding on the Closing Date in excess of $500,000, as set forth on Schedule 8.1;

(iv)     Purchase Money Obligations and Financing Lease Obligations to the extent permitted by the Approved Budget;

(v)     Indebtedness consisting of accommodation Guarantees for the benefit of trade creditors of Intermediate Holdings or any of its Restricted Subsidiaries;

(vi)     (A) Guarantees by Intermediate Holdings or any Restricted Subsidiary of Indebtedness or any other obligation or liability of Intermediate Holdings or any Restricted Subsidiary (other than any Indebtedness Incurred by Intermediate Holdings or such Restricted Subsidiary, as the case may be, in violation of this Subsection 8.1), or (B) without limiting Subsection 8.6, Indebtedness of Intermediate Holdings or any Restricted Subsidiary arising by reason of any Lien granted by or applicable to such Person securing Indebtedness of Intermediate Holdings or any Restricted Subsidiary (other than any Indebtedness Incurred by Intermediate Holdings or such Restricted Subsidiary, as the case may be, in violation of this Subsection 8.1), in the case of both clause (A) and clause (B), subject to the Non-Loan Party Investment Cap;

(vii)     Indebtedness of Intermediate Holdings or any Restricted Subsidiary arising from the honoring of a check, draft or similar instrument of such Person drawn against insufficient funds in the ordinary course of business;

(viii)     Indebtedness of Intermediate Holdings or any Restricted Subsidiary in respect of (A) letters of credit, bankers' acceptances or other similar instruments or obligations issued, or relating to liabilities or obligations Incurred, in the ordinary course of business (including those issued to governmental entities in connection with self-insurance under applicable workers' compensation statutes), (B) performance and completion Guarantees, surety, judgment, appeal, bid, performance bonds, or other similar bonds, instruments or obligations, provided, or relating to liabilities or obligations Incurred, in the ordinary course of business, (C) Hedging Obligations, entered into for bona fide hedging purposes, (D) Management Guarantees, (E) the financing of insurance premiums in the ordinary course of business, (F) take-or-pay obligations

109

under supply arrangements Incurred in the ordinary course of business or (G) netting, overdraft protection and other arrangements arising under standard business terms of any bank at which Intermediate Holdings or any Restricted Subsidiary maintains an overdraft, cash pooling or other similar facility or arrangement;

 (ix) [reserved];

 (x) [reserved];

 (xi) [reserved];

 (xii) other Indebtedness of Intermediate Holdings or any Restricted Subsidiary in an aggregate principal amount at any time outstanding not exceeding $2,500,000;

 (xiii) [reserved];

 (xiv) [reserved];

 (xv) Indebtedness of any Foreign Subsidiary in an aggregate principal amount at any time outstanding not exceeding the amount in existence as of the Petition Date; *provided* that any reduction in such Indebtedness may not be increased or re-used;

 (xvi) [Reserved]; and

 (xvii) [reserved].

 (c) For purposes of determining compliance with, and the outstanding principal amount of any particular Indebtedness Incurred pursuant to and in compliance with, this Subsection 8.1, (i) any other obligation of the obligor on such Indebtedness (or of any other Person who could have Incurred such Indebtedness under this Subsection 8.1) arising under any Guarantee, Lien or letter of credit, bankers' acceptance or other similar instrument or obligation supporting such Indebtedness shall be disregarded to the extent that such Guarantee, Lien or letter of credit, bankers' acceptance or other similar instrument or obligation secures the principal amount of such Indebtedness and (ii) the amount of Indebtedness issued at a price that is less than the principal amount thereof shall be equal to the amount of the liability in respect thereof determined in accordance with GAAP.

 (d) For purposes of determining compliance with any provision of Subsection 8.1(b) (or any category of Permitted Liens described in the definition thereof) measured by a Dollar amount, in each case, for the Incurrence of Indebtedness or Liens securing Indebtedness denominated in a foreign currency, the Dollar Equivalent principal amount of such Indebtedness Incurred pursuant thereto shall be calculated based on the relevant currency exchange rate in effect, from time to time.

 8.2 Limitation on Restricted Payments.

 (a) Topco Borrower shall not, and shall not permit any Restricted Subsidiary, directly or indirectly, to (i) declare or pay any dividend or make any distribution on or in respect

110

of its Capital Stock (including any such payment in connection with any merger or consolidation to which Intermediate Holdings is a party) except (x) dividends or distributions payable solely in its Capital Stock (other than Disqualified Stock) and (y) dividends or distributions payable to Intermediate Holdings or any Restricted Subsidiary (and, in the case of any such Restricted Subsidiary making such dividend or distribution, to other holders of its Capital Stock on no more than a pro rata basis, measured by value), (ii) purchase, redeem, retire or otherwise acquire for value any Capital Stock of Intermediate Holdings held by Persons other than Intermediate Holdings or a Restricted Subsidiary (other than any acquisition of Capital Stock deemed to occur upon the exercise of options if such Capital Stock represents a portion of the exercise price thereof), (iii) voluntarily purchase, repurchase, redeem, defease or otherwise voluntarily acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any Junior Debt (other than a purchase, repurchase, redemption, defeasance or other acquisition or retirement of Prepetition Debt, in each case, as permitted by (a) the Orders, (b) any Approved Bankruptcy Court Order, (c) the Disclosure Statement Order (as defined in the RSA), (d) the Confirmation Order (as defined in the RSA), (e) the First Day Orders or (e) any other order of the Bankruptcy Court in amounts reasonably satisfactory to the Required Lenders; *provided* that, in the case of clauses (a) and (b), such prepayments shall be in amounts not in excess of the amount set forth for such prepayments in the Approved Budget) or (iv) make any Investment (other than a Permitted Investment) in any Person (any such dividend, distribution, purchase, repurchase, redemption, defeasance, other acquisition or retirement, Investment being herein referred to as a "Restricted Payment").

(b)     The provisions of Subsection 8.2(a) do not prohibit any of the following (each, a "Permitted Payment"):

(i)     [reserved];

(ii)     [reserved];

(iii)     any dividend paid or redemption made within 60 days after the date of declaration thereof or of the giving of notice thereof, as applicable, if at such date of declaration or the giving of such notice, such dividend or redemption would have complied with this Subsection 8.2;

(iv)     [reserved];

(v)     [Reserved[;

(vi)     [Reserved];

(vii)     [Reserved];

(viii)     loans, advances, dividends, distributions or other payments by the Borrowers or any Restricted Subsidiary to any Parent Entity (but not a Parent Entity of Topco Borrower) to pay or permit any such Parent Entity to pay (but without duplication) any Related Taxes;

(ix)     [Reserved];

(x)     [reserved];

(xi)    [reserved];

(xii)   [reserved];

(xiii)  [reserved];

(xiv)   [reserved];

(xv)    [reserved];

(xvi)   [reserved];

(xvii)  [reserved];

(xviii) [reserved]; and

(xix)   [reserved].

8.3     <u>Limitation on Restrictive Agreements</u>. Topco Borrower will not, and will not permit any Restricted Subsidiary to, create or otherwise cause to exist or become effective any consensual encumbrance or restriction on (<u>i</u>) the ability of Intermediate Holdings or any of its Restricted Subsidiaries to create, Incur, assume or suffer to exist any Lien in favor of the Lenders in respect of obligations and liabilities under this Agreement or any other Loan Documents upon any of its property, assets or revenues constituting Collateral as and to the extent contemplated by this Agreement and the other Loan Documents, whether now owned or hereafter acquired or (<u>ii</u>) the ability of any Restricted Subsidiary to (<u>x</u>) pay dividends or make any other distributions on its Capital Stock or pay any Indebtedness or other obligations owed to any Borrower, (<u>y</u>) make any loans or advances to any Borrower or (<u>z</u>) transfer any of its property or assets to any Borrower (<u>provided</u> that dividend or liquidation priority between classes of Capital Stock, or subordination of any obligation (including the application of any remedy bars thereto) to any other obligation, will not be deemed to constitute such an encumbrance or restriction), except any encumbrance or restriction:

(a)     pursuant to an agreement or instrument in effect at or entered into on the Closing Date, this Agreement and the other Loan Documents or the other Prepetition Debt Documents;

(b)     [reserved];

(c)     [reserved];

(d)     (<u>i</u>) pursuant to any agreement or instrument that restricts in a customary manner (as determined by Intermediate Holdings in good faith) the assignment or transfer thereof, or the subletting, assignment or transfer of any property or asset subject thereto, (<u>ii</u>) by virtue of any transfer of, agreement to transfer, option or right with respect to, or Lien on, any property or assets of Intermediate Holdings or any Restricted Subsidiary not otherwise prohibited by this

112

Agreement, (iii) contained in mortgages, pledges or other security agreements securing Indebtedness or other obligations of Intermediate Holdings or a Restricted Subsidiary to the extent restricting the transfer of the property or assets subject thereto, (iv) pursuant to customary provisions (as determined by Intermediate Holdings in good faith) restricting dispositions of real property interests set forth in any reciprocal easement agreements of Intermediate Holdings or any Restricted Subsidiary, (v) pursuant to Purchase Money Obligations that impose encumbrances or restrictions on the property or assets so acquired, (vi) on cash or other deposits or net worth or Inventory imposed by customers or suppliers under agreements entered into in the ordinary course of business, (vii) pursuant to customary provisions (as determined by Intermediate Holdings in good faith) contained in agreements and instruments entered into in the ordinary course of business (including but not limited to leases and licenses) or in joint venture and other similar agreements or in shareholder, partnership, limited liability company and other similar agreements in respect of non-wholly owned Restricted Subsidiaries, (viii) that arises or is agreed to in the ordinary course of business and does not detract from the value of property or assets of Intermediate Holdings or any Restricted Subsidiary in any manner material to Intermediate Holdings or such Restricted Subsidiary, (ix) pursuant to Hedging Obligations or Bank Products Obligations or (x) that arises under the terms of documentation governing any factoring agreement or any similar arrangements that in the good faith determination of Intermediate Holdings, are necessary or appropriate to effect such factoring agreement or similar arrangements;

(e)     [reserved];

(f)     by reason of any applicable law, rule, regulation or order, or required by any regulatory authority having jurisdiction over Intermediate Holdings or any Restricted Subsidiary or any of their businesses, including any such law, rule, regulation, order or requirement applicable in connection with such Restricted Subsidiary's status (or the status of any Subsidiary of such Restricted Subsidiary) as an Insurance Subsidiary;

(g)     [reserved];

(h)     any agreement relating to intercreditor arrangements and related rights and obligations, to or by which the Lenders and/or the Administrative Agent, the Collateral Agent or any other agent, trustee or representative on their behalf may be party or bound at any time or from time to time, and any agreement providing that in the event that a Lien is granted for the benefit of the Lenders another Person shall also receive a Lien, which Lien is permitted by Subsection 8.6; or

(i)     any agreement governing or relating to Indebtedness and/or other obligations and liabilities secured by a Lien permitted by Subsection 8.6 (in which case any restriction shall only be effective against the assets subject to such Lien, except as may be otherwise permitted under this Subsection 8.3).

8.4     Limitation on Sales of Assets and Subsidiary Stock. (a) Topco Borrower will not, directly or indirectly, and will not permit any Restricted Subsidiary to, make any Asset Disposition unless:

(i)     Intermediate Holdings or such Restricted Subsidiary receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise) at the time of such Asset Disposition at least equal to the fair market value (as of the date on which a legally binding commitment for such Asset Disposition was entered into) of the shares and assets subject to such Asset Disposition, as such fair market value may be determined in good faith by Intermediate Holdings (including as to the value of all non-cash consideration), in an aggregate amount not to exceed $1,000,000 for all such Asset Dispositions pursuant to this Section 8.4(i); and

(ii)    to the extent required by Subsection 8.4(b), the Net Available Cash from such Asset Disposition (such amount, the "Net Available Cash Amount") is applied by Intermediate Holdings (or any Restricted Subsidiary, as the case may be) as provided therein.

(b)     In the event that on or after the Closing Date, Intermediate Holdings or any Restricted Subsidiary shall make an Asset Disposition or a Recovery Event shall occur, an amount equal to 100.0% of the Net Available Cash from such Asset Disposition or Recovery Event shall be applied by Intermediate Holdings (or any Restricted Subsidiary, as the case may be) in accordance with Section 4.4(e).

(i)     Notwithstanding the foregoing provisions of this Subsection 8.4, Intermediate Holdings and its Restricted Subsidiaries shall not be required to apply any Net Available Cash or equivalent amount in accordance with this Subsection 8.4 except to the extent that (i) the aggregate Net Available Cash from all Asset Dispositions exceeds $1,000,000 or (ii) the aggregate Net Available Cash from all Recovery Events exceeds $1,000,000.

(c)     For the purposes of Subsection 8.4(a)(ii), Temporary Cash Investments and Cash Equivalents shall be deemed to be cash.

Notwithstanding anything herein to the contrary, Topco Borrower shall not, nor shall it permit any Subsidiary to, dispose, sell or engage in any transaction or series of transactions (including any Investment) that results in the transfer (including by way of exclusive licensing) of any Material Property from the Loan Parties to Persons that are not Loan Parties, except in connection with (i) a bona-fide sale for cash or cash equivalents to an unaffiliated third party, (ii) a bona-fide joint venture with an unaffiliated third party in the ordinary course of business, using available Investment capacity, or (iii) a non-exclusive lease, sublicense or licensing arrangement.

8.5     Limitations on Transactions with Affiliates. (a) Topco Borrower will not, and will not permit any Restricted Subsidiary to, directly or indirectly, enter into or conduct any transaction or series of related transactions (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Intermediate Holdings (an "Affiliate Transaction") involving aggregate consideration in excess of $250,000 unless (i) the terms of such Affiliate Transaction are not materially less favorable to Intermediate Holdings or such Restricted Subsidiary, as the case may be, than those that could be obtained at the time in a transaction with a Person who is not such an Affiliate and (ii) if such Affiliate Transaction involves aggregate consideration in excess of $500,000, the terms of such Affiliate Transaction have been approved by a majority of the Board of Directors. For purposes of this Subsection 8.5(a), any Affiliate

114

Transaction shall be deemed to have satisfied the requirements set forth in this <u>Subsection 8.5(a)</u> if such Affiliate Transaction is approved by a majority of the Disinterested Directors.

(b) The provisions of <u>Subsection 8.5(a)</u> will not apply to:

(i) any Restricted Payment Transaction,

(ii) (<u>1</u>) the entering into, maintaining or performance of any employment or consulting contract, collective bargaining agreement, Benefit Plan, program or arrangement, related trust agreement or any other similar arrangement for or with any current or former management member, employee, officer or director or consultant of or to Intermediate Holdings, any Restricted Subsidiary or any Parent Entity heretofore or hereafter entered into in the ordinary course of business, including vacation, health, insurance, deferred compensation, severance, retirement, savings or other similar plans, programs or arrangements, (<u>2</u>) payments, compensation, performance of indemnification or contribution obligations, the making or cancellation of loans in the ordinary course of business to any such management members, employees, officers, directors or consultants, (<u>3</u>) any issuance, grant or award of stock, options, other equity related interests or other securities, to any such management members, employees, officers, directors or consultants, (<u>4</u>) the payment of reasonable fees to directors of Intermediate Holdings or any of its Subsidiaries or any Parent Entity or (<u>5</u>) Management Advances and payments in respect thereof (or in reimbursement of any expenses referred to in the definition of such term), in each case, in accordance with the Approved Budget,

(iii) any transaction between or among any of Holdings and one or more Restricted Subsidiaries,

(iv) any transaction arising out of agreements or instruments in existence on the Closing Date and set forth on <u>Schedule 8.5</u>,

(v) [reserved],

(vi) [reserved],

(vii) payments to CD&R or any of its Affiliates included in the Approved Budget,

(viii) the Transactions, all transactions in connection therewith (including but not limited to the financing thereof), and all fees and expenses paid or payable in connection with the Transactions, including the fees and out-of-pocket expenses of CD&R and its Affiliates,

(ix) any issuance or sale of Capital Stock (other than Disqualified Stock) of Intermediate Holdings or any capital contribution to Intermediate Holdings.

8.6 <u>Limitation on Liens</u>. Topco Borrower shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create or permit to exist any Lien (other than Permitted Liens) on any of its property or assets (including Capital Stock of any other Person), whether owned on the Closing Date or thereafter acquired, securing any Indebtedness (the "<u>Initial Lien</u>") unless, in the case of Initial Liens on any asset or property other than Collateral, the DIP

115

Facility Obligations are equally and ratably secured with (or on a senior basis to, in the case such Initial Lien secures any Junior Debt) the obligations secured by such Initial Lien for so long as such obligations are so secured. Any such Lien created in favor of the DIP Facility Obligations pursuant to the preceding sentence requiring an equal and ratable (or senior, as applicable) Lien for the benefit of the DIP Facility Obligations will be automatically and unconditionally released and discharged upon (i) the release and discharge of the Initial Lien to which it relates, (ii) in the case of any such Lien in favor of any Subsidiary Guaranty, the termination and discharge of such Subsidiary Guaranty in accordance with the terms thereof, hereof and of the Prepetition ABL/Cash Flow Intercreditor Agreement, to the extent applicable, or (iii) any sale, exchange or transfer (other than a transfer constituting a transfer of all or substantially all of the assets of Intermediate Holdings that is permitted by the provisions of Subsection 8.7) to any Person not an Affiliate of Intermediate Holdings of the property or assets secured by such Initial Lien, or of all of the Capital Stock held by Intermediate Holdings or any Restricted Subsidiary in, or all or substantially all the assets of, any Restricted Subsidiary creating such Initial Lien.

8.7     Limitation on Fundamental Changes. None of the Debtors will consolidate with or merge with or into, or convey, lease or otherwise transfer all or substantially all its assets to, any Person (including pursuant to a Division).

8.8     Limitation on Amendments. Topco Borrower shall not and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(a)     amend, supplement, waive or otherwise modify any of the provisions of any indenture, instrument or agreement evidencing Subordinated Obligations in a manner that (i) changes the subordination provisions of such Indebtedness in a manner that is materially adverse to the Lenders or (ii) shortens the maturity date of such Indebtedness to a date that is prior to the Maturity Date or provides for a shorter weighted average life to maturity than the remaining weighted average life to maturity of the Term Loans; provided that, notwithstanding the foregoing, the provisions of this Subsection 8.8(a) shall not restrict or prohibit any refinancing of Indebtedness (in whole or in part) permitted pursuant to Subsection 8.1.

8.9     Limitation on Lines of Business. Topco Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any business, either directly or through any Restricted Subsidiary, except for those businesses of the same type as those in which Intermediate Holdings and its Restricted Subsidiaries are engaged in on the Closing Date or which are reasonably related thereto and any business related thereto.

8.10     Priority of Liens and Claims. Each Loan Party hereby covenants, represents and warrants that:

(a)     upon entry of the Interim DIP Order (and when applicable, the Final DIP Order), its Obligations hereunder and under the other Loan Documents, in each case subject to the Orders, as applicable shall at all times (i) constitute an allowed Superpriority Claim against such Loan Party, which will be payable from and have recourse to all pre- and Post-Petition property of such Loan Party and all proceeds thereof (excluding Avoidance Actions, subject to the entry of the Final DIP Order, but including Avoidance Proceeds), subject to the Carve Out to the extent provided in the Interim DIP Order or the Final DIP Order, as applicable, and any payments or

116

proceeds on account of such Superpriority Claim shall be distributed in accordance with Section 10.14 and (ii) be secured by a valid, binding, continuing, enforceable, fully-perfected senior security interest and Lien on all of the assets of such Loan Party, whether currently existing or thereafter acquired, of the same nature, scope and type as the Collateral, in each case to the extent of and consistent with the priorities set forth in the Orders.

(b)      Except to the extent of the Carve Out and subject to the entry of the Final DIP Order providing such relief, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the Administrative Agent, the Collateral Agent and the Required Lenders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the Administrative Agent, the Collateral Agent or the Lenders. Subject to the entry of the Final DIP Order providing such relief, in no event shall the Administrative Agent, the Collateral Agent, the Lenders, the Prepetition Cash Flow Secured Parties (as defined in the Orders) or the Prepetition Secured Noteholders (as defined in the Orders) be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code, or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

(c)      Except for the Carve Out and as otherwise set forth in the applicable Order and herein, the Superpriority Claims shall at all times be senior to the rights of such Loan Party, any Chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any Chapter 7 trustee, or any other creditor (including, without limitation, Post-Petition counterparties and other Post-Petition creditors) in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 cases (if any of the Chapter 11 Cases are converted to cases under Chapter 7 of the Bankruptcy Code).

8.11    Additional Bankruptcy Matters. No Loan Party shall, and no Loan Party shall permit any of its Subsidiaries to, without the Required Lenders' prior written consent (with an email from counsel being sufficient), do any of the following:

(a)      use any portion or proceeds of the Loans or the Collateral for payments or purposes that would violate the terms of the Orders, the Approved Budget or this Agreement;

(b)      subject to the terms of the Orders, incur, create, assume, suffer to exist or permit, except for the Carve Out, Permitted Liens, or as otherwise expressly permitted by the Orders or any other order of the Bankruptcy Court reasonably acceptable to the Required Lenders, any other superpriority administrative claim which is pari passu with or senior to the claim of the Lenders against any Debtor;

(c)      except as set forth in the Approved Budget or as provided in any Order, enter into any agreement to return any of its Inventory to any of its creditors for application against any Prepetition Indebtedness, trade payables arising before the Petition Date or other claims arising before the Petition Date under section 546(c) of the Bankruptcy Code if, after giving effect to any

117

such agreement, the aggregate amount applied to Prepetition Indebtedness, trade payables arising before the Petition Date and other claims arising before the Petition Date subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $100,000.

(d)     Subject to the terms of the Orders, assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any of the Administrative Agent or Lenders.

(e)     subject to the terms of the Orders, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Administrative Agent, the Collateral Agent or the Lenders with respect to the Collateral following the occurrence, and during the continuance, of a Default or an Event of Default; provided that any Loan Party may contest or dispute whether a Default has occurred, has been cured or has been waived in accordance with the terms of the Orders;

(f)     except as expressly provided or permitted hereunder (including, without limitation, to the extent authorized pursuant to any order of the Bankruptcy Court complying with the terms of this Agreement or the Approved Budget (subject to permitted variances)) or with the prior consent of the Required Lenders and, if applicable, the Administrative Agent and/or Collateral Agent (with an email from counsel being sufficient)  or provided pursuant to an Approved Bankruptcy Court Order, make any payment or distribution to any non-Debtor Affiliate or insider unless such payment or distribution is on arm's length terms, consistent with past practice and in the ordinary course of business for the applicable Loan Party or Subsidiary; provided that, any vote, decision or other action of any independent director of the Board of Directors, members or other governing body of any Loan Party (whether or not such vote, decision or other action binds such Loan Party to such vote, decision or other action) shall not be subject to this Section 8.11.

8.12     Budget Variance Covenant. On each Budget Variance Test Date, the Debtors will not permit actual total expenditures and disbursements of the Debtors on an aggregate basis (excluding (i) Professional Fee Disbursements, (ii) payments in respect of fees of the U.S. Trustee (as defined in the Interim DIP Order or the Final DIP Order, as applicable) and (iii) non-operating disbursements (which shall be capped at $20,000,000 for foreign non-Debtor funding) for such Budget Variance Test Period to be greater than 115.0% of the forecasted total expenditures and disbursements of the Debtors on an aggregate basis for such Budget Variance Test Period as set forth in the applicable Approved Budget. For the avoidance of doubt, it is understood and agreed that the second week of any Budget Variance Test Period shall be based off of the Approved Budget as updated during such week, with the first week based off of the immediately preceding Approved Budget.

8.13     Material Adverse Changes to Organizational Documents.

No Loan Party shall consent to or permit any amendment, supplement, modification or waiver of any of the terms or provisions of its Organizational Documents without the written consent of the Administrative Agent (acting at the Direction of the Required Lenders), if such amendment, supplement, modification or waiver would materially impair or diminish, or

circumvent or otherwise be materially adverse to the rights and remedies of the Lenders under the Loan Documents.

SECTION 9

Events of Default

9.1 <u>Events of Default</u>. Any of the following from and after the Closing Date shall constitute an event of default:

(a) The Borrowers shall fail to pay any principal of any Loan when due in accordance with the terms hereof (whether at Stated Maturity, by mandatory prepayment or otherwise); or the Borrowers shall fail to pay any interest on any Loan or any other amount payable hereunder, within two (2) Business Days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b) Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document (or in any amendment, modification or supplement hereto or thereto) or which is contained in any certificate furnished at any time by or on behalf of any Loan Party pursuant to this Agreement or any such other Loan Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made, and for the failure of any representation or warranty that is capable of being cured (as determined in good faith by Intermediate Holdings), such default shall continue unremedied for a period of 10 days after the earlier of (<u>A</u>) the date on which a Responsible Officer of Intermediate Holdings becomes aware of such failure and (<u>B</u>) the date on which written notice thereof shall have been given to the Borrower Representative by the Administrative Agent (acting at the Direction of the Required Lenders) or the Required Lenders; or

(c) Any Loan Party shall default in the payment, observance or performance of any term, covenant or agreement contained in Subsection 7.17, <u>Section 8</u>; or

(d) Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in clauses (a) through (c) and clause (k) of this <u>Subsection 9.1</u>), and such default shall continue unremedied for a period of, in the case of a default with respect to failure to deliver financial statements under <u>Subsection 7.1 (a)</u>, <u>(b)</u>, <u>(d)</u> or <u>(e)</u> or related certificates under <u>Subsection 7.2</u>, ten (10) days, with respect to <u>Subsection 7.1(f)</u> or <u>(g),</u> two (2) Business Days, and in the case of any other default, twenty (15) days, in each case, after the earlier of (<u>A</u>) the date on which a Responsible Officer of Intermediate Holdings becomes aware of such failure and (<u>B</u>) the date on which written notice thereof shall have been given to the Borrower Representative by the Administrative Agent (acting at the Direction of the Required Lenders) or the Required Lenders; or

(e) Any Loan Party or any of its Restricted Subsidiaries shall (i) default in (x) any payment of principal of or interest on any Indebtedness (excluding (<u>1</u>) Indebtedness hereunder, (<u>2</u>) any Indebtedness owed to Intermediate Holdings or any other Loan Party, (<u>3</u>) the Prepetition Debt) in excess of $10,000,000 or (<u>y</u>) in the payment of any Guarantee Obligation in respect of Indebtedness in excess of $10,000,000, beyond the period of grace, if any, provided in the

119

instrument or agreement under which such Indebtedness or Guarantee Obligation was created or (ii) default in the observance or performance of any other agreement or condition relating to any Indebtedness (excluding (1) Indebtedness hereunder or (2) the Prepetition Debt) or Guarantee Obligation referred to in clause (i) above or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice or lapse of time if required, such Indebtedness to become due prior to its Stated Maturity or such Guarantee Obligation to become payable (an "Acceleration"; and the term "Accelerated" shall have a correlative meaning), and such time shall have lapsed and, if any notice (a "Default Notice") shall be required to commence a grace period or declare the occurrence of an Event of Default before notice of Acceleration may be delivered, such Default Notice shall have been given and (in the case of the preceding clause (i) or (ii)) such default, event or condition shall not have been remedied or waived by or on behalf of the holder or holders of such Indebtedness or Guarantee Obligation or Guarantee Obligations referred to in clause (i) above such that such Indebtedness or Guarantee Obligation shall have been Accelerated and such Acceleration shall not have been rescinded; or

(f)      Other than the Chapter 11 Cases and other than to the extent in compliance with Section 7.14, if (i) Topco Borrower or any Subsidiary of Topco Borrower shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts (excluding, in each case, the solvent liquidation or reorganization of any Foreign Subsidiary of Topco Borrower that is not a Loan Party), or (B) seeking appointment of a receiver, interim receiver, receivers, receiver and manager, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Topco Borrower or any Material Subsidiary of Topco Borrower shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Topco Borrower or any Material Subsidiary of Intermediate Holdings any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged, unstayed or unbonded for a period of 90 days; or (iii) there shall be commenced against Topco Borrower or any Subsidiary of Topco Borrower any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, stayed or bonded pending appeal within 90 days from the entry thereof; or (iv) Topco Borrower or any Subsidiary of Topco Borrower shall take any corporate or other similar organizational action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or

(g)      (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any failure to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the

120

PBGC or a Plan shall arise on the assets of either of Topco Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is in the reasonable opinion of the Administrative Agent (acting at the Direction of the Required Lenders) likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA other than a standard termination pursuant to Section 4041(b) of ERISA, (v) either of Topco Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Administrative Agent (acting at the Direction of the Required Lenders) is reasonably likely to, Incur any liability in connection with a withdrawal from, or the Insolvency of, a Multiemployer Plan, or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, would be reasonably expected to result in a Material Adverse Effect; or

(h) One or more judgments or decrees shall be entered against Topco Borrower or any of its Restricted Subsidiaries involving in the aggregate at any time a liability (net of any insurance or indemnity payments actually received in respect thereof prior to or within 90 days from the entry thereof, or to be received in respect thereof in the event of any appeal thereof shall be unsuccessful, or that Topco Borrower has determined there exists reasonable evidence that such amount will be reimbursed by the insurer or indemnifying party and such amount is not denied by the applicable insurer or indemnifying party in writing within 180 days and is reimbursed within 365 days of the date of such evidence) of $10,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, satisfied, stayed or bonded pending appeal within 90 days from the entry thereof; or

(i) Subject to the Orders (i) the Guarantee Agreement, the Collateral Agreement, or any other Security Document covering a significant portion of the Collateral shall (at any time after its execution, delivery and effectiveness), cease for any reason to be in full force and effect (other than pursuant to the terms hereof or thereof), or any Loan Party which is a party to any such Security Document shall so assert in writing or (ii) the Lien created by any of the Security Documents shall cease to be perfected and enforceable in accordance with its terms or of the same effect as to perfection and priority purported to be created thereby with respect to any significant portion of the Collateral (other than in connection with any termination of such Lien in respect of any Collateral as permitted hereby or by any Security Document) and such failure of such Lien to be perfected and enforceable with such priority shall have continued unremedied for a period of 5 days; or

(j) A Change of Control shall have occurred.

(k) Specified Bankruptcy Events of Default. There occurs any of the following:

(i) The entry of an order dismissing any of the Chapter 11 Cases, converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any filing by any Loan Party (or any Subsidiary thereof) of a motion or other pleading seeking entry of such an order, in each case, without the consent of the Required Lenders in their sole discretion (with an email from counsel being sufficient);

121

(ii)     a trustee, a responsible officer or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner), or any similar person is appointed or elected in any of the Chapter 11 Cases, any Loan Party (or any Subsidiary thereof) applies for, consents to, or fails to contest, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case, without the consent of the Required Lenders in their sole discretion (with an email from counsel being sufficient);

(iii)     the entry of an order or the filing by any Loan Party (or any Subsidiary thereof) of an application, motion or other pleading seeking or supporting entry of an order staying, reversing, amending, supplementing, vacating or otherwise modifying the Interim DIP Order or the Final DIP Order, as applicable, or if any of the Borrowers or any of its Subsidiaries shall apply for authority to do so (unless substantially concurrently with the entry of such order the DIP Facility will be repaid in full and the Term Loan Commitments will be terminated), without the consent of the Required Lenders (with an email from counsel being sufficient) or the Interim DIP Order or Final DIP Order shall cease to be in full force and effect;

(iv)     (1) the entry of an order in any of the Chapter 11 Cases denying or terminating use of Cash Collateral by the Loan Parties that remains unstayed for more than five Business Days; (2) the termination of the right of any Loan Party to use any Cash Collateral under the Orders, and in either case, the Loan Parties have not otherwise obtained authorization to use Cash Collateral with the prior written consent of the Administrative Agent and the Collateral Agent, as applicable (solely with respect to its own rights, obligations, liabilities, duties and treatment) and the Required Lenders  (with an email from counsel being sufficient); or (3) any other event that terminates the Loan Parties' right to use Cash Collateral, in each case, without the consent of the Required Lenders (with an email from counsel being sufficient);

(v)     Subject to the applicable provisions of the Orders, any of the Loan Parties or any of their Subsidiaries shall commence, join in, assist, support or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent, the Collateral Agent or the Lenders (in each case, in their capacities as such), including, without limitation, with respect to the Debtors' stipulations, admissions, agreements and releases contained in the Orders, the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations of the Debtors or any other rights granted to the Administrative Agent, the Collateral Agent or the Lenders in the Orders or this Agreement or with respect to any relief under section 506(c) or 552 of the Bankruptcy Code with respect to any Collateral of the Debtors, in each case, without the consent of the Required Lenders (with an email from counsel being sufficient);

(vi)     the entry of an order in any of the Chapter 11 Cases (other than the Orders and the Cash Management Order) granting authority to use Cash Collateral (other than with the prior written consent of the Administrative Agent and the Collateral Agent, in each case, solely with respect to its own rights, obligations, liabilities, duties and treatment and the Required Lenders (with an email from counsel being sufficient)) or to obtain financing under section 364 of the Bankruptcy Code (other than in accordance with the Orders);

(vii)     [reserved];

(viii)   [reserved];

(ix)   an order of the Bankruptcy Court granting, other than in respect of this Agreement and the Carve Out or pursuant to the Orders or as may be expressly permitted by the Orders, any superpriority administrative expense claim or lien security interest in the Chapter 11 Cases pursuant to section 364(c) or (d) of the Bankruptcy Code, in each case that is pari passu with or senior to the claims of the Administrative Agent the Collateral Agent and the Lenders, or the filing by any Loan Party (or any of its Subsidiaries) of a motion or application (or any other pleading, or the making of any statement to the Bankruptcy Court) seeking or supporting entry of such an order;

(x)   [reserved];

(xi)   noncompliance by any Loan Party or any of its Subsidiaries with the terms of the Interim DIP Order or the Final DIP Order in any material respect;

(xii)   the filing of a Chapter 11 Plan that is not an Acceptable Plan;

(xiii)   subject to the Orders, the filing of a motion, pleading or proceeding by any Loan Party or any of its Subsidiaries that initiates, pursues, supports or otherwise constitutes a Challenge (as defined in the Interim DIP Order (or, as applicable, the Final DIP Order)) with respect to, or that could reasonably be expected to result in any material impairment of the rights or interests of the Secured Parties in their capacities as holders of the Obligations and/or Prepetition Indebtedness, in each case, without the prior written consent of the Required Lenders (with an email from counsel being sufficient);

(xiv)   any Loan Party (or any of its Subsidiaries) shall file a motion, without the Required Lenders' written consent, seeking authority to sell all, substantially all or a material portion of the Collateral;

(xv)   an order of the Bankruptcy Court granting, other than in respect of this Agreement or as provided under the Interim DIP Order or Final DIP Order, relief from the automatic stay with respect to a material portion of Collateral; or

(xvi)   the RSA shall have been terminated as to the Consenting First Lien Lenders (as defined in the RSA) in accordance with the applicable provisions thereof or shall no longer be in full force and effect (including for the avoidance of doubt subject to the Cooperation Period).

Notwithstanding the foregoing, an Event of Default shall not be deemed to have occurred until the expiration of the DIP Remedies Notice Period.

9.2   <u>Remedies Upon an Event of Default</u>. Subject to the Orders (a) if any Event of Default occurs and is continuing, then, and in any such event, (<u>A</u>) if such event is an Event of Default specified in clause (i) or (ii) of <u>Subsection 9.1(f)</u> with respect to any Borrower, automatically the Commitments, if any, shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement shall immediately become due and payable, and (<u>B</u>) if such event is any other Event of Default, with

the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower Representative, declare the Commitments to be terminated forthwith, whereupon the Commitments, if any, shall immediately terminate, and/or declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon the same shall immediately become due and payable. For the avoidance of doubt, the foregoing shall be subject to the Orders, including the DIP Remedies Notice Period.

(b)     Except as expressly provided above in this Section 9, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

(c)     Notwithstanding anything to the contrary in this Agreement, the exercise of any remedies upon a Default or Event of Default shall be subject to the Orders, including, for the avoidance of doubt, Paragraph 9(f) of the Interim DIP Order and Final DIP Order.

SECTION 10

The Agents

10.1     Appointment. (a) Each Lender hereby irrevocably designates and appoints the Co-Administrative Agents as the agents of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes each Co- Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to or required of such Co-Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Each Lender hereby irrevocably designates and appoints ACQUIOM AGENCY SERVICES LLC as the Collateral Agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to or required of the Collateral Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent. Notwithstanding any of the foregoing, the appointment of Seaport as a Co-Administrative Agent is solely with respect to its capacity in processing assignments of the Loans under this Agreement (and Seaport shall not be required to, or have any duty to or responsibility for, acting in any other capacities, without its prior written consent).

(b)     Each of the Agents may perform any of their respective duties under this Agreement, the other Loan Documents and any other instruments and agreements referred to herein or therein by or through its respective officers, directors, agents, employees or Affiliates, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such

124

Agent (it being understood and agreed, for avoidance of doubt and without limiting the generality of the foregoing, that the Administrative Agent and the Collateral Agent may perform any of their respective duties under the Security Documents by or through one or more of their respective Affiliates). Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section 10 shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

(c)    Except for Subsections 10.5, 10.8(a), (b), (c) (e), (to the extent of the Borrowers' rights thereunder and the conditions included therein) 10.9 and 10.15, the provisions of this Section 10 are solely for the benefit of the Agents and the Lenders, and none of the Borrowers nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

10.2    The Administrative Agent and Affiliates. Each person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each person serving as an Agent hereunder in its individual capacity. Such person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Holdings, Intermediate Holdings or any Subsidiary or other Affiliate thereof as if such person were not an Agent hereunder and without any duty to account therefor to the Lenders.

10.3    Action by an Agent. In performing its functions and duties under this Agreement, (a) each Agent shall act solely as an agent for the Lenders and, as applicable, the other Secured Parties, and (b) no Agent assumes any (and shall not be deemed to have assumed any) relationship of agency or trust with or for Intermediate Holdings or any of its Subsidiaries. Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact (including the Collateral Agent in the case of the Administrative Agent), and shall be entitled to advice of counsel concerning all matters pertaining to such duties. No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact or counsel selected by it with reasonable care.

10.4    Exculpatory Provisions. (a) No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, no Agent:

(i)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that no Agent shall be required to

125

take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Requirement of Law; and

(iii) shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Intermediate Holdings or any of its Affiliates that is communicated to or obtained by the person serving as such Agent or any of its Affiliates in any capacity.

(b) No Agent shall be liable for any action taken or not taken by it (x) with the consent or at the request of the Required Lenders, the Required Backstop Lenders or the Required Consenting First Lien Lenders (or, in each case, such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Subsection 9.2 or Subsection 11.1, as applicable) or the Required Holders (as defined in the Collateral Agreement) (or such other number or percentage of holders of the Obligations (as defined in the Collateral Agreement) as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Subsection 9.2 or Subsection 11.1, as applicable) or (y) in the absence of its own gross negligence or willful misconduct as determined by the final and non-appealable judgment of a court of competent jurisdiction in connection with this Agreement or any other Loan Document; provided that any action or inaction taken at the Direction of the Required Lenders, the Direction of the Required Backstop Lenders or the Direction of the Required Consenting First Lien Lenders (or, in each case, such other number or percentage of Lenders as shall be necessary, or as such Agent shall believe in good faith to be necessary, under the circumstances provided herein) or the Direction of the Required Holders (as defined in the Collateral Agreement) (or such other number or percentage of holders of the Obligations (as defined in the Collateral Agreement) as shall be necessary, or as such Agent shall believe in good faith to be necessary, under the circumstances provided herein), shall not be deemed gross negligence or willful misconduct. No Agent shall be deemed to have knowledge of any Default unless and until written notice describing such Default is given to such Agent by Intermediate Holdings or the Borrower Representative or a Lender.

(c) No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report, statement, agreement or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection, maintenance, monitoring, preserving, protecting or priority of any Lien purported to be created by the Security Documents, (v) the value or sufficiency of any Collateral, (vi) the satisfaction of any condition set forth in Section 6 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent, as applicable, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof, (vii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times, or (vii) providing, maintaining, monitoring or preserving insurance on (including any flood insurance policies or for determining whether any flood insurance policies are or should be obtained in respect of the Collateral, which

each Lender shall be solely responsible for), or the payment of taxes with respect to, any of the Collateral.  The duties of the Administrative Agent or Collateral Agent, as applicable, shall be mechanical and administrative in nature; the Administrative Agent or Collateral Agent, as applicable, shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender; and nothing in this Agreement or in any other Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent or Collateral Agent, as applicable, any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term as used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

(d)    Each party to this Agreement acknowledges and agrees that the Administrative Agent may use an outside service provider for the tracking of all UCC financing statements required to be filed pursuant to the Loan Documents and notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof, and that any such service provider will be deemed to be acting at the request and on behalf of Intermediate Holdings and the other Loan Parties. No Agent shall be liable for any action taken or not taken by any such service provider.

(e)    No Agent shall be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Parties. Without limiting the generality of the foregoing, and notwithstanding anything herein to the contrary, the Administrative Agent shall not (i) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant  or prospective Lender or Participant is a Disqualified Party or (ii) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Party.

(f)    No Agent shall be (i) liable for interest on any money received by it hereunder except as otherwise agreed in writing, and money held by the Administrative Agent hereunder need not be segregated from other funds except to the extent required by law, or (ii) required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Agent.

10.5    Acknowledgement and Representations by Lenders. (a) Each Lender expressly acknowledges that none of the Agents nor any of their officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of Intermediate Holdings or any other Loan Party, shall be deemed to constitute any representation or warranty by such Agent to any Lender. Each Lender represents to the Agents and each of the Loan Parties that, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, it has made and will make, its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of Holdings and Intermediate Holdings and the other Loan Parties, it has made its own decision to make its Loans hereunder and enter into this Agreement and it will make

127

its own decisions in taking or not taking any action under this Agreement and the other Loan Documents and, except as expressly provided in this Agreement, the Agents shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. Each Lender (other than, in the case of clause (i), a Plan Sponsor Lender or any Parent Entity (other than Holdings)) represents to each other party hereto that (i) it is a bank, savings and loan association or other similar savings institution, insurance company, investment fund or company or other financial institution which makes or acquires commercial loans in the ordinary course of its business and that it is participating hereunder as a Lender for such commercial purposes and (ii) it has the knowledge and experience to be and is capable of evaluating the merits and risks of being a Lender hereunder. Each Lender acknowledges and agrees to comply with the provisions of Subsection 11.6 applicable to the Lenders hereunder.

(b)     Each Lender (and each Participant of any of the foregoing) hereby acknowledges and agrees that if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds (or any portion thereof) received by such Lender (any of the foregoing, a "Recipient") from the Administrative Agent (or any of its Affiliates) were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Recipient (whether or not known to such Recipient) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Payment") and demands the return of such Payment, such Recipient shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment as to which such a demand was made. A notice of the Administrative Agent to any Recipient under this Section shall be conclusive, absent manifest error.

(c)     Without limitation of clause (b) above, each Recipient further acknowledges and agrees that if such Recipient receives a Payment from the Administrative Agent (or any of its Affiliates) (x) that is in an amount, or on a date different from the amount and/or date specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "Payment Notice"), (y) that was not preceded or accompanied by a Payment Notice, or (z) that such Recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, it understands and agrees at the time of receipt of such Payment that an error has been made (and that it is deemed to have knowledge of such error) with respect to such Payment. Each Recipient agrees that, in each such case, it shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made.

(d)     Any Payment required to be returned by a Recipient under this Section 10.5 shall be made in immediately available funds in the currency so received, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Recipient to the date such amount is repaid to the Administrative Agent at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. Each Recipient hereby agrees that it shall not assert and, to the fullest extent permitted by

128

applicable law, hereby waives, any right to retain such Payment, and any claim, counterclaim, defense or right of set-off or recoupment or similar right to any demand by the Administrative Agent for the return of any Payment received, including without limitation any defense based on "discharge for value" or any similar doctrine.

(e)     The Borrowers and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrowers or any other Loan Party except, in each case, to the extent such erroneous Payment is, and with respect to the amount of such erroneous Payment that is, comprised of funds of the Borrowers or any other Loan Party.

10.6     Indemnity; Reimbursement by Lenders. (a) To the extent that Intermediate Holdings or any other Loan Party for any reason fails to indefeasibly pay any amount required under Subsection 11.5 to be paid by it to the Administrative Agent (or any sub-agent thereof), or the Collateral Agent (or any sub-agent thereof) or any Related Party of any of the foregoing (other than through such Agent's, or Related Party's bad faith, gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable decision);provided that any action or inaction taken at the Direction of the Required Lenders, the Direction of the Required Backstop Lenders or the Direction of the Required Consenting First Lien Lenders (or, in each case, such other number or percentage of Lenders as shall be necessary, or as such Agent (or any sub-agent thereof) shall believe in good faith to be necessary, under the circumstances provided herein) or the Direction of the Required Holders (as defined in the Collateral Agreement) (or such other number or percentage of holders of the Obligations (as defined in the Collateral Agreement) as shall be necessary, or as such Agent (or any sub-agent thereof) shall believe in good faith to be necessary, under the circumstances provided herein), shall not be deemed bad faith, gross negligence or willful misconduct, each Lender severally agrees to pay ratably according to their respective Term Credit Percentages, on the date on which the applicable unreimbursed expense or indemnity payment is sought under this Subsection 10.6 such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are Incurred or asserted by any party hereto or any third party); provided  further that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was Incurred by or asserted against the Administrative Agent (or any such sub-agent) or the Collateral Agent (or any sub-agent thereof) or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Collateral Agent (or any sub-agent thereof) .The obligations of the Lenders under this Subsection 10.6 are subject to the provisions of Subsection 4.8.

(b)     Any Agent shall be fully justified in failing or refusing to take any action hereunder and under any other Loan Document (except actions expressly required to be taken by it hereunder or under the Loan Documents) unless it shall first be indemnified to its satisfaction by the Lenders pro rata against any and all liability, cost and expense that it may Incur by reason of taking or continuing to take any such action.

(c)     All amounts due under this Subsection 10.6 shall be payable not later than three Business Days after demand therefor. The agreements in this Subsection 10.6 shall survive the payment of the Loans and all other amounts payable hereunder.

10.7     Right to Request and Act on Instructions. (a) Each Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Loan Documents an Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, the requesting Agent shall be absolutely entitled as between itself and the Lenders to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Lender for refraining from any action or withholding any approval under any of the Loan Documents until it shall have received such instructions or direction from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement. Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of an Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions or direction of the Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions or direction of the Required Lenders (or such other applicable portion of the Lenders), an Agent shall have no obligation to any Lender to take any action if it believes, in good faith, that such action would violate applicable law or exposes an Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Subsection 10.6.

(b)     Each Agent shall be entitled to rely upon, and shall not Incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not Incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall be entitled to rely upon the advice of any such counsel, accountants or experts and shall not be liable for any action taken or not taken by it in accordance with such advice.

10.8     Collateral Matters. (a) Each Lender authorizes and directs the Administrative Agent and the Collateral Agent to enter into (x) the Security Documents, the Prepetition ABL/Cash Flow Intercreditor Agreement (or an acknowledgement thereof) for the benefit of the Lenders and the other Secured Parties and (y) any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to the Security Documents, the Prepetition ABL/Cash Flow Intercreditor Agreement or other intercreditor agreements required hereunder. Each Lender hereby agrees that, except as otherwise set forth herein, any action taken by the Administrative Agent, Collateral Agent or the Required Lenders in accordance with the provisions of this Agreement, the Security Documents, the Prepetition ABL/Cash Flow Intercreditor Agreement and the exercise by the Agents or the Required Lenders

130

of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. Each Lender appoints and authorizes the Collateral Agent to act as the agent of such Lender under this Agreement and the other Loan Documents (and, in its capacity as Collateral Agent, to hold the benefit of any security interest created by the Security Documents and/or any asset and proceeds of any asset paid to, held by or received or recovered by it under or in connection with the Loan Documents on trust for itself and the other Lenders according to its and their respective interests and upon the terms and conditions set out in the relevant Loan Documents). The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time, to take any action with respect to any applicable Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents. Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Loans unless instructed to do so by the Collateral Agent, it being understood and agreed that such rights and remedies may be exercised only by the Collateral Agent. Notwithstanding the foregoing, each Lender expressly and irrevocably waives any right to take or institute any actions or proceedings, judicial or otherwise, for any right or remedy or assert any other cause of action against any Loan Party (including the exercise of any right of set-off, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings or any other cause of action, or otherwise commence any remedial procedures, in each case in its capacity as a Lender, against Holdings, Intermediate Holdings and/or any of their respective Subsidiaries or any Parent Entity with respect to any Collateral or any other property of any such Person, without the prior written consent of the Administrative Agent and the Required Lenders (which shall not be withheld in contravention of this Section 10); provided, that, for the avoidance of doubt, this provision may be enforced against any Lender by the Required Lenders, the Agents or the Borrowers (or any of their Affiliates) and each Lender and the Agents expressly acknowledge that this provision shall be available as a defense of the Borrowers (or any of their Affiliates) in any action, proceeding, cause of action or remedial procedure. The Collateral Agent may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Closing Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Closing Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

(b)     The Lenders hereby authorize each Agent, in each case at its option and in its discretion, (A) to release any Lien granted to or held by such Agent upon any Collateral (i) upon the payment and satisfaction of all of the DIP Facility Obligations under the Loan Documents at any time arising under or in respect of this Agreement or the Loan Documents or the transactions contemplated hereby or thereby that are then due and unpaid, (ii) constituting property being sold or otherwise disposed of (to Persons other than a Borrower or a Subsidiary Guarantor) upon the sale or other disposition thereof, (iii) owned by any Subsidiary Guarantor that is released from its DIP Facility Obligations in accordance with this Agreement and the other Loan Documents, (iv) if approved, authorized or ratified in writing by the Required Lenders (or such greater amount, to the extent required by Subsection 11.1) or (v) as otherwise may be expressly provided in the relevant Security Documents, (B) at the written request of the Borrower Representative to

subordinate any Lien (or to confirm the absence of any Lien) on any Excluded Assets or any other property granted to or held by such Agent, as the case may be under any Loan Document, to the holder of any Permitted Lien (other than Permitted Liens securing the DIP Facility Obligations that are required by the express terms of this Agreement to be *pari passu* with or junior to the Liens on the Collateral securing the DIP Facility Obligations pursuant to the Prepetition ABL/Cash Flow Intercreditor Agreement), (D) to release any Subsidiary Guarantor from its DIP Facility Obligations at the discretion of the Required Lenders and (E) to release any Lien granted to or held by such Agent upon any ABL Priority Collateral to the extent required pursuant to the terms of the Prepetition ABL/Cash Flow Intercreditor Agreement. Upon request by any Agent, at any time, the Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement will confirm in writing any Agent's authority to release particular types or items of Collateral pursuant to this Subsection 10.8.

(c)     The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as the case may be, in each case at its option and in its discretion, to enter into any amendment, amendment and restatement, restatement, waiver, supplement or modification, and to make or consent to any filings or to take any other actions, in each case as contemplated by Subsection 11.17. Upon request by any Agent, at any time, the Required Lenders will confirm in writing the Administrative Agent's and the Collateral Agent's authority under this Subsection 10.8(c).

(d)     No Agent shall have any obligation whatsoever to the Lenders to assure that the Collateral exists or is owned by Holdings, Intermediate Holdings or any of its Restricted Subsidiaries or is cared for, protected or insured or that the Liens granted to any Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Agents in this Subsection 10.8 or in any of the Security Documents, it being understood and agreed by the Lenders that in respect of the Collateral, or any act, omission or event related thereto, each Agent may act in any manner it may deem appropriate, in its sole discretion, given such Agent's own interest in the Collateral as a Lender and that no Agent shall have any duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct.

(e)     Notwithstanding any provision herein to the contrary, any Security Document may be amended (or amended and restated), restated, waived, supplemented or modified as contemplated by and in accordance with Subsection 11.1 , with the written consent of the Agent (at the Direction of the Required Lenders) party thereto and the Loan Party party thereto.

(f)     [reserved].

(g)     [reserved].

10.9     Successor Agent. The Administrative Agent and the Collateral Agent may resign as Administrative Agent or Collateral Agent, respectively, in each case upon thirty days' notice to the Administrative Agent, the Lenders and the Borrower Representative, as applicable. If the Administrative Agent or the Collateral Agent shall resign as Administrative Agent or

Collateral Agent, as applicable, under this Agreement and the other Loan Documents, then the Required Lenders shall appoint a successor agent for the Lenders, which such successor agent shall be subject to approval by the Borrower Representative; provided that such approval by the Borrower Representative in connection with the appointment of any successor Administrative Agent shall only be required so long as no Event of Default has occurred and is continuing; provided, further, that the Borrower Representative shall not unreasonably withhold its approval of any successor Administrative Agent if such successor is an Approved Commercial Bank.  Upon the successful appointment of a successor agent, such successor agent shall succeed to the rights, powers and duties of the Administrative Agent or the Collateral Agent, as applicable, and the term "Administrative Agent" or "Collateral Agent", as applicable, shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Administrative Agent or Collateral Agent, as applicable, shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Loans. After any retiring Agent's resignation as Agent, the provisions of this Section 10 (including this Subsection 10.9) shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents. The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower Representative and such successor. If a successor Administrative Agent or Collateral Agent, as applicable, shall not have been so appointed within such thirty day period, resignation shall nonetheless become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent or Collateral Agent, as applicable, hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent or Collateral Agent, as applicable, as provided above. The retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent or Collateral Agent, as applicable, on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent or Collateral Agent, as applicable, shall continue to hold such collateral security until such time as a successor Administrative Agent or Collateral Agent, as applicable, is appointed) and all payments, communications and determinations provided to be made by, to or through the Administrative Agent or Collateral Agent, as applicable, shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent or Collateral Agent, as applicable, as provided for above in this Section 10.09.

10.10  [Reserved].

10.11  Withholding Tax. To the extent required by any applicable law, each Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax, and in no event shall such Agent be required to be responsible for or pay any additional amount with respect to any such withholding. If the Internal Revenue Service or any other Governmental Authority asserts a claim that any Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify such Agent of a change in circumstances which rendered the exemption from or reduction of withholding tax ineffective or for any other reason, without limiting the provisions of Subsection 4.11(a) or 4.12, such Lender shall indemnify such Agent fully for all amounts paid, directly or indirectly, by such Agent as tax

or otherwise, including any penalties or interest and together with any expenses Incurred and shall make payable in respect thereof within 30 days after demand therefor. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Subsection 10.11. The agreements in this Subsection 10.11 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other DIP Facility Obligations.

10.12 Credit Bidding. Subject to the Orders, each Lender hereby irrevocably authorizes the Administrative Agent (and the Collateral Agent at the Direction of the Required Holders (as defined in the Collateral Agreement)), acting at the Direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, the CCAA, including Section 36 of the CCAA, the BIA, including Section 65.13 of the BIA or any other Debtor Relief Laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent acting at the Direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid, (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.1 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any

134

Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid. As used in this Section 10.12, "Obligations" shall have the meaning assigned to such term in the Collateral Agreement.

10.13    Administrative Agent May File Proofs of Claim. Subject to the Orders, in case of the pendency of any bankruptcy proceeding or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) is hereby authorized by the Lenders, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Subsections 4.5 and 11.5) allowed in such judicial proceeding;

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Subsections 4.5 and 11.5.

10.14    Application of Proceeds. The Lenders, the Administrative Agent and the Collateral Agent agree, as among such parties, as follows: subject to the terms of the Prepetition ABL/Cash Flow Intercreditor Agreement, the Carve Out, the Orders and, with respect to proceeds of Collateral, subject Subsection 6.5 of the Collateral Agreement, all amounts collected or received by the Administrative Agent, the Collateral Agent or any Lender on account of amounts then due and outstanding under any of the Loan Documents (the "Collection Amounts") shall, except as

135

otherwise expressly provided herein, be applied as follows: <u>first</u>, to pay all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees to the extent provided herein) due and owing hereunder of the Administrative Agent and the Collateral Agent in connection with enforcing the rights of the Agents and the Lenders under the Loan Documents (including all expenses of sale or other realization of or in respect of the Collateral and any sums advanced to the Collateral Agent or to preserve its security interest in the Collateral), <u>second</u>, to pay all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees to the extent provided herein) due and owing hereunder of each of the Lenders in connection with enforcing such Lender's rights under the Loan Documents, <u>third</u>, to pay interest on Loans then outstanding, <u>fourth</u>, to pay principal of Loans then outstanding and <u>fifth</u>, to the remaining DIP Facility Obligations on a pro rata basis and <u>sixth</u>, pay the surplus, if any, to whomever may be lawfully entitled to receive such surplus. To the extent any amounts available for distribution are insufficient to pay all obligations described therein in full, such moneys shall be allocated pro rata among the applicable Secured Parties in proportion to the respective amounts described in the applicable clause at such time. This <u>Subsection 10.14</u> may be amended (and the Lenders hereby irrevocably authorize the Administrative Agent to enter into any such amendment) to the extent necessary to reflect differing amounts payable, and priorities of payments, to Lenders.

10.15   <u>Certain ERISA Matters</u>.

(a)      Each Lender (<u>x</u>) represents and warrants, as of the date such Person became a Lender party hereto, to, and (<u>y</u>) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)      (<u>A</u>) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (<u>B</u>) such Qualified Professional Asset Manager made the Investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (<u>C</u>) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-

136

14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) subclause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with subclause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

10.16    Interest Rates. The interest rate on a Loan denominated in Dollars or Euros may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform. Upon the occurrence of an inability to determine the interest rate, Section 4.7 provides a mechanism for determining an alternative rate of interest. The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the continuation of, the administration of, submission of, calculation of, performance of or any other matter related to any interest rate used in this Agreement (including, without limitation, the Alternate Base Rate, SOFR, Term SOFR Reference Rate, Term SOFR Rate or the Adjusted EURIBOR Rate) or any component definition thereof or rates referred to in the definition thereof, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, or have the same value or economic equivalence of, the existing interest rate (or any component thereof) being replaced, or have the same volume or liquidity as did any existing interest rate (or any component thereof) prior to its discontinuance or unavailability except in the case of administration or calculation of such interest rate hereunder, liability for its own gross negligence, bad faith, willful misconduct or material breach of the Loan Documents, to the extent determined in a final, nonappealable judgment by a court of competent jurisdiction, provided that any action or inaction taken at the Direction of the Required Lenders, the Direction of the Required Backstop Lenders or the Direction of the Required Consenting First Lien Lenders (or, in each case, such other number or percentage of Lenders as shall be necessary, or as such Agent shall believe in good faith to be necessary, under the circumstances provided herein) or the Direction of the Required Holders (as defined in the Collateral Agreement) (or such other number or percentage of holders of the Obligations (as defined in the Collateral Agreement) as shall be necessary, or as such Agent shall believe in good faith to be necessary, under the circumstances provided herein), shall not be deemed gross negligence, bad faith or willful misconduct.

The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the any interest rate used in this Agreement, any component thereof, or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error by, or calculation of any such rate (or component thereof) provided by any such information source or service.

10.17 <u>Direction of the Required Lenders; Direction of the Required Holders</u>

For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to any Agent hereunder (including without limitation this Section 10), phrases such as "satisfactory to the Administrative Agent," "satisfactory to the Collateral Agent," "approved by the Administrative Agent," "approved by the Collateral Agent," "acceptable to the Administrative Agent," "acceptable to the Collateral Agent," "as determined by the Administrative Agent," "as determined by the Collateral Agent," "in the Administrative Agent's discretion," "in the Collateral Agent's discretion," "selected by the Administrative Agent," "selected by the Collateral Agent," "elected by the Administrative Agent," "elected by the Collateral Agent," "requested by the Administrative Agent," "requested by the Collateral Agent," and phrases of similar import that authorize and permit the Administrative Agent or Collateral Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Administrative Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents), the Required Backstop Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) or the Required Consenting First Lien Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights or the Collateral Agent receiving written direction from the Required Lenders or the Required Holders (as defined in the Collateral Agreement) (or such other number or percentage of the Lenders or the holders of the Obligations (as defined in the Collateral Agreement) as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

SECTION 11

<u>Miscellaneous</u>

11.1 <u>Amendments and Waivers</u>. (a) Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof, may be amended, supplemented, modified or waived except in accordance with the provisions of this <u>Subsection 11.1</u>. The Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent may, from time to time, (x) enter into with the respective Loan Parties hereto or thereto, as the case may be, written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or to the other Loan Documents or changing, in any manner the rights or obligations of the Lenders or the Loan Parties hereunder or thereunder or (y) waive at any Loan Party's request, on such terms and conditions as the Required Lenders or the Administrative Agent (at the Direction of the Required Lenders), as the case may be, may

138

specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that amendments, supplements, modifications or waivers pursuant to Subsections 11.1(d) may be effected without the consent of the Required Lenders to the extent provided therein; provided, further, that no such waiver and no such amendment, supplement or modification shall, subject to the exceptions in Subsections 2.1, 2.4, 2.6, 2.7 and 2.8 hereof, or as may be required pursuant to any Order:

(i) (A) reduce or forgive the amount or extend the scheduled date of maturity of any Loan hereunder (including extending the Maturity Date) except as set forth in the definition of "Maturity Date", (B) reduce the stated rate of any interest, commission or fee payable hereunder (other than as a result of any waiver of the applicability of any post-default increase in interest rates), (C) [reserved], (D) increase the Commitment of such Lender; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall constitute an increase of any Commitment of such Lender or (E) change the currency in which any Loan is payable, in each case without the consent of each Lender directly and adversely affected thereby (it being understood that amendments or supplements to, or waivers or modifications of any conditions precedent, representations, warranties, covenants, Defaults or Events of Default or of a mandatory repayment of the Loans of all Lenders shall not constitute an extension of the scheduled date of maturity, any scheduled installment, or the scheduled date of payment of the Loans of any Lender);

(ii) amend, modify or waive any provision of Subsection 4.4(g), 10.14, Subsection 6.5 of the Collateral Agreement, this Subsection 11.1(a), Subsection 11.1(h) or reduce the percentage specified in the definition of "Required Lenders", or consent to the assignment or transfer by the Borrowers of any of their rights and obligations under this Agreement and the other Loan Documents (other than pursuant to Subsection 8.7 or 11.6(a)), in each case without the written consent of all the Lenders;

(iii) release Guarantors accounting for all or substantially all of the value of the Guarantee of the DIP Facility Obligations pursuant to the Guarantee Agreement, or, in the aggregate (in a single transaction or a series of related transactions), all or substantially all of the Collateral without the consent of all of the Lenders, except as expressly permitted hereby or by any Security Document (as such documents are in effect on the Closing Date or, if later, the date of execution and delivery thereof in accordance with the terms hereof);

(iv) require any Lender to make Loans having an Interest Period of longer than three months or shorter than one month without the consent of such Lender;

(v) amend, modify or waive any provision of Section 10 without the written consent of the then Agents; or

(b) Any waiver and any amendment, supplement or modification pursuant to this Subsection 11.1 shall apply to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans. In the case of any waiver, each of the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall

139

be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

(c)    Notwithstanding any provision herein to the contrary, (x) no Defaulting Lender shall have any right to approve or disapprove any amendment, supplement, modification, waiver or consent hereunder or under any of the Loan Documents, except to the extent the consent of such Lender would be required under clause (i) in the further proviso to the second sentence of Subsection 11.1(a)and (y) no Disqualified Party shall have any right to approve or disapprove any amendment, supplement, modification, waiver or consent hereunder or under any of the Loan Documents.

(d)    Notwithstanding any provision herein to the contrary, this Agreement and the other Loan Documents may be amended, supplemented, waived or otherwise modified (i) to cure any ambiguity, mistake, omission, defect or inconsistency with the consent of the Borrower Representative and the Administrative Agent (acting at the Direction of the Required Lenders), (ii) to implement any changes contemplated by the definition of "SOFR", "Term SOFR Rate", "Benchmark Replacement Conforming Changes" or "EURIBOR Screen Rate" in Subsection 1.1 hereof with the consent of the Borrower Representative and the Administrative Agent (acting at the Direction of the Required Lenders). The Administrative Agent hereby agrees (if requested by the Borrower Representative) to execute any amendment, supplement, modification or waiver referred to in this clause (d) or an acknowledgement thereof.

(e)    No amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, directly and adversely affect the rights and duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document.

(f)    [reserved].

(g)    If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement and/or any other Loan Document as contemplated by Subsection 11.1(a), the consent of each Lender or each affected Lender, as applicable, is required and either (x) the consent of the Required Lenders or the Required Majority in Interest Lenders, as applicable, at such time is obtained or (y) the consent of the Required Lenders or the Required Majority in Interest Lenders, as applicable, at such time is not obtained, but, in each case under clause (x) or (y), the consent of one or more of such other Lenders whose consent is required is not obtained (each such Lender, a "Non-Consenting Lender"), then the Borrower Representative may, on notice to, in the case of clause (x), the Administrative Agent and any relevant Non-Consenting Lender, or, in the case of clause (y), the Administrative Agent and every Non-Consenting Lender, (A) replace such Non-Consenting Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Subsection 11.6 (with the assignment fee and any other costs and expenses to be paid by the Borrowers in such instance) all of its rights and obligations under this Agreement to one or more Assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrowers to find a replacement Lender; provided, further, that the applicable Assignee shall have agreed to the applicable change, waiver, discharge or termination of this Agreement and/or the other Loan Documents; and provided, further, that all obligations of the Borrowers owing to such Non-

Consenting Lender relating to the Loans, Commitments and participations so assigned shall be paid in full by the Assignee (or, at its option, by a Borrower) to such Non-Consenting Lender concurrently with such Assignment and Acceptance, in each case, for the avoidance of doubt, in an amount not in excess of the amount of such obligations, as applicable, or (B) so long as no Event of Default under Subsection 9.1(a) then exists or will exist immediately after giving effect to the respective prepayment, prepay the Loans and, if applicable, terminate the Commitments of such Non-Consenting Lender, in whole or in part, subject to Subsection 4.12, without premium or penalty. In connection with any such replacement under this Subsection 11.1(g), if a Non-Consenting Lender that was provided notice as set forth in the previous sentence does not execute and deliver to the Administrative Agent a duly completed Assignment and Acceptance and/or any other documentation necessary to reflect such replacement by the later of (a) the date on which the replacement Lender executes and delivers such Assignment and Acceptance and/or such other documentation and (b) the date as of which all obligations of the Borrowers owing to such Non-Consenting Lender relating to the Loans, Commitments and participations so assigned shall be paid in full by the Assignee to such Non-Consenting Lender, then such Non-Consenting Lender shall be deemed to have executed and delivered such Assignment and Acceptance and/or such other documentation as of such date and the Borrower Representative shall be entitled (but not obligated) to execute and deliver such Assignment and Acceptance and/or such other documentation on behalf of such Non-Consenting Lender, and the Administrative Agent shall record such assignment in the Register.

(h)      Notwithstanding anything to the contrary herein, the DIP Note Holders shall be deemed to be third party beneficiaries of the "sacred right" provisions applicable to adversely and affected Lenders set forth in this Subsection 11.1 *mutatis mutandis*.  Notwithstanding anything to the contrary herein, the Required Lenders shall not agree to any amendment, supplement, modification or waiver, that adversely and disproportionately affects the DIP Note Holders, without the consent of the Required Holders (as defined in the DIP Note Purchase Agreement) unless the corresponding provision of this Agreement is also amended, supplemented, modified or waived, as applicable, as it relates to the Lenders in such respect.

11.2    Notices. (a) All notices, requests, and demands to or upon the respective parties hereto to be effective shall be in writing (including facsimile or electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or three days after being deposited in the mail, postage prepaid, or, in the case of facsimile notice or electronic mail, when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day), or, in the case of delivery by a nationally recognized overnight courier, when received, addressed as follows in the case of the Borrower Representative, the Administrative Agent and the Collateral Agent:

| The Borrower Representative: | LABL, Inc.<br>4053 Clough Woods Drive<br>Batavia, OH 45103<br>Attention: Sharon Birkett<br>Telephone: (513) 345-5311<br>Email: sbirkett@mcclabel.com |

141

| | |
|---|---|
| With copies (which shall not constitute notice) to: | Kirkland & Ellis LLP<br>601 Lexington Avenue.<br>New York NY 10022<br>Attention: Jennifer McWhaw; Jacob Ruby<br>Email: jennifer.mcwhaw@kirkland.com;<br>jacob.ruby@kirkland.com |
| The Administrative Agent/the Collateral Agent: | Acquiom Agency Services LLC<br>950 17th Street, Suite 1400<br>Denver, CO 80202<br>Attention: Jennifer Anderson<br>Email: janderson@srsacquiom.com<br><br>Seaport Loan Products LLC<br>360 Madison Ave.<br>New York NY 10017<br>Attention: Jonathan Silverman, General counsel and Paul St. Mauro, Managing Director<br>Email: jsilverman@seaportglobal.com and pstmauro@seaportglobal.com |
| With copies (which shall not constitute notice) to: | ArentFox Schiff LLP<br>1301 Avenue of the Americas, 42nd Floor<br>New York, NY 10019<br>Attention Jeffrey R. Gleit<br>Email: Jeffrey.gleit@afslaw.com |
| With copies (which shall not constitute notice) to: | Milbank LLP<br>55 Hudson Yards<br>New York NY 10001<br>Attention: Maya Grant<br>Email: MGrant@milbank.com |

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders pursuant to Subsection 4.2, 4.4 or 4.8 shall not be effective until received.

(b)     Without in any way limiting the obligation of any Loan Party and its Subsidiaries to confirm in writing any telephonic notice permitted to be given hereunder, the Administrative Agent may prior to receipt of written confirmation act without liability upon the basis of such telephonic notice, believed by the Administrative Agent in good faith to be from a Responsible Officer of a Loan Party.

142

(c)     Loan Documents may be transmitted and/or signed by facsimile or other electronic means (e.g., a "pdf", "tiff" or DocuSign). The effectiveness of any such documents and signatures shall, subject to applicable law, have the same force and effect as manually signed originals and shall be binding on each Loan Party, each Agent and each Lender. The Administrative Agent may also require that any such documents and signatures be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any facsimile or other electronic document or signature.

(d)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including electronic mail and Internet or intranet websites). Notices or communications posted to an Internet or intranet website shall be deemed received upon the posting thereof.

(e)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANT THE ACCURACY OR COMPLETENESS OF MATERIALS AND/OR INFORMATION PROVIDED BY OR ON BEHALF OF ANY BORROWER HEREUNDER (THE "BORROWER MATERIALS") OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.

(f)     Each Lender may change its address, email, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower Representative and the Administrative Agent.

(g)     All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

11.3     No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of any Agent, any Lender or any Loan Party, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4     Survival of Representations and Warranties. All representations and warranties made hereunder and in the other Loan Documents (or in any amendment, modification or supplement hereto or thereto) and in any certificate delivered pursuant hereto or such other Loan Documents shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

11.5    Payment of Expenses and Taxes. The Borrowers agree, jointly and severally, (a) to pay or reimburse the Agents, the Secured Ad Hoc Group Advisors and the Plan Sponsor Advisors for (1) all their reasonable and documented and invoiced out-of-pocket costs and expenses Incurred in connection with (i) the negotiation of the Facilities and the development, preparation, execution and delivery of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, (ii) the consummation and administration of the transactions (including the syndication of the Term Loans) contemplated hereby and thereby and (iii) efforts to monitor the Loans and verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral in accordance with the terms of the Loan Documents, and (2) the reasonable and documented fees and disbursements of (x) one firm of counsel, solely in its capacity as counsel to the Administrative Agent, and such other special or local counsel (limited to one firm of counsel in each appropriate jurisdiction), consultants, advisors, appraisers and auditors, (y) two firms of counsel, solely in its capacity as counsel to the Secured Ad Hoc Group, and such other special or local counsel (limited to one firm of counsel in each appropriate jurisdiction), consultants, advisors, appraisers and auditors and (z) two firms of counsel, solely in their capacity as counsel to the Plan Sponsor and such other special or local counsel (limited to one firm of counsel in each appropriate jurisdiction), consultants, advisors, appraisers and auditors, (b) to pay or reimburse each Lender and the Agents for all their reasonable and documented and invoiced out-of-pocket costs and expenses Incurred in connection with the enforcement of any rights under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, including the fees and disbursements of counsel to the Agents (limited to one firm of counsel for the Agents and, if necessary, one firm of local counsel in each appropriate jurisdiction, in each case for the Agents), (c) to pay, indemnify, or reimburse each Lender, each Secured Ad Hoc Group Advisor, each Plan Sponsor Advisor and the Agents for, and hold each Lender and the Agents harmless from, any and all documented recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, any stamp, documentary, excise and other similar taxes, if any, which may be payable or determined to be payable in connection with the execution, delivery or enforcement of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify or reimburse each Lender each Agent (and any sub-agent thereof) and each Related Party of any of the foregoing Persons (each, an "Indemnitee") for, and hold each Indemnitee harmless from and against, any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (in the case of fees and disbursements of counsel, limited to one firm of counsel for all Indemnitees and, if necessary, one firm of local counsel in each appropriate jurisdiction, in each case for all Indemnitees (and, in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict informs the Borrower Representative of such conflict and thereafter, after receipt of the Borrower Representative's consent (which shall not be unreasonably withheld), retains its own counsel, of another firm of counsel for such affected group of Indemnitees)) arising out of or relating to any actual or prospective claim, litigation, investigation or proceeding, whether based on contract, tort or any other theory, brought by a third party or by Topco Borrower or any other Loan Party and regardless of whether any Indemnitee is a party thereto, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any of the

144

foregoing relating to the use of proceeds of the Loans, the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of Topco Borrower or any of its Restricted Subsidiaries or any of the property of Topco Borrower or any of its Restricted Subsidiaries (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"); provided, that the Borrowers shall not have any obligation hereunder to any Agent (or sub agent thereof) or any Lender (or any Related Party of any such Agent (or any sub-agent thereof) or Lender) with respect to Indemnified Liabilities arising from (i) the gross negligence, bad faith or willful misconduct of such Agent (or any sub-agent thereof) or Lender (or any Related Party of such Agent (or any sub-agent thereof) or Lender), as the case may be, as determined by a court of competent jurisdiction in a final and non-appealable decision; provided that any action or inaction taken at the Direction of the Required Lenders, the Direction of the Required Backstop Lenders or the Direction of the Required Consenting First Lien Lenders (or, in each case, such other number or percentage of Lenders as shall be necessary, or as such Agent (or any sub-agent thereof) shall believe in good faith to be necessary, under the circumstances provided herein) or the Direction of the Required Holders (as defined in the Collateral Agreement) (or such other number or percentage of holders of the Obligations (as defined in the Collateral Agreement) as shall be necessary, or as such Agent (or any sub-agent thereof) shall believe in good faith to be necessary, under the circumstances provided herein), shall not be deemed gross negligence, bad faith or willful misconduct, (ii) a material breach of the Loan Documents by such Lender (or any Related Party of such Lender), as the case may be, as determined by a court of competent jurisdiction in a final and non-appealable decision, (iii) claims against such Indemnitee or any Related Party brought by any other Indemnitee that do not arise from an act or omission by Topco Borrower, the Parent Borrower or any of its Affiliates (other than claims against any Agent (or any of its Related Parties in its capacity as such)) or (iv) any agreement governing any settlement of claims that is effected without the Borrower's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed). The Borrowers shall reimburse and pay all reasonable and documented out-of-pocket expenses Incurred by the Fronting Lender in connection with the Transactions (including as set forth in the Fronting Fee Letter) limited, in the case of counsel fees and expenses, to one counsel at a time. No Borrower nor any Indemnitee shall be liable for any indirect, special, punitive or consequential damages hereunder; provided that nothing contained in this sentence shall limit the Borrowers' indemnity or reimbursement obligations under this Subsection 11.5 to the extent such indirect, special, punitive or consequential damages are included in any third party claim in connection with which such Indemnitee is entitled to indemnification hereunder. All amounts due under this Subsection 11.5 shall be payable not later than 30 days after written demand therefor. Statements reflecting amounts payable by the Loan Parties pursuant to this Subsection 11.5 shall be submitted to the address of the Borrower Representative set forth in Subsection 11.2, or to such other Person or address as may be hereafter designated by the Borrower Representative in a notice to the Administrative Agent. Notwithstanding the foregoing, except as provided in Subsections 11.5(b) and (c) above, the Borrowers shall have no obligation under this Subsection 11.5 to any Indemnitee with respect to any tax, levy, impost, duty, charge, fee, deduction or withholding imposed, levied, collected, withheld or assessed by any Governmental Authority other than any tax, levy, impost, duty, charge, fee, deduction or withholding that represent losses, claims, damages, etc. arising from any non-tax claim. The agreements in this Subsection 11.5 shall survive repayment of the Loans and all other amounts payable hereunder. Nothing contained in this Agreement shall limit or impair the Borrower's reimbursement or indemnification obligations set forth in the Fronting Fee Letter.

11.6    <u>Successors and Assigns; Participations and Assignments</u>. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (<u>i</u>) no Borrower shall assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void) and (<u>ii</u>) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Subsection 11.6 and, to the extent applicable, the Syndication Procedures, <u>Subsection 4.13(d)</u> or <u>Subsection 11.1(g)</u>.

(b)    (i) Subject to the conditions set forth in <u>Subsection 11.6(b)(ii)</u> below, any Lender other than a Conduit Lender may, in the ordinary course of business and in accordance with applicable law, assign (other than to a Disqualified Party or any natural person) to one or more assignees (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement (including its Commitments and/or Loans, pursuant to an Assignment and Acceptance) with the prior written consent of:

(A)    [reserved];

(B)    the Administrative Agent (such consent not to be unreasonably withheld); <u>provided</u> that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender, an Approved Fund or to Seaport (solely for the purpose of facilitating an assignment to a Lender, an Affiliate of a Lender or an Approved Fund).

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Facility or assignments by the Fronting Lender contemplated under the Master Consent to Assignment or contemplated by the Syndication Procedures, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an amount of an integral multiple of not less than $1,000,000 in the case of Term Loans denominated in Dollars and €1,000,000 in the case of Term Loans denominated in Euros; <u>provided</u> that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 (unless waived by the Administrative Agent in any given case); <u>provided</u> that (i) for concurrent assignments to two or more Approved Funds such assignment fee shall only be required to be paid once in respect of and at the time of such assignments

146

and (ii) no processing and recordation fee shall be charged in the case of assignments by the Fronting Lender contemplated under the Master Consent to Assignment or contemplated under the Syndication Procedures;

> (C)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent (i) an administrative questionnaire and (ii) a joinder to the RSA;

> (D)     any assignment of Commitments or Loans to a Plan Sponsor Lender shall also be subject to the requirements of Subsections 11.6(h) and (i);

> (E)     any Term Loans or Commitments acquired by Topco Borrower or any Restricted Subsidiary shall be retired and cancelled promptly upon acquisition thereof; and

> (F)     any assignment of Final New Money Term Loan Commitments to a Person that is not an Affiliate of such assignor or an Approved Fund or a Related Fund of such assignor, then such Assignee shall identify a corresponding amount of Prepetition First Lien Claims to be "rolled" up upon the funding of such Final New Money Term Loans relating to such Final New Money Term Loan Commitments; and

> (G)     notwithstanding anything to the contrary herein, any assignment by the Fronting Lender of Interim New Money Dollar Term Loans and/or Interim New Money Euro Term Loans shall not include all or any part of the corresponding Interim New Money Dollar Term Loan Commitments and/or Interim New Money Euro Term Loan Commitments, as applicable, fronted by the Fronting Lender and the Fronting Lender shall retain such commitments to the extent undrawn.

For the purposes of this Subsection 11.6, the term "Approved Fund" has the following meaning: "Approved Fund" means any Person (other than a natural person) that is (a) an Approved Fund, or (b) engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender or (iii) an entity or an Affiliate of an entity that administers or manages a Lender. Notwithstanding the foregoing, no Lender shall be permitted to make assignments under this Agreement to any Disqualified Party, except to the extent the Borrower Representative and, if applicable, the Sponsor has consented to such assignment in writing and any such assignment and Disqualified Party shall be subject to the provisions of Subsection 11.6(m), except to the extent the Borrower Representative has otherwise expressly consented in writing.

> (iii)     Subject to acceptance and recording thereof pursuant to clause (b)(iv) below, from and after the effective date specified in each Assignment and Acceptance the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment

147

and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and bound by any related obligations under) Subsections 4.10, 4.11, 4.12, 4.13 and 11.5, and bound by its continuing obligations under Subsection 11.6(m), Subsection 11.16). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with the Syndication Procedures, Subsection 4.13(d), Subsection 11.1(g) or this Subsection 11.6 shall, to the extent it would comply with Subsection 11.6(c), be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Subsection 11.6 (and any attempted assignment, transfer or participation which does not comply with this Subsection 11.6 shall be null and void).

(iv) The Borrowers hereby designate the Administrative Agent, and the Administrative Agent agrees, to serve as the Borrowers' non-fiduciary agent, solely for purposes of this Subsection 11.6, to maintain a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and interest and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers (and, solely with respect to entries applicable to such Lender, any Lender), at any reasonable time and from time to time upon reasonable prior notice. Notwithstanding the foregoing, in no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any Lender is a Plan Sponsor Lender nor shall the Administrative Agent be obligated to monitor the aggregate amount of Term Loans held by Plan Sponsor Lenders. Upon request by the Administrative Agent, the Borrower Representative shall use commercially reasonable efforts to promptly (and in any case, not less than two (2) Business Days (or such shorter period as may be agreed to by the Administrative Agent) prior to the proposed effective date of any amendment, consent or waiver pursuant to Subsection 11.1) provide to the Administrative Agent, a list of, to Intermediate Holdings' knowledge, all Plan Sponsor Lenders holding Loans or Commitments at the time of such notice.

(v) Each Lender that sells a participation shall, acting for itself and, solely for this purpose, as non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans, Commitments or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary (x) to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or Section 1.163-5(b) of the proposed United States Treasury Regulations or (y) for any Borrower to enforce its rights hereunder. The entries in the Participant Register shall be conclusive absent manifest error, and a Lender shall treat each person whose name is recorded in

148

the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(vi)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender (unless such assignment is being made in accordance with the Subsection 4.13(d), Subsection 4.14(c), Subsection 11.1(g), Subsection 11.6(f) or Subsection 11.6(m)(iv) in which case the effectiveness of such Assignment and Acceptance shall not require execution by the assigning Lender) and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this Subsection 11.6(b) and any written consent to such assignment required by this Subsection 11.6(b), the Administrative Agent shall accept such Assignment and Acceptance, record the information contained therein in the Register and give prompt notice of such assignment and recordation to the Borrower Representative. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause (vi).

(vii)    On or prior to the effective date of any assignment pursuant to this Subsection 11.6(b), the assigning Lender shall surrender to the Administrative Agent any outstanding Notes held by it evidencing the Loans or Commitments, as applicable, which are being assigned. Any Notes surrendered by the assigning Lender shall be returned by the Administrative Agent to the Borrower Representative marked "cancelled."

Notwithstanding the foregoing provisions of this Subsection 11.6(b) or any other provision of this Agreement, if the Borrower Representative shall have consented thereto in writing in its sole discretion, the Administrative Agent shall have the right, but not the obligation, to effectuate assignments of Loans, Term Loan Commitments via an electronic settlement system acceptable to Administrative Agent and the Borrower Representative as designated in writing from time to time to the Lenders by Administrative Agent (the "Settlement Service"). At any time when the Administrative Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed Assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be subject to the prior written approval of the Borrower Representative and shall be consistent with the other provisions of this Subsection 11.6(b). Each assigning Lender and proposed Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loans and Commitments pursuant to the Settlement Service. Assignments and assumptions of Loans and Commitments shall be effected by the provisions otherwise set forth herein until the Administrative Agent notifies the Lenders of the Settlement Service as set forth herein. The Borrower Representative may withdraw its consent to the use of the Settlement Service at any time upon notice to the Administrative Agent, and thereafter assignments and assumptions of the Loans and Commitments shall be effected by the provisions otherwise set forth herein. Notwithstanding the foregoing, it is understood and agreed that the Administrative Agent shall have the right, but not the obligation, to effectuate assignments of Loans and Commitments via the ClearPar electronic settlement system pursuant to procedures consistent with this Subsection 11.6(b), including execution and delivery of the Assignment and Acceptance (it being

understood that such execution and delivery may be by way of electronic signature) by the parties to the assignment.

Furthermore, no Assignee, which as of the date of any assignment to it pursuant to this Subsection 11.6(b) would be entitled to receive any greater payment under Subsection 4.10, 4.11, 4.12 or 11.5 than the assigning Lender would have been entitled to receive as of such date under such Subsections with respect to the rights assigned shall notwithstanding anything to the contrary in this Agreement be entitled to receive such greater payments unless the assignment was made after an Event of Default under Subsection 9.1(a) or (f) has occurred and is continuing or the Borrower Representative has expressly consented in writing to waive the benefit of this provision at the time of such assignment.

(c)      (i) Any Lender other than a Conduit Lender may, in the ordinary course of its business and in accordance with applicable law, without the consent of the Borrower Representative or the Administrative Agent, sell participations (other than to any Disqualified Party or a natural person) to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Term Loan Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents, (D) the Borrowers, the Borrower Representative, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, (E) [reserved], (F) from time to time upon the reasonable request of the Borrower Representative, each Lender shall provide the Borrower Representative a list all of outstanding participations that such Lender has sold and (G) in the case of any participation to a Permitted Affiliated Assignee, such participation shall be governed by the provisions of Subsection 11.6(h)(ii) to the same extent as if each reference therein to an assignment of a Loan were to a participation of a Loan and the references to Plan Sponsor Lender were to such Permitted Affiliated Assignee in its capacity as a participant. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, supplement, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, supplement, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to clause (i) or (iii) of the second proviso to the second sentence of Subsection 11.1(a) and (2) directly affects such Participant. Subject to Subsection 11.6(c)(ii), the Borrowers agree that each Participant shall be entitled to the benefits of (and shall have the related obligations under) Subsections 4.10, 4.11, 4.12, 4.13 and 11.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Subsection 11.6(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Subsection 11.7(b) as though it were a Lender, provided that such Participant shall be subject to Subsection 11.7(a) as though it were a Lender. Notwithstanding the foregoing, no Lender shall be permitted to sell or maintain a participation under this Agreement to or with any Disqualified Party and any participation to a Person that is or at any time becomes a Disqualified Party shall be null and void, except to the extent the Borrower Representative and the Sponsor has expressly consented to such participation in writing; provided that if any such

150

participation by a Lender is subject to a sub-participation by such Disqualified Party to a Person that is not a Disqualified Party or natural person, and such sub-participation if made as a participation directly by such Lender would comply with Subsection 11.6, such sub-participant shall have the right to assume all of the rights and obligations of such Disqualified Party under such participation and thereby become a Participant hereunder in substitution for such Disqualified Party (it being understood that such sub-participant shall, prior to the effectiveness of such assumption, provide to such Lender that sold or maintained such participation all documentation and information as is reasonably required by such Lender pursuant to "know your customer" and anti-money laundering rules and regulations and execute and deliver an appropriate assumption agreement to effect such substitution on terms and conditions mutually agreed between such sub-participant and such Lender, and such Disqualified Party shall thereupon be deemed to have executed and delivered such assumption agreement). Any such participation and Disqualified Party not permitted prior to the foregoing sentence shall be subject to the provisions of Subsection 11.6(m), except to the extent the Borrower Representative has otherwise expressly consented in writing. Any attempted participation which does not comply with Subsection 11.6 shall be null and void.

(ii)     No Loan Party shall be obligated to make any greater payment under Subsection 4.10, 4.11, 4.12 or 11.5 than it would have been obligated to make in the absence of any participation, unless the sale of such participation is made with the prior written consent of the Borrower Representative and the Borrower Representative expressly waives the benefit of this provision at the time of such participation or to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Any Participant that is not incorporated under the laws of the United States of America or a state thereof shall not be entitled to the benefits of Subsection 4.11 unless such Participant complies with Subsection 4.11(b) and provides the forms and certificates referenced therein to the Lender that granted such participation.

(d)     Any Lender, without the consent of the Borrower Representative or the Administrative Agent, may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or central bank of a member state of the European Union, and this Subsection 11.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute (by foreclosure or otherwise) any such pledgee or Assignee for such Lender as a party hereto.

(e)     No assignment or participation made or purported to be made to any Assignee or Participant shall be effective without the prior written consent of the Borrower Representative if it would require any Borrower to make any filing with any Governmental Authority or qualify any Loan or Note under the laws of any jurisdiction, and the Borrower Representative shall be entitled to request and receive such information and assurances as it may reasonably request from any Lender or any Assignee or Participant to determine whether any such filing or qualification is required or whether any assignment or participation is otherwise in accordance with applicable law.

(f)    Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower Representative or the Administrative Agent and without regard to the limitations set forth in Subsection 11.6(b). Each Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any domestic or foreign bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state, federal or provincial bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance. Each such indemnifying Lender shall pay in full any claim received from each such Borrower pursuant to this Subsection 11.6(f) within 30 Business Days of receipt of a certificate from a Responsible Officer of the Borrower Representative specifying in reasonable detail the cause and amount of the loss, cost, damage or expense in respect of which the claim is being asserted, which certificate shall be conclusive absent manifest error. Without limiting the indemnification obligations of any indemnifying Lender pursuant to this Subsection 11.6(f), in the event that the indemnifying Lender fails timely to compensate each such Borrower for such claim, any Loans held by the relevant Conduit Lender shall, if requested by the Borrower Representative, be assigned promptly to the Lender that administers the Conduit Lender and the designation of such Conduit Lender shall be void.

(g)    If the Borrower Representative wishes to replace the Loans under any Facility with ones having different terms, it shall have the option, with the consent of the Administrative Agent (acting at the Direction of the Required Lenders) and subject to at least three Business Days' advance notice to the Lenders under such Facility, instead of prepaying the Loans to be replaced, to (i) require the Lenders under such Facility to assign such Loans to the Required Lenders or their respective designees and (ii) amend the terms thereof in accordance with Subsection 11.1. Pursuant to any such assignment, all Loans to be replaced shall be purchased at par (allocated among the Lenders under such Facility in the same manner as would be required if such Loans were being optionally prepaid by the Borrowers), accompanied by payment of any accrued interest and fees thereon and any amounts owing pursuant to Subsection 4.12. By receiving such purchase price, the Lenders under such Facility shall automatically be deemed to have assigned the Loans under such Facility pursuant to the terms of the form of the Assignment and Acceptance, the Administrative Agent shall record such assignment in the Register and accordingly no other action by such Lenders shall be required in connection therewith. The provisions of this clause (g) are intended to facilitate the maintenance of the perfection and priority of existing security interests in the Collateral during any such replacement.

(h)    (i) Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Loans or Commitments to a Plan Sponsor Lender; provided that

(1)    such Plan Sponsor Lender and such other Lender shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit K hereto (an "Plan Sponsor Lender Assignment and Assumption") and the Administrative Agent shall record

152

such assignment in the Register; and

(2)    at the time of such assignment after giving effect to such assignment, the aggregate principal amount of all Term Loans held (or participated in) by Plan Sponsor Lender shall not exceed 25.0% of the aggregate principal amount of all Term Loans (other than Incremental Term Loans) outstanding under this Agreement.

(ii)    Notwithstanding anything to the contrary in this Agreement, no Plan Sponsor Lender shall have any right to (A) attend (including by telephone) any meeting or discussions (or portion thereof) among the Administrative Agent or any Lender to which representatives of the Loan Parties are not invited, (B) receive any information or material prepared by the Administrative Agent or any Lender or any communication by or among the Administrative Agent and/or one or more Lenders, except to the extent such information or materials have been made available to the Borrower Representative or its representatives or (C) receive advice of counsel to the Administrative Agent, the Collateral Agent or any other Lender or challenge their attorney client privilege.

(iii)    Notwithstanding anything in Subsection 11.1 or the definitions of "Required Backstop Lenders", "Required Lenders" and "Required Majority in Interest Lenders" to the contrary, for purposes of determining whether the Required Backstop Lenders, Required Lenders or the Required Majority in Interest Lenders, as applicable, have (A) consented (or not consented) to any amendment or waiver of any provision of this Agreement or any other Loan Document or any departure by any Loan Party therefrom, (B) otherwise acted on any matter related to any Loan Document, or (C) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, a Plan Sponsor Lender shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not such Plan Sponsor Lenders; provided that, (I) to the extent Lenders are being compensated by the Borrowers for consenting to an amendment, supplement, modification, waiver or any other action, each Plan Sponsor Lender who has been deemed to have voted its Loans in accordance with this Subsection 11.6(h)(ii) shall be entitled to be compensated on the same basis as each consenting Lender as if it had voted all of its Loans in favor of the applicable amendment, modification, waiver or other action; and (II) no amendment, supplement, modification, waiver, consent or other action with respect to any Loan Document shall deprive such Plan Sponsor Lender of its ratable share of any payments of Loans of any class to which such Plan Sponsor Lender is entitled under the Loan Documents without such Plan Sponsor Lender providing its consent; provided, further, that such Plan Sponsor Lender shall have the right to approve any amendment, supplement, modification, waiver or consent that (x) disproportionately and adversely affects such Plan Sponsor Lender in its capacity as a Lender or affects such Plan Sponsor Lender differently in its capacity as a Lender than other Lenders or (y) is of the type described in Subsections 11.1(a)(i) through (iv); and in furtherance of the foregoing, (x) the Plan Sponsor Lender agrees to execute and deliver to the Administrative Agent any instrument reasonably requested by the Administrative Agent (acting at the Direction of the Required Lenders) to evidence the voting of its interest as a Lender in accordance with the provisions of this Subsection 11.6(h)(ii); provided that if the Plan Sponsor Lender fails to promptly execute such instrument such failure shall in no way prejudice any of the Administrative Agent's rights under this Subsection 11.6(h)(ii) and (y)

153

the Administrative Agent is hereby appointed (such appointment being coupled with an interest) by such Plan Sponsor Lender as such Plan Sponsor Lender's attorney-in-fact, with full authority in the place and stead of such Plan Sponsor Lender and in the name of such Plan Sponsor Lender, from time to time in the Administrative Agent's discretion (acting at the Direction of the Required Lenders) to take any action and to execute any instrument that the Administrative Agent (acting at the Direction of the Required Lenders) may deem reasonably necessary to carry out the provisions of this Subsection 11.6(h)(ii).

(iv)    [reserved].

(v)    Each Lender making an assignment to, or taking an assignment from, a Plan Sponsor Lender acknowledges and agrees that in connection with such assignment, (1) such Plan Sponsor Lender then may have, and later may come into possession of Excluded Information, (2) such Lender has independently and, without reliance on the Plan Sponsor Lender, , has made its own analysis and determination to enter into such assignment notwithstanding such Lender's lack of knowledge of the Excluded Information and (3) such Plan Sponsor Lender shall not have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against such Plan Sponsor Lender, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information. Each Lender entering into such an assignment further acknowledges that the Excluded Information may not be available to the Administrative Agent or the other Lenders.

(i)    Notwithstanding anything to the contrary in this Agreement, Subsection 11.1 or the definitions of "Required Backstop Lenders", "Required Lenders" and "Required Majority in Interest Lenders" for purposes of determining whether the Required Backstop Lenders, Required Lenders or the Required Majority in Interest Lenders, as applicable, have (i) consented (or not consented) to any amendment, supplement, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required the Administrative Agent, Collateral Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, all Loans and/or Commitments held by Plan Sponsor Lenders may not account for more than 30.0% of the Loans and/or Commitments of consenting Lenders included in determining whether the Required Lenders or the Required Majority in Interest Lenders, as applicable, have consented to any action pursuant to Subsection 11.1.

(j)    Notwithstanding the foregoing provisions of this Subsection 11.6, nothing in this Subsection 11.6 is intended to or should be construed to limit the Borrowers' right to prepay the Loans as provided hereunder, including under Subsection 4.4.

(k)    [Reserved].

(l)    [Reserved].

(m)    (i) Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, if any Lender or Participant at any time is or becomes a Disqualified Party, then for so long as such Lender or Participant shall be a Disqualified Party, the provisions

154

of this <u>Subsection 11.6(m)</u> shall apply with respect to such Disqualified Party unless the Borrower Representative shall have otherwise expressly consented in writing in its sole discretion (and regardless of whether the Borrower Representative shall have consented to any assignment or participation to such Lender or Participant).

(ii)      Any Disqualified Party shall be bound by the provisions of, but shall not have any rights or remedies or be a beneficiary (whether as a Lender, a Participant or otherwise) under or with respect to, this Agreement or any other Loan Document. Without limiting the foregoing, a Disqualified Party (<u>1</u>) shall not be entitled to and shall have no right to receive any payment in respect of principal (other than with respect to payments of principal on the Maturity Date for the applicable Tranche), interest, fees, costs, expenses or any other amount under or in respect of any Loan Document, including but not limited to pursuant to <u>Subsection 2.2</u>, <u>2.6(c)</u>, <u>4.1</u>, <u>4.4</u>, <u>4.5</u>, <u>4.8</u>, <u>4.10</u>, <u>4.11</u>, <u>4.12</u>, <u>11.5</u>, <u>11.6(c)</u> or <u>11.7</u> of this Agreement, <u>Subsection 8.4</u> of the Collateral Agreement, <u>Subsection 9.4</u> of the Guarantee Agreement or  similar provision of any other Loan Document, and (<u>2</u>) shall be deemed not to be (<u>v</u>) a Secured Party (as defined in the Collateral Agreement or any other applicable Security Document) under or in respect of any Loan Document or (<u>w</u>) a Fixed Asset Claimholder (as defined in the Prepetition ABL/Cash Flow Intercreditor Agreement) under or in respect of the Prepetition ABL/Cash Flow Intercreditor Agreement. No fees or interest shall accrue for the account of a Disqualified Party (except solely for interest payable to a permitted Assignee thereof following an assignment to such Assignee (<u>1</u>) pursuant to and as expressly provided in <u>Subsection 11.6(b)</u> and (<u>2</u>) pursuant to and as expressly provided in <u>Subsection 11.6(m)(iv)</u> below).

(iii)      No Disqualified Party shall have any right to approve, disapprove or consent to any amendment, supplement, waiver or modification of this Agreement or any other Loan Document or any term hereof or thereof. In determining whether the requisite Lender or Lenders have consented to any such amendment, supplement, waiver or modification, and in determining the Required Lenders or the Required Majority in Interest Lenders for any purpose under or in respect of any Loan Document, any Lender that is a Disqualified Party (and the Loans, Commitments of such Disqualified Party) shall be excluded and disregarded. Each such amendment, supplement, waiver or modification shall be binding and effective as to each Disqualified Party.

(iv)      The Borrower Representative shall have the right (<u>A</u>) at the sole expense of any Lender that is a Disqualified Party and/or the Person that assigned its Commitments and/or Loans to such Disqualified Party, to seek to replace or terminate such Disqualified Party as a Lender by causing such Lender to (and such Lender shall be obligated to) assign any or all of its Commitments and/or Loans and its rights and obligations under this Agreement to one or more Assignees (which may, at the Borrower Representative's sole option, be or include any Parent Entity, Intermediate Holdings or any Subsidiary); <u>provided</u> that (<u>1</u>) the Administrative Agent shall not have any obligation to the Borrower Representative to find such a replacement Lender, (<u>2</u>) the Borrower Representative shall not have any obligation to such Disqualified Party or any other Person to find such a replacement Lender or accept or consent to any such assignment to itself or any other Person and (<u>3</u>) the Assignee (or, at its option, the Borrower Representative) shall pay to such Disqualified Party concurrently with such assignment an amount (which payment shall be deemed payment in full) equal to the lesser of (<u>x</u>) the face principal amount of the Loans so assigned, (<u>y</u>) the amount that such Disqualified Party paid to acquire such Commitments and/or

155

Loans, and (z) the most recently available quoted price for such Commitments and/or Loans (as determined by Required Lenders in good faith, the "Trading Price"), in each case without interest thereon (it being understood that if the effective date of such assignment is not an Interest Payment Date, such Assignee shall be entitled to receive on the next succeeding Interest Payment Date interest on the principal amount of the Loans so assigned that has accrued and is unpaid from the Interest Payment Date last preceding such effective date (except as may be otherwise agreed between such Assignee and the Borrower Representative)), or (B) to prepay any Loans held by such Disqualified Party, in whole or in part, by paying an amount (which payment shall be deemed payment in full) equal to the lesser of (x) the face principal amount of the Loans so prepaid, (y) the amount that such Disqualified Party paid to acquire such Loans, and (z) the Trading Price for such Loans (in each case without interest thereon), and if applicable, terminate the Commitments of such Disqualified Party, in whole or in part (provided that, in the case of any Disqualified Party pursuant to clause (iii)(c) of the definition thereof, each Participant that has a participation in the Commitments and/or Loans of such Disqualified Party shall be provided a bona fide and reasonable opportunity to be assigned the Commitments and/or Loans in accordance with clause (A) above in an aggregate amount equal to no less than the aggregate principal amount of such participation). In connection with any such replacement, (1) if the Disqualified Party does not execute and deliver to the Administrative Agent a duly completed Assignment and Acceptance and/or any other documentation necessary or appropriate (in the good faith determination of the Administrative Agent or Intermediate Holdings) to reflect such replacement by the later of (a) the date on which the replacement Lender executes and delivers such Assignment and Acceptance and/or such other documentation and (b) the date as of which the Disqualified Party shall be paid by the Assignee (or, at its option, a Borrower) the amount required pursuant to Subsection 11.6(m)(iv)(B), then such Disqualified Party shall be deemed to have executed and delivered such Assignment and Acceptance and/or such other documentation as of such date and the Borrower Representative shall be entitled (but not obligated) to execute and deliver such Assignment and Acceptance and/or such other documentation on behalf of such Disqualified Party, and the Administrative Agent shall record such assignment in the Register, (2) each Lender (whether or not then a party hereto) agrees to disclose to the Borrower Representative the amount that the applicable Disqualified Party paid to acquire Commitments and/or Loans from such Lender and (3) each Lender that is a Disqualified Party agrees to disclose to the Borrower Representative the amount it paid to acquire the Commitments and/or Loans held by it.

(v)     No Disqualified Party (whether as a Lender, a Participant or otherwise) shall have any right to (A) receive any information or material made available to any Lender or the Administrative Agent hereunder or under any other Loan Document, (B) have access to any Internet or intranet website to which any of the Lenders and the Administrative Agent have access (whether a commercial, third-party or other website or whether sponsored by the Administrative Agent, any Borrower or otherwise), (C) attend (including by telephone) or otherwise participate in any meeting or discussions (or portions thereof) among or with any of the Borrowers, the Administrative Agent and/or one or more Lenders, (D) receive any information or material prepared by any Borrower, the Administrative Agent and/or one or more Lenders or (E) receive advice of counsel to the Administrative Agent, the Collateral Agent or any other Lender or challenge their attorney client privilege. Any Disqualified Party shall not solicit or seek to obtain any such information or material. If at any time any Disqualified Party receives or possesses any such information or material, such Disqualified Party shall (1) notify the Borrower Representative as soon as possible that such information or material has become known to it or came into its

possession, (2) immediately return to the Borrower Representative or, at the option of the Borrower Representative, destroy (and confirm to the Borrower Representative such destruction) such information or material, together with any notes, analyses, compilations, forecasts, studies or other documents related thereto which it or its advisors prepared and (3) keep such information or material confidential and shall not utilize such information or material for any purpose. Each Lender (whether or not then a party hereto) agrees to notify the Borrower Representative as soon as possible if it becomes aware that (x) it made an assignment to or has a participation with a Disqualified Party or (y) any such Disqualified Party has received any such information of materials; provided that any action or inaction taken at the Direction of the Required Lenders (or such other number or percentage of Lenders as shall be necessary, or as the Administrative Agent (or any sub-agent thereof) or the Collateral Agent (or any sub-agent thereof) shall believe in good faith to be necessary, under the circumstances provided herein) shall not be deemed bad faith, gross negligence or willful misconduct.

(vi)     The rights and remedies of Intermediate Holdings and the Borrower Representative provided herein are cumulative and are not exclusive of any other rights and remedies provided to Intermediate Holdings and the Borrower Representative or any other Borrower at law or in equity, and each of Intermediate Holdings, the Borrower Representative and the Borrowers shall be entitled to pursue any remedy available to it against any Lender that has (or has purported to have) made an assignment or sold or maintained a participation to or with a Disqualified Party or against any Disqualified Party. In no event shall the Administrative Agent be obligated to ascertain, monitor or inquire as to whether any prospective Assignee pursuant to Subsection 11.6(b) is a Disqualified Party or have any liability with respect to or arising out of any assignment or participation of Loans by the Lenders or disclosure of confidential information by the Lenders, in each case, to any Disqualified Party; provided that, unless the Borrower Representative and, if applicable, the Sponsor, have expressly consented in writing to an assignment to an applicable Disqualified Party, this sentence shall not relieve the Administrative Agent of any liability arising from the bad faith, gross negligence or willful misconduct of the Administrative Agent (as determined by a court of competent jurisdiction in a final and non-appealable decision); provided that any action or inaction taken at the Direction of the Required Lenders (or such other number or percentage of Lenders as shall be necessary, or as the Administrative Agent (or any sub-agent thereof) or the Collateral Agent (or any sub-agent thereof) shall believe in good faith to be necessary, under the circumstances provided herein) shall not be deemed bad faith, gross negligence or willful misconduct.

(vii)    Notwithstanding any other provision of this Agreement, any other Loan Document, any Assignment and Acceptance or any other document, the provisions of this Subsection 11.6(m) shall apply and survive with respect to each Lender, Participant and Disqualified Party notwithstanding that any such Person may have ceased to be a Lender or Participant (or any purported participation to any such Disqualified Party shall be void) hereunder or this Agreement may have been terminated.

11.7    Adjustments; Set-off; Calculations; Computations. (a) If any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of its Loans, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Subsection 9.1(f), or otherwise (except pursuant to Subsection 4.4, 4.5(b), 4.9, 4.10, 4.11, 4.12, 4.13(d), 11.1(g) or 11.6)), in a

157

greater proportion than any such payment to or Collateral received by any other Lender, if any, in respect of such other Lender's Loans owing to it, or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders an interest (by participation, assignment or otherwise) in such portion of each such other Lender's Loans owing to it, or shall provide such other Lenders with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower Representative, any such notice being expressly waived by the Borrower Representative to the extent permitted by applicable law, upon the occurrence of an Event of Default under Subsection 9.1(a) to set-off and appropriate and apply against any amount then due and payable under Subsection 9.1(a) by the Borrowers any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrowers. Each Lender agrees promptly to notify the Borrower Representative and the Administrative Agent after any such set-off and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application.

11.8     Judgment. (a) If, for the purpose of obtaining or enforcing judgment against any Loan Party in any court in any jurisdiction, it becomes necessary to convert into any other currency (such other currency being hereinafter in this Subsection 11.8 referred to as the "Judgment Currency") an amount due under any Loan Document in any currency (the "Obligation Currency") other than the Judgment Currency, the conversion shall be made at the rate of exchange prevailing on the Business Day immediately preceding the date of actual payment of the amount due, in the case of any proceeding in the courts of any other jurisdiction that will give effect to such conversion being made on such date, or the date on which the judgment is given, in the case of any proceeding in the courts of any other jurisdiction (the applicable date as of which such conversion is made pursuant to this Subsection 11.8 being hereinafter in this Subsection 11.8 referred to as the "Judgment Conversion Date").

(b)     If, in the case of any proceeding in the court of any jurisdiction referred to in Subsection 11.8(a), there is a change in the rate of exchange prevailing between the Judgment Conversion Date and the date of actual receipt for value of the amount due, the applicable Loan Party shall pay such additional amount (if any, but in any event not a lesser amount) as may be necessary to ensure that the amount actually received in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of the Judgment Currency stipulated in the judgment or judicial order at the rate of exchange prevailing on the Judgment Conversion Date. Any amount due from any Loan Party under this Subsection 11.8(b) shall be due as a separate debt and shall not be affected by judgment being obtained for any other amounts due under or in respect of any of the Loan Documents.

(c)     The term "rate of exchange" in this <u>Subsection 11.8</u> means the rate of exchange at which the Administrative Agent, on the relevant date at or about 12:00 P.M., New York City time, would be prepared to sell, in accordance with its normal course foreign currency exchange practices, the Obligation Currency against the Judgment Currency.

11.9    <u>Counterparts</u>. This Agreement may be executed by one or more of the parties to this Agreement in any number of separate counterparts (including by facsimile and other electronic transmission), and all of such counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be delivered to the Borrower Representative and the Administrative Agent.

11.10   <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.11   <u>Integration</u>. This Agreement, the Fronting Fee Letter and the other Loan Documents represent the entire agreement of each of the Loan Parties party hereto, the Administrative Agent and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by any of the Loan Parties party hereto, the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

11.12   <u>Governing Law</u>. THIS AGREEMENT AND ANY NOTES AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

11.13   <u>Submission to Jurisdiction; Waivers</u>. Each party hereto hereby irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party to the exclusive general jurisdiction of the Supreme Court of the State of New York for the County of New York (the "<u>New York Supreme Court</u>"), and the United States District Court for the Southern District of New York (the "<u>Federal District Court</u>", and together with the New York Supreme Court, the "<u>New York Courts</u>") and appellate courts from either of them; <u>provided</u> that nothing in this Agreement shall be deemed or operate to preclude (i) any Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the DIP Facility Obligations (in which case any party shall be entitled to assert any claim or defense, including any claim or defense that this <u>Subsection 11.13</u> would otherwise require to be asserted in a legal action or proceeding in a New York Court), or to enforce a judgment or other court order in favor of the

159

Administrative Agent or the Collateral Agent, (ii) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment, (iii) if all such New York Courts decline jurisdiction over any Person, or decline (or in the case of the Federal District Court, lack) jurisdiction over any subject matter of such action or proceeding, a legal action or proceeding may be brought with respect thereto in another court having jurisdiction and (iv) in the event a legal action or proceeding is brought against any party hereto or involving any of its assets or property in another court (without any collusive assistance by such party or any of its Subsidiaries or Affiliates), such party from asserting a claim or defense (including any claim or defense that this Subsection 11.13(a) would otherwise require to be asserted in a legal proceeding in a New York Court) in any such action or proceeding;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient forum and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower Representative, the applicable Lender or the Administrative Agent, as the case may be, at the address specified in Subsection 11.2 or at such other address of which the Administrative Agent, any such Lender and the Borrower Representative shall have been notified pursuant thereto;

(d)     agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or (subject to clause (a) above) shall limit the right to sue in any other jurisdiction; and

(e)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Subsection 11.13 any consequential or punitive damages.

11.14   Acknowledgements. Each Borrower hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     neither any Agent nor any Lender has any fiduciary relationship with or duty to such Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Administrative Agent and Lenders, on the one hand, and such Borrower, on the other hand, in connection herewith or therewith is solely that of creditor and debtor;

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby and thereby among the Lenders or among such Borrower and the Lenders; and

(d)     each Agent, each Lender and their Affiliates may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their Affiliates.

160

11.15  <u>Waiver of Jury Trial</u>. EACH OF THE BORROWERS, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY NOTES OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

11.16  <u>Confidentiality</u>. (a) Each Agent and each Lender agrees to keep confidential any information (<u>a</u>) provided to it by or on behalf of Holdings or Intermediate Holdings or any of their respective Subsidiaries pursuant to or in connection with the Loan Documents or (<u>b</u>) obtained by such Lender based on a review of the books and records of Holdings or Topco Borrower or any of their respective Subsidiaries; <u>provided</u> that nothing herein shall prevent any Lender or any Agent from disclosing any such information (<u>i</u>) to any other Agent or any other Lender, (<u>ii</u>) to any Transferee, or prospective Transferee in any rights or obligations under this Agreement or any creditor or any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Borrower and its obligations which agrees to comply with the provisions of this <u>Subsection 11.16</u> pursuant to a written instrument (or electronically recorded agreement from any Person listed above in this clause (ii), in respect to any electronic information (whether posted or otherwise distributed on any Platform)) for the benefit of the Borrowers (it being understood that each relevant Lender and each relevant Agent shall be solely responsible for obtaining such instrument (or such electronically recorded agreement)), (<u>iii</u>) to its Affiliates and the employees, officers, partners, directors, agents, attorneys, accountants and other professional advisors of it and its Affiliates, <u>provided</u> that such Lender shall inform each such Person of the agreement under this <u>Subsection 11.16</u> and take reasonable actions to cause compliance by any such Person referred to in this clause (iii) with this agreement (including, where appropriate, to cause any such Person to acknowledge its agreement to be bound by the agreement under this <u>Subsection 11.16</u>), (<u>iv</u>) upon the request or demand of any Governmental Authority having jurisdiction over such Lender or such Agent or its Affiliates or to the extent required in response to any order of any court or other Governmental Authority or as shall otherwise be required pursuant to any Requirement of Law, <u>provided</u> that, other than with respect to any disclosure to any bank regulatory authority, such Lender shall, unless prohibited by any Requirement of Law, notify the Borrower Representative of any disclosure pursuant to this clause (<u>iv</u>) as far in advance as is reasonably practicable under such circumstances, (<u>v</u>) which has been publicly disclosed other than in breach of this Agreement, (<u>vi</u>) in connection with the exercise of any remedy hereunder, under any Loan Document or under any Interest Rate Agreement, (<u>vii</u>) in connection with periodic regulatory examinations and reviews conducted by the National Association of Insurance Commissioners or any Governmental Authority having jurisdiction over such Agent or such Lender or its Affiliates (to the extent applicable), (<u>viii</u>) in connection with any litigation to which such Agent or such Lender (or, with respect to any Interest Rate Agreement, any Affiliate of any Lender party thereto) may be a party subject to the proviso in clause (iv) above, and (<u>ix</u>) if, prior to such information having been so provided or obtained, such information was already in an Agent's or a Lender's possession on a non-confidential basis without a duty of confidentiality to Topco Borrower or any of its Subsidiaries being violated. Notwithstanding any other provision of this Agreement, any other Loan Document or any Assignment and Acceptance, the provisions of this <u>Subsection 11.16</u> shall survive with respect to each Agent and Lender until the second anniversary of such Agent or Lender ceasing to be an Agent or a Lender, respectively. In addition, the Administrative Agent may provide information regarding the Facilities to service providers providing administrative and ministerial services solely in connection with the syndication and

161

administration of the Facilities on a confidential basis; provided that, except with respect to information which has been publicly disclosed other than in breach of this Agreement, the Administrative Agent shall inform each such Person of the agreement under this Subsection 11.16 and take reasonable actions to cause compliance by any such Person with this agreement (including, where appropriate, to cause any such Person to acknowledge its agreement to be bound by the agreement under this Subsection 11.16).

(b)    Each Lender acknowledges that any such information referred to in Subsection 11.16(a), and any information (including requests for waivers and amendments) furnished by Topco Borrower or any of its Subsidiaries or the Administrative Agent pursuant to or in connection with this Agreement and the other Loan Documents, may include material non-public information concerning Topco Borrower or any of its Subsidiaries, the other Loan Parties and their respective Affiliates or their respective securities. Each Lender represents and confirms that such Lender has developed compliance procedures regarding the use of material non-public information; that such Lender will handle such material non-public information in accordance with those procedures and applicable law, including United States federal and state securities laws; and that such Lender has identified to the Administrative Agent a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law.

11.17    [Reserved].

11.18    USA PATRIOT Act Notice. Each Lender hereby notifies each Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act") and the CDD Rule, it is required to obtain, verify, and record information that identifies each Loan Party, which information includes the name of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the Patriot Act and the CDD Rule, and each Borrower agrees to provide such information from time to time to any Lender.

11.19    Electronic Execution of Assignments and Certain Other Documents. The words "execution", "signed", "signature", and words of like import in any Assignment and Acceptance or Plan Sponsor Lender Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

11.20    Reinstatement. This Agreement shall remain in full force and effect and continue to be effective should any petition or other proceeding be filed by or against any Loan Party for liquidation or reorganization, should any Loan Party become insolvent or make an assignment for the benefit of any creditor or creditors or should an interim receiver, receiver, receiver and manager or trustee be appointed for all or any significant part of any Loan Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time

162

payment and performance of the obligations of the Borrowers under the Loan Documents, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the obligations, whether as a fraudulent preference, reviewable transaction or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the obligations of the Borrowers hereunder shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

11.21 Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary herein or in any other Loan Document, each Borrower, each Lender and the Administrative Agent (each, an "Acknowledging Party") acknowledges that any liability of any Lender that is an Affected Financial Institution arising hereunder or under any other Loan Document, to the extent such liability is unsecured and solely relates to the Loans and not to any other Person, including any other party hereto or any other Loan Document (and not to any other obligations), to such Acknowledging Party (all such liabilities, other than any Excluded Liability, the "Covered Liabilities") may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers to any Covered Liability arising hereunder or under any other Loan Document which may be payable to it by any Lender party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such Covered Liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such Covered Liability;

(ii)    a conversion of all, or a portion of, such Covered Liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such Covered Liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such Covered Liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Notwithstanding anything to the contrary herein, nothing contained in this Subsection 11.21 shall modify or otherwise alter the rights or obligations under this Agreement or any other Loan Document of any Person party hereto (other than an Acknowledging Party to the extent set forth in this Subsection 11.21) or with respect to any liability that is not a Covered Liability.

11.22 Joint and Several Liability; Postponement of Subrogation. (a) The obligations of the Borrowers hereunder and under the other Loan Documents and all other DIP Facility Obligations shall be joint and several and, as such, each Borrower shall be liable for all of

such obligations of each other Borrower under this Agreement and the other Loan Documents or otherwise in respect of the DIP Facility Obligations. To the fullest extent permitted by law, the liability of each Borrower for the obligations under this Agreement and the other Loan Documents and all other DIP Facility Obligations of the other applicable Borrowers with whom it has joint and several liability shall be absolute, unconditional and irrevocable, without regard to (i) the validity or enforceability of this Agreement or any other Loan Document, any of the obligations hereunder or thereunder or any other collateral security therefor or Guarantee or right of offset with respect thereto at any time or from time to time held by any applicable Secured Party, (ii) any defense, set-off or counterclaim (other than a defense of payment or performance hereunder; provided that no Borrower hereby waives any suit for breach of a contractual provision of any of the Loan Documents) which may at any time be available to or be asserted by such other applicable Borrower or any other Person against any Secured Party or (iii) any other circumstance whatsoever (with or without notice to or knowledge of such other applicable Borrower or such Borrower) which constitutes, or might be construed to constitute, an equitable or legal discharge of such other applicable Borrower for the obligations hereunder or under any other Loan Document, or of such Borrower under this Subsection 11.22 in bankruptcy or in any other instance.

(b)      Each Borrower agrees that it will not exercise any rights which it may acquire by way of rights of subrogation under this Agreement, by any payments made hereunder or otherwise, until the prior payment in full in cash of all of the DIP Facility Obligations and the permanent termination of all Commitments. Any amount paid to any Borrower on account of any such subrogation rights prior to the payment in full in cash of all of the obligations hereunder and under any other Loan Document and all other DIP Facility Obligations and the permanent termination of all Commitments shall be held in trust for the benefit of the applicable Secured Parties and shall immediately be paid to the Administrative Agent for the benefit of the applicable Secured Parties and credited and applied against the obligations of the applicable Borrowers, whether matured or unmatured, in such order as the Administrative Agent shall elect (acting at the Direction of the Required Lenders). In furtherance of the foregoing, for so long as any obligations of any Borrower hereunder or any Commitments remain outstanding hereunder or under any other Loan Document, each Borrower shall refrain from taking any action or commencing any proceeding against any other Borrower (or any of its successors or assigns, whether in connection with a bankruptcy proceeding or otherwise) to recover any amounts in respect of payments made in respect of the obligations hereunder or under any other Loan Document of such other Borrower to any Secured Party.

11.23  Recognition of U.S. Special Resolution Regime. In the event that any Lender that is a Covered Entity becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer from such Lender of this Agreement, and any interest and obligation in or under this Agreement, will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if this Agreement, and any such interest and obligation, were governed by the laws of the United States or a state of the United States. In the event that any Lender that is a Covered Entity or a BHC Act Affiliate of such Lender becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under this Agreement that may be exercised against such Lender are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if this Agreement were governed by the laws of the United States or a state of the United States.

11.24    <u>Acknowledgment Regarding any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a Guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 11.24, the following terms have the following meanings:

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

11.25    <u>Orders Controls</u>. To the extent that any representation, warrant, covenant or other provision hereof or in any other Loan Document is inconsistent with any of the Orders, the Interim DIP Order or the Final DIP Order (as applicable) shall control.

[SIGNATURE PAGES FOLLOW]

## Exhibit 2

**DIP Note Purchase Agreement**

*Filing Version*

LABL, Inc., as Intermediate Holdings and as a Debtor-in-Possession under
Chapter 11 of the Bankruptcy Code,

and

Multi-Color Corporation, as Issuer
MCC Manufacturing, Inc., as Co-Issuer,
as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

Acquiom Agency Services LLC, as Collateral Agent

and

Acquiom Agency Services LLC, as Paying Agent

Floating Rate Senior Secured Roll-Up Notes
Floating Rate Senior Secured New Money Notes

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION NOTE PURCHASE
AGREEMENT

_____

Dated as of February 2, 2026

TABLE OF CONTENTS

SECTION 1. AUTHORIZATION OF DIP NOTES ........................................................ 3

    Section 1.1. Authorization of DIP Notes .................................................... 3
    Section 1.2. Priority of Security .............................................................. 3
    Section 1.3. Other Definition and Interpretive Provisions ............................ 4

SECTION 2. GENERAL PROVISIONS APPLICABLE TO DIP NOTES ........................... 7

    Section 2.1. Issuance of DIP Notes .......................................................... 7
    Section 2.2. Fees and Payments ............................................................... 8
    Section 2.3. Payment of Certain Fees ....................................................... 9
    Section 2.4. Syndication ........................................................................ 9
    Section 2.5. Acceptable Plan .................................................................. 9
    Section 2.6. Backstop Premium ............................................................... 9
    Section 2.7. [Reserved] ......................................................................... 9
    Section 2.8. Requirements of Law ........................................................... 9
    Section 2.9. Taxes ............................................................................... 10
    Section 2.10. Indemnity ....................................................................... 10
    Section 2.11. Certain Relationships Relating to the Payment of Additional
                  Amounts ....................................................................... 10

SECTION 3. CLOSING ..................................................................................... 10

    Section 3.1. Effectiveness .................................................................... 10
    Section 3.2. Closings .......................................................................... 10

SECTION 4. CONDITIONS TO FIRST DRAW CLOSING .......................................... 11

    Section 4.1. Conditions to the First Draw Closing ................................... 11
    Section 4.2. Conditions to the Second Draw Closing After Entry of Final DIP
                  Order ......................................................................... 14

SECTION 5. REPRESENTATIONS AND WARRANTIES ........................................... 16

    Section 5.1. [Reserved] ....................................................................... 16
    Section 5.2. No Change ....................................................................... 16
    Section 5.3. Corporate Existence; Compliance with Law ........................... 16
    Section 5.4. Corporate Power; Authorization; Enforceability Obligations ...... 16
    Section 5.5. No Legal Bar .................................................................... 16
    Section 5.6. No Material Litigation ........................................................ 16
    Section 5.7. No Default ....................................................................... 16
    Section 5.8. Ownership of Property; Liens ............................................. 16
    Section 5.9. Intellectual Property .......................................................... 16
    Section 5.10. Taxes ............................................................................ 16
    Section 5.11. Federal Regulation .......................................................... 16
    Section 5.12. ERISA ........................................................................... 16

Section 5.13.   Collateral ................................................................................ 16
Section 5.14.   Investment Company Act; Other Regulations ........................ 17
Section 5.15.   Subsidiaries ............................................................................ 17
Section 5.16.   Use of Proceeds ...................................................................... 17
Section 5.17.   Environmental Matters ........................................................... 17
Section 5.18.   No Material Misstatements ..................................................... 17
Section 5.19.   Labor Matters ......................................................................... 17
Section 5.20.   Chapter 11 Cases; Orders ...................................................... 17
Section 5.21.   Anti-Terrorism ....................................................................... 17
Section 5.22.   Prohibited Transactions under ERISA .................................... 17
Section 5.23.   Private Offering; No General Solicitation .............................. 17
Section 5.24.   No Integration ........................................................................ 17

SECTION 6.      REPRESENTATIONS OF THE PURCHASERS ................................ 18

Section 6.1.    Purchase for Investment .......................................................... 18
Section 6.2.    Source of Funds ...................................................................... 18
Section 6.3.    Accredited Investor; Independent Investigation ..................... 19
Section 6.4.    Organization and Good Standing ............................................ 20
Section 6.5.    Authorization .......................................................................... 20
Section 6.6.    Good Title ............................................................................... 20
Section 6.7.    Arms' Length Dealing ............................................................ 20
Section 6.8.    Compliance with Other Instruments ....................................... 20
Section 6.9.    Advice of Advisor ................................................................... 21

SECTION 7.      [RESERVED] .............................................................................. 21

SECTION 8.      PAYMENT AND PREPAYMENT OF THE DIP NOTES ..................... 21

Section 8.1.    Payment; Maturity .................................................................. 21
Section 8.2.    Optional Prepayments ............................................................. 21
Section 8.3.    Mandatory Redemption and Prepayment ................................ 22
Section 8.4.    [Reserved] ............................................................................... 23
Section 8.5.    Maturity; Surrender, Etc. ........................................................ 23
Section 8.6.    [Reserved] ............................................................................... 23
Section 8.7.    [Reserved] ............................................................................... 23
Section 8.8.    Payments Due on Non-Business Days ..................................... 23

SECTION 9.      AFFIRMATIVE COVENANTS ....................................................... 23

Section 9.1.    Financial Statements ............................................................... 23
Section 9.2.    Certificates; Other Information ............................................... 24
Section 9.3.    Payment of Taxes .................................................................... 24
Section 9.4.    Conduct of Business and Maintenance of Existence; Compliance
                with Contractual Obligations and Requirements of Law ......... 24
Section 9.5.    Maintenance of Property; Insurance ........................................ 24
Section 9.6.    Inspection of Property; Books and Records; Discussions ........ 24

Section 9.7. Notices ........................................................................................ 24
Section 9.8. Environmental Laws .................................................................... 24
Section 9.9. After-Acquired Subsidiaries ....................................................... 24
Section 9.10. Use of Proceeds .......................................................................... 24
Section 9.11. Commercially Reasonable Efforts to Maintain Ratings ............ 24
Section 9.12. Accounting Changes ................................................................... 24
Section 9.13. Post-Closing Obligations ........................................................... 24
Section 9.14. Certain Bankruptcy Matters (Compliance with Orders) ............ 24
Section 9.15. Bankruptcy Notices .................................................................... 24
Section 9.16. Insolvency Proceedings .............................................................. 24
Section 9.17. Milestones ................................................................................... 25
Section 9.18. Employee Benefit Matters .......................................................... 25
Section 9.19. Interest Rate Updates ................................................................. 25
Section 9.20. CUSIPS/PPNs ............................................................................ 25

SECTION 10. NEGATIVE COVENANTS .......................................................................... 25

Section 10.1. Limitation on Indebtedness ........................................................ 25
Section 10.2. Limitation on Restricted Payments ............................................ 25
Section 10.3. Limitation on Resrictive Agreements ......................................... 25
Section 10.4. Limitation on Sales of Assets and Subsidiary Stock ................. 25
Section 10.5. Limitation on Tranasctions with Affiliates ................................ 25
Section 10.6. Limitation on Liens .................................................................... 25
Section 10.7. Limitation on Fundamental Changes .......................................... 25
Section 10.8. Limitation on Amendments ........................................................ 26
Section 10.9. Limitation on Lines of Business ................................................. 26
Section 10.10. Priority of Liens and Claims ...................................................... 26
Section 10.11. Additional Bankruptcy Matters .................................................. 26
Section 10.12. Budget Variance ......................................................................... 26
Section 10.13. Material Adverse Changes to Organizational Documents .......... 26

SECTION 11. EVENTS OF DEFAULT ............................................................................. 26

SECTION 12. REMEDIES ON DEFAULT, ETC. ............................................................... 31

Section 12.1. Acceleration ................................................................................ 31
Section 12.2. [Reserved] ................................................................................... 31
Section 12.3. [Reserved] ................................................................................... 31
Section 12.4. Collateral Agreement; Concurrent Actions ............................... 31

SECTION 13. REGISTRATION; EXCHANGE; SUBSTITUTION OF DIP NOTES ................. 32

Section 13.1. Registration of DIP Notes .......................................................... 32
Section 13.2. Transfer and Exchange of DIP Notes ......................................... 32
Section 13.3. Replacement of DIP Notes ......................................................... 32

SECTION 14. PAYMENTS ON AND IN RESPECT OF DIP NOTES ............................................ 33

Section 14.1. Place of Payment.................................................................. 33
Section 14.2. Payment by Wire Transfer ................................................... 33
Section 14.3. Tax Withholding; FATCA Information................................... 34
Section 14.4. Payments to the Issuers ....................................................... 35

SECTION 15. EXPENSES, ETC ........................................................................... 35

Section 15.1. Payment of Expenses and Taxes.......................................... 35
Section 15.2. [Reserved].............................................................................. 35
Section 15.3. Survival .................................................................................. 35

SECTION 16. SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT .......... 35

SECTION 17. AMENDMENT AND WAIVER ............................................................ 36

Section 17.1. Requirements ........................................................................ 36
Section 17.2. Solicitation of Holders of DIP Notes ................................... 37
Section 17.3. [Reserved].............................................................................. 37

SECTION 18. NOTICES......................................................................................... 37

SECTION 19. REPRODUCTION OF DOCUMENTS..................................................... 38

SECTION 20. CONFIDENTIAL INFORMATION........................................................ 38

SECTION 21. SUBSTITUTION .............................................................................. 39

SECTION 22. MISCELLANEOUS ........................................................................... 40

Section 22.1. Successors and Assigns........................................................ 40
Section 22.2. [Reserved].............................................................................. 40
Section 22.3. Severability ........................................................................... 40
Section 22.4. Acceptable Plan .................................................................... 40
Section 22.5. Counterparts.......................................................................... 40
Section 22.6. Governing Law ...................................................................... 41
Section 22.7. Submission to Jurisdiction; Waivers..................................... 41
Section 22.8. Release of Collateral ............................................................ 42
Section 22.9. Credit Bid............................................................................... 42
Section 22.10. Order Controls ...................................................................... 42
Section 22.11. Reinstatement........................................................................ 42

SECTION 23. COLLATERAL AGENT ..................................................................... 42

Section 23.1. Appointment of Collateral Agent.......................................... 42
Section 23.2. Incorporation from DIP Credit Facility ............................... 43
Section 23.3. Relaying of Applicable Interest ........................................... 43

-4-

SECTION 24.    [RESERVED] ................................................................................................ 43

SECTION 25.    CERTAIN AGREEMENTS.................................................................................... 43

SECTION 26.    INTERCREDITOR AGREEMENT AND DIP ORDERS ................................................. 44


SCHEDULE A            —        Defined Terms
SCHEDULE B            —        Information Relating to Purchasers

SCHEDULE 1.1(a)       —        Form of [First Draw][Second Draw] New Money Note
SCHEDULE 1.1(b)       —        Form of [First Draw][Second Draw] Roll-Up Note
SCHEDULE 2.1          —        Commitment Schedule
SCHEDULE 3.1          —        Form of Notice of Drawing
SCHEDULE 4.1(e)       —        Existing Investments
SCHEDULE 4.1(g)       —        Existing Liens
SCHEDULE 5.4          —        Consents Required
SCHEDULE 5.6          —        Litigation
SCHEDULE 5.9          —        Intellectual Property Claims
SCHEDULE 5.15         —        Subsidiaries
SCHEDULE 5.17         —        Environmental Matters
SCHEDULE 7.2          —        Website Address for Electronic Financial Reporting
SCHEDULE 7.13         —        Post-Closing Obligations
SCHEDULE 8.1          —        Existing Indebtedness
SCHEDULE 8.5          —        Affiliate Transactions
SCHEDULE 9.1          —        Tax Compliance Certificates

EXHIBIT A             —        Form of DIP Guarantee Agreement
EXHIBIT B             —        General Rights Offering Procedures

**Multi-Color Corporation**
**MCC Manufacturing, Inc.**
4053 Clough Woods Drive
Batavia, OH 45103

Floating Rate Senior Secured Roll-Up Notes

Floating Rate Senior Secured New Money Notes

Dated as of February 2, 2026

To

EACH OF THE PURCHASERS LISTED IN SCHEDULE B HERETO, AND
ACQUIOM AGENCY SERVICES LLC, AS COLLATERAL AGENT AND PAYING AGENT:

Ladies and Gentlemen:

On January 29, 2026 (the "**Petition Date**"), Multi-Color Corporation, an Ohio corporation (the "**Issuer**"), MCC Manufacturing, Inc., a Delaware corporation (the "**Co-Issuer**" and, together with the Issuer, collectively, the "**Issuers**" and each individually, an "**Issuer**"), LABL, Inc., a Delaware corporation ("**Intermediate Holdings**"), the Guarantors (as defined below) and certain other Subsidiaries (each a "**Debtor**" and collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each such case, a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**") and have continued in the possession and operation of their assets and management of their business pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Prior to the First Draw Closing Date, Purchasers party hereto (or Affiliates thereof) provided secured financing to the Issuers pursuant to the Prepetition Participating Debt Documents (in such capacity, the "**Prepetition Lenders and Holders**"), which secured financing was guaranteed by certain of the Guarantors.

The Issuers have requested that the Prepetition Lenders and Holders, including the Purchasers party hereto, provide superpriority secured debtor-in-possession financing facilities in aggregate principal amount of $500,000,000 (excluding the Backstop Premium Amount (as defined below)), comprising (x) $250,000,000 of (i) a new money superpriority secured debtor-in-possession term loan credit facility (the "**New Money DIP Credit Facility**") consisting of (A) Dollar-denominated term loans and (B) Euro-denominated term loans and (ii) new money superpriority Floating Rate Senior Secured New Money Notes (the "**New Money DIP Notes**" and, together with the New Money DIP Credit Facility, the "**New Money DIP Financing**") and (y) $250,000,000 of (i) a roll-up superpriority secured debtor-in-possession term loan credit facility (the "**Roll-Up DIP Credit Facility**" and, together with the New Money DIP Credit Facility, the "**DIP Credit Facility**") consisting of (A) Dollar-denominated term loans and (B) Euro-denominated term loans and (ii) roll-up superpriority Floating Rate Senior Secured Roll-Up DIP Notes (the "**Roll-Up DIP Notes**" and, together with the New Money DIP Notes, the "**DIP Notes**" and the Roll-Up DIP Notes, together with the Roll-Up DIP Credit Facility, the "**Roll-Up DIP Financing**"). All of the Issuer's Obligations under the DIP Credit Facility and the DIP Notes will

be guaranteed by each Guarantor.  The DIP Notes and the DIP Credit Facility are collectively referred to as the "**DIP Financing**."

The DIP Financing, including the Backstop Premium Amount shall be $507,500,000 in aggregate principal amount, which shall be offered in the following manner (x) $250,000,000 in New Money DIP Financing, consisting of (A) $175,000,000 to be offered to holders of Prepetition Secured Debt in respect of claims thereunder in a rights offering for the DIP Financing (the "**New Money Rights Offering**") and (B) $75,000,000 to be purchased by the Purchasers as part of the holdback, in the case clause (B) on a several and not joint basis *pro rata* in proportion to their Commitments hereunder in Schedule 2.1 hereto and under the DIP Credit Facility (the "**New Money Holdback**"), (y) $250,000,000 in Roll-Up DIP Financing in exchange for Prepetition Secured Debt, consisting of (A) $175,000,000 to be offered to holders of Prepetition Secured Debt in respect of (and exchange for) claims thereunder in a rights offering for the DIP Financing (the "**Roll-Up Rights Offering**" and, together with the New Money Rights Offering, the "**General Rights Offering**") and (B) $75,000,000 to be purchased by the Purchasers as part of the holdback, in the case of clause (B) on a several and not joint basis *pro rata* in proportion to their Commitments hereunder in Schedule 2.1 and under the DIP Credit Facility (the "**Roll-Up Holdback**" and, together with the New Money Holdback, the "**Holdback**") and (z) $7,500,000 in additional New Money DIP Notes to be paid to Purchasers as set forth in Section 2.6 on the First Draw Closing Date (the "**Backstop Premium Amount**").

On or promptly following the Interim DIP Order Entry Date, the Issuers will issue $250,000,000 of DIP Financing, comprising (x) $[125,000,000] in the General Rights Offering of which $[62,500,000] will be part of the New Money Rights Offering and $[62,500,000] will be part of the Roll-Up Rights Offering  (the "**First Rights Offering Settlement**") and (y) $[125,000,000] in the Holdback of which $[62,500,000] will be New Money Holdback and $[62,500,000] will be Roll-Up Holdback, in each case provided by the Purchasers pursuant to this agreement and the DIP Credit Facility.  The Backstop Premium Amount will be issued to the Purchasers on the same date as the First Rights Offering Settlement.

On the Final DIP Order Entry Date, the Issuers will issue $250,000,000 of additional DIP Financing all of which will be issued as part of the General Rights Offering of which (x) $[125,000,000] will be part of the New Money Rights Offering and (y) $[125,000,000] will be part of the Roll-Up Rights Offering (the "**Second Rights Offering Settlement**").  To the extent that a holder of Prepetition Secured Debt elects not to participate in the General Rights Offering or defaults in any of its obligations under the General Rights Offering and its election to participate is rejected, such portion of the Rights Offering previously allocable to such holder shall be purchased *pro rata* on several and not joint basis by the Purchasers hereunder and under the DIP Credit Facility *pro rata* in proportion to their Commitments hereunder and under the DIP Credit Facility (such amounts the "**Syndication Shortfall Amounts**").

The priority of the DIP Financing with respect to the Collateral granted to secure the Notes Obligations shall be as set forth in the Financing Documents and the Interim DIP Order and the Final DIP Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.  All of the claims and the Liens granted under the DIP Orders (as defined below) and the Financing Documents to the Secured Parties in respect of the DIP Facility shall be subject to the Carve-Out.

-2-

The Issuers and the Guarantors are engaged in related businesses, and each Guarantor will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement.

Each of the Purchasers is willing on a several and not joint basis to (x) purchase the New Money DIP Notes from the Issuers and (y) exchange its Prepetition Secured Debt for Roll-Up DIP Notes on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto covenant and agree as follows:

**Section 1.     AUTHORIZATION OF DIP NOTES.**

**Section 1.1.   Authorization of DIP Notes.**

(a)     The Issuers will, subject to the terms and conditions of this Agreement and the DIP Orders, authorize:

(i)     on and from the Interim DIP Order Entry Date, (1) the issue and sale of New Money DIP Notes on the First Draw Closing Date (the "**First Draw New Money DIP Notes**") and (2) an exchange on the First Draw Closing Date of the Prepetition Secured Debt (including all of the obligations thereunder) for Floating Rate Senior Secured Roll-Up DIP Notes (the "**First Draw Roll-Up DIP Notes**" and, such exchange, the "**First Draw Roll-Up**") as set forth in respect of the Purchasers, on Schedule 2.1 hereto; and

(ii)     on and from the Final DIP Order Entry Date, (1) the issue and sale of New Money DIP Notes on the Second Draw Closing Date (the "**Second Draw New Money DIP Notes**") and (2) an exchange on the Second Draw Closing Date of Prepetition Secured Debt (including all of the obligations thereunder) for Floating Rate Senior Secured Roll-Up DIP Notes (the "**Second Draw Roll-Up DIP Notes**" and, such exchange, the "**Second Draw Roll-Up**") as set forth on Schedule 2.1 hereto.

(b)     The DIP Notes shall be substantially in the form set out in Schedule 1.1, with effect from the First Draw Closing Date or the Second Draw Closing Date, as applicable. Certain capitalized and other terms used in this Agreement are defined in Schedule A and, for purposes of this Agreement, the rules of construction set forth in Section 1.3 shall govern.

**Section 1.2.   Priority of Security.**

The relative priorities of the Liens described in Section 10.10 with respect to the Collateral shall be as set forth in the Interim DIP Order (and, when entered, the Final DIP Order). All of the Liens described in Section 10.10 shall be effective and perfected upon entry of the Interim DIP Order (and, when entered, the Final DIP Order) without the necessity of the execution or recordation of filings by any Note Party of security agreements, mortgages, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Collateral Agent of, or over, any Collateral, as set forth in the Interim DIP Order and, when entered, the Final DIP Order; *provided* that for the avoidance of doubt, each such Lien shall be subject to the Carve-Out in all respects; *provided, further*, that the DIP Notes and the liens securing the DIP Notes shall be *pari passu* with the DIP Credit Facility.

**Section 1.3.   Other Definition and Interpretive Provisions**.

(a)     [Reserved].

(b)     As used herein and in any DIP Notes and any other Financing Document, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to Intermediate Holdings and its Restricted Subsidiaries not defined in Schedule A and accounting terms partly defined in Schedule A, to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Subsection, Schedule and Exhibit references are to this Agreement unless otherwise specified.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  Any reference herein to any Person shall be construed to include such Person's successors and assigns permitted hereunder.  Any reference herein to the financial statements (or any component thereof) of Intermediate Holdings shall be construed to include the financial statements (or the applicable component thereof) of Intermediate Holdings or any Parent Entity whose financial statements satisfy Intermediate Holdings' financial reporting obligations under Section 9.1.  With respect to any Default or Event of Default, the words "exists," "is continuing" or similar expressions with respect thereto shall mean that such Default or Event of Default has occurred and has not yet been cured or waived.  If any Default or Event of Default has occurred hereunder (any such Default or Event of Default, an "**Initial Default**") and is subsequently cured (a "**Cured Default**"), any other Default, Event of Default or failure of a condition precedent that resulted or may have resulted from (i) the making or deemed making of any representation or warranty by any Note Party or (ii) any act or omission by any Note Party or any Subsidiary of any Note Party, in each case which subsequent Default, Event of Default or failure would not have arisen had the Cured Default not been continuing at the time of such representation, warranty, action or omission, shall be deemed to automatically be cured or satisfied, as applicable, upon, and simultaneously with, the cure of the Cured Default, so long as at the time of such representation, warranty, action or omission, no Responsible Officer of Intermediate Holdings had knowledge of any such Initial Default.  To the extent not already so notified, Intermediate Holdings will provide prompt written notice of any such automatic cure to the holders after a Responsible Officer of Intermediate Holdings knows of the occurrence of any such automatic cure.  Any time period in this Agreement to cure any actual or alleged Default or Event of Default may be extended or stayed by a court of competent jurisdiction to the extent such actual or alleged Default or Event of Default is the subject of litigation.

(d)     [Reserved].

(e)     [Reserved].

(f)     Any financial ratios required to be maintained pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (rounding up if there is no nearest number).

(g)      Any references in this Agreement to "cash and/or Cash Equivalents," "cash, Cash Equivalents and/or Temporary Cash Investments" or any similar combination of the foregoing shall be construed as not double counting cash or any other applicable amount which would otherwise be duplicated therein.

(h)      The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(i)      [Reserved].

(j)      [Reserved].

(k)      Any reference herein or in any other Financing Document to (i) a transfer, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company or a limited partnership, as applicable, or an allocation of assets to a series of a limited liability company, as if it were a transfer, assignment, sale or transfer, or similar term, as applicable, to a separate Person, and (ii) a merger, consolidation, amalgamation or consolidation, or similar term, shall be deemed to apply to the division of or by a limited liability company, or an allocation of assets to a series of a limited liability company, or the unwinding of such a division or allocation, as if it were a merger, consolidation, amalgamation or consolidation or similar term, as applicable, with a separate Person.

(l)      [Reserved].

(m)      [Reserved].

(n)      Subject to Section 10.1(d), when determining compliance with any basket, threshold, ratio or other amounts under this Agreement or the other Financing Documents, the Dollar Equivalent shall be calculated as at the date of the incurrence or making of the relevant disposition, acquisition, Investment, Indebtedness or Restricted Payment or taking other relevant action.

(o)      Except as otherwise provided in this Agreement, when the payment of any obligation or the performance of any covenant, duty, or obligation is stated to be due or performance required on (or before) a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(p)      Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any DIP Notes, any other Financing Document or any certificate or other document made or delivered pursuant hereto. Capitalized terms used but not defined herein or in the foregoing documents shall have the meanings given to such terms in the DIP Credit Facility.

(q)      Incorporation of DIP Credit Facility Provisions. Certain provisions of this Agreement are incorporated from the DIP Credit Facility in effect as of the date hereof. With respect to such provisions, unless otherwise provided herein:

-5-

(i)      References to provisions of the DIP Credit Facility shall refer to the provisions in the DIP Credit Facility as of the date of this Agreement; *provided* that to the extent any provision of the DIP Credit Facility is amended, supplemented or otherwise modified by a vote of the parties thereto in compliance with the procedures set forth in Section 11.1 of the DIP Credit Facility, this Agreement (and the DIP Notes, if applicable) shall likewise be deemed modified in such respect to the extent (x) this Agreement (and the DIP Notes, if applicable) contain a similar provision and (y) the holders were included in the voting for such amendment, supplement, or modification; *provided* that no such amendment, supplement or modification shall affect the items listed in Sections 17.1(a) and (b).

(ii)      With respect to provisions incorporated from the DIP Credit Facility, for and limited to such incorporated sections, references to:

(A)      "Administrative Agent" shall be deemed to refer to the "holders" and the "Collateral Agent" as the context requires, each as defined herein;

(B)      "Affected Loans" shall be deemed to refer to "Affected DIP Notes" as defined herein;

(C)      "Agent" shall be deemed to refer to the "Collateral Agent" as defined herein; *provided*, *further*, that with respect to Section 23.2, "Agent" shall be deemed to refer to the "Collateral Agent" and the "Paying Agent," as each such term is defined herein;

(D)      "Agreement" shall be deemed to mean the "Agreement" as defined herein;

(E)      "Backstop Lenders" shall be deemed to refer to the "Purchasers" as defined herein;

(F)      "Borrower" and "Borrowers" shall be deemed to refer to "Issuer" and the "Issuers" as defined here;

(G)      "Borrower Representative" shall be deemed to refer to the "Issuer" as defined herein;

(H)      "Extension of Credit" shall have the meaning given in this Agreement;

(I)      "Final New Money Term Loan" shall mean "Second Draw New Money DIP Notes" as defined herein;

(J)      "Interim New Money Term Loan" shall mean "First Draw New Money DIP Notes" as defined herein;

(K)      "Lender" and "Lenders" shall be deemed to refer "holder" and "holders," respectively, each as defined herein;

(L)    "Loan Document" shall be deemed to refer to "Financing Document" as defined herein;

(M)    "Loan Party" or "Loan Parties" shall be deemed to refer to "Note Party" or "Note Parties," respectively, as defined herein;

(N)    "New Money Term Loan Commitments" shall be deemed to refer to "New Money DIP Notes Commitments" as defined herein;

(O)    "Roll-Up Term Loans" shall be deemed to refer to "Roll-Up DIP Notes" as defined herein;

(P)    "Transactions" shall be deemed to mean the "Transactions" as defined herein;

(Q)    "Term SOFR Rate Loans" shall be deemed to refer to the "DIP Notes" as defined herein;

(R)    "Adjusted EUROBOR Rate" shall not be deemed to be part of this Agreement;

(S)    "Alternate Base Rate" shall not be deemed to be part of this Agreement;

(T)    "EURIBOR Loans" shall not be deemed to be part of this Agreement;

(U)    "Fronting Lender" shall not be deemed to be part of this Agreement;

(V)    "Term SOFR Rate" shall not be deemed to be part of this Agreement; and

(W)    "Term SOFR Reference Rate" shall not be deemed to be part of this Agreement.

**Section 2.    GENERAL PROVISIONS APPLICABLE TO DIP NOTES.**

**Section 2.1. Issuance of DIP Notes**.  Subject to the terms and conditions of this Agreement and the DIP Orders:

(a)    the Issuers will issue and sell to each Purchaser and each Purchaser will (on a several and not joint basis) purchase from the Issuers at a purchase price equal to 100%, at the First Draw Closing provided for in Section 3, the corresponding New Money DIP Notes to be issued in accordance with its applicable New Money DIP Commitment, *less* the OID Premium set forth in Section 2.3(b) hereto, in each case as set forth in Schedule 2.1 hereto,

(b)    the Issuers will issue and sell to each Purchaser and each Purchaser will (on a several and not joint basis) purchase from the Issuers at a purchase price equal to 100%, at the

-7-

Second Draw Closing provided for in <u>Section 3</u>, the corresponding New Money DIP Notes to be issued in accordance with its applicable New Money DIP Commitment, *less* the OID Premium set forth in <u>Section 2.3(b)</u> hereto, in each case as set forth in <u>Schedule 2.1</u> hereto,

(c)     the Issuers and each Purchaser will (on a several and not joint basis) exchange on a cashless basis at a ratio of 1.00:1.00 against Roll-Up DIP Notes, at the First Draw Closing, Prepetition Secured Debt in the an amount equal to the aggregate First Draw Roll-Up Commitments (which, for the avoidance of doubt, shall be in respect of claims owed under such Prepetition Secured Debt and shall include all corresponding outstanding principal, accrued and unpaid fees, premiums and interest (including any interest to be paid in kind to the extent not yet capitalized as additional principal) thereunder), held by such Purchaser for Roll-Up DIP Notes, as set forth on <u>Schedule 2.1</u> hereto,

(d)     the Issuers and each Purchaser will (on a several and not joint basis) exchange on a cashless basis at a ratio of 1.00:1.00 against Roll-Up DIP Notes, at the Second Draw Closing, Prepetition Secured Debt in the an amount equal to the aggregate Second Draw Roll-Up Commitments (which, for the avoidance of doubt, shall be in respect of claims owed under such Prepetition Secured Debt and include all corresponding outstanding principal, accrued and unpaid fees, premiums and interest (including any interest to be paid in kind to the extent not yet capitalized as additional principal) thereunder) held by such Purchaser for Roll-Up DIP Notes, as set forth on <u>Schedule 2.1</u>, and

(e)     *provided* that the aggregate principal amount of the DIP Notes to be purchased or exchanged, as applicable, by each Purchaser hereunder at the respective Closing shall not exceed the principal amount specified, or calculated pursuant to the formula set forth, opposite the applicable Commitment for such Purchaser's name in <u>Schedule 2.1</u>.  The Purchasers' obligations hereunder are several and not joint obligations and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

**Section 2.2.  Fees and Payments**.

(a)     [Reserved].

(b)     [Reserved].

(c)     The Issuers agree to pay the reasonable and documented fees of the Collateral Agent (all such fees, the "**Agency Fee**").

(d)     The Agency Fee and the Backstop Premium and any OID Premium, once earned and paid, the fees or any part thereof payable hereunder shall not be refundable under any circumstances.  The Agency Fee and the Backstop Premium shall be (<u>a</u>) paid free and clear of any set-off or counterclaims, and shall not otherwise be affected by any claim or dispute relating to any other matter, (<u>b</u>) made without deduction or withholding for any taxes, levies, imposts, duties or charges imposed by any federal, national, state or local taxing authority unless otherwise required by Applicable Law; *provided* that each payee of such fees shall provide a duly executed IRS Form W-9 to the Issuers on or prior to the date of this Agreement, (<u>c</u>) unless payable in kind in accordance to the terms hereunder, be paid in United States Dollars in immediately available

funds and (d) separate and apart from, and in addition to, any other fees, expenses or other amounts payable to the Purchasers and their Affiliates and funds or managed accounts advised by it and its Affiliates, and their or their representatives, pursuant to the Financing Documents. The Purchasers reserve the right to allocate, in whole or in part, to their Affiliates the DIP Payments payable to them hereunder in such manner as they and such Affiliates shall agree in their sole discretion.

Section 2.3.   **Payment of Certain Fees**.  In addition to the DIP Notes set forth in this Section 2 (without double counting), the Issuers shall issue:

(a)     to the Purchasers, DIP Notes in an amount equal to the Backstop Premium as set forth in Schedule 2.1 hereto; and

(b)     the Issuers agree, jointly and severally, to pay (or cause to be paid) on the First Draw Closing Date and the Second Draw Closing Date, as applicable, to each Purchaser, a funding fee in accordance with Schedule 2.1 in an amount equal to 2.00% (the "**OID Premium**") of the aggregate principal amount of such Purchaser's New Money DIP Notes funded on such date, which such payment shall be treated as original issue discount.

Section 2.4.   **Syndication**.  The Parties hereto will comply with the syndication provisions of the DIP Credit Facility set forth in Section 2.6 hereto; *provided*, for the avoidance of doubt, the obligations in respect of this Agreement shall be reduced *pro rata* as set forth in Section 2.6 of the DIP Credit Facility.

Section 2.5.   **Acceptable Plan**.  The Parties hereto agree to incorporate Section 2.7 of the DIP Credit Facility as though such section were set forth in this Agreement.

Section 2.6.  **Backstop Premium**.  Subject to the terms and conditions herein, each Purchaser will be bound to purchase its share of the DIP Notes in the aggregate amounts set forth on Schedule 2.1 hereto (such commitments, the "**Backstop Commitments**"), and in exchange for such Backstop Commitments, the Issuers agree to pay to each Purchaser, a backstop premium in an amount equal to 3.00% of the maximum aggregate principal amount of New Money DIP Notes (the "**Backstop Premium**") that such Purchaser has committed (on a several and not joint basis) to purchase pursuant to this Agreement, of which 50% of such Backstop Premium shall be fully paid on the First Draw Closing Date, with the with the remaining 50% fully paid on the Second Draw Closing Date.  The Backstop Premium payable is set forth in Column 9 of Schedule 2.1 hereto.  For the avoidance of doubt the entire Backstop Premium shall be paid on the First Draw Closing Date.  For the further avoidance of doubt, no Backstop Premium shall be payable on any Roll-Up DIP Notes.  For the further avoidance of doubt, the Note Parties intend to treat the Backstop Premium as "put" premium for U.S. federal, and applicable state and local, income tax purposes.  The Note Parties shall file all tax returns consistent with, and take no position inconsistent with, this tax treatment (whether in any audit, tax return or otherwise), unless required to do so pursuant to a change in law following the date hereof or a "determination" as defined under Section 1313(a) of the Internal Revenue Code.

Section 2.7.   **[Reserved]**.

Section 2.8.   **Requirements of Law**.  The Parties hereto agree to incorporate Section 4.10 of the DIP Credit Facility as though such section were set forth in this Agreement.

-9-

**Section 2.9.   Taxes**.  The Parties hereto agree to incorporate Section 4.11 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 2.10. Indemnity**.  The Parties hereto agree to incorporate Section 4.12 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 2.11. Certain Relationships Relating to the Payment of Additional Amounts**.  The Parties hereto agree to incorporate Section 4.13 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 3.      CLOSING**.

**Section 3.1.   Effectiveness**.  This Agreement shall become effective on the date on which conditions precedent in Section 4.1 being satisfied or waived (such date, the "**First Draw Closing Date**").

**Section 3.2.   Closings**.  The sale and purchase of New Money DIP Notes to be purchased on a several and not joint basis by each Purchaser and the exchange on a several and not joint basis by each Purchaser of the Prepetition Secured Debt for the Roll-Up DIP Notes shall occur at the offices of Milbank LLP, 55 Hudson Yards, New York, NY 10001-2163, at 9:00 a.m., New York time, at a closing (i) on the First Draw Closing Date, with respect to the purchase of First Draw New Money DIP Notes and the exchange for First Draw Roll-Up DIP Notes, subject to the conditions precedent in Section 4.1 being satisfied or waived (such closing, the "**First Draw Closing**") and (ii) on the Second Draw Closing Date, with respect to the purchase of the Second Draw New Money DIP Notes and the exchange for Second Draw Roll-Up DIP Notes, subject to the conditions precedent in Section 4.2 being satisfied or waived (such closing, the "**Second Draw Closing**").

(a)      First Draw Closing Date; First Draw Roll-Up.  On the First Draw Closing Date, (i) the Issuers will deliver to each Purchaser the applicable Roll-Up DIP Notes to be exchanged with such Purchaser in the form of a DIP Note, (in denominations of at least $1.00 as such Purchaser may request) dated the date of the First Draw Closing Date and registered in such Purchaser's name, and (1) upon receipt by such Purchaser of such DIP Notes, such Purchaser shall be deemed to have exchanged its Prepetition Secured Debt for an aggregate principal amount of First Draw Roll-Up DIP Notes in respect of claims owed under such Purchaser's Prepetition Secured Debt and (2) upon the exchange by each Purchaser for the DIP Notes as described in this Section 3.2, any such Prepetition Secured Debt shall be deemed surrendered and canceled in accordance with Section 8.5 and (ii) the Issuers will deliver to each Purchaser the First Draw New Money DIP Notes to be purchased by such Purchaser in the form of a DIP Note dated the date of the First Draw Closing Date and registered in such Purchaser's name (or in the name of its nominee), against delivery by such Purchaser to the Paying Agent of an instruction to transfer funds in the amount of the purchase price therefor, in accordance with such instruction.  If at the First Draw Closing, the Issuers shall fail to deliver such First Draw New Money DIP Notes to any Purchaser as provided in this Section 3.2, or any of the conditions specified in Section 4.1 shall not have been fulfilled (or waived) to such Purchaser's satisfaction, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement with respect to such First Draw New Money DIP Notes, without thereby waiving any rights such Purchaser may have by reason of such

failure by the Issuers to deliver such First Draw New Money DIP Notes or any of the conditions specified in Section 4.1 not having been fulfilled to such Purchaser's satisfaction. No Purchaser shall be required to purchase First Draw New Money DIP Notes and/or exchange for First Draw Roll-Up DIP Notes in excess of such Purchaser's DIP First Draw Commitment and/or First Draw Roll-Up Commitment. All DIP First Draw Commitments and First Draw Roll-Up Commitments shall automatically and permanently terminate upon the issuance of the First Draw New Money DIP Notes and First Draw Roll-Up DIP Notes on the First Draw Closing Date.

(b)    Second Draw Closing; Second Draw Roll-Up. On the Second Draw Closing Date, (i) the Issuers will deliver to each Purchaser the Second Draw Roll-Up DIP Notes to be exchanged with such Purchaser in the form of a Roll-Up DIP Note dated the date of the Second Draw Closing Date and registered in such Purchaser's name, and (1) upon receipt by such Purchaser of such Second Draw Roll-Up DIP Notes, such Purchaser shall be deemed to have exchanged its remaining Prepetition Secured Debt for an aggregate principal amount of Second Draw Roll-Up as set forth in Schedule 2.1 hereto and (2) upon the exchange by each Purchaser for the Second Draw Roll-Up DIP Notes as described in this Section 3.2, any such Prepetition Secured Debt shall be deemed surrendered and canceled in accordance with Section 8.5 and (ii) the Issuers will deliver to each Purchaser the Second Draw New Money DIP Notes to be purchased by such Purchaser in the form of a DIP Note dated the date of the Second Draw Closing Date and registered in such Purchaser's name (or in the name of its nominee), against delivery by such Purchaser to the Collateral Agent of an instruction to transfer funds in the amount of the purchase price therefor in accordance with such instruction. If at the Second Draw Closing, the Issuers shall fail to deliver such DIP Notes to any Purchaser as provided in this Section 3.2, or any of the conditions specified in Section 4.2 shall not have been fulfilled (or waived) by the affected party, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement with respect to such Second Draw New Money DIP Notes, without thereby waiving any rights such affected party may have by reason of such failure by the Issuers to tender such Second Draw New Money DIP Notes or any of the conditions specified in Section 4.2 not having been fulfilled to the satisfaction of such affected party. No Purchaser shall be required to purchase Second Draw New Money DIP Notes and/or exchange for Second Draw Roll-Up DIP Notes in excess of such Purchaser's DIP Second Draw New Money Commitment and/or Second Draw Roll-Up Commitment. All DIP Second Draw Commitments and Second Draw Roll-Up Commitments shall automatically and permanently terminate upon the issuance of the Second Draw New Money DIP Notes and Second Draw Roll-Up DIP Notes on the Second Draw Closing Date. On the Second Draw Closing Date, subject to the terms and conditions hereof, each Purchaser will deliver to the Issuers for cancellation (to the extent not previously delivered and cancelled) the Prepetition Secured Debt (including all of the obligations thereunder) with respect to the Roll-Up DIP Notes held by such Purchaser through the Deposit and Withdrawal and Custodian System and/or the Automated Tender Offer Program of The Depository Trust Company. Upon the request of the Issuers, each Purchaser shall execute and deliver such instruments, documents, or other writings as may be reasonably necessary or desirable to effectuate fully the intent and purposes of this Agreement.

**Section 4.    CONDITIONS TO FIRST DRAW CLOSING.**

**Section 4.1.  Conditions to the First Draw Closing**. The occurrence of the First Draw Closing before entry of the Final DIP Order with respect to a Purchaser is subject to the fulfillment

to satisfaction or waiver by the affected party, prior to or on the First Draw Closing Date, of the following conditions in this Section 4.1.

(a) Financing Documents. Such Purchaser shall have received the following Financing Documents, executed and delivered as required below:

(i) this Agreement, executed and delivered by a duly authorized officer of Holdings, Intermediate Holdings and each Issuer and such Purchaser;

(ii) the Collateral Agreement, executed and delivered by a duly authorized officer of each Domestic Note Party required to be a signatory thereto on the Closing Date; *provided* that each Foreign Subsidiary required to become a Note Party shall deliver a joinder thereto by no later than the date that is the 10th Business Day following the Closing Date and any such failure to so deliver shall constitute an immediate Event of Default (unless waived or extended by the Required Backstop Lenders);

(iii) the Guarantee Agreement, executed and delivered by a duly authorized officer of each Note Party required to be a signatory thereto on the Closing Date; and

(iv) the DIP Notes with respect to such Purchaser, executed and delivered by a duly authorized officer of the Issuers and the Collateral Agent.

(b) Officer's Certificate. Such Purchaser has received the documents set forth in Section 6.1(b) of the DIP Credit Facility, which shall be addressed to such Purchaser.

(c) Perfected Liens. The Note Parties shall have satisfied the conditions set forth in Section 6.1(c) the DIP Credit Facility in respect of the DIP Notes.

(d) Fees. The Note Parties shall have satisfied the conditions set forth in Section 6.1(d) the DIP Credit Facility.

(e) Secretary's Certificate. Such Purchaser shall have received the documents set forth in Section 6.1(e) of the DIP Credit Facility.

(f) PATRIOT Act. Such Purchaser shall have received the documents set forth in Section 6.1(f) of the DIP Credit Facility at least three (3) Business Days (or such shorter period as otherwise agreed to) prior to the Closing Date.

(g) Funding Instructions. Such Purchaser and the Collateral Agent shall have received at least one (1) Business Day prior to the First Draw Closing Date a Notice of Drawing in substantially the form of Schedule 3.1 (the "**Notice of Drawing**") signed by a Responsible Officer of the Issuers, setting forth the following information setting forth the following information:

(i) the requested Closing Date; and

(ii) the requested principal amount of DIP Notes.

-12-

(h)     Representations and Warranties.  Each of the representations and warranties made by any Note Party pursuant to this Agreement or any other Financing Document (or in any amendment, modification or supplement hereto or thereto) to which it is a party, and each of the representations and warranties contained in any certificate furnished at any time by or on behalf of any Note Party pursuant to this Agreement or any other Financing Document shall, except to the extent that they relate to a particular date, be true and correct in all material respects on and as of such date as if made on and as of such date.

(i)     No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the First Draw Roll-Up DIP Notes and First Draw New Money DIP Notes requested to be made on the Closing Date.

(j)     Occurrence of Petition Date.  The Petition Date shall have occurred, and the Issuers and each other Note Party that is a Debtor as of the Closing Date shall be a debtor and a debtor-in-possession in the Chapter 11 Cases and this Agreement shall have been approved by the Interim DIP Order.

(k)     Post-Petition Material Adverse Effect.  Since the Petition Date, other than as a result of the commencement of the Chapter 11 Cases, there has not been any event, change, occurrence or circumstance that has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(l)     Absence of Dismissal of Chapter 11 Cases.  The Chapter 11 Cases of any of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(m)     Budget.  The Purchasers shall have received the documents set forth in Section 6.1(m) of the DIP Credit Facility.

(n)     [Reserved].

(o)     Absence of Trustee or Examiner.

No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

(p)     Effectiveness of RSA.  The RSA shall be in full force and effect and shall not have been amended or modified (other than in accordance with its terms) and shall not have been terminated.

(q)     Effectiveness of Interim DIP Order.  The Interim DIP Order upon entry, shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or modified without the consent of the Required Lenders.

(r)     Occurrence of Effective Date.  The Restructuring Effective Date shall have occurred.

(s)     Entry into DIP Credit Facility.  At the time of the First Draw Closing, the Issuers shall have entered into the DIP Credit Facility, commitments in respect of which shall be in such amounts and proportions as previously disclosed to the Purchasers.

Upon the satisfaction or waiver of the conditions set forth in this Section 4.1, each Purchaser shall wire the proceeds owed in respect of the First Draw New Money DIP Notes to the Paying Agent at the account set forth in Section 14.1 hereof (such amounts owed set forth in Schedule 2.1 under Column 3 and Column 6, in respect of the First Draw New Money DIP Notes – Net Purchase Price (General Rights Offering) and First Draw New Money DIP Notes – Net Purchase Price (Holdback)  with respect to each Purchaser) and, upon receipt, the Paying Agent shall transmit those funds to the Issuers in respect of the DIP Notes offered on the First Draw Closing Date. Notwithstanding the forgoing, proceeds owed by the Purchasers on the appliable Closing Date in respect of this Section 4.1 may be transmitted by a managing or advising fund of any Purchaser (a "**Master Fund**"), which may act behalf of one or more Purchasers; *provided* that the proceeds received by the Paying Agent shall, in the aggregate, at least equal the sum of the obligations owed the Purchasers for whom the Master Fund is acting, such obligations to be calculated in the manner specified above and set forth for each Purchaser on Schedule 2.1. The Paying Agent shall wire all such proceeds received on any Business Day as of 4:30 pm (ET) on such Business Day to the Issuers to the account set forth in Section 14.4.

**Section 4.2.   Conditions to the Second Draw Closing After Entry of Final DIP Order**. In respect of the Second Draw Closing occurring from and after entry of the Final DIP Order, each Purchaser's obligation to purchase and pay for the applicable DIP Notes to be sold to such Purchaser at each such Closing is subject to the satisfaction or waiver by the affected party, prior to or at the relevant Closing, of the following conditions:

(a)     Funding Instructions.  Each Purchaser and the Collateral Agent shall have received at least two (2) Business Days prior to the Second Draw Closing Date, a Notice of Drawing in signed by a Responsible Officer of the Issuers, setting forth the following information:

(i)      the requested Closing Date; and

(ii)     an estimate of the requested principal amount of DIP Notes.

(b)     Representations and Warranties.  Each of the representations and warranties made by any Note Party pursuant to this Agreement or any other Financing Document (or in any amendment, modification or supplement hereto or thereto) to which it is a party, and each of the representations and warranties contained in any certificate furnished at any time by or on behalf of any Note Party pursuant to this Agreement or any other Financing Document shall, except to the extent that they relate to a particular date, be true and correct in all material respects on and as of such date as if made on and as of such date.

(c)     No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Second Draw Roll-Up DIP Notes and Second Draw New Money DIP Notes requested to be made on the Second Draw Closing Date.

(d)     Absence of Material Adverse Effect.  Since the Petition Date, other than as a result of the commencement of the Chapter 11 Cases, there has not been any event, change, occurrence

or circumstance that has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)     Absence of Dismissal of Chapter 11 Cases.  The Chapter 11 Cases of any of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(f)     Absence of Trustee or Examiner.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

(g)     Effectiveness of Final DIP Order.  The Final DIP Order, upon entry, shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or modified without the consent of the Required Lenders.

(h)     Additional Financing Documents.  (a) There shall have been delivered to the Purchasers executed counterparts (from each of the Note Parties) to each of the following Financing Documents:

(i)     [reserved]; and

(ii)     the Second Draw Roll-Up DIP Notes and the Second Draw New Money DIP Notes.

(i)     Conduct of General Rights Offering.  The General Rights Offering shall have been conducted in all material respects in accordance with the rights offering procedures attached as Exhibit B hereof.

(j)     [Reserved].

(k)     Effectiveness of DIP Credit Facility.  At the time of the Second Draw Closing Date, the DIP Credit Facility shall remain in full force and effect, with commitments in respect of such facility in such amounts and proportions as previously disclosed to the Purchasers.

Upon the satisfaction or waiver of the conditions set forth in this Section 4.2, each Purchaser shall wire the proceeds owed in respect of the Second Draw New Money DIP Notes to the Paying Agent at the account set forth in Section 14.1 hereof (such amounts owed set forth in Schedule 2.1 under Column 11 with respect to each Purchaser) and, upon receipt, the Paying Agent shall transmit those funds to the Issuers in respect of the DIP Notes offered on the Second Draw Closing Date. Notwithstanding the forgoing, proceeds owed by the Purchasers in respect of this Section 4.2 may be transmitted by Master Fund, which may act behalf of one or more Purchasers; provided that the proceeds received by the Paying Agent shall, in the aggregate, at least equal the sum of the obligations owed by Purchasers on the applicable Closing Date for whom the Master Fund is acting, such obligations set forth for each Purchaser on Schedule 2.1. The Paying Agent shall wire all such proceeds received on any Business Day as of 4:30 pm (ET) on such Business Day to the Issuers to the account set forth in Section 14.4.

**Section 5.** **REPRESENTATIONS AND WARRANTIES.**

The Issuers represent and warrant to each Purchaser and the Collateral Agent that, as of the date hereof and as of each Closing (or, for those representations and warranties that are made only as of a particular date, as of such date):

**Section 5.1. [Reserved]**.

**Section 5.2. No Change**. The Parties hereto agree to incorporate Section 5.2 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.3. Corporate Existence; Compliance with Law**. The Parties hereto agree to incorporate Section 5.3 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.4. Corporate Power; Authorization; Enforceability Obligations**. The Parties hereto agree to incorporate Section 5.4 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.5. No Legal Bar**. The Parties hereto agree to incorporate Section 5.5 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.6. No Material Litigation**. The Parties hereto agree to incorporate Section 5.6 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.7. No Default**. The Parties hereto agree to incorporate Section 5.7 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.8. Ownership of Property; Liens**. The Parties hereto agree to incorporate Section 5.8 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.9. Intellectual Property**. The Parties hereto agree to incorporate Section 5.9 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.10. Taxes**. The Parties hereto agree to incorporate Section 5.10 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.11. Federal Regulation**. The Parties hereto agree to incorporate Section 5.11 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.12. ERISA**. The Parties hereto agree to incorporate Section 5.12 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.13. Collateral**. The Parties hereto agree to incorporate Section 5.13 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.14. Investment Company Act; Other Regulations**.  The Parties hereto agree to incorporate Section 5.14 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.15. Subsidiaries**.  The Parties hereto agree to incorporate Section 5.15 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.16. Use of Proceeds**.  The Parties hereto agree to incorporate Section 5.16 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.17. Environmental Matters**.  The Parties hereto agree to incorporate Section 5.17 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.18. No Material Misstatements**.  The Parties hereto agree to incorporate Section 5.18 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.19. Labor Matters**.  The Parties hereto agree to incorporate Section 5.19 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.20. Chapter 11 Cases; Orders**.  The Parties hereto agree to incorporate Section 5.20 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.21. Anti-Terrorism**.  The Parties hereto agree to incorporate Section 5.21 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 5.22. Prohibited Transactions under ERISA.**  The execution and delivery of this Agreement and the issuance and sale of the DIP Notes hereunder will not involve any transaction that is subject to the prohibitions of section 406(a) of ERISA or in connection with which a tax could be imposed pursuant to section 4975(c)(1)(A)-(D) of the Code.  The representation by the Issuers to each Purchaser in this Section 5.22 is made in reliance upon and subject to the accuracy of such Purchaser's representation in Section 6.2 as to the sources of the funds to be used to pay the purchase price of the DIP Notes to be purchased by such Purchaser.

**Section 5.23. Private Offering; No General Solicitation**.  Neither the Issuers nor any of their Subsidiaries, nor any Person acting on their behalf, has offered the DIP Notes or any similar securities for sale to, or made any general solicitation or general advertising of any offer to buy the DIP Notes or any similar securities from, or otherwise approached or negotiated in respect thereof with, any Person other than the Purchasers, each of which has been offered the DIP Notes at a private sale for investment and not pursuant to a distribution or underwritten offering. Assuming the accuracy of the representations and warranties of the Purchasers set forth in Section 6, the offer, sale and issuance of the DIP Notes pursuant hereto are exempt from the registration requirements of the Securities Act pursuant to Section 4(a)(2) thereof, and it is not necessary to qualify this Agreement in respect of the DIP Notes under the Trust Indenture Act.

**Section 5.24. No Integration**.  Neither the Issuers nor any of their Subsidiaries, nor any Person acting on their behalf, has, directly or through any agent, sold, offered for sale, solicited offers to buy or otherwise negotiated in respect of, any security that is or will be integrated with

-17-

the offer, sale or issuance of the DIP Notes in a manner that would require registration of such securities or the DIP Notes under the Securities Act.

**Section 6.** **REPRESENTATIONS OF THE PURCHASERS.**

**Section 6.1.** **Purchase for Investment**. Each Purchaser severally represents that it is purchasing the DIP Notes for its own account or for one or more separate accounts maintained by such Purchaser or for the account of one or more pension or trust funds and not with a view to the distribution thereof; *provided* that the disposition of such Purchaser's or their property shall at all times be within such Purchaser's or their control. Each Purchaser understands that the DIP Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Issuers are not required to register the DIP Notes.

**Section 6.2.** **Source of Funds**. Each Purchaser severally represents that at least one of the following statements is an accurate representation as to each source of funds (a "**Source**") to be used by such Purchaser to pay the purchase price of the DIP Notes to be purchased by such Purchaser hereunder:

(a)    the Source is an "insurance company general account" (as the term is defined in the United States Department of Labor's Prohibited Transaction Exemption ("**PTE**") 95-60) in respect of which the reserves and liabilities (as defined by the annual statement for life insurance companies approved by the NAIC (the "**NAIC Annual Statement**")) for the general account contract(s) held by or on behalf of any employee benefit plan together with the amount of the reserves and liabilities for the general account contract(s) held by or on behalf of any other employee benefit plans maintained by the same employer (or affiliate thereof as defined in PTE 95-60) or by the same employee organization in the general account do not exceed ten percent (10%) of the total reserves and liabilities of the general account (exclusive of separate account liabilities) plus surplus as set forth in the NAIC Annual Statement filed with such Purchaser's state of domicile; or

(b)    the Source is a separate account that is maintained solely in connection with such Purchaser's fixed contractual obligations under which the amounts payable, or credited, to any employee benefit plan (or its related trust) that has any interest in such separate account (or to any participant or beneficiary of such plan (including any annuitant)) are not affected in any manner by the investment performance of the separate account; or

(c)    the Source is either (i) an insurance company pooled separate account, within the meaning of PTE 90-1 or (ii) a bank collective investment fund, within the meaning of PTE 91-38 and, except as disclosed by such Purchaser to the Issuers in writing pursuant to this clause (c), no employee benefit plan or group of plans maintained by the same employer or employee organization beneficially owns more than ten percent (10%) of all assets allocated to such pooled separate account or collective investment fund; or

(d)    the Source constitutes assets of an "investment fund" (within the meaning of Part VI of PTE 84-14 (the "**QPAM Exemption**")) managed by a "qualified professional asset

-18-

manager" or "QPAM" (within the meaning of Part VI of the QPAM Exemption), no employee benefit plan's assets that are managed by the QPAM in such investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Part VI(c)(1) of the QPAM Exemption) of such employer or by the same employee organization and managed by such QPAM, represent more than twenty percent (20%) of the total client assets managed by such QPAM, the conditions of Part I(c), (g) and (h) of the QPAM Exemption are satisfied, neither the QPAM nor a person controlling or controlled by the QPAM maintains an ownership interest in the Issuers that would cause the QPAM and the Issuers to be "related" within the meaning of Part VI(h) of the QPAM Exemption and (i) the identity of such QPAM and (ii) the names of any employee benefit plans whose assets in the investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Part VI(c)(1) of the QPAM Exemption) of such employer or by the same employee organization, represent ten percent (10%) or more of the assets of such investment fund, have been disclosed to the Issuers in writing pursuant to this clause (d); or

(e)    the Source constitutes assets of a "plan(s)" (within the meaning of Part IV(h) of PTE 96-23 (the "**INHAM Exemption**")) managed by an "in-house asset manager" or "INHAM" (within the meaning of Part IV(a) of the INHAM Exemption), the conditions of Part I(a), (g) and (h) of the INHAM Exemption are satisfied, neither the INHAM nor a person controlling or controlled by the INHAM (applying the definition of "control" in Part IV(d)(3) of the INHAM Exemption) owns a ten percent (10%) or more interest in the Issuers and (i) the identity of such INHAM and (ii) the name(s) of the employee benefit plan(s) whose assets constitute the Source have been disclosed to the Issuers in writing pursuant to this clause (e); or

(f)    the Source is a governmental plan; or

(g)    the Source is one or more employee benefit plans, or a separate account or trust fund comprised of one or more employee benefit plans, each of which has been identified to the Issuers in writing pursuant to this clause (g); or

(h)    the Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA.

As used in this Section 6.2, the terms "**employee benefit plan**," "**governmental plan**," and "**separate account**" shall have the respective meanings assigned to such terms in section 3 of ERISA.

**Section 6.3. Accredited Investor; Independent Investigation**.    Each Purchaser represents that it is an "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act) acting for its own account (and not for the account of others) or as a fiduciary or agent for others (which others are also "accredited investors"). Each Purchaser has made its own independent investigation of the condition (financial or otherwise), prospects and affairs of the Issuers and the Subsidiaries, except the Subsidiaries identified in clauses (b) – (e) of the definition of Excluded Subsidiaries, in connection with its purchase of the DIP Notes hereunder and has made its own appraisal of the creditworthiness of the Issuers.

Case 26-10900-MBK Doc 106 Filed 02/02/16 Entered 02/02/16 17:28:34 Desc Main
Document     Page 304 of 344

**Section 6.4.   Organization and Good Standing**.  Each Purchaser is duly organized and is validly existing and in good standing under the laws of the jurisdiction of its organization.

**Section 6.5.   Authorization**.  This Agreement constitutes each Purchaser's valid and legally binding obligation, enforceable against such Purchaser in accordance with its terms except as may be limited by (i) applicable bankruptcy, insolvency, reorganization, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) the effect of rules of law governing the availability of equitable remedies.  Each Purchaser represents and warrants to the Issuers that it has the requisite power and authority to enter into this Agreement.  No consent, approval, permit, governmental order, declaration or filing with, or notice to, any governmental authority is required by or with respect to such Purchaser in connection with the execution and delivery of this Agreement and the transactions contemplated thereby.

**Section 6.6.   Good Title**.  Each Purchaser (i) is the beneficial owner of the face amount of the Prepetition Secured Debt to be exchanged pursuant to this Agreement, (ii) as of each Closing, will hold such Prepetition Secured Debt free and clear of any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership whatsoever (in each case, other than pledges or securities interests that such Purchaser may have created in favor of a prime broker in accordance with its prime brokerage agreement with such broker, or except as may arise pursuant to the terms of such Prepetition Secured Debt), and (iii) upon such Purchaser's delivery of such Prepetition Secured Debt to the Issuers pursuant to this Agreement, such Prepetition Secured Debt shall be free and clear of any charge, claim, community property interest, pledge, condition equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership whatsoever (in each case except as may arise pursuant to the terms of such Prepetition Secured Debt).

**Section 6.7.   Arms' Length Dealing**.  Each Purchaser acknowledges that the terms of this Agreement have been individually and mutually negotiated between such Purchaser and the Issuers and that such Purchaser was given a meaningful opportunity to negotiate the terms of this Agreement.

**Section 6.8.   Compliance with Other Instruments**.  With respect to each Purchaser, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated thereby, will not (i) result in violation, breach or default by such Purchaser, and will not conflict (and there is no current violation, breach, default or conflict) with, (A) any term of its certificate of incorporation or bylaws, (B) any law, rule or regulation, or any judgment, decree, order, writ, or any statute, rule or regulation applicable to such Purchaser or (C) any contract, deed, agreement or other instrument to which such Purchaser may be party, except, in the case of clauses (B) and (C), for violations, defaults or conflicts that would not reasonably be expected to have a material adverse effect on the business, properties, management, operations or prospects of such Purchaser, or on the ability of such Purchaser to complete such transactions or (ii) require any approval of stockholders, members or partners or any approval or consent of any person under any contractual obligation of such Purchaser, except for such approvals or consents which will be

-20-

obtained on or before the applicable Closing Date and except for any such approvals or consents the failure of which to obtain will not have a material adverse effect on the business, properties, management, operations or prospects of such Purchaser, or on the ability of such Purchaser to complete such transactions.  As of the date hereof, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement.

**Section 6.9.  Advice of Advisor**.  Each Purchaser has had the opportunity to consult such Purchaser's own advisors with respect to the consequences to such Purchaser of the ownership and exchange of the Prepetition Secured Debt as well as the ownership of the DIP Notes, including the legal and tax consequences under federal, state, local, and other laws of the United States or any other country and the possible effects of changes in any such laws.

**Section 7.      [RESERVED]**.

**Section 8.      PAYMENT AND PREPAYMENT OF THE DIP NOTES**.

**Section 8.1.  Payment; Maturity**.

(a)      As provided therein, the entire unpaid principal balance of the DIP Notes shall be due and payable on the Maturity Date.

(b)      Interest payable on each DIP Note shall accrue in accordance with the terms of such DIP Note at the Applicable Rate from the date of such DIP Note until the Maturity Date; provided that, upon expiration of the DIP Remedies Notice Period, if an Event of Default has occurred and is continuing, interest on each DIP Note shall be paid at the Applicable Rate, plus 2.00% (such rate, the "**Default Rate**"), in accordance with the terms of such DIP Note; *provided* that (1) no amount shall be payable pursuant to this Section 8.1(b) to a Defaulting Holder so long as such holder shall be a Defaulting Holder and (2) no amounts shall accrue pursuant to this Section 8.1(b) on any overdue amount or other amount payable to a Defaulting Holder so long as such holder shall be a Defaulting Holder.

(c)      Interest payable on each DIP Note shall be payable on each Interest Payment Date.

**Section 8.2.  Optional Prepayments**.  The Issuers may, at their option, prepay at any time all but not less than all of the DIP Notes, at one hundred percent (100%) of the principal amount so prepaid *plus* unpaid accrued interest on the principal amount so prepaid without premium or penalty; *provided* that any prepayment pursuant to this Section 8.2 shall only take place if upon the occurrence of (and shall be *pro rata* with) any optional prepayment pursuant to the DIP Credit Facility.  Any optional prepayment or purported optional prepayment of less than all of the outstanding principal amount of the DIP Notes (including accrued and unpaid premiums and interest) made by the Issuers shall be automatically void *ab initio*.  The Issuers will give each holder of DIP Notes and the Paying Agent written notice of each optional prepayment under this Section 8.2 not less than three (3) Business Days prior to the anticipated date for such prepayment unless the Issuers and the Required Lenders agree to another time period pursuant to Section 17.  Each such notice shall specify such anticipated date of prepayment (which shall be a Business Day), the aggregate principal amount of the DIP Notes to be prepaid on such date of prepayment, the principal amount of each DIP Note held by such holder to be prepaid (determined in accordance

-21-

with Section 8.2 and Section 8.3), and the interest to be paid on the prepayment date with respect to such principal amount being prepaid.

**Section 8.3.   Mandatory Redemption and Prepayment**.

(a)     *Mandatory Redemption and Prepayment Events.*

(i)     Indebtedness.  The Issuers shall, in accordance with Section 8.3(a)(ii), prepay (a) the DIP Notes to the extent required by Section 10.4 or (b) if on or after the Closing Date, Holdings or any of its Restricted Subsidiaries shall Incur Indebtedness for borrowed money (excluding Indebtedness permitted pursuant to Section 10.1), in each case in an amount equal to 100.0% of the Net Cash Proceeds thereof minus the portion of such Net Cash Proceeds applied or offered (to the extent either Issuer or any of its Subsidiaries is required by the terms thereof) to prepay, repay or purchase Indebtedness under the DIP Credit Facility on a *pro rata* basis with the DIP Notes, in each case with such prepayment to be made on or before the second Business Day following notice given to each holder as of the Prepayment Date, as contemplated by Section 8.3(b).  Nothing in this Section 8.3(a)(i) shall limit the rights of the Collateral Agent and the holders set forth in Section 11.

(ii)     Subject to the last sentence of Section 8.3(b), each prepayment of DIP Notes pursuant to this Section 8.3(a) shall be allocated *pro rata* among the Term Loans (other than the Incremental Term Loans) and DIP Notes and, with respect to the DIP Notes, *pro rata* among the DIP Notes.

(iii)     [Reserved].

(iv)     [Reserved].

(v)     [Reserved].

(vi)     [Reserved].

(b)     *Procedures for Mandatory Prepayments*.

(i)     With respect to any Mandatory Prepayment, (A) the Issuers shall notify the Collateral Agent and Paying Agent in writing of any such Mandatory Prepayment no later than three (3) Business Days before the date of any such Mandatory Prepayment (the "**Prepayment Notice**") and (B) on any date as required in accordance with Section 8.3(a), the Issuers shall (1) to the extent lawful, accept for payment the DIP Notes or portions thereof tendered for repayment pursuant to the related Mandatory Prepayment and (2) pay to each applicable holder an amount equal to the payment required in respect of such holder's DIP Notes or portions thereof so tendered pursuant to Section 8.3.  Promptly following receipt of any Prepayment Notice, the Paying Agent shall forward such Prepayment Notice to the holders of the DIP Notes.  On such date of any Mandatory Prepayment, all DIP Notes purchased or repaid by the Issuers in full shall be delivered to the Issuers for cancellation.  Any amount so declined by any holder (the "**DIP Notes Declined Amount**") may be retained by Intermediate Holdings and its Restricted

Subsidiaries and/or applied by Intermediate Holdings or any of its Restricted Subsidiaries in any manner not inconsistent with the Approved Budget.

(ii)     If the Issuers comply with the provisions of the preceding clause, on and after such date of repurchase or repayment, interest shall cease to accrue on the DIP Notes or the portions thereof repurchased or repaid.  If the Issuers are required to make a Mandatory Prepayment, but the Issuers do not repurchase or repay such DIP Note because of the failure of the Issuers to comply with the preceding clause, interest shall be paid on the unpaid principal, from the proposed date of repurchase or repayment until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the DIP Notes.

(iii)     [Reserved].

**Section 8.4.   [Reserved]**.

**Section 8.5.   Maturity; Surrender, Etc.**   In the case of each optional or Mandatory Prepayment of DIP Notes pursuant to this Section 8, the principal amount of each DIP Note to be prepaid or redeemed shall mature and become due and payable on the date fixed for such prepayment or redemption, together with interest on such principal amount accrued to such date. From and after such date, unless the Issuers shall fail to pay such principal amount when so due and payable, together with the interest, if any, as aforesaid, interest on such principal amount shall cease to accrue.  Any DIP Note paid or prepaid in full shall be surrendered to the Issuers and cancelled and shall not be reissued, and no DIP Note shall be issued in lieu of any prepaid or redeemed principal amount of any DIP Note.

**Section 8.6.   [Reserved]**.

**Section 8.7.   [Reserved]**.

**Section 8.8.   Payments Due on Non-Business Days**.  Anything in this Agreement or the DIP Notes to the contrary notwithstanding, except as set forth in clause (y), any payment of interest on any DIP Note that is due on a date that is not a Business Day shall be made on the next succeeding Business Day without including the additional days elapsed in the computation of the interest payable on such next succeeding Business Day; that is due on a date that is not a Business Day shall be made on the next succeeding Business Day and shall include the additional days elapsed in the computation of interest payable on such next succeeding Business Day.

**Section 9.     AFFIRMATIVE COVENANTS**.

Holdings hereby agrees that, from and after the Closing Date and thereafter until payment in full of the DIP Notes and all other Notes Obligations then due and owing to any holder or the Collateral Agent hereunder, Holdings shall and shall cause each of its Restricted Subsidiaries to:

**Section 9.1.   Financial Statements**.  Deliver the documents set forth in Section 7.1 of the DIP Credit Facility to the Purchasers at the times set such documents must be delivered pursuant to the DIP Credit Facility.

-23-

**Section 9.2. Certificates; Other Information**. Deliver the documents set forth in Section 7.2 of the DIP Credit Facility to the Purchasers at the times set such documents must be delivered pursuant to the DIP Credit Facility.

**Section 9.3. Payment of Taxes**. Comply with Section 7.3 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.4. Conduct of Business and Maintenance of Existence; Compliance with Contractual Obligations and Requirements of Law**. Comply with Section 7.4 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.5. Maintenance of Property; Insurance**. Comply with Section 7.5 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.6. Inspection of Property; Books and Records; Discussions**. Comply with Section 7.6 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.7. Notices**. Deliver the documents set forth in Section 7.7 of the DIP Credit Facility to the Purchasers at the times set such documents must be delivered pursuant to the DIP Credit Facility.

**Section 9.8. Environmental Laws**. Comply with Section 7.8 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.9. After-Acquired Subsidiaries**. Comply with Section 7.9 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.10. Use of Proceeds**. Use the proceeds of the DIP Notes only for the purposes set forth in <u>Section 5.16</u>.

**Section 9.11. Commercially Reasonable Efforts to Maintain Ratings**. Comply with Section 7.11 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.12. Accounting Changes**. Comply with Section 7.12 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.13. Post-Closing Obligations**. Comply with Section 7.13 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.14. Certain Bankruptcy Matters (Compliance with Orders)**. Comply with Section 7.14 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.15. Bankruptcy Notices**. Comply with Section 7.15 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.16. Insolvency Proceedings**. Comply with Section 7.16 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.17. Milestones**. Comply with Section 7.17 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 9.18. Employee Benefit Matters**. Commencing on the First Draw Closing Date, the Issuers shall use commercially reasonably efforts to deliver to each holder of a DIP Note that is an Institutional Investor written notice of any matter that would require notice to the Administrative Agent and Lenders under Section 7.7(e) of the DIP Credit Facility, within the same time period such notice is to be provided to the Administrative Agent and the Lenders thereunder.

**Section 9.19. Interest Rate Updates**. The Issuers shall, at the request of any holder, deliver to such holder a statement showing in reasonable detail the calculations in determining any interest rate pursuant to Section 8.1. Each determination of an interest rate pursuant to any provision of this Agreement shall be conclusive and binding on each of the holders in the absence of manifest error.

**Section 9.20. CUSIPS/PPNs**. If requested by the Required Holders, the Issuers shall use commercially reasonable efforts to obtain a CUSIP number of a Private Placement number from CUSIP Global Services or the National Association of Insurance Commissioners. For the avoidance of doubt, the holders agree that the First Draw Closing and the Second Draw Closing are not conditioned on obtaining a CUSIP number, if requested.

**Section 10.    NEGATIVE COVENANTS**.

Holdings hereby agrees that, from and after the Closing Date and thereafter, until payment in full of the DIP Notes and all other Notes Obligations then due and owing to any holder or the Collateral Agent hereunder and termination to:

**Section 10.1. Limitation on Indebtedness**. Comply with Section 8.1 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.2. Limitation on Restricted Payments**. Comply with Section 8.2 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.3. Limitation on Resrictive Agreements**. Comply with Section 8.3 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.4. Limitation on Sales of Assets and Subsidiary Stock**. Comply with Section 8.4 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.5. Limitation on Transasctions with Affiliates**. Comply with Section 8.5 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.6. Limitation on Liens**. Comply with Section 8.6 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.7. Limitation on Fundamental Changes**. Comply with Section 8.7 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.8. Limitation on Amendments**.  Comply with Section 8.8 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.9. Limitation on Lines of Business**.  Comply with Section 8.9 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.10. Priority of Liens and Claims**.  Comply with Section 8.10 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.11. Additional Bankruptcy Matters**.  Comply with Section 8.11 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.12. Budget Variance**.  Comply with Section 8.12 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 10.13. Material Adverse Changes to Organizational Documents**.  Comply with Section 8.13 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 11.    EVENTS OF DEFAULT.**

Any of the following from and after the Closing Date shall constitute an Event of Default:

(a)    The Issuers shall fail to pay any principal of any DIP Note when due in accordance with the terms hereof (whether at Stated Maturity, by mandatory prepayment or otherwise); or the Issuers shall fail to pay any interest on any DIP Note or any other amount payable hereunder, within two (2) Business Days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    Any representation or warranty made or deemed made by any Note Party herein or in any other Financing Document (or in any amendment, modification or supplement hereto or thereto) or which is contained in any certificate furnished at any time by or on behalf of any Note Party pursuant to this Agreement or any such other Financing Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made, and for the failure of any representation or warranty that is capable of being cured (as determined in good faith by Intermediate Holdings), such default shall continue unremedied for a period of ten (10) days after the earlier of (A) the date on which a Responsible Officer of Intermediate Holdings becomes aware of such failure and (B) the date on which written notice thereof shall have been given to the Issuers by the Required Lenders; or

(c)    Any Note Party shall default in the payment, observance or performance of any term, covenant or agreement contained in Section 9.17 or Section 10; or

(d)    Any Note Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Financing Document (other than as provided in clauses (a) through (c) and clause (k) of this Section 11), and such default shall continue unremedied for a period of, in the case of a default with respect to failure to deliver financial statements under Subsection 7.1 (a), (b), (d) or (e) of the DIP Credit Facility, ten (10) days, with respect to (x) Subsection 7.1 (f) or (g) of the DIP Credit Facility, two (2) Business Days and (y) in

-26-

the case of any other default, fifteen (15) days, in each case, after the earlier of (A) the date on which a Responsible Officer of Intermediate Holdings becomes aware of such failure and (B) the date on which written notice thereof shall have been given to the Issuers by or the Required Lenders; or

(e)      Any Note Party or any of its Restricted Subsidiaries shall (i) default in (x) any payment of principal of or interest on any Indebtedness (excluding (1) Indebtedness hereunder, (2) any Indebtedness owed to Intermediate Holdings or any other Note Party, (3) the Prepetition Debt) in excess of $10,000,000 or (y) in the payment of any Guarantee Obligation in respect of Indebtedness in excess of $10,000,000, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness or Guarantee Obligation was created or (ii) default in the observance or performance of any other agreement or condition relating to any Indebtedness (excluding (1) Indebtedness hereunder or (2) the Prepetition Debt) or Guarantee Obligation referred to in clause (i) above or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice or lapse of time if required, such Indebtedness to become due prior to its Stated Maturity or such Guarantee Obligation to become payable (an "**Acceleration**"; and the term "**Accelerated**" shall have a correlative meaning), and such time shall have lapsed and, if any notice (a "**Default Notice**") shall be required to commence a grace period or declare the occurrence of an Event of Default before notice of Acceleration may be delivered, such Default Notice shall have been given and (in the case of the preceding clause (i) or (ii)) such default, event or condition shall not have been remedied or waived by or on behalf of the holder or holders of such Indebtedness or Guarantee Obligation or Guarantee Obligations referred to in clause (i) above such that such Indebtedness or Guarantee Obligation shall have been Accelerated and such Acceleration shall not have been rescinded; or

(f)      Other than the Chapter 11 Cases and other than to the extent in compliance with Section 9.14, if (i) Intermediate Holdings or any Subsidiary of Intermediate Holdings shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts (excluding, in each case, the solvent liquidation or reorganization of any Foreign Subsidiary of Intermediate Holdings that is not a Note Party), or (B) seeking appointment of a receiver, interim receiver, receivers, receiver and manager, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Intermediate Holdings or any Material Subsidiary of Intermediate Holdings shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Intermediate Holdings or any Material Subsidiary of Intermediate Holdings any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged, unstayed or unbonded for a period of 90 days; or (iii) there shall be commenced against Intermediate Holdings or any Subsidiary of Intermediate Holdings any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or

-27-

similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, stayed or bonded pending appeal within 90 days from the entry thereof; or (iv) Intermediate Holdings or any Subsidiary of Intermediate Holdings shall take any corporate or other similar organizational action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or

(g)    (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any failure to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of either of Intermediate Holdings or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is in the reasonable opinion of the Required Lenders likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA other than a standard termination pursuant to Section 4041(b) of ERISA, (v) either of Intermediate Holdings or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders is reasonably likely to, Incur any liability in connection with a withdrawal from, or the Insolvency of, a Multiemployer Plan, or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, would be reasonably expected to result in a Material Adverse Effect; or

(h)    One or more judgments or decrees shall be entered against Intermediate Holdings or any of its Restricted Subsidiaries involving in the aggregate at any time a liability (net of any insurance or indemnity payments actually received in respect thereof prior to or within 90 days from the entry thereof, or to be received in respect thereof in the event of any appeal thereof shall be unsuccessful, or that Intermediate Holdings has determined there exists reasonable evidence that such amount will be reimbursed by the insurer or indemnifying party and such amount is not denied by the applicable insurer or indemnifying party in writing within 180 days and is reimbursed within 365 days of the date of such evidence) of $10,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, satisfied, stayed or bonded pending appeal within 90 days from the entry thereof; or

(i)    (i) The Guarantee Agreement or Collateral Agreement shall, or any other Security Document covering a significant portion of the Collateral shall (at any time after its execution, delivery and effectiveness), cease for any reason to be in full force and effect (other than pursuant to the terms hereof or thereof), or any Note Party which is a party to any such Security Document shall so assert in writing or (ii) the Lien created by any of the Security Documents shall cease to be perfected and enforceable in accordance with its terms or of the same effect as to perfection and priority purported to be created thereby with respect to any significant portion of the Collateral (other than in connection with any termination of such Lien in respect of any Collateral as permitted hereby or by any Security Document) and such failure of such Lien to be perfected and enforceable with such priority shall have continued unremedied for a period of 5 days; or

(j)      A Change of Control shall have occurred.

(k)      Specified Bankruptcy Events of Default.  There occurs any of the following:

(i)      the entry of an order dismissing any of the Chapter 11 Cases, converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any filing by any Note Party (or any Subsidiary thereof) of a motion or other pleading seeking entry of such an order, in each case, without the consent of the Required Lenders in their sole discretion (with an email from counsel being sufficient);

(ii)      a trustee, a responsible officer or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner), or any similar person is appointed or elected in any of the Chapter 11 Cases, any Note Party (or any Subsidiary thereof) applies for, consents to, or fails to contest, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case, without the consent of the Required Lenders in their sole discretion (with an email from counsel being sufficient);

(iii)      the entry of an order or the filing by any Note Party (or any Subsidiary thereof) of an application, motion or other pleading seeking or supporting entry of an order staying, reversing, amending, supplementing, vacating or otherwise modifying the Interim DIP Order or the Final DIP Order, as applicable, or if any of the Issuers or any of their Subsidiaries shall apply for authority to do so (unless substantially concurrently with the entry of such order the DIP Facility will be repaid in full and the Note Commitments will be terminated), without the consent of the Required Lenders (with an email from counsel being sufficient) or the Interim DIP Order or Final DIP Order shall cease to be in full force and effect;

(iv)      (1) the entry of an order in any of the Chapter 11 Cases denying or terminating use of Cash Collateral by the Note Parties that remains unstayed for more than five (5) Business Days; (2) the termination of the right of any Note Party to use any Cash Collateral under the DIP Orders, and in either case, the Note Parties have not otherwise obtained authorization to use Cash Collateral with the prior written consent of the Collateral Agent, as applicable (solely with respect to its own rights, obligations, liabilities, duties and treatment), and the Required Lenders (with an email from counsel being sufficient); or (3) any other event that terminates the Note Parties' right to use Cash Collateral, in each case, without the consent of the Required Lenders (with an email from counsel being sufficient);

(v)      subject to the applicable provisions of the DIP Orders, any of the Note Parties or any of their Subsidiaries shall commence, join in, assist, support or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent, the Collateral Agent or the Lenders (in each case, in their capacities as such), including, without limitation, with respect to the Debtors' stipulations, admissions, agreements and releases contained in the DIP Orders, the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations

-29-

of the Debtors or any other rights granted to the Collateral Agent or the Lenders in the DIP Orders or this Agreement or with respect to any relief under section 506(c) or 552 of the Bankruptcy Code with respect to any Collateral of the Debtors, in each case, without the consent of the Required Lenders (with an email from counsel being sufficient);

(vi)     the entry of an order in any of the Chapter 11 Cases (other than the DIP Orders and the Cash Management Order) granting authority to use Cash Collateral (other than with the prior written consent of the Collateral Agent (in each case, solely with respect to its own rights, obligations, liabilities, duties and treatment) and the Required Lenders (with an email from counsel being sufficient) or to obtain financing under section 364 of the Bankruptcy Code (other than in accordance with the DIP Orders));

(vii)     [reserved];

(viii)     [reserved];

(ix)     an order of the Bankruptcy Court granting, other than in respect of this Agreement and the Carve-Out or pursuant to the DIP Orders or as may be expressly permitted by the DIP Orders, any superpriority administrative expense claim or lien security interest in the Chapter 11 Cases pursuant to section 364(c) or (d) of the Bankruptcy Code, in each case that is pari passu with or senior to the claims of the Collateral Agent, or the filing by any Note Party (or any of its Subsidiaries) of a motion or application (or any other pleading, or the making of any statement to the Bankruptcy Court) seeking or supporting entry of such an order;

(x)     [reserved];

(xi)     noncompliance by any Note Party or any of its Subsidiaries with the terms of the Interim DIP Order or the Final DIP Order, as applicable, in any material respect;

(xii)     the filing of a Chapter 11 Plan that is not an Acceptable Plan;

(xiii)     subject to the DIP Orders, the filing of a motion, pleading or proceeding by any Note Party or any of its Subsidiaries that initiates, pursues, supports or otherwise constitutes a Challenge (as defined in the Interim DIP Order (or, as applicable, the Final DIP Order)) with respect to, or that could reasonably be expected to result in any material impairment of the rights or interests of the Secured Parties in their capacities as holders of the Obligations and/or Prepetition Indebtedness, in each case, without the prior written consent of the Required Lenders (with an email from counsel being sufficient);

(xiv)     any Note Party (or any of its Subsidiaries) shall file a motion, without the Required Lenders' written consent, seeking authority to sell all, substantially all or a material portion of the Collateral;

(xv)     an order of the Bankruptcy Court granting, other than in respect of this Agreement or as provided under the Interim DIP Order or Final DIP Order, relief from the automatic stay with respect to a material portion of Collateral; or

-30-

(xvi)    the RSA shall have been terminated as to the Consenting First Lien Lenders (as defined in the RSA) in accordance with the applicable provisions thereof or shall no longer be in full force and effect (including for the avoidance of doubt subject to the Cooperation Period (as defined in the RSA)).

(l)    the DIP Credit Facility shall be subject to Acceleration.

Notwithstanding the foregoing, an Event of Default shall not be deemed to have occurred until the expiration of the DIP Remedies Notice Period.

## Section 12.    REMEDIES ON DEFAULT, ETC.

### Section 12.1. Acceleration.

(a)    Subject to the DIP Orders, if any Event of Default occurs and is continuing, then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of Section 11(f) or in Section 11(l) with respect to any Issuer, automatically the Commitments, if any, shall immediately terminate and the DIP Notes (with accrued interest thereon) and all other amounts owing under this Agreement shall immediately become due and payable, and (B) if such event is any other Event of Default, the Required Lenders may, by notice to the Issuers, declare the Commitments to be terminated forthwith, whereupon the Commitments, if any, shall immediately terminate, and/or declare the DIP Notes (with accrued interest thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon the same shall immediately become due and payable.  For the avoidance of doubt, the foregoing shall be subject to the DIP Orders, including the DIP Remedies Notice Period.

(b)    Except as expressly provided above in Section 11 or this Section 12, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

(c)    Notwithstanding anything to the contrary in this Agreement, the exercise of any remedies upon a Default or Event of Default shall be subject to the Orders, including, for the avoidance of doubt, Paragraph 9(f) of the Interim Order and Final DIP Order.

### Section 12.2. [Reserved].

### Section 12.3. [Reserved].

### Section 12.4. Collateral Agreement; Concurrent Actions.  Notwithstanding anything else herein, all actions taken with respect to the Collateral, shall be taken in compliance with the Collateral Agreement; provided that no action shall be taken with respect to the Collateral unless such action is taken concurrently pursuant to the DIP Credit Facility with respect to the Collateral; provided, further, that the Collateral Agent shall take action in respect of the Collateral at the direction of the Required Lenders unless otherwise provided herein.

**Section 13.    REGISTRATION; EXCHANGE; SUBSTITUTION OF DIP NOTES.**

**Section 13.1. Registration of DIP Notes**.  The Issuers or the Paying Agent shall keep at their principal executive office a register for the registration and recordation of transfers of DIP Notes.  The name and address of each holder of one or more DIP Notes, each transfer thereof and the name and address of each transferee of one or more DIP Notes shall be registered in such register.  If any holder of one or more DIP Notes is a nominee, then (a) the name and address of the beneficial owner of such DIP Note or DIP Notes shall also be registered in such register as an owner and holder thereof and (b) at any such beneficial owner's option, either such beneficial owner or its nominee may execute any amendment, waiver or consent pursuant to this Agreement.  Prior to due presentment for registration of transfer, the Person in whose name any DIP Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Issuers shall not be affected by any notice or knowledge to the contrary.  The Issuers shall give to the Paying Agent and any holder of a DIP Note that is an Institutional Investor promptly upon request therefor, a complete and correct copy of the names and addresses of all registered holders of DIP Notes.  If the Paying Agent keeps such register, the Issuers agree to notify the Paying Agent of any transfer of one or more DIP Notes and the Paying Agent shall have no responsibility or liability to any Person to update such register other than pursuant to notice from the Issuers.

**Section 13.2. Transfer and Exchange of DIP Notes**.  Upon surrender of any DIP Note to the Issuers at the address and to the attention of the designated officer (all as specified in Section 18(iii)), for registration of transfer or exchange (and in the case of a surrender for registration of transfer accompanied by a written instrument of transfer duly executed by the registered holder of such DIP Note or such holder's attorney duly authorized in writing and accompanied by the relevant name, address and other information for notices of each transferee of such DIP Note or part thereof), within ten (10) Business Days thereafter, the Issuers shall execute and deliver, at the Issuers' expense (except as provided below), one or more new DIP Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered DIP Note.  Each such new DIP Note shall be payable to such Person as such holder may request and shall be substantially in the form of Schedule 1.1.  Each such new DIP Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered DIP Note or dated the date of the surrendered DIP Note if no interest shall have been paid thereon.  The Issuers may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of DIP Notes.  DIP Notes shall not be transferred in denominations of less than $10,000.  Any transferee, by its acceptance of a DIP Note registered in its name (or the name of its nominee), shall be deemed to have made the representation set forth in Section 6.2.  Notwithstanding the foregoing, each holder agrees that it shall not assign or otherwise transfer any Commitments or DIP Notes to any person without the prior written consent of the Issuers (such consent not to be unreasonably withheld); *provided* that no consent shall be required for an assignment or a transfer of DIP Notes by a holder to (i) any of its Affiliates or (ii) any other holder.  Each holder agrees to notify the Issuers and the Paying Agent of any transfer hereunder.

**Section 13.3. Replacement of DIP Notes**.  Upon receipt by the Issuers at the address and to the attention of the designated officer (all as specified in Section 18(iii)) of evidence reasonably

satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any DIP Note, and

(a) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it (provided that if the holder of such DIP Note is, or is a nominee for, an original Purchaser or another holder of a DIP Note with a minimum net worth of at least $100,000,000 or a Qualified Institutional Buyer, such Person's own unsecured agreement of indemnity shall be deemed to be satisfactory), or

(b) in the case of mutilation, upon surrender and cancellation thereof,

within ten (10) Business Days thereafter, the Issuers at their own expense shall execute and deliver, in lieu thereof, a new DIP Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed, mutilated or updated DIP Note or dated the date of such lost, stolen, destroyed, mutilated or updated DIP Note if no interest shall have been paid thereon.

**Section 14.** PAYMENTS ON AND IN RESPECT OF DIP NOTES.

**Section 14.1. Place of Payment.** Subject to Section 14.2, payments of principal and interest becoming due and payable on the DIP Notes shall be made by the Issuers to the Paying Agent at the account set forth below:

Bank: Citizens Bank
ABA: 011500120
Account: 1403276533
Account Name: Acquiom Agency Services LLC
Reference: Multi-Color DIP

or any other account of the Paying Agent specified in writing by the Paying Agent to the Issuers upon at least ten (10) Business Days' prior written notice. Subject to Section 14.2, the Paying Agent shall make any payments of principal, and interest becoming due and payable on the DIP Notes that it receives from the Issuers to each holder of DIP Notes pursuant to (a) the information for each Purchaser as set forth on Schedule B or (b) the information separately provided in writing by such holder of DIP Notes to the Issuers and the Paying Agent, in each case, to the holder of DIP Notes of record of each such DIP Note on the Business Day immediately preceding the applicable date of payment. For avoidance of doubt, payments hereunder shall be made net of any applicable withholding tax (including any amounts required to withheld pursuant to FATCA) and no party shall have any obligation to pay additional amount, or indemnify any other party, with respect to any such withholding tax.

**Section 14.2. Payment by Wire Transfer.** So long as any Purchaser or its nominee shall be the holder of any DIP Note, and notwithstanding anything contained in Section 14.1 or in such DIP Note to the contrary, the Issuers will pay all sums becoming due on such DIP Note for principal, interest and all other amounts becoming due hereunder by the method and at the address specified for such purpose below such Purchaser's name in Schedule B, or by such other method or at such other address as such Purchaser shall have from time to time specified to the Issuers and the Paying Agent in writing for such purpose, without the presentation or surrender of such DIP

-33-

Note or the making of any notation thereon, except that upon written request of the Issuers or the Paying Agent made concurrently with or reasonably promptly after payment or prepayment in full of any DIP Note, such Purchaser shall surrender such DIP Note for cancellation, reasonably promptly after any such request, to the Issuers at its principal executive office or at the place of payment most recently designated by the Issuers pursuant to Section 14.1. Prior to any sale or other disposition of any DIP Note held by a Purchaser or its nominee, such Purchaser will, at its election, either endorse thereon the amount of principal paid thereon and the last date to which interest has been paid thereon or surrender such DIP Note to the Issuers in exchange for a new DIP Note or DIP Notes pursuant to Section 13.2.

**Section 14.3. Tax Withholding; FATCA Information.**

(a)     By acceptance of any DIP Note, the holder of such DIP Note agrees that such holder will with reasonable promptness duly complete and deliver to the Issuers, the Paying Agent, or to such other Person as may be reasonably requested by the Issuers, from time to time (a) in the case of any such holder that is a United States Person, such holder's United States tax identification number or other forms reasonably requested by the Issuers or Paying Agent necessary to establish such holder's status as a United States Person under FATCA and as may otherwise be necessary for the Issuers and the Paying Agent to comply with its obligations under FATCA, to the extent not otherwise provided pursuant to this Section 14.3, and (b) in the case of any such holder that is not a United States Person, such documentation prescribed by Applicable Law (including as prescribed by section 1471(b)(3)(C)(i) of the Code) and such additional documentation as may be necessary for the Issuers and the Paying Agent to comply with its obligations under FATCA and to determine that such holder has complied with such holder's obligations under FATCA or to determine the amount (if any) to deduct and withhold from any such payment made to such holder, to the extent not otherwise provided pursuant to this Section 14.3. Nothing in this Section 14.3 shall require any holder to provide information that is confidential or proprietary to such holder unless the Issuers or the Paying Agent is required to obtain such information under FATCA and, in such event, the Issuers shall treat any such information it receives as confidential.

(b)     Without limiting the foregoing, each holder of a DIP Note shall deliver to the Issuers and the Paying Agent (in such number of copies as shall be requested), on or about the date on which such holder becomes a holder under this Agreement (and from time to time thereafter upon the reasonable request of the Issuers or Paying Agent) executed copies of IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable, certifying that such holder is exempt from U.S. federal backup withholding or, in the event that such holder is not a United States Person, whichever of the following is applicable: (i) in the case of any such holder claiming the benefits of an income tax treaty to which the United States is a party, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from withholding under such tax treaty with respect to such payment, (ii) executed copies of IRS Form W-8ECI, (iii) in the case of any such holder claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, as well as a U.S. Tax Compliance Certificate substantially in the form attached as Schedule 9.1-1, or (iv) in the case of any such holder that is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, as well as the applicable U.S. Tax Compliance Certificate substantially in the form attached as Schedule 9.1-2 or Schedule 9.1-3, IRS Form W-9, and/or

-34-

other certification documents from each beneficial owner; *provided* that if such holder is a partnership and one or more direct or indirect partners of such holder is claiming the benefits of the portfolio interest exemption, such holder may provide a U.S. Tax Compliance Certificate substantially in the form of Schedule 9.1-4 on behalf of such direct or indirect partner. Each holder agrees that if any form or certification that it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly update and deliver such form or certification to the Issuers and the Paying Agent.

**Section 14.4. Payments to the Issuers**. The payments to the Paying Agent specified in Section 4.1 and Section 4.2 shall be made by the Paying Agent to the Issuers at the account set forth below:

Bank: ConnectOne Bank
ABA: 021213944
Account: 857626140
Account Name: MCC-Norwood LLC

or any other account of the Issuers specified in writing by the Issuers to the Paying Agent upon at least ten (10) Business Days' prior written notice.

**Section 15. EXPENSES, ETC**.

**Section 15.1. Payment of Expenses and Taxes**. The Parties hereto agree to incorporate Section 11.5 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 15.2. [Reserved]**.

**Section 15.3. Survival**. The obligations of the Issuers under this Section 15 will survive the payment or transfer of any DIP Note, the enforcement, amendment or waiver of any provision of this Agreement or any other Financing Documents, and the termination of this Agreement.

**Section 16. SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT**.

All representations and warranties contained herein shall survive the execution and delivery of this Agreement and the DIP Notes, the purchase or transfer by any Purchaser of any DIP Note or portion thereof or interest therein and the payment of any DIP Note, and may be relied upon by any subsequent holder of a DIP Note, regardless of any investigation made at any time by or on behalf of such Purchaser or any other holder of a DIP Note. All statements contained in any certificate or other instrument delivered by or on behalf of the Issuers pursuant to this Agreement and all other Financing Documents shall be deemed representations and warranties of the Issuers under this Agreement. Subject to the preceding sentence, this Agreement and all other Financing Documents embody the entire agreement and understanding between each Purchaser and the Issuers and supersede all prior agreements and understandings relating to the subject matter hereof.

**Section 17.**     **AMENDMENT AND WAIVER**.

**Section 17.1. Requirements**.  Neither this Agreement nor any other Financing Document, nor any terms hereof or thereof, may be amended, supplemented, modified or waived except in accordance with the provisions of this Section 17.1.  The Required Lenders may, from time to time, (x) enter into with the respective Note Parties hereto or thereto, as the case may be, written amendments, supplements or modifications hereto and to the other Financing Documents for the purpose of adding any provisions to this Agreement or to the other Financing Documents or changing, in any manner the rights or obligations of the holders of DIP Notes or the Note Parties hereunder or thereunder or (y) waive at any Note Party's request, on such terms and conditions as the Required Lenders may specify in such instrument, any of the requirements of this Agreement or the other Financing Documents or any Default or Event of Default and its consequences, except that:

     (a)     no such waiver and no such amendment, supplement or modification shall:

     (i)     Subject to the exception in Section 22.4, (A) reduce or forgive the amount or extend the scheduled date of maturity of any DIP Note hereunder (including extending the Maturity Date) except as set forth in the definition of "Maturity Date," (B) reduce the stated rate of any interest, commission or fee payable hereunder (other than as a result of any waiver of the applicability of any post-default increase in interest rates), (C) [reserved], (D) increase the Commitment of any Purchaser; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall constitute an increase of any Commitment of such Purchaser or (E) change the currency in which any DIP Note is payable, in each case without the consent of each Purchaser or holder of DIP Notes directly and adversely affected thereby (it being understood that amendments or supplements to, or waivers or modifications of any conditions precedent, representations, warranties, covenants, Defaults or Events of Default or of a mandatory repayment of the DIP Notes of all holders of DIP Notes shall not constitute an extension of the scheduled date of maturity, any scheduled installment, or the scheduled date of payment of the DIP Notes of any holder);

     (ii)     amend, modify or waive any provision of Subsection 4.4(g), 10.14, Subsection 6.5 of the Collateral Agreement, this Section 17.1 or reduce the percentage specified in the definition of "Required Lenders" or "Required Holders" or consent to the assignment or transfer by the Purchasers or holders of DIP Notes of any of their rights and obligations under this Agreement and the other Financing Documents (other than pursuant to Section 10.7 or 22.1), in each case without the written consent of all the holders of DIP Notes; or

     (iii)     release Guarantors accounting for all or substantially all of the value of the Guarantee of the DIP Facility Obligations pursuant to the Guarantee Agreement, or, in the aggregate (in a single transaction or a series of related transactions), all or substantially all of the Collateral without the consent of all of the holders of DIP Notes, except as expressly permitted hereby or by any Security Document (as such documents are in effect on the

-36-

Closing Date or, if later, the date of execution and delivery thereof in accordance with the terms hereof).

(b)     [Reserved].

Any waiver and any amendment, supplement or modification pursuant to this Section 17.1 shall apply to each of the Purchasers and each holder of DIP Notes and shall be binding upon the Note Parties, the Purchasers and each holder of DIP Notes, the Collateral Agent and the Paying Agent and all future holders of the DIP Notes.  In the case of any waiver, each of the Note Parties, the Purchasers and each holder of DIP Notes and the Collateral Agent and the Paying Agent shall be restored to their former position and rights hereunder and under the other Financing Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding any provision herein to the contrary, (x) no Defaulting Holder shall have any right to approve or disapprove any amendment, supplement, modification, waiver or consent hereunder or under any of the Financing Documents, except to the extent the consent of such holder would be required under Section 17.1(a)(i) and (y) no Disqualified Party shall have any right to approve or disapprove any amendment, supplement, modification, waiver or consent hereunder or under any of the Financing Documents.

**Section 17.2. Solicitation of Holders of DIP Notes**.

(a)     [*Reserved.*]

(b)     *Consent in Contemplation of Transfer*.  Any consent given pursuant to this Section 17 by a holder of a DIP Note that has transferred or has agreed to transfer its DIP Note to (i) the Issuers, (ii) any Subsidiary, except the Subsidiaries identified in clauses (b) – (e) of the definition of Excluded Subsidiaries, or any other Affiliate or (iii) any other Person in connection with, or in anticipation of, such other Person acquiring, making a tender offer for or merging with the Issuers and/or any of its Affiliates in connection with such consent, shall be void and of no force or effect except solely as to such holder, and any amendments effected or waivers granted or to be effected or granted that would not have been or would not be so effected or granted but for such consent (and the consents of all other holders of DIP Notes that were acquired under the same or similar conditions) shall be void and of no force or effect except solely as to such holder.

**Section 17.3. [Reserved]**.

**Section 18.     NOTICES**.

All notices and communications provided for hereunder shall be in writing and sent (a) by e-mail if the sender on the same day sends a confirming copy of such notice by an internationally recognized overnight delivery service (charges prepaid); *provided* that such confirming copy shall not be required if the recipient of such e-mail provides a confirmation of receipt, (b) by registered or certified mail with return receipt requested (postage prepaid), or (c) by an internationally recognized overnight delivery service (charges prepaid).  Any such notice must be sent:

(i)      if to any Purchaser or its nominee, to such Purchaser or nominee at the address specified for such communications in the Schedule B, or at such other address as such Purchaser or nominee shall have specified to the Issuers and the Collateral Agent in writing;

(ii)      if to any other holder of any DIP Note, to such holder at such address as such other holder shall have specified to the Issuers and the Collateral Agent in writing;

(iii)     if to the Issuers, to the Issuers at its address set forth at the beginning hereof to the attention of Legal Department, email: sbirkett@mcclabel.com, phone: (513) 345-5311, or at such other address as the Issuers shall have specified to the holder of each DIP Note and the Paying Agent in writing with a copy to (which shall not constitute notice) Kirkland & Ellis LLP, Attention: Sophia Hudson, P.C., Julia Danforth, P.C. and Anthony L. Sanderson, email: sophia.hudson@kirkland.com, julia.danforth@kirkland.com and anthony.sanderson@kirkland.com; or

(iv)      if to the Collateral Agent or the Paying Agent, to the Collateral Agent or Paying Agent, as the case may be, at its address Acquiom Agency Services LLC, 950 17th Street, Suite 1400 Denver, Colorado 80202 to the attention of Jennifer Anderson, email: janderson@srsacquiom.com, phone: (612) 417-0766, or at such other address as the Collateral Agent shall have specified to the holder of each DIP Note and the Issuers in writing with a copy to (which shall not constitute notice) ArentFox Schiff LLP, Attention: Jeffrey R. Gleit, email: jeffrey.gleit@afslaw.com.

Notices under this Section 18 will be deemed given only when actually received.

**Section 19.      REPRODUCTION OF DOCUMENTS.**

This Agreement and all documents relating thereto, including (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by any Purchaser at each Closing (except the DIP Notes themselves), and (c) financial statements, certificates and other information previously or hereafter furnished to any Purchaser, may be reproduced by such Purchaser by any photographic, photostatic, electronic, digital, or other similar process and such Purchaser may destroy any original document so reproduced.  The Issuers agree and stipulate that, to the extent permitted by Applicable Law, any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by such Purchaser in the regular course of business) and any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.  This Section 19 shall not prohibit the Issuers or any other holder of DIP Notes from contesting any such reproduction to the same extent that it could contest the original, or from introducing evidence to demonstrate the inaccuracy of any such reproduction.

**Section 20.      CONFIDENTIAL INFORMATION.**

Each Purchaser agrees to keep confidential any information (a) provided to it by or on behalf of Intermediate Holdings, the Issuers or any of their respective Subsidiaries pursuant to or in connection with the Financing Documents or (b) obtained by such Purchaser based on a review of the books and records of Intermediate Holdings, the Issuers or any of their respective

-38-

Subsidiaries; *provided* that nothing herein shall prevent any Purchaser from disclosing any such information (i) to any Agent, or any other Purchaser, (ii) to any transferee, or prospective transferee or any creditor or any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Intermediate Holdings, the Issuers and their obligations which agrees to comply with the provisions of this Section 20 pursuant to a written instrument (or electronically recorded agreement from any Person listed above in this clause (ii), in respect to any electronic information (whether posted or otherwise distributed on any Platform)) for the benefit of Intermediate Holdings and the Issuers (it being understood that each relevant Purchaser shall be solely responsible for obtaining such instrument (or such electronically recorded agreement)), (iii) to its Affiliates and the employees, officers, partners, directors, agents, attorneys, accountants and other professional advisors of it and its Affiliates, *provided* that such Purchaser shall inform each such Person of the agreement under this Section 20 and take reasonable actions to cause compliance by any such Person referred to in this clause (iii) with this agreement (including, where appropriate, to cause any such Person to acknowledge its agreement to be bound by the agreement under this Section 20), (iv) upon the request or demand of any Governmental Authority having jurisdiction over such Purchaser or its affiliates or to the extent required in response to any order of any court or other Governmental Authority or as shall otherwise be required pursuant to any Requirement of Law, *provided* that, other than with respect to any disclosure to any bank regulatory authority, such Purchaser shall, unless prohibited by any Requirement of Law, notify Intermediate Holdings of any disclosure pursuant to this clause (iv) as far in advance as is reasonably practicable under such circumstances, (v) which has been publicly disclosed other than in breach of this Agreement, (vi) in connection with the exercise of any remedy hereunder, under any Financing Document or under any Interest Rate Agreement, (vii) in connection with periodic regulatory examinations and reviews conducted by NAIC or any Governmental Authority having jurisdiction over such Purchaser or its affiliates (to the extent applicable), (viii) in connection with any litigation to which such Purchaser (or, with respect to any Interest Rate Agreement, any Affiliate of any Purchaser party thereto) may be a party subject to the proviso in clause (iv) above, and (ix) if, prior to such information having been so provided or obtained, such information was already in an Agent's or a Purchaser's possession on a non-confidential basis without a duty of confidentiality to Intermediate Holdings or any of its Subsidiaries being violated.  Notwithstanding any other provision of this Agreement or any other Financing Document, the provisions of this Section 20 shall survive with respect to the Collateral Agent and the Purchaser until the second anniversary of such Collateral Agent or Purchaser ceasing to be the Collateral Agent or a holder, respectively.

**Section 21.**    SUBSTITUTION.

(a)    Substitution of Purchaser. Each Purchaser shall have the right to substitute any one of its Affiliates or another Purchaser or any one of such other Purchaser's Affiliates (a "**Substitute Purchaser**") as the purchaser of the DIP Notes that it has agreed to purchase hereunder, by prior written notice to the Issuers, which notice shall be signed by both such Purchaser and such Substitute Purchaser, shall contain such Substitute Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by such Substitute Purchaser of the accuracy with respect to it of the representations set forth in Section 6.  Upon receipt of such notice, any reference to such Purchaser in this Agreement (other than in this Section 21), shall be deemed to refer to such Substitute Purchaser in lieu of such original Purchaser.  In the event that such Substitute Purchaser is so substituted as a Purchaser hereunder and such Substitute Purchaser thereafter

-39-

transfers to such original Purchaser all of the DIP Notes then held by such Substitute Purchaser, upon receipt by the Issuers of notice of such transfer, any reference to such Substitute Purchaser as a "Purchaser" in this Agreement (other than in this Section 21), shall no longer be deemed to refer to such Substitute Purchaser, but shall refer to such original Purchaser, and such original Purchaser shall again have all the rights of an original holder of the DIP Notes under this Agreement.

(b)      Substitution of Commitments.  Each Purchaser shall have the right to assign any Commitments, by prior written notice to the Issuers; provided, that such assignment complies with Section 13.2; provided that no consent shall be required from the Administrative Agent or the Collateral Agent of the DIP Credit Facility and no documents shall be owed to such agents in connection with any assignment under this Section 21(b); provided, further, that prior to any assignment pursuant to this Section 21(b) the assignee shall first deliver a joinder to the RSA to the Issuers.  Upon the request of the Issuers, each Purchaser seeking to assign such Commitments shall execute and deliver such instruments, documents, or other writings as may be reasonably necessary or desirable to effectuate fully the intent and purposes of this Agreement.

**Section 22.    MISCELLANEOUS.**

**Section 22.1. Successors and Assigns**.  All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including any subsequent holder of a DIP Note) whether so expressed or not, except that, the Issuers may not assign or otherwise transfer any of its rights or obligations hereunder or under the DIP Notes without the prior written consent of each holder. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto and their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement.

**Section 22.2. [Reserved]**.

**Section 22.3. Severability**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 22.4. Acceptable Plan**.  Notwithstanding anything to the contrary herein (including in Section 17), (i) no holder shall object to the treatment of their Obligations upon emergence by the Note Parties from the Chapter 11 Cases to the extent such treatment is in accordance with an Acceptable Plan and each holder hereby agrees to accept such treatment and (ii) each holder shall execute and deliver (and direct the Collateral Agent to execute and deliver) any applicable Acceptable Plan Definitive Documentation in accordance with the applicable Acceptable Plan.

**Section 22.5. Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.  Each counterpart may consist of a number of copies hereof, each signed by less than

all, but together signed by all, of the parties hereto.  The parties agree to electronic contracting and signatures with respect to this Agreement and the other Financing Documents.  Delivery of an electronic signature to, or a signed copy of, this Agreement and such other Financing Documents by email or other electronic transmission shall be fully binding on the parties to the same extent as the delivery of the signed originals and shall be admissible into evidence for all purposes.  The words "execution," "execute," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the other Financing Documents shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Issuers, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Notwithstanding the foregoing, if any Purchaser shall request manually signed counterpart signatures to any Financing Document, the Issuers hereby agree to use their reasonable endeavors to provide such manually signed signature pages as soon as reasonably practicable (but in any event within thirty (30) days of such request or such longer period as the requesting Purchaser and the Issuers may mutually agree).  Solely with respect to the DIP Notes, in the event of any conflict between any other provision of the Financing Documents and this Section 22.5, this Section 22.5 shall govern.

**Section 22.6. Governing Law**.  This Agreement and any DIP Notes and the rights and obligations of the parties under this Agreement and any DIP Notes shall be governed and construed and interpreted in accordance with the law of the State of New York and, to the extent applicable, the Bankruptcy Code, without giving effect to its principles or rules of conflicts of laws to the extent such principles or rules are not mandatorily applicable by statute and would require or permit the application of the laws of another jurisdiction.

**Section 22.7. Submission to Jurisdiction; Waivers**.  Each party hereto irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Financing Documents to which it is a party to the exclusive general jurisdiction of the Supreme Court of the State of New York for the County of New York (the "**New York Supreme Court**"), and the United States District Court for the Southern District of New York (the "**Federal District Court**," and together with the New York Supreme Court, the "**New York Courts**") and appellate courts from either of them; *provided* that nothing in this Agreement shall be deemed or operate to preclude (i) the Collateral Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Notes Obligations (in which case any party shall be entitled to assert any claim or defense, including any claim or defense that this Section 22.7 would otherwise require to be asserted in a legal action or proceeding in a New York Court), or to enforce a judgment or other court order in favor of the Collateral Agent, (ii) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment, (iii) if all such New York Courts decline jurisdiction over any Person, or decline (or in the case of the Federal District Court, lack) jurisdiction over any subject matter of such action or proceeding, a legal action or proceeding may

be brought with respect thereto in another court having jurisdiction and (iv) in the event a legal action or proceeding is brought against any party hereto or involving any of its assets or property in another court (without any collusive assistance by such party or any of its Subsidiaries or Affiliates), such party from asserting a claim or defense (including any claim or defense that this Section 22.7 would otherwise require to be asserted in a legal proceeding in a New York Court) in any such action or proceeding;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient forum and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Issuer, the applicable holder, as the case may be, at the address specified in Section 22.7 or at such other address of which any such holder and the Issuers shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or (subject to clause (a) above) shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 22.7 any consequential or punitive damages.

**Section 22.8. Release of Collateral**.  To extent that the Collateral securing the DIP Credit Facility has been (or will concurrently be) released and, provided that such release complies with the provisions of the Collateral Agreement for the DIP Credit Facility, the holders authorize and direct the Collateral Agent to release the Collateral securing the DIP Notes.

**Section 22.9. Credit Bid**.  The holders agree to authorize the Administrative Agent and the Collateral Agent to credit bid all or a *pro rata* portion of the DIP Notes in connection with any credit bid provided under Section 10.12 of the DIP Credit Facility.

**Section 22.10.  Order Controls**.  To the extent that any representation, warranty, covenant or other provision hereof or in any other Financing Document is inconsistent with any of the DIP Orders, the Interim DIP Order or the Final DIP Order (as applicable) shall control.

**Section 22.11. Reinstatement**.  The Parties hereto agree to incorporate Section 11.20 of the DIP Credit Facility as though such section were set forth in this Agreement.

**Section 23.    COLLATERAL AGENT**

**Section 23.1. Appointment of Collateral Agent**.  By entering into this Agreement, and its acceptance of the DIP Notes, each Purchaser hereby (i) agrees to appoint Acquiom Agency Services LLC as the Collateral Agent hereunder and (ii) is deemed to instruct the Collateral Agent

to enter into the Security Documents to which the Collateral Agent is a party on the First Draw Closing Date.

Section 23.2. **Incorporation from DIP Credit Facility**.  The Parties hereto agree to incorporate Sections 10.1 to 10.11 and Sections 10.13 to 10.17 of the DIP Credit Facility as though such subsections were set forth in this Agreement.

Section 23.3. **Relaying of Applicable Interest**.  Upon receipt of the information specified in Section 9.19, the Paying Agent shall relay such information to holders.

**Section 24.**    **[RESERVED]**.

**Section 25.**    **CERTAIN AGREEMENTS**

(a)    Notwithstanding anything to the contrary in this Agreement, (A) the foregoing requirements shall be subject to the terms of the Prepetition ABL/Cash Flow Intercreditor Agreement, (B) no security interest or lien is or will be granted pursuant to any Financing Document or otherwise in any right, title or interest of any of Holdings, the Issuers or any of its Subsidiaries in, and "Collateral" shall not include, any Excluded Asset, (C) no Note Party or any Affiliate thereof shall be required to take any action in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction in order to create any security interests in assets located or titled outside of the U.S. or to perfect any security interests (it being understood that there shall be no guarantee agreements, security agreements, pledge agreements or other similar agreements governed under the laws of any non-U.S. jurisdiction); provided, that, at any time on or after the four (4) month anniversary of the Second Draw Closing Date, the Required Lenders may reasonably request that the Note Parties enter into such non-U.S. law governed security agreements and/or take such non-U.S. perfection actions consistent with those taken under the Prepetition ABL Agreement, and in each case, the Note Parties shall be afforded ninety (90) days from the date of receipt of such request to enter such agreement(s) and/or take such perfection action(s) (it being understood so long as the Note Parties shall have used commercially reasonable efforts, any failure to implement such request shall not result in a Default or Event of Default), (D) to the extent not automatically perfected by filings under the Uniform Commercial Code in the jurisdiction of incorporation or organization, no Note Party shall be required to take any actions in order to perfect any security interests granted with respect to any assets specifically requiring perfection through control (including, but not limited to, cash, cash equivalents, deposit accounts, or securities accounts), and (E) nothing in this Section 25 shall require that Holdings, the Issuers or any Subsidiary grant a Lien with respect to any property or assets in which such Person acquires ownership rights to the extent that the Issuers and the Collateral Agent reasonably determine that the burden, costs or other consequences to Topco or any of its Subsidiaries (or at the election of the Issuers in connection with an initial public offering or other restructuring of the Parent Borrower, any Parent Entity, either Issuer or any of its Subsidiaries) of the granting of such a Lien is excessive in view of the benefits that would be obtained by the Secured Parties.

(b)    The parties hereto (i) agree that for U.S. federal income tax purposes the DIP Notes are intended to constitute debt; and (ii) shall file all U.S. federal and applicable state and local income tax returns consistently with the foregoing intended treatment.

**Section 26.    INTERCREDITOR AGREEMENT AND DIP ORDERS.**

Each Secured Party hereby (a) authorizes the Collateral Agent and holder of the DIP Notes to enter into (i) each Intercreditor Agreement, (ii) amendments or supplements to each Intercreditor Agreement to the extent permitted by this Agreement and made in accordance with the applicable Intercreditor Agreement, (iii) the Interim DIP Order and the Final DIP Order and (iv) amendments or supplements to the Interim DIP Order or the Final DIP Order, in each case, to the extent permitted by this Agreement and made in accordance with the Interim DIP Order or the Final DIP Order, as applicable and (b) agrees that such Person will be subject to and bound by, and will take no actions contrary to, the provisions of any Intercreditor Agreement.

[*Signature Pages Follow*]

## SCHEDULE A

### DEFINED TERMS

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term:

"**Acceleration**" is defined in Section 11(e).

"**Acceptable Plan**" shall have the meaning given to such term in the DIP Credit Facility.

"**Acceptable Plan Definitive Documentation**" shall have the meaning given to such term in the DIP Credit Facility.

"**Administrative Agent**" shall have the meaning given to such term in the DIP Credit Facility.

"**Administrative Agent Fee Letter**" shall have the meaning given to such term in the DIP Credit Facility.

"**Affected Loan**" shall have the meaning given to such term in the DIP Credit Facility.

"**Affected DIP Notes**" means DIP Notes as contemplated by this Agreement.

"**Affiliate**" shall have the meaning given to such term in the DIP Credit Facility.

"**Agency Fee**" is defined in Section 2.2.

"**Agent**" is defined in Section 1.3.

"**Agreement**" means this Senior Secured Superpriority Debtor-in-Possession Note Purchase Agreement, including all Schedules attached to this Agreement.

"**Applicable Law**" means with respect to any Person, property or matter, any of the following applicable thereto: any statute, law, regulation, ordinance, rule, judgment, rule of common law, order, decree, authorization, approval, concession, grant, franchise, license, or other requirement of any Governmental Authority, whether in effect as of the original date of this Agreement or thereafter and in each case as amended, including any of the foregoing pertaining to land use or zoning restrictions and the UCC.

"**Applicable Rate**" means, on any date of determination, a fluctuating rate per annum equal to the rate applicable to the Dollar-denominated loans issued pursuant to the DIP Credit Facility as of such date of determination, as set forth in writing to the Paying Agent by the Issuers pursuant to Section 8.1(b).

"**Approved Budget**" shall have the meaning given to such term in the DIP Credit Facility.

"**Backstop Commitments**" is defined in Section 2.6.

"**Backstop Lenders**" shall have the meaning given to such term in the DIP Credit Facility.

"**Backstop Premium**" is defined in Section 2.6.

"**Backstop Premium Amount**" shall have the meaning given to such term in the introduction hereto.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"**Bankruptcy Court**" has the meaning assigned to the term in the recitals hereto.

"**Belgian Sale/Leaseback Transactions**" shall have the meaning given to such term in the DIP Credit Facility.

"**Business Day**" shall have the meaning given to such term in the DIP Credit Facility.

"**Capital Stock**" shall have the meaning given to such term in the DIP Credit Facility.

"**Carve-Out**" shall have the meaning given to such term in the DIP Credit Facility.

"**Carve-Out Trigger Notice**" is defined in Section 12(b).

"**Cash Collateral**" shall have the meaning given to such term in the DIP Credit Facility.

"**Cash Equivalents**" shall have the meaning given to such term in the DIP Credit Facility.

"**Cash Management Order**" shall have the meaning given to such term in the DIP Credit Facility.

"**Change of Control**" shall have the meaning given to such term in the DIP Credit Facility.

"**Chapter 11 Case**" or "**Chapter 11 Cases**" has the meaning assigned to the term in the recitals hereto.

"**Closing**" means (i) the First Draw Closing, (ii) the Second Draw Closing, as context requires.

"**Closing Date**" means (i) the First Draw Closing Date and (ii) the Second Draw Closing Date, as context requires.

"**Co-Issuer**" has the meaning assigned to the term in the recitals hereto.

"**Code**" shall have the meaning given to such term in the DIP Credit Facility.

"**Collateral**" shall have the meaning given to such term in the DIP Credit Facility.

"**Collateral Agent**" shall mean Acquiom Agency Services LLC.

"**Collateral Agreement**" shall have the meaning given to such term in the DIP Credit Facility.

"**Commitment**" means a New Money DIP Commitment and/or a Roll-Up DIP Commitment, as the context requires.

"**Commonly Controlled Entity**" shall have the meaning given to such term in the DIP Credit Facility.

"**Consenting First Lien Lenders**" shall have the meaning given to such term in the DIP Credit Facility.

"**Contractual Obligation**" shall have the meaning given to such term in the DIP Credit Facility.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.

"**Cured Default**" is defined in Section 1.3(c).

"**Debtor**" or "**Debtors**" has the meaning assigned to such term in the recitals hereto.

"**Default**" or "**Defaults**" shall have the meaning given to such term in the DIP Credit Facility.

"**Default Rate**" is defined in Section 8.1(b).

"**Defaulting Holder**" any holder or Agent whose circumstances, acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of "Holder Default."

"**Default Notice**" is defined in Section 11(e).

"**Definitive Documents**" is defined in Section 11(k).

"**DIP Credit Facility**" has the meaning given to such term in the introduction of this Agreement.

"**DIP Facility**" shall have the meaning given to such term in the DIP Credit Facility.

"**DIP Facility Obligations**" shall have the meaning given to such term in the DIP Credit Facility.

"**DIP Financing**" has the meaning given to such term in the introduction of this Agreement.

"**DIP First Draw Commitment**" means a DIP First Draw New Money Commitment and/or a First Draw Roll-Up Commitment, as the context requires.

"**DIP First Draw New Money Commitment**" means with respect to each Purchaser, the commitment of such Purchaser to purchase First Draw New Money DIP Notes on the First Draw Closing Date, in an aggregate principal amount not to exceed the amount set forth or calculated as set forth opposite such Purchaser's name on Schedule 2.1 hereto under the headings "First Draw New Money DIP Notes – Principal Amount (General Rights Offering)" and "First Draw New Money DIP Notes – Principal Amount (Holdback)".

"**DIP Notes**" is defined in Section 1.1.

"**DIP Notes Declined Amount**" is defined in Section 8.3(b).

"**DIP Order**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**DIP Payments**" is defined in Section 2.2.

"**DIP Remedies Notice Period**" shall have the meaning given to such term in the DIP Credit Facility.

"**DIP Second Draw Commitment**" means a DIP Second Draw New Money Commitment and/or a Second Draw Roll-Up Commitment, as the context requires.

"**DIP Second Draw New Money Commitment**" means with respect to each Purchaser, the commitment of such Purchaser to purchase Second Draw New Money DIP Notes on the Second Draw Closing Date, in an aggregate principal amount not to exceed the amount set forth or calculated as set forth opposite such Purchaser's name on Schedule 2.1 hereto under the heading "Second Draw New Money DIP Notes Principal Amount."

"**disposition**" or "**dispose**" shall have the meaning given to such term in the DIP Credit Facility.

"**Dollar Equivalent**" shall have the meaning given to such term in the DIP Credit Facility.

"**Domestic Note Party**": any Note Party other than a Foreign Note Party.

"**Environmental Law**" shall have the meaning given to such term in the DIP Credit Facility.

"**ERISA**" shall have the meaning given to such term in the DIP Credit Facility.

"**Event of Default**" means any of the events specified in Section 11, *provided* that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"**Excluded Asset**" shall have the meaning given to such term in the DIP Credit Facility.

"**Excluded Subsidiary**" or "**Excluded Subsidiaries**" shall have the meaning given to such term in the DIP Credit Facility.

"**Extension of Credit**" means as to any Purchaser, the issuances of the DIP Notes.

"**FATCA**" shall have the meaning given to such term in the DIP Credit Facility.

"**Federal District Court**" is defined in <u>Section 22.7</u>.

"**Final DIP Order**" shall have the meaning given to such term in the DIP Credit Facility.

"**Final DIP Order Entry Date**" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"**Financing Documents**" means this Agreement, any DIP Notes, the Guarantee Agreement, the Collateral Agreement, the Prepetition ABL/Cash Flow Intercreditor Agreement and any other Security Documents, each as amended, restated, supplemented, waived or otherwise modified from time to time.

"**First Draw Closing Date**" is defined in <u>Section 3.1</u>.

"**First Draw New Money DIP Notes**" is defined in <u>Section 1.1</u>.

"**First Draw Roll-Up**" is defined in <u>Section 1.1</u>.

"**First Draw Roll-Up Commitment**" means with respect to each Purchaser, the commitment of such Purchaser to exchange Prepetition Secured Debt on the First Draw Closing Date, in an aggregate principal amount not to exceed the amount set forth or calculated as set forth opposite such Purchaser's name on <u>Schedule 2.1</u> hereto under the headings "First Draw Roll-Up DIP Notes Principal Amount (General Rights Offering)" and "First Draw Roll-Up Commitment Principal Amount (Holdback)."

"**First Draw Roll-Up DIP Notes**" is defined in <u>Section 1.1</u>.

"**First Rights Offering Settlement**" shall have the meaning given to such term in the introduction of this Agreement.

"**Foreign Note Party**": any Note Party that is organized under the laws of any jurisdiction outside of the United States of America, including any Note Party which is organized and existing under the laws of Puerto Rico or any other territory of the United States of America.

"**Foreign Subsidiary**" shall have the meaning given to such term in the DIP Credit Facility.

"**GAAP**" shall have the meaning given to such term in the DIP Credit Facility.

"**General Rights Offering**" shall have the meaning given to such term in the introduction hereto.

"**Governmental Authority**" shall have the meaning given to such term in the DIP Credit Facility.

"**Guarantee**" shall have the meaning given to such term in the DIP Credit Facility.

A-5

"**Guarantee Agreement**" means the DIP Guarantee delivered to the Purchasers as of the First Draw Closing Date, substantially in the form of Exhibit A hereto, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"**Guarantee Obligation**" shall have the meaning given to such term in the DIP Credit Facility.

"**Guarantor**" or "**Guarantors**" shall have the meaning given to such term in the DIP Credit Facility.

"**Holdback**" shall have the meaning given to such term in the introduction hereto.

"**holder**" means, unless context requires otherwise, with respect to any DIP Note, the Person in whose name such DIP Note is registered in the register maintained by the Issuers pursuant to Section 13.1; *provided, however,* that if such Person is a nominee, then for the purposes of Section 7, Section 12, Section 17.2 and Section 18 and any related definitions in this Schedule A, "holder" shall mean the beneficial owner of such DIP Note whose name and address appears in such register.

"**Holder Default**" means (a) the refusal (which may be given verbally or in writing and has not been retracted) or failure of any holder to make available its portion of any incurrence of DIP Notes, which refusal or failure is not cured within two Business Days after the date of such refusal or failure, (b) the failure of any holder to pay over to the Paying Agent, or any holder any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute, (c) a holder has notified the Issuers or the Paying Agent that it does not intend to comply with its funding obligations hereunder, (d) a holder has failed, within 10 Business Days after request by the Issuers, to confirm that it will comply with its funding obligations hereunder (provided that such Holder Default pursuant to this clause (d) shall cease to be a Holder Default upon receipt of such confirmation by the Issuers) or (e) [reserved].

"**Holdings**" shall have the meaning given to such term in the DIP Credit Facility.

"**Incur**" shall have the meaning given to such term in the DIP Credit Facility.

"**Indebtedness**" shall have the meaning given to such term in the DIP Credit Facility.

"**INHAM**" is defined in Section 6.2(e).

"**INHAM Exemption**" is defined in Section 6.2(e).

"**Initial Default**" is defined in Section 1.3(c).

"**Interest Payment Date**" means any date interest is due and payable in respect of the DIP Credit Facility.

"**Insolvency**" shall have the meaning given to such term in the DIP Credit Facility.

"**Institutional Investor**" means (a) any Purchaser of a DIP Note, (b) any holder of a DIP Note holding (together with one or more of its affiliates) more than 5% of the aggregate principal amount of the DIP Notes then outstanding, (c) any bank, trust company, savings and loan association or other financial institution, any pension plan, any investment company, any insurance company, any broker or dealer, or any other similar financial institution or entity, regardless of legal form, and (d) any Related Fund of any holder of any DIP Note.

"**Interest Period**" shall have the meaning given to such term in the DIP Credit Facility.

"**Interest Rate Agreement**" shall have the meaning given to such term in the DIP Credit Facility.

"**Interim DIP Order**" shall have the meaning given to such term in the DIP Credit Facility.

"**Interim DIP Order Entry Date**" means the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"**Intermediate Holdings**" has the meaning assigned to the term in the recitals hereto.

"**Investment**" shall have the meaning given to such term in the DIP Credit Facility.

"**Issuer**" has the meaning assigned to the term in the recitals hereto.

"**Issuers**" has the meaning assigned to the term in the recitals hereto.

"**Lender**" or "**Lenders**" shall have the meaning given to such term in the DIP Credit Facility.

"**Lien**" shall have the meaning given to such term in the DIP Credit Facility.

"**Mandatory Prepayment**" means any mandatory prepayment of the DIP Notes pursuant to Section 8.3(a).

"**Material**" means material in relation to the business, operations, affairs, financial condition, assets, properties, or prospects of the Issuers and their Subsidiaries, taken as a whole.

"**Material Adverse Effect**" shall have the meaning given to such term in the DIP Credit Facility.

"**Material Subsidiary**" shall have the meaning given to such term in the DIP Credit Facility.

"**Maturity Date**" shall have the meaning given to such term in the DIP Credit Facility.

"**Multiemployer Plan**" shall have the meaning given to such term in the DIP Credit Facility.

"**NAIC**" means the National Association of Insurance Commissioners.

A-7

"**NAIC Annual Statement**" is defined in <u>Section 6.2(a)</u>.

"**Net Cash Proceeds**" shall have the meaning given to such term in the DIP Credit Facility.

"**New Money DIP Commitment**" means a DIP First Draw Commitment or a DIP Second Draw Commitment, as the context requires.

"**New Money DIP Credit Facility**" has the meaning assigned to such term in the recitals hereto.

"**New Money DIP Notes**" has the meaning assigned to the term in the introduction of this Agreement.

"**New Money Holdback**" has the meaning assigned to the term in the introduction of this Agreement.

"**New Money Rights Offering**" has the meaning assigned to the term in the introduction of this Agreement.

"**New York Courts**" is defined in <u>Section 22.7</u>.

"**New York Supreme Court**" is defined in <u>Section 22.7</u>.

"**Note Party**" or "**Note Parties**" shall have the meaning given to the terms "Loan Party" and "Loan Parties," respectively, as such terms as defined in the DIP Credit Facility.

"**Notes Obligations**" shall mean obligations of the Issuers and the other Note Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during (or that would accrue but for) the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the DIP Notes, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations Incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Issuers and the other Parties under this Agreement and the other Financing Documents.

"**Notice of Drawing**" is defined in <u>Section 4.1(g)</u>.

"**Obligations**" shall have the meaning given to such term in the DIP Credit Facility.

"**Officer's Certificate**" means a certificate of a Senior Financial Officer or of any other officer or authorized representative of the Issuers whose responsibilities extend to the subject matter of such certificate.

"**OID Premium**" has the meaning ascribed to such term in <u>Section 2.3(b)</u>.

"**Parent Borrower**" shall have the meaning given to such term in the DIP Credit Facility.

"**Parent Entity**" shall have the meaning given to such term in the DIP Credit Facility.

"**Parties**" means the Issuers, Intermediate Holdings, Holdings and the Purchasers.

"**Paying Agent**" means Acquiom Agency Services LLC, not in its individual capacity but as paying agent, together with its successors and assigns in such capacity.

"**PBGC**" shall have the meaning given to such term in the DIP Credit Facility.

"**Person**" shall have the meaning given to such term in the DIP Credit Facility.

"**Petition Date**" has the meaning assigned to the term in the recitals hereto.

"**Plan**" shall have the meaning given to such term in the DIP Credit Facility.

"**Plan Sponsor**" shall have the meaning given to such term in the DIP Credit Facility.

"**Plan Sponsor Advisors**" shall have the meaning given to such term in the DIP Credit Facility.

"**Platform**" shall have the meaning given to such term in the DIP Credit Facility.

"**Prepayment Date**" shall have the meaning given to such term in the DIP Credit Facility.

"**Prepayment Notice**" is defined in Section 8.3(b).

"**Prepetition ABL/Cash Flow Intercreditor Agreement**" shall have the meaning given to such term in the DIP Credit Facility.

"**Prepetition Debt**" shall have the meaning given to such term in the DIP Credit Facility.

"**Prepetition Indebtedness**" shall have the meaning given to such term in the DIP Credit Facility.

"**Prepetition Lenders and Holders**" has the meaning assigned to the term in the recitals hereto.

"**Prepetition Participating Debt Documents**" shall have the meaning given to such term in the DIP Credit Facility.

"**Prepetition ABL Agreement**" shall have the meaning given to such term in the DIP Credit Facility.

"**Prepetition Secured Debt**" shall have the meaning given to such term in the DIP Credit Facility.

"**property**" or "**properties**" means, unless otherwise specifically limited, real or personal property of any kind, tangible or intangible, choate or inchoate.

"**PTE**" is defined in Section 6.2(a).

"**Purchaser**" or "**Purchasers**" means each of the purchasers that has executed and delivered this Agreement to the Issuers and such Purchaser's successors and assigns (so long as any such assignment complies with Section 13.2), *provided*, *however*, that any Purchaser of a DIP Note that ceases to be the registered holder or a beneficial owner (through a nominee) of such DIP Note as the result of a transfer thereof pursuant to Section 13.2 shall cease to be included within the meaning of "Purchaser" of such DIP Note for the purposes of this Agreement upon such transfer.

"**QPAM**" is defined in Section 6.2(d).

"**QPAM Exemption**" is defined in Section 6.2(d).

"**Qualified Institutional Buyer**" means any Person who is a "qualified institutional buyer" within the meaning of such term as set forth in Rule 144A(a)(1) under the Securities Act.

"**Related Fund**" shall have the meaning given to such term in the DIP Credit Facility.

"**Related Party**" shall have the meaning given to such term in the DIP Credit Facility.

"**Reportable Event**" shall have the meaning given to such term in the DIP Credit Facility.

"**Required Holders**" means at any time on or after the First Draw Closing Date, the holders of more than fifty percent (50%) in principal amount of the DIP Notes at the time outstanding.

"**Required Lender**" or "**Required Lenders**" shall have the meaning given to such term in the DIP Credit Facility.

"**Required Backstop Lenders**" shall have the meaning given to such term in the DIP Credit Facility.

"**Requirement of Law**" shall have the meaning given such term in the DIP Credit Facility.

"**Responsible Officer**" shall have the meaning given to such term in the DIP Credit Facility.

"**Restricted Payment**" shall have the meaning given to such term in the DIP Credit Facility.

"**Restricted Subsidiary**" shall have the meaning given to such term in the DIP Credit Facility.

"**Restructuring Effective Date**" shall have the meaning given to such term in the DIP Credit Facility.

A-10

"**Rights Offering**" shall have the meaning given to such term in the introduction hereto.

"**Roll-Up DIP Commitment**" means a First Draw Roll-Up Commitment or a Second Draw Roll-Up Commitment, as the context requires.

"**Roll-Up DIP Credit Facility**" has the meaning ascribed to such term in the recitals hereto.

"**Roll-Up DIP Notes**" shall have the meaning given to such term in the introduction hereto.

"**Roll-Up Holdback**" shall have the meaning given to such term in the introduction hereto.

"**Roll-Up Rights Offering**" shall have the meaning given to such term in the introduction hereto.

"**RSA**" shall have the meaning given to such term in the DIP Credit Facility.

"**Second Draw Closing Date**" means a date within three (3) Business Days after entry of the Final DIP Order.

"**Second Draw New Money DIP Notes**" is defined in Section 1.1.

"**Second Draw Roll-Up**" is defined in Section 1.1.

"**Second Draw Roll-Up Commitment**" means with respect to each Purchaser, the commitment of such Purchaser to exchange Prepetition Secured Debt on the Second Draw Closing Date, in an aggregate principal amount not to exceed the amount set forth or calculated as set forth opposite such Purchaser's name on Schedule 2.1 hereto under the heading "Second Draw Roll-Up Commitment Principal Amount."

"**Second Draw Roll-Up DIP Notes**" is defined in Section 1.1.

"**Second Rights Offering Settlement**" shall have the meaning given to such term in the introduction of this Agreement.

"**Secured Ad Hoc Group**" shall have the meaning given to such term in the DIP Credit Facility.

"**Secured Ad Hoc Group Advisors**" shall have the meaning given to such term in the DIP Credit Facility.

"**Secured Parties**" shall have the meaning given to such term in the DIP Credit Facility.

"**Securities**" or "**Security**" has the meaning specified in Section 2(a)(1) of the Securities Act.

"**Securities Act**" shall have the meaning given to such term in the DIP Credit Facility.

"**Security Documents**" shall have the meaning given to such term in the DIP Credit Facility.

"**Senior Financial Officer**" means the chief financial officer, principal accounting officer, treasurer or comptroller of the respective Issuers.

"**Single Employer Plan**" shall have the meaning given to such term in the DIP Credit Facility.

"**Source**" is defined in Section 6.2.

"**Stated Maturity**" shall have the meaning given to such term in the DIP Credit Facility.

"**Subsidiary**" or "**Subsidiaries**" shall have the meaning given to such term in the DIP Credit Facility.

"**Substitute Purchaser**" is defined in Section 21.

"**Superpriority Claim**" or "**Superpriority Claims**" shall have the meaning given to such term in the DIP Credit Facility.

"**Syndication Shortfall Amounts**" shall have the meaning given to such term in the introduction of this Agreement.

"**Tax**" or "**Taxes**" shall have the meaning given to such term in the DIP Credit Facility.

"**Temporary Cash Investments**" shall have the meaning given to such term in the DIP Credit Facility.

"**Term Loans**" shall have the meaning given to such term in the DIP Credit Facility.

"**Topco**" shall have the meaning given to such term in the DIP Credit Facility.

"**Transaction Costs**" shall mean the fees, premiums, commissions and expenses payable by Holdings and its Subsidiaries, the Secured Ad Hoc Group, the Secured Ad Hoc Group Advisors, the Plan Sponsor and the Plan Sponsor Advisors in connection with the Transactions.

"**Transactions**" means, collectively, (a) the execution, delivery and performance of the Note Parties of the Financing Documents to which they are a party and the issuance of the DIP Notes hereunder and (b) the payment of the Transaction Costs.

"**U.S. Tax Compliance Certificate**" shall have the meaning given to such term in the DIP Credit Facility.

"**UCC**" shall have the meaning given to such term in the DIP Credit Facility.

"**United States Person**" shall have the meaning given to such term in the DIP Credit Facility.

## SCHEDULE B

## INFORMATION RELATING TO PURCHASERS

**Exhibit 3**

**Priorities of Liens**

| ABL Priority Collateral | Term/Notes Priority Collateral | Unencumbered Property |
|---|---|---|
| 1. Carve-Out | 1. Carve-Out | 1. Carve-Out |
| 2. Prepetition ABL Permitted Senior Liens | 2. Prepetition Cash Flow Permitted Senior Liens / Prepetition Senior Notes Permitted Senior Liens | 2. DIP Liens |
| 3. ABL Adequate Protection Liens | 3. DIP Liens | 3. Adequate Protection Liens |
| 4. Prepetition ABL Liens | 4. Cash Flow Adequate Protection Liens / Secured Notes Adequate Protection Liens | |
| 5. DIP Liens | 5. Prepetition Cash Flow Liens / Prepetition Secured Notes Liens | |
| 6. Cash Flow Adequate Protection Liens / Secured Notes Adequate Protection Liens | 6. ABL Adequate Protection Liens | |
| 7. Prepetition Cash Flow Liens / Prepetition Secured Notes Liens | 7. Prepetition ABL Liens | |

## Schedule 1

### Initial DIP Budget

**DIP Budget**
$ in thousands

| Forecast Week Number | WK1 | WK2 | WK3 | WK4 | WK5 | WK6 | WK7 | WK8 | WK9 | WK10 | WK11 | WK12 | WK13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ending | 2/1/26 | 2/8/26 | 2/15/26 | 2/22/26 | 3/1/26 | 3/8/26 | 3/15/26 | 3/22/26 | 3/29/26 | 4/5/26 | 4/12/26 | 4/19/26 | 4/26/26 |
| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Receipts** | | | | | | | | | | | | | |
| Cash Receipts | 14,504 | 40,637 | 42,332 | 37,700 | 42,732 | 34,021 | 41,344 | 37,986 | 35,554 | 53,859 | 48,865 | 45,345 | 45,984 |
| **Total Receipts** | **14,504** | **40,637** | **42,332** | **37,700** | **42,732** | **34,021** | **41,344** | **37,986** | **35,554** | **53,859** | **48,865** | **45,345** | **45,984** |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Operating Disbursements (Excl. Payroll & Benefits) | - | (93,703) | (44,457) | (48,549) | (40,612) | (28,072) | (25,264) | (24,902) | (25,128) | (36,736) | (28,185) | (33,816) | (30,031) |
| Payroll & Benefits | - | (14,754) | (15,562) | (11,612) | (16,792) | (14,775) | (15,583) | (11,633) | (24,432) | (11,109) | (17,199) | (11,559) | (15,057) |
| **Operating Disbursements** | **-** | **(108,457)** | **(60,019)** | **(60,162)** | **(57,404)** | **(42,848)** | **(40,847)** | **(36,536)** | **(49,559)** | **(47,846)** | **(45,384)** | **(45,374)** | **(45,088)** |
| **Operating Cash Flows** | **14,504** | **(67,821)** | **(17,687)** | **(22,461)** | **(14,672)** | **(8,826)** | **496** | **1,450** | **(14,005)** | **6,013** | **3,481** | **(30)** | **896** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | |
| Rx Professional Fees - Non-Carve Out | - | (14,453) | (4,923) | - | - | (11,241) | - | - | - | (10,234) | - | - | - |
| Rx Professional Fees - Carve-Out | - | - | - | (2,666) | (2,666) | (2,666) | (2,666) | (2,185) | (2,185) | (2,185) | (2,185) | (2,185) | (2,606) |
| Utility Deposit | - | (150) | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | (3,500) | - | - | - |
| **Non-Operating Disbursements** | **-** | **(14,602)** | **(4,923)** | **(2,666)** | **(2,666)** | **(13,907)** | **(2,666)** | **(2,185)** | **(2,185)** | **(15,919)** | **(2,185)** | **(2,185)** | **(2,606)** |
| **Net Cash Flow before Financing** | **14,504** | **(82,423)** | **(22,609)** | **(25,127)** | **(17,338)** | **(22,733)** | **(2,170)** | **(735)** | **(16,190)** | **(9,906)** | **1,296** | **(2,215)** | **(1,710)** |
| **Financing** | | | | | | | | | | | | | |
| Interest Payments | | (3,829) | (2,877) | (204) | - | - | - | - | - | (814) | - | - | - |
| DIP - New Money | 150,000 | - | - | - | 100,000 | - | - | - | - | - | - | - | - |
| DIP - Interest and Fees | (3,300) | - | - | - | (5,250) | - | - | - | - | (4,451) | - | - | - |
| **Financing Cash Flows** | **146,700** | **(3,829)** | **(2,877)** | **(204)** | **94,750** | **-** | **-** | **-** | **-** | **(5,265)** | **-** | **-** | **-** |
| **Net Cash Flow After Financing** | **161,204** | **(86,253)** | **(25,486)** | **(25,332)** | **77,412** | **(22,733)** | **(2,170)** | **(735)** | **(16,190)** | **(15,171)** | **1,296** | **(2,215)** | **(1,710)** |
| **Net Change in Cash** | | | | | | | | | | | | | |
| Beginning Cash Balance | 67,189 | 228,393 | 142,140 | 116,655 | 91,323 | 168,735 | 146,001 | 143,831 | 143,097 | 126,906 | 111,736 | 113,032 | 110,817 |
| Net Cash Flow After Financing | 161,204 | (86,253) | (25,486) | (25,332) | 77,412 | (22,733) | (2,170) | (735) | (16,190) | (15,171) | 1,296 | (2,215) | (1,710) |
| ABL Draw/(Repayments) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RCF Draw/(Repayments) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | **228,393** | **142,140** | **116,655** | **91,323** | **168,735** | **146,001** | **143,831** | **143,097** | **126,906** | **111,736** | **113,032** | **110,817** | **109,107** |
| Cash Available to Fund Foreign Non-Debtors | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| **Adj. Ending Cash Balance** | **208,393** | **122,140** | **96,655** | **71,323** | **148,735** | **126,001** | **123,831** | **123,097** | **106,906** | **91,736** | **93,032** | **90,817** | **89,107** |